1              IN THE DISTRICT OF THE UNITED STATES OF AMERICA
                FOR THE SOUTHERN DISTRICT OF ILLINOIS
2        _____
                                         )
3        **UNITED STATES OF AMERICA**,           )
                                         )
4                        Plaintiff(s),   )
                                         )
5            vs.                         )   Case No. **08-30010-GPM**
                                         )
6        **MICKEY L. DOOLEY**,                   )
                                         )
7                        Defendant(s).   )
         _____)
8

9

                    **TRIAL TESTIMONY OF MICKEY DOOLEY**
10

11       BE IT REMEMBERED AND CERTIFIED that heretofore on  **9/11/2008**,
         the same being one of the regular judicial days in and for the
12        United States District Court for the Southern District of
         Illinois, Honorable G. Patrick Murphy, United States District
13        Judge, presiding, the following proceedings were recorded by
            mechanical stenography; transcript produced by computer.
14

15                            **APPEARANCES:**

16       *FOR PLAINTIFF:*  **Steven D. Weinhoeft and Norman R. Smith**,
         Assistant U.S. Attornys  - Fairview Heights, 9 Executive Drive
17       Suite 300, Fairview Heights, IL 62208

18
         *FOR DEFENDANT*: **Gordon E. Freese** of Law Offices of Gordon E.
19       Freese, 222 South Central Avenue, Suite 1004, St. Louis, MO
         63105-3509
20
         *REPORTED BY*:  **Molly N. Clayton, RPR**, Official Reporter for
21       United States District Court, SDIL, 750 Missouri Ave., East St.
         Louis, Illinois 62201, (618)482-9226,
22                       *molly_clayton@ilsd.uscourts.gov*

23

24

25

1                    **INDEX OF WITNESS EXAMINATION**

2                                **DX**        **CX**       **R-DX**       **R-CX**

3       *Dooley, Mick ...................3        131        186*

4                          **INDEX OF EXHIBITS**

5       **EXHIBIT**              **DESCRIPTION**           **Id'D**        **Rcv'd**

6       *Dft's 1          2003 tax return ...........60*
        *Dft's 5          Citations & Awards .........11           12*
7       *Dft's 34         Evidence Bag ..............122          124*
        *Dft's 37         Evidence Bag ..............122          124*
8       *Dft's 38         Evidence Bag ..............122          124*
        *Dft's 39         Evidence Bag ..............122          124*
9       *Dft's 40         Evidence Bag ..............122          124*
        *Dft's 44         2004 tax returns ..........60*
10      *Dft's 45         2007 tax returns ..........60*
        *Gvt's 201        Apple brand laptop computer 67*
11      *Gvt's 205        Photo Linksys wireless ....149          149*
                          *router*
12      *Gvt's 224        Receipt, Atlantis Pools, ...63*
                          *#22719*
13      *Gvt's 225        Receipt, Atlantis Pools, ...63*
                          *#22723*
14      *Gvt's 226        Receipt, Doug Haufe, #3815 .63*
        *Gvt's 227        Receipt, REX, #074245 ......63*
15      *Gvt's 228        Receipt, Sears, ...........63*
                          *#020211578861*
16                          **MISCELLANEOUS**

17                                                  **PAGE**

18      *Instruction discussion                    54*

19

20

21

22

23

24

25

1    *(Preceding court proceedings not ordered for transcription.)*

2         *THE COURT:*  Call your next witness.

3         *MR. FREESE:*  At this time I call Mick Dooley to the

4    stand.

5         *THE COURT:*  Mr. Dooley, come forward; the clerk will

6    administer the oath.

7         *COURTROOM DEPUTY:*  Do you solemnly swear that the

8    testimony you are about to give shall be the truth, the whole

9    truth, and nothing but the truth, so help you God?

10        *THE WITNESS:*  Yes.

11        *COURTROOM DEPUTY:*  Would you state your name and spell

12   your last name for the record.

13        *THE WITNESS:*  Mick Dooley.  Last name is D-O-O-L-E-Y.

14                         **DIRECT EXAMINATION**

15   ***Q.  (BY MR. FREESE:)***  Okay.  Mick, this is the time for you to

16   be able to talk with the jury, explain what's happened.

17        But before we do, let's get some background.  What was your

18   position prior to April 16th or -- say, in April 16th of '07

19   where were you employed?

20   *A.*  I was employed at the Alton Police Department.  I've been

21   employed there for 24 years prior to that date.  Currently at

22   that time I was assigned as the evidence technician and vault

23   custodian.

24   *Q.*  And prior to that, give us a background of your 24-year

25   career?

Direct Examination - Dooley, Mick

1    A.   Briefly, I was hired in 1983 as a patrolman.  I had that

2    position for approximately four years.  I was assigned to the

3    detective division as the suit detective.  I'm not certain how

4    long I was at that position.

5         And I transferred back out of the parole division as a

6    field training officer.  I had that for a short period of time.

7         Was transferred back to the detective division for another,

8    I don't recall period of time.  At that point I was transferred

9    back out to the parole division for several years.

10        And my last assignment was back to the detective division

11   as the vault custodian evidence technician; which I had that

12   job approximately four years probably.

13   Q.   And during this time had you gone through a lot of

14   different training and courses in police work and police

15   detection?

16   A.   Yeah.  Beginning in 1983 with my graduation from the

17   Illinois State Police Academy I've had periodic updates of

18   course?  Some of the specialty classes that I've attended has

19   been interview related classes, beginning, intermediate and

20   advance read schools in interrogation.

21        I'm also one of the negotiators for the TRT team.  I've had

22   that position for seven or eight years.  And schools that

23   correspond with that.

24        For my evidence recovery and evidence tech school I went to

25   Eastern University for a -- I believe a four-week course in

1    crime scene processing.  I've had other photographer related

2    courses.  I've taken courses at Eastern Northwestern University

3    for various hostage negotiation crime scene profiling, that

4    type of thing.

5    Q.  Now before we get into any specifics or anything of that

6    nature, I have a couple questions for you.

7        Did you take, misappropriate, or in any way remove any

8    money out of the Alton Police Department vault for your own

9    personal use?

10   A.  No.

11   Q.  Did you at any time print out counterfeit money on copier

12   paper --

13   A.  No.

14   Q.  -- and insert it into evidence envelopes?

15   A.  No.

16   Q.  The -- we have seen -- did you knowingly and willfully fail

17   to file your tax return in 2007?

18          MR. SMITH:  It's 2006, your Honor.

19          THE COURT:  Well, it was for tax year 2006 but it

20   would have been filed.

21          MR. FREESE:  2007.

22          THE COURT:  So the question is correct.

23   Q.  For your 2006 taxes filed in the year 2007, did you

24   willfully and deliberately fail to file that?

25   A.  No, that was not willfully and deliberate.  And that varies

1    according to what your description of that be.  As time passed

2    I was well aware they were not filed.

3        I think I'm going to be given an opportunity to explain

4    that further or should I do that now?

5    Q.  Go ahead.  Explain it.

6    A.  At the beginning of this investigation where we determined

7    that at the time -- I say that we determined money was missing

8    at the FBI office, what I'm referring to is that we suspected

9    that that could possibly be the case.

10       I believe that -- and I have a lot of dates and case

11   numbers in my mind from sitting here for four days.  But I

12   believe that to be close to April 13th.  And again as the IRS

13   Agent Singer described I know that you had until the 17th to

14   file your taxes.

15       In anticipation of that date to file my taxes throughout

16   the year because of my gambling -- that has came up obviously I

17   have lots of tax forms that get strung out in my suit cases, in

18   my car, wherever.  At which time I -- as the date approaches I

19   accumulate all of the things that I can in anticipation of

20   filing my taxes.  And prior to the week of April 17th -- and

21   generally pretty much wait until the last minute.  I figure

22   that you are supposed to wait until the last minute if you are

23   making interest on your money and I'm not making that.  But at

24   the same time due to my relationship with the IRS, I wait until

25   the last minute.

1          And I had all of my tax information together in a manila

2     folder with taxes of 2006 on top of it.  And I put that in the

3     top desk drawer -- not desk drawer, top chest door of my back

4     bedroom.  As this investigation came upon us on the 13th, that

5     weekend, from that point on, I would say in the beginning it

6     didn't have the effect on me that it accumulatively did by the

7     Monday.  Meaning over that weekend, that wasn't the only thing

8     on my mind because I suspected that the Alton Police Department

9     was not involved in any shady practices or anything like that.

10         But after Monday, I would say that filing my income taxes

11    was the last thing on my mind.  At no point did it ever enter

12    my mind.  My whole time was consumed with trying to anticipate

13    what was going to happen with this investigation and all of

14    that.

15         As the time went on -- and I'll be able to go back and make

16    up some of -- account for some of this jump in time that I'm

17    moving to now -- but through interviews with the FBI and

18    through the general goings on with the police department, being

19    put on administrative leave in May, things like that, again

20    distanced myself from the acknowledgment that I needed to file

21    my taxes for 2006.

22         At some point, and I don't know the month for sure, but I

23    received a letter in the mail from the IRS.  And as soon as I

24    got the envelope and I had it in my hand and I seen the IRS

25    emblem on it, I knew at that point that I had not filed my

1    taxes.  And I'm guessing when I say that I believe that to be

2    in August, maybe September; I'm not quite confident on that

3    date.  But in opening up the envelope and anticipating a

4    scolding for not filing my taxes.  Instead, the letter said

5    that -- from the IRS that they had reviewed my 2002 tax returns

6    and that I had overpaid them $6,000, which I was very shocked

7    about.  I wasn't shocked that I overpaid them $6,000.  I had

8    had an argument with them back in 2002 about that very issue

9    that ended with me telling them they should just come and get

10   my money.  And in fact they did come and get it and immediately

11   garnished my check within three days to pay for that bill.  But

12   at that point now I am armed with the information that I need

13   to file my tax and I haven't.

14       Well, what happened in that intern was that a search

15   warrant had been done at my residence.  And now while I'm armed

16   with the information that I need to file my taxes, I'm also

17   aware that the IRS and the FBI -- well, actually I believed it

18   to be the FBI because I wasn't sure that the IRS was looking

19   into any of my things.  The hint that they were was that I

20   received the letter reflecting the 2002 thing.  And I laughed

21   to myself.  I was like, you mean, you are going back to see if

22   I've done something wrong since 2002.  And, in fact, I'm happy

23   that they admitted that there was a mistake.

24       So any way, at that point I know that I haven't filed my

25   taxes.  And I also know that they have my stuff, I can't file

1    my taxes.  I think that when this is resolved, and I did not

2    begin to ever believe that it would be resolved with me sitting

3    in this seat describing to you what's going on, but that they

4    would give me back my stuff.  And I assumed there would be a

5    penalty attached for late filing and I would argue that by

6    saying that, hey, you had my stuff I couldn't file my taxes.

7        So time goes on.  It gets to be and I believe it's in --

8    they're going to know -- October, I talked to a friend who was

9    an attorney.  Not talking to him as my attorney I'm just

10   letting him know, because everybody in the town is wondering,

11   what's going on with this investigation.  It hits the newspaper

12   and there is nothing else said.  I know the last time I was

13   interviewed was months and months prior to anything happening.

14   I don't want to go get a job because I don't want to go to work

15   for a week and have the FBI come and arrest me for something.

16   So during that time instead of filing unemployment or anything

17   like that -- I believe that's for mother's with children to

18   feed -- I cashed in.

19        *MR. SMITH:*  Your Honor, let me object when it got to

20   that point.  That is complete narrative.  I want to --

21        *THE COURT:*  The objection is it is a narrative.  Ask

22   questions and let him answer.

23   *Q.  (BY MR. FREESE:)*  When did you find and obtain your tax

24   return or your forms, the W-2 the 1040s and so forth?

25   *A.*  Okay.  That day came when I went to the U.S. attorney's

1   office to give a proffer in reference to this incident here.

2       What I describe when I say a "proffer" was I just wanted

3   the U.S. attorney to be aware of what it was that I was going

4   to say in reference to any of the allegations that had been

5   levied against me.  And at that point I didn't know what

6   allegations had been levied against me and I was well aware

7   that I was a suspect.  And I was well aware --

8   Q.  And then at the proffer?

9   A.  At the proffer I was handed a eight-count indictment that

10  listed the counts that were against me, and in thumbing through

11  them the very last one was that I had failed to file my taxes

12  for 2006.  My response to that was that I couldn't file my

13  taxes because they had my stuff.  We bantered back and forth

14  about that and Agent Singer is correct when she says that

15  ultimately I told them that, yes, that search warrant did not

16  stop me from filing my taxes because that search warrant was

17  done in May and my taxes were due in April.

18      However, if they would give me a copy of the information

19  that they had obtained from me then I would file my taxes.  At

20  which time, after I left that interview they gave me my copies

21  and I went and I filed my taxes.  I didn't add anything to the

22  tax thing, the packet had already been prepared, and they gave

23  it to me.

24  Q.  Okay.  And you weren't meaning that the investigation as --

25  because of the search warrant and when they removed your

1   property, you are not meaning that that's what kept you from

2   filing your taxes but --

3   *A.*  My emotional distress, to put it, I guess, in another way,

4   is what kept me from remembering that I needed to file my

5   taxes.  At the point that I knew that I needed to file my

6   taxes, my taxes were in the custody of the IRS.

7   *Q.*  Now Mr. Dooley, I'm going to hand you what's marked for

8   identification as Defendant's Exhibit 5.  And take a look and

9   ask if you recognize these materials.

10  *A.*  Yes.

11  *Q.*  What are they?

12  *A.*  It looks like it came out of -- and I know it came out of

13  my personnel jacket.  And it's various certificates of

14  achievement, I guess, for various schools.  Letters from --

15  letters of appreciation from police chiefs, the cases that I

16  worked.  You know, basically showing some of my training and

17  awards.

18  *Q.*  And you recognize all these as awards and citations that

19  you received?

20  *A.*  Yes, sir.

21  *Q.*  And these are fair and accurate representation of what you

22  actually have received?

23  *A.*  I believe so.  And I don't think that I would be able to

24  remember each individual one.  I see them dated as far as back

25  as 1983.

1    *Q.* And the original letters would be placed or a copy of the

2    letters would be placed in your file?

3    *A.* Yes.

4          *MR. SMITH:* Your Honor, objection on prior good acts

5    evidence, ordinarily not admissible. It's up to you.

6          *THE COURT:* But the defendant put in his reputation of

7    good character in a criminal prosecution and that's really

8    what's involved here. So the objection is overruled; those

9    will be admitted.

10          *MR. FREESE:* Thank you.

11          *(Exhibit Dft's 5 received in evidence)*

12   ***Q.  (BY MR. FREESE:)*** I'm not going to go through all of these,

13   but I want to show a couple.

14       This is citations you received from the major case squad?

15   *A.* Yeah. I think that's a certificate of one of the major

16   case squad schools. I don't think I mentioned I was a member

17   of the major case squad also.

18   *Q.* Dated?

19   *A.* Periodically they have training periods where you are

20   re-initiated into the major case squad.

21   *Q.* And this is March of '06, correct?

22   *A.* Yeah.

23   *Q.* This is a letter of appreciation from the St. Charles

24   County Sheriff's Department?

25   *A.* Yes, and if you -- if you expect me to read anything you

1   will have to zoom in dramatically.

2   Q.  Okay.

3       This is from the City of Alton February of 2001 as officer

4   of the month?

5   A.  Yes.

6   Q.  For January of 2001, correct?

7   A.  Yes.

8   Q.  And in -- a letter in March of '02 for officer of the month

9   for February of 2002; is that correct?

10  A.  Yes.  I think I've accumulated nine or ten officer of the

11  month citations.

12  Q.  Now let me ask you:  For the moment let's go to the morning

13  of April the 10th?

14  A.  Okay.

15  Q.  I'm sorry.  Let me get my dates straight.  Okay.  April the

16  10th then you had a meeting that day with Melanie Jiminez

17  April 10th of 2007?

18  A.  Yes.  If that day falls on a Tuesday, I had a meeting with

19  her.

20  Q.  Okay.  And now we have seen the video earlier.

21  A.  Mmm hmm.

22  Q.  Was that a fair and accurate representation?

23  A.  With the exception of the speed, yes.  It accurately --

24  accurate view what transpired there.

25  Q.  Explain the process.  We've heard testimony that you very

1  thoroughly and carefully scrutinized each individual bag or

2  envelope before you put it in.  What transpired?

3  A.  Well, I think the viewing of it will indicate that that was

4  not the case at all.  And that in the course of my career I

5  have handled hundreds of thousands of pieces of evidence.  And

6  maybe because of that and pretty acclimented [sic] to picking

7  them up and moving them around.

8      And, again, as I describe these things at the time, uh, I

9  wasn't suspicious of any packaging whatsoever, and specially in

10  this instance, because 99 percent of the packaging is my own.

11  And when I transferred that case over to Agent Jimenez, not

12  having transferred evidence over to the FBI before -- and I've

13  testified in federal court and things for the FBI or during an

14  investigations requiring evidence from the Alton Police

15  Department but never had I given to it that agency to be

16  transported to this Court.  I was always directed to take from

17  my evidence directly to court.  In this instance the FBI was

18  coming to get it.  So in order for that to happen the evidence

19  needed to be signed out to the FBI and you have seen what chain

20  of custody is and you can see that evidence goes from a slam

21  locker to the vault and then in this instance to the FBI.  The

22  exception being that evidence that I tagged doesn't go into a

23  slam locker.  That step is bypassed because of my access to the

24  vault itself.  So if I work a scene I -- my bar code, my chain

25  of custody, begins at the vault itself.  And that's what the

1   majority of this evidence was.

2       So in anticipation of Mrs. Jimenez coming to accept the

3   evidence in the Olin Credit Union robbery, I had been advised

4   by e-mail from my lieutenant that it was going to happen.  And

5   I don't think he had a copy of my response but it was:  Yes,

6   okay.

7       And I began getting that together.

8       Well, on one -- on the chain of custody when it leaves the

9   Alton Police Department vault it has to have a destination and

10  there's a block where I can type in "to the FBI".  However,

11  because of the volume of evidence that needed to be typed in, I

12  had gotten with Detective Bazzell earlier on Monday morning, I

13  believe it to be Monday morning.  If I was to see the front

14  page chain of custody the date and stamp would be on there.

15  But at that point when I told him what had happened he made me

16  a block that would say that "From the Alton police to the FBI"

17  so that it could speed up the transition of the evidence when I

18  hit it with the bar code.

19      After I had taken the evidence out of -- I pulled up the

20  report, took all the evidence out of the vault, brought it into

21  my office, hit it to the bar code indicating it was going to be

22  FBI, and I would put it in the storage tubs that we've seen and

23  have described.  Transfer a lot of evidence that way.  That's

24  how I maintain all of the homicide evidence in the evidence

25  vault.

1      So I got that together.  I had talked with Agent Jimenez on

2  the phone prior to this and she had told me that she

3  anticipated a receipt to be signed.  And that's standard for

4  everybody.  So I didn't want to print out the report prior to

5  signing out the evidence or the chain wouldn't be on there.  So

6  after I got everything signed out then I printed out the report

7  that showed the chain of custody.  I made a separate log, I

8  guess, of each item, bar code number, so that when we went

9  through if there was supposed to be 80 and we checked off 80

10  then we would know that we had them all.  And that is the

11  process that you are seeing.

12       When I had already printed out the -- or already bar

13  coded them to go to the FBI I believe that that -- that the

14  majority of that happened Monday or Monday evening.  I'm not

15  sure.  But I moved the evidence into the vault itself and I

16  think set up a table and things outside there because every --

17  any time an attorney comes to the police department or comes to

18  the evidence area to view evidence -- and it happens once in a

19  while mostly with the prosecuting attorneys -- I'm always

20  underneath this camera.  Falsely under the impression that that

21  was recording forever and that anything that turned up there

22  would be on video.

23      So the next day on Tuesday Agent Jimenez came to my office.

24  Actually they were upstairs.  Actually it was Dee Dee Durborow

25  with the U.S. attorney's office and Agent Jimenez.  And the

1   intent was for us to get the evidence signed out to the FBI; go

2   through the evidence so they could determine what it was they

3   anticipated using in court.  And I know they like that make

4   sure that's what it is.  And you don't want to open up a bag

5   that says Nike tennis shoes and a T-shirt be in it.  So a lot

6   of times they lay that out and put their stickers on it.  So

7   that's what I anticipated was going to happen.

8       So me and Agent Jimenez went down to my office to do that

9   while Detective Simmons and the U.S. Attorney Durborow talked

10  in the conference room upstairs, and you can see the video of

11  me and her doing what we did.  I at one point -- at one point I

12  cleared -- I had both tubs up on the table.  And then I moved

13  them off of the table, and I was doing that in anticipation of

14  us opening up the stuff.  I wasn't quite clear on what her

15  procedure was to do it.  But she seemed to be okay with

16  checking off the items as I picked them up.  And again I picked

17  up every item from both tubs.

18      When I watched the video it doesn't appear as though I'm in

19  the second tub.  But the proof I was in the second tub is the

20  fact that she knows that she checked off all of the evidence.

21  I mean I don't have the evidence numbers in my head so, anyway.

22  We checked off all of the evidence.  I picked up each piece

23  individually, read off the bar code, and I have to have it here

24  to see the numbers on the bar code.  I didn't --

25  Q.  Did you just pick up the envelopes and read this bar code

1    without examining the envelope?

2    *A.*  Yes.  That's what I was getting at is I did no scrutiny of

3    anything.  I had no exception in the world that there could be

4    anything wrong with my evidence.  And I transferred it all to

5    the tubs with the exception of I think we decided there was a

6    car bumper that I had also taken as evidence in the trial and

7    obviously she didn't want to stick that under her arm and bring

8    it into court, so she elected to leave that there.

9        There was another question that she had about -- and I

10   would have to see it now to explain what it was.  But it had to

11   do with two case numbers on one piece of evidence; or one piece

12   of evidence listed twice.  But I don't know what it was and we

13   sorted it out in a manner that made sense.  I'm not sure what

14   had happened.

15       But, so any way, we had both boxes.  We walk back up to the

16   conference room.  She apparently forgot that part.  And we had

17   a little brief discussion with the U.S. Attorney, Ms. Durborow,

18   who in her statement said that she could see the activity that

19   was going on upstairs and felt that, you know, our time would

20   be better spent doing something else, I guess.  And they

21   elected to leave without going through any of the items.

22       I carried the items to Agent Jimenez's car and they drove

23   off.  I believe that to be on a Tuesday.  I'm not certain what

24   time.

25   *Q.*  I'm going to hand you what's already been admitted into

1   evidence as Government's Exhibit 26.  To the second page.  This

2   first typed paragraph you were referring to -- Mrs. Jimenez

3   referring to confusion on two evidence numbers.

4       Does that help clear you up any?

5       If it doesn't that's okay.

6   A.  I'm thinking it doesn't help.  What would be more is if I

7   knew specifically what item she was referring to, which we both

8   knew of its existence.  And in my chain of custody, and I don't

9   know that I put an explanation out to the side of it or what,

10  but she would have that paperwork.

11  Q.  We'll come back to that a little later.

12      Now prior to April the 10th, that Friday before April the

13  6th?

14  A.  Mmm hmm.

15  Q.  Did you receive an e-mail from your supervisor, Lieutenant

16  Hayes.

17  A.  Yes.

18  Q.  And what was he advising you of?

19  A.  Well, we see the e-mail.  And it says for me to get stuff

20  ready for the FBI to come Monday to pick up the evidence in the

21  Olin Credit Union case.  Typically he didn't do it all the

22  time, but he did it a lot of times.  And I always appreciate

23  the heads up that something was coming because I always like

24  to, in the time when it's not as chaotic as it gets for me in

25  my case load, I like to have things prepared and ready to go

1    for their arrival.  And that was an opportunity in this

2    instance to do that.  I had a couple day head start.

3    Q.  Did you, over the weekend, go into the vault?

4    A.  I'm certain that I did.  If I'm not out of town, I'm not

5    aware of any day that I am not in the evidence vault.  I'm sure

6    that if you looked at the prox card entries you would be able

7    to find some times that:  Hey, Mick, it's Sunday and you ain't

8    been there, what's going on.

9         Some of that in the beginning of my position there, some of

10    those weekends weren't as charitable as they appear.  And I

11    can't explain it as well as like probably Lieutenant Hayes, but

12    we are granted eight hours of overtime a month.  That's

13    guaranteed overtime.

14        And what it used to be for was for preliminary hearings and

15    things that we were supposed to show up for and as long as we

16    would -- it was union deal where as long as you had to be

17    available for those days you were guaranteed eight hours of

18    overtime.  And most guys tack -- like, up in the detective

19    division they work four-day shifts ten-hour shifts so they tack

20    on like two hours a week or one hour a day somehow to

21    accommodate this guaranteed overtime that you have to work.

22    And I had made a deal with the Chief and Lieutenant Hayes that

23    I would work my overtime on Saturday and Sunday.  So I would

24    come in because I was coming in any way, so this was like their

25    gift to me not to have work over on the other day.  So in the

1    beginning that's -- but then I was just in the habit of doing

2    it so I would say that it's not unusual at all.  It would be

3    more unusual for me not to show up than for me to show up.

4    Q.  Including a --

5    A.  And on that weekend, yes, I came in and I took advantage of

6    that time that I had from the e-mail to the point that she was

7    going to pick up the evidence and started gathering things.

8    Q.  During that time, April the -- that Saturday, the -- well,

9    starting that Friday night.  From Friday night, April the 6th,

10   Saturday April the 7th, Sunday April the 9th, and then even

11   Monday April -- I'm sorry, Sunday April the 8th and Monday

12   April the 9th.  That weekend after the e-mail?

13   A.  Okay.

14   Q.  Did you go in there to prepare the items to be ready for

15   Ms. Durborow?

16   A.  Yes.

17   Q.  Were you going in there to cut open any bags and remove the

18   money?

19   A.  No.

20   Q.  Were you going in there to push some cardboard into any of

21   the evidence envelopes or bags?

22   A.  No.

23       Not only would I not be going in there to do that, but it

24   would make no sense whatsoever for me to do that.  I've taken

25   full responsibility for the finding of this evidence.  I've

1    taken full responsibility for its tagging.  I take full

2    responsibility for having logged it into the evidence vault.

3    And ultimately was assured full responsibility of being up on

4    the witness stand opening up exhibits and presenting them to

5    the jury under my name on the whole thing.

6         First of all, I wouldn't do that.  If by some stretch of

7    the imagination I was on crack cocaine and decided to do

8    something like that in the evidence vault, I wouldn't tamper

9    with evidence that I'm responsible for; I'd tamper with

10   evidence you are responsible for.  It's not going to happen

11   anyway.  But, no, I did not do that.

12   Q.  Now can you offer an explanation as to how the bags got cut

13   and the money missing --

14   A.  Well --

15   Q.  -- of yourself?  Do you know of who did it?

16   A.  No.

17   Q.  But it was not you?

18   A.  It wasn't me.

19   Q.  You can make your surmises but you don't have any

20   knowledge?

21   A.  I think I have enough investigative skill to narrow down

22   the field.  But the field got narrower when I knew it wasn't me

23   it must be someone else.

24   Q.  As a trained police officer and investigator, are you

25   surprised that you were designated as one of the top and

1   leading suspects?

2   *A.* I think as Detective Simmons suggested when he was on the

3   stand up here, if you did not think that I had the opportunity

4   and possibility that I could do it, then I wouldn't have any

5   respect for you at all. That is what I had told Jake when he

6   surmised that, hey, I hate to tell you this, you would be

7   suspect.

8       Well, absolutely. I understand fully that I would have to

9   be the first person to be focused upon because of my position.

10  Regardless of any integrity issues, period. I have the best

11  opportunity to do practically all of the crimes that are

12  alleged.

13  *Q.* But did you do them?

14  *A.* No.

15  *Q.* Now, but you obviously acknowledge because of the videos

16  showing that you were in there over the weekend, is that

17  correct?

18  *A.* Yes.

19          *MR. SMITH:* For which weekend?

20          *THE COURT:* Weekend.

21          *MR. FREESE:* Weekend of April the 7th and 8th.

22          *THE COURT:* Very well.

23  *A.* Yes. Not only that weekend but every weekend. Christmas

24  Day.

25  *Q.* Now are you in there in the early morning hours sometimes?

Direct Examination - Dooley, Mick

1   *A.*  Yes.  There's no rhyme or reason to -- while I could give

2   you a reason for practically -- I'm in there multiple times for

3   many different reasons.  Some related to personal reasons, some

4   related to working in the vault reasons.

5       If I was to look at prox card entries and you pointed out

6   that on January the 14th of 2004 what are you doing in here at

7   4:00 a.m?  I would be like, well, right now I don't know.  But

8   I probably got called out at that hour or I was showing up

9   real, real early for work.  I could have been on the boat

10  gambling and came in to there to get money out of my personal

11  safe.

12      I don't know -- looking back now what my answer would be.

13  And I'm assuming I'll be presented with those opportunities so

14  maybe I'll come up with what I was there for.  But legitimately

15  there at any hour of the day I can account for being that I

16  know that I've never went in there and done some criminal,

17  sinister thing.

18  *Q.*  Now going to -- back to -- moving on from April 13th to

19  April the 16th of 2007.  I'm sorry, I'm getting -- going from

20  April 10th of 2007 to April 13th of 2007, back to the day you

21  and Agent Jimenez transferred the evidence.

22  *A.*  Okay.

23  *Q.*  Later that day did you get notification that there was a

24  problem?

25  *A.*  No.

1    *Q.*  That Friday?

2    *A.*  Oh, that --

3    *Q.*  The Friday the 13th?

4    *A.*  The Friday, yes.  On Friday.  We made that transition on

5    Tuesday.  And then on Friday and I'm quite certain I was off

6    that day.  I think Detective Simmons implied that I was working

7    but I believe, in reflecting back, that I was off that day.

8         And I received a phone call from Agent Jimenez and she left

9    a voice mail on my phone saying -- she didn't say there was a

10   problem.  She wanted me to call her back as I recall.  I think

11   there is a better record of that account somewhere in our

12   report, but.

13        I had called her back, got her voicemail and told her that

14   I will call you back in an hour.  She seemed to think that was

15   strange at the time that she was up here.  I believe that I was

16   going to Schnucks where my phone don't work inside, and

17   anticipated grocery shopping for an hour and when I came out I

18   would call her back.  She didn't have the tone of an emergency

19   or anything like to.

20        So I got out of the store and I think at that point I was

21   contacted by Sergeant Simmons or Detective Brandtly.  I'm not

22   quite certain.  But they notified me that there was a problem

23   with the evidence at the FBI office on that Friday.  And I

24   responded directly to the Sergeant Simmons' office.

25   *Q.*  And when you got there did you have a telephone

1   conversation you and Sergeant Simmons with Mrs. Plain --

2   Jimenez?

3   *A.*  Yes, there was a conversation, there might have been a

4   couple.  And we put her on voice --

5   *Q.*  Speaker phone?

6   *A.*  -- activation thing -- yeah, speaker phone -- so that we

7   could all hear what was going on at once.  When you described

8   it over the phone it appeared to be very abstract and we

9   couldn't tell exactly what it is that she was describing.  I'm

10  not even certain -- I'm not certain if we knew at that point

11  that the envelopes had been comprised.  I'm believing that we

12  did.  But if we didn't know at that point they were compromised

13  then, she determined that while she was on the phone with us.

14      Because at first it was a matter of I think the bills

15  weren't matching up with what was supposed to be in that and

16  later she determined --

17  *Q.*  Now as a result of that conversation you and Sergeant

18  Simmons went to the FBI office.

19  *A.*  Yes, we did.  We wanted to see what it was that was -- what

20  had been comprised and how it had been done to see, you know,

21  it was our evidence.

22  *Q.*  And --

23  *A.*  We went directly there.

24  *Q.*  And at that time you were not allowed upstairs to see it?

25  *A.*  Nope.  When we got there, and we already anticipated that

1    before we got there because Agent Jimenez had called us or we

2    called her.  I don't recall.  But we were on 255 in route there

3    and she was like our supervisor doesn't want anybody up there

4    at all.

5    Q.  Now, so, you and Sergeant Simmons came back to the Alton

6    Police Department, correct, that afternoon?

7    A.  Yeah, after being --

8    Q.  Being there for a little while --

9    A.  Yes.

10   Q.  -- at the FBI?

11   A.  Mmm hmm.

12   Q.  And did you and Sergeant Simmons have a meeting and a

13   conversation with Lieutenant Hayes?

14   A.  Yes --

15   Q.  And --

16   A.  -- to describe that.

17   Q.  -- what transpired?

18   A.  On the way back from the FBI office when we were not

19   allowed to go up and inspect the envelopes, but, as U.S.

20   Attorney Durborow described, they did show us a Xerox of that

21   evidence that I believe Agent Kelly had been one of the agents

22   that brought it down.  We left.  We notified the chief.  And I

23   guess chief notified Hayes or possibly Simmons notified Hayes

24   on our way back, and they had said that they wanted to have a

25   meeting at our police department; everybody come back, they had

1   to have a meeting.

2       So that's what we did.  We went back.  While we were

3   waiting for them to show up, I was walking around the police

4   department.  And it was my first encounter with the chief of

5   police in the record room as he was coming my direction.  Prior

6   to this meeting, which set up my conversation with Simmons.  In

7   answering this question, was the chief as soon as he saw me

8   told me he said --

9   Q.  Now when you say "the chief" who are you referring to?

10  A.  I refer to Chief Sullivan.  He's the only chief on the

11  police department.  And he didn't say "hi", nothing.  He said,

12  just so I know have you ever given your vault key to anyone?

13      And I said, no.  And then I go, whoa, wait a minute.  I go,

14  yeah, I've given it to Lieutenant Hayes before.

15      And he goes, well, that's not what he says.

16      I go, well, chief, this hasn't got nothing to do with us.

17      And he goes, okay, I hope not.  And he goes, is Hayes up

18  there yet?  Referring to Lieutenant Hayes.

19      And I said, no.  And he walked into the command center, and

20  I turned around and walked right back up to investigation to

21  where Sergeant Simmons was standing by the sink.  And I told

22  Simmons, I go, man, this is weird.  The chief just asked me if

23  I ever gave my vault key to anyone, and when I told him I gave

24  it to Hayes he said that Hayes said, no, I didn't.  I go, what

25  are they doing talking about something like that?

1        And while me and Simmons were at that point of that

2   conversation Lieutenant Hayes arrived and he walked directly up

3   to us and said, what was the deal with the thing?  And Simmons

4   was trying to explain that Agent Jimenez had found some

5   tampered envelopes and that the FBI everybody was upset that

6   the FBI wouldn't let us up into the room to see what the

7   evidence was.

8        And I think in doing that it further enhanced our opinion

9   that something bad had happened at the FBI office and that they

10  didn't want an outside agency even knowing about it.  But

11  anyway, we -- Hayes, after getting a very brief explanation of

12  what was happening, and where is the chief, is he on his way up

13  here?

14       And I said, yes, I seen him in records.

15       He goes, and pointed at me, just so I'm clear, you've never

16  given your vault key to anyone, right?

17       I said, yeah, Lieutenant, I've given it to you.

18       And he goes, no, I don't.

19       And before he could stop, Simmons said, yeah, Lieutenant,

20  you've let me in there before.

21       Well, I don't remember that.

22       And I was like totally shocked.  Of course he remembers it.

23  And I know that he had logged in previously.

24       So he said, but you've never given your cash locker key to

25  anyone, have you?

1       I said, yeah, to you.

2       He goes, no, I don't have one of them.

3       I said, well, when they installed doors I gave you the key.

4       And he said, come down to my office and I want you to show

5   me what key it is.

6       He showed me a key ring of 50 keys.  And I can't get --

7   even get the key right when I try to unlock the drug cabinet

8   myself.  I'm like, without going down there I don't know which

9   one it is.  Later, as it turns out, I don't think he had that

10  key at that time.  But we will get to that as this story

11  progresses, I'm sure.

12  Q.  Now, yous go back -- you and -- the five of you:  Sergeant

13  Simmons, Lieutenant Hayes, yourself, the Chief, and the Deputy

14  Chief, then all go to Fairview Heights.

15  A.  We have a meeting in the conference room.

16  Q.  And then proceed to Fairview Heights?

17  A.  Yep.

18      And during that --

19  Q.  Now --

20  A.  -- during that meeting Lieutenant Hayes wanted me to be

21  adamant that whatever was wrong with the evidence at the FBI

22  office was not like that when I gave it to Agent Jimenez.

23      I commented, without seeing it I don't know.  I'd have to

24  see it.  But I find it very, very hard to believe that I could

25  give her anything that appeared to be tampered with, and I find

1    it hard to believe that she would accept anything that would be

2    tampered with.

3        Then we went and got in our vehicles and that's where we

4    drove to.  Me, Lieutenant Hayes and Sergeant Simmons in one

5    vehicle; and the deputy chief and the chief in another vehicle.

6    Q.  Now you get there and after a while you are allowed

7    upstairs to view the evidence?

8    A.  At that point it was immediate.  As soon as we got there we

9    got on the elevator.  We were met by agents and I don't

10   remember names.  I don't know if Agent Kelly was there or Mike

11   Meyers.  But I think ultimately they did show up.  And we were

12   ushered into a conference room, they had the evidence laid out

13   how they had found it and how it had been tampered with.

14       When I looked at the evidence, at that point I already had

15   a vague idea of what I should be looking for and because of

16   that, the evidence, it appeared to be -- I mean, it didn't just

17   jump out at you.  When I look at it now that I know what I am

18   looking for I can plainly see scotch tape folded on the bottom

19   edge and another piece of scotch tape folded over one of the

20   other seams.  And there was money laying there that was one

21   dollar bills.  I recall that.  And cut out shapes of money.

22   That none of it made any sense whatsoever.  And no one had an

23   explanation.  When they were questioning the FBI guys about,

24   well, okay when did it get here?  And when did you -- how come

25   you've got it on Tuesday and you are just finding it on Friday?

1      And having been involved in police work my entire adult

2   life I can assure you that as strange as it sounds to you

3   sitting there, there's multiple times when evidence does not

4   necessarily take the path that is dictated on the chains of

5   custody.  What I'm referring to is instances as patrol, for

6   example, where you find something innocent -- you find a

7   watch -- and you need to tag that as evidence and it's Tuesday

8   and you don't have time, you don't want to, you go home; you

9   throw it in your locker.  And then Friday when you are going to

10  go on vacation for the weekend or whatever you ultimately end

11  up grabbing that evidence, tagging it, and you may put the date

12  of Tuesday.  Or in this instance in the modern age with bar

13  coding and that, you can't really cheat.

14      Now in listening to the FBI description while I've been

15  sitting at that table, they can cheat and they can type in the

16  date that they want.  With ours, we hit it and it puts it.

17  That is what I deducted.  I thought, and I'm wrong in my

18  assumption, but at the time I thought that Agent Jimenez came

19  back to the headquarters, took those two tubs that I had, slid

20  them underneath her desk, and then Friday came along and she

21  said, oh, before I go I've got to log all this in.  And at that

22  point I think -- I deducted that that's when she found this

23  crime.  So it made me believe that in that period of time

24  something had happened at the FBI office.  And I think

25  everybody -- again, they say that -- when they described it now

1    they're like, well, Mick would have caught that for sure and he

2    said there's no way he would have missed that.  And I'm telling

3    you, I missed it.  There's no question about that.  And the

4    confirming thing that I missed it is what we ended up finding

5    Monday morning in the Alton evidence vault but --

6    Q.  Now let's go on from there a moment.

7       You leave the FBI headquarters and go back to the Alton

8    Police Department.  Was there at that time any arrangement or

9    agreement between the five of you, you and Sergeant Simmons and

10    Chief Sullivan, Deputy Chief O'Guinn, Sergeant Hayes that you

11    are going to go back to the Alton Police Department and have a

12    meeting?

13    A.  No.  No.  That was the last time that I ever laid eyes on

14    the deputy chief or the chief when we walked out of the U.S.

15    Bank office.

16    Q.  On that day the 13th in the evening?

17    A.  Yep.

18    Q.  Now on the way back you and Sergeant Simmons drove together

19    by yourselves?

20    A.  Sergeant Simmons drove and I rode, yes.  The lieutenant,

21    the deputy chief and the chief, at the chief's direction, all

22    rode back together.

23    Q.  Now on the way -- at this point in time are you aware of

24    any order that the chief or Lieutenant Hayes gave saying,

25    nobody is to go into the vault?

1    *A.*  No, there was no such order.  There was not even a

2    conversation about it.

3    *Q.*  Was there a comment made that Monday yous would do an

4    audit?

5    *A.*  Ultimately that conversation was made.  And as this story

6    progresses we'll get to that point.

7    *Q.*  Now you go back to the office in the Alton Police

8    Department.  And what do you and Sergeant Simmons do at that

9    point?

10   *A.*  On the way back to the Alton Police Department me and

11   Simmons are pretty assured and I guess we're humbled by it now,

12   but we were joking about the big cluster at the FBI office.

13   But at the same time just being suspicious, being the police,

14   we were like -- he's like, man, if this turns out to be

15   something ugly I wouldn't want to be you.  And I'm like, yeah,

16   I know.  And we didn't like the way that Lieutenant Hayes had

17   distanced himself from the key to the evidence vault.

18       And because of that conversation, and I'm sure it grew as

19   we drove, Simmons and I agreed with him, we decided that as

20   soon as we got back to the police department we were going to

21   go get that evidence log-in sheet.  We were afraid that it was

22   going to walk off.  That was our only intention.  And

23   Simmons -- good police work -- he was like, well, while we are

24   there we will just check the rest of the cash evidence.  It

25   made perfect since.  I'm like, okay.  And we knew that we were

Direct Examination - Dooley, Mick

1    getting that vault log sheet because we were afraid that if

2    something did happen at the police department that that thing

3    would disappear, because Lieutenant Hayes had gotten caught in

4    his lie with me and Simmons about having access to being --

5         *MR. SMITH:*  Objection, to the --

6    *Q.*  Now did yous go down to the vault?

7         *THE COURT:*  Just a minute.

8         The jury will disregard the interjection caught in a

9    lie.  That's a question for the jury to make that

10   determination.

11        *THE WITNESS:*  Okay.  I apologize.

12   *Q.  (BY MR. FREESE:)*  Did you and Sergeant Simmons go down to

13   the...

14   *A.*  We walked.  We went directly there.  We went from the

15   upstairs detective office down to the evidence vestibule that

16   you seen the map of.  Used my prox card to walk into the room.

17       I see -- I can't recall from -- as I sit here I can't

18   recall how this occurred, but in looking at the prox card

19   entries for that day it appears that I went in, came back out

20   within seconds I believe, and I'd have to refer to it again,

21   and then me and Simmons walked in together.  Like, we used my

22   card.  He followed me in.  So we're both in there.  And I go

23   directly to the vault door and I use my key out of my pocket.

24   I open up the vault door.  And within arms reach right there,

25   you have seen video of it, we picked up the vault log sheet.

1    It's on the clip board.  And we turned around and went directly

2    to records.  And in records we ran it through the copier.

3    Q.  And I hand -- I show you what's already in evidence as

4    Defendant's Exhibit 22 and ask if that is a copy of the

5    evidence register that you and Sergeant Simmons --

6    A.  That's a page of --

7    Q.  -- made.

8    A.  Yeah.

9    Q.  And after yous had made the copy you returned the register

10   to the vault?

11   A.  Yes.  We left the copy machine.  We walked down the hall,

12   around the corner, and down to my office.  And as I was using

13   my prox card to make the entry -- according to the prox card

14   register I think it's like 15, 16 minutes from the last entry

15   because it doesn't record when you walk out of the door -- me

16   and Simmons are in the hall getting ready to walk into the door

17   and before it buzzes we hear running down the hallway.

18       Sergeant Simmons described it as a hurried walk; I'm

19   telling you it was running.

20   Q.  And who was proceeding towards you?

21   A.  And we looked and Lieutenant Hayes rounded the corner and

22   saw us standing there and basically, hey, what are you guys

23   doing here?  What are you doing?  And we were busted.  I mean,

24   we had copies of this.  I had the log sheet clip board in my

25   hand.  Simmons had copies of the log.  And I buzzed the door

1    and we all three walked into the evidence vestibule area.

2        As soon as I got inside there I kind of stepped off into my

3    office and was playing my messages.  Sergeant Simmons was

4    standing there.  It got to the point where it was just awkward,

5    nobody said anything.  And Simmons goes:  See, Lieutenant, you

6    did log yourself in here.  And he started to show himself where

7    he logged himself in.  And he just took it from him.  And Jake

8    said, we're gonna check the rest of the money in the vault.

9    And Hayes said no, no, we're not.  I don't want us to do that.

10   He goes, the deputy chief said we need to do that Monday.  He

11   goes, so I don't want us inventorying the money until Monday.

12   I want us to all leave.  And we're like looking at each other,

13   oh, okay.

14   Q.  Did he say why he was down there?  Did he say what he was

15   going after?

16   A.  At that time he never said a word to me about it.  I know

17   from talking to Sergeant Simmons --

18        *MR. SMITH:*  Objection hearsay.

19   Q.  That would be hearsay.

20   A.  Okay.

21        *THE COURT:*  No need for a ruling.  He didn't answer.

22   Q.  **(BY MR. FREESE:)**  Okay.  Now let's switch gears again for a

23   moment.  There is so much to cover in such a short period of

24   time.

25   A.  I understand.

1          *THE COURT:*  Mr. Freese, I'm not going to limit you on

2     your time.

3          *MR. FREESE:*  Okay.

4          *THE COURT:*  You put on the testimony you want.

5          *MR. FREESE:*  Thank you, your Honor.

6     **Q.   (BY MR. FREESE:)**  I hand you -- is there a --

7          *MR. SMITH:*  250.

8          *MR. FREESE:*  Fifty?

9          *MR. SMITH:*  250.

10         *MR. FREESE:*  Oh, here it is.

11    *Q.*  I hand you what's been marked as Government's Exhibit 250.

12    Do you recognize this?

13    *A.*  I recognize it as -- yes.  It is a Budweiser box and it is

14    purported to come out of the evidence box, and I don't doubt

15    that for one second.

16    *Q.*  Is this an official Alton Police Department storage box?

17    *A.*  The storage boxes inside the Alton Police Department I

18    accumulated 90 percent of them.  And if you was to look on the

19    rotating shelves, the length of that room, most of the time I

20    went to zzz Schwables up town, a grocer and got egg cartons --

21    egg cases that -- the box that egg cartons come in.

22    *Q.*  You mean the plastic?

23    *A.*  No.  I mean the larger than that.  Longer.  They're tall.

24    And it's because it accommodated the shelves, I didn't have to

25    move the shelves so much.

1      That box there in particular, I have no idea the
2   significance of where it came from or how it got there other
3   than the fact that it's a box.  And if I would have had the
4   opportunity to pick that box up out of a dumpster, off of the
5   floor, or if it was in the evidence vault when I got there, I
6   would have done what was done with it; I would have slapped a
7   envelope on the front of it.  Now that one is not labeled.  But
8   that's what I use to store the evidence in.
9      The logic behind that was when I first took over there was
10   big shelves and it would say in the chain of custody, Isle 20
11   Shelf 3.  And there would be 2,000 things on Shelf 3.  So when
12   you went to try to find item you were looking for you had to
13   shuffle through 2,000 things.  If we put the things in boxes
14   that only hold 50 things then you only have 50 to go through.
15   So the smaller type boxes like that was a priority for the drug
16   cabinet because of the doors closing.  We let some of the other
17   boxes hang over just a little bit, but there is no uniformity
18   there.  I think that Sergeant Gillispie who had the job before
19   we had tried to get the city to buy file boxes that turned out
20   to be pretty expensive and really it's --
21   Q.  Let me ask you about another item that was in the evidence
22   vault and, in fact, I'll show you what's already been entered
23   into evidence as Defendant's Exhibit 33.
24      Do you need me to move that up?
25   A.  No.

1   Q.   That is a consent to search form; is that correct?

2   A.   Yes.

3   Q.   And that is your signature down there?

4   A.   Absolutely.

5   Q.   And what item were you consenting to be searched?

6   A.   In this instance I was allowing them to search my personal

7   fire safe that was located in there.  But as with any instance,

8   the consent is granted to the police to do anything they want

9   with any property I have at any time.  So that's just a

10   furtherance of my verbal consent to --

11   Q.   Well, is that fire file safe part of the normal Alton

12   Police Department?

13   A.   Nope.  And it's not labeled that way either.

14       We saw pictures of the fire safe from the side, but if you

15   was to see a picture of the fire safe from the lid itself I

16   made it very, very clear that it was the personal property of

17   Mick Dooley with my DSN and all of that.

18   Q.   Were you aware that that's a violation of policy?

19   A.   Didn't even think about it one way or the other.  And even

20   now looking back on having done it, I don't see the problem at

21   all.

22   Q.   What was the purpose of having that in there?

23   A.   Originally my purpose was -- I have to give you an example

24   of why I felt the need to do that.

25       Originally what sparked it was I would go to the Belle,

1    have a hundred dollars, $200 on me, and I would lose it in

2    about eight seconds.  And I would go to the ATM machine and

3    pull out $300 out of my checking account and lose it in five

4    seconds.  And now I can't get any more money out of my account.

5    It's 2:00 a.m. and I can't go to the bank and get any money.

6    The only thing that the bank offers me is interest on my money.

7    I mean it's just as secure probably in my house.

8        So, and I don't make any interest off of that money, I

9    decided that, hey, wait a minute, why fight this.  I will get a

10   safe; I will put it in the evidence vault at the Alton Police

11   Department where it's got 24-hour-camera surveillance; where

12   the only thing bad that can happen is a fire and I don't know

13   what could burn, and if it did burn and the sprinklers came on

14   I guess there might be a water problem, but I solved that too

15   by vacuum sealing the contents inside that bag.  And mostly it

16   was just playing with money that I had won when I would win

17   sums of money.

18       But I'm not totally stupid, I realize that if for some

19   reason I was in a car wreck and you found $50,000 in the

20   evidence vault they would try to make assumptions as to where

21   they thought this evidence guy got that money.  So when I

22   vacuumed sealed the money in $10,000 things, I would write on

23   the outside of it that it was mine in case I was in a car wreck

24   and died, maybe a policeman would give it to my family.  Or in

25   case there was ever any question I would put where it came

1    from, like, the Alton Belle and write the date down because

2    that would correspond to one of my tax win forms.  That's how

3    the money got to where it was at.

4        So I basically used that personal safe inside that evidence

5    room because I thought it was so secure and because I had 24

6    hour access to it.

7    Q.  Would you might consider that at least not the wisest thing

8    considering you were the evidence officer dealing with --

9    A.  Considering the fact that I'm sitting here now, yeah, I

10   wished I could take it back.  But prior to that there was never

11   any -- and aside from the fact I never really told anybody

12   about it.  Why would I do that.

13   Q.  Now you were under the impression that the video cameras

14   recorded all the time?

15   A.  Absolutely.  And I had no exception that they didn't.

16   Whenever I mentioned my previous work experience I neglected to

17   tell you that for a couple years I worked full time on the

18   Alton Belle Casino.  I'm well aware of cameras and how they

19   work and how they can do what they do.  And when we installed

20   that camera system into the areas that we did and they told me

21   that it -- I understand why they told me it tapes 24/7 and

22   don't pick your nose in front of the camera and all that,

23   trying to keep an honest person honest.  And I fully believed

24   that it did what they said.

25   Q.  Let's explore for just a few minutes, because you mentioned

1    it a few times, and part of the reason for the safe, yous

2    obviously enjoy gambling?

3    *A.*  Sure.

4    *Q.*  And how do you, on your pay -- explain how you can blow so

5    much money or spend so much money on the boat don't you have to

6    -- how much rent do you pay?

7    *A.*  I think what you are getting at is my personal expenses

8    versus what I deem to be entertainment expenses.  And my living

9    situation is not quite the same, as I'm sure, anybody's in this

10   room.  I rent my apartment from a friend of mine that needed

11   money at the time.  And I had just sold a condominium and I

12   needed a place to live.  So we met up.  And he had a room that

13   was half completed as an apartment.  We negotiated back and

14   forth forever and in the end you will see that it's a very,

15   very generous deal.  But at the time its condition may have

16   made you not think so.

17        Ultimately what we arrived at was that I would pay for my

18   rent a year in advance and that my rent would include all of my

19   utilities, my telephone, my internet, my water, and my

20   electric.  And that I would put money into this apartment to

21   obviously make it livable because I'm the one living there.

22   And that the deal could never be changed unless I wanted to

23   leave he couldn't raise the rent or anything else.  At first we

24   arrived at $200 a month.  And I know that you are listening or

25   thinking that's ridiculous.  But that building is vacant

1    upstairs and all of the things that I named going through his

2    business.

3        So for the first year or so I did, I paid $200 a month

4    rent.  I paid my rent a year in advance.  And then with the

5    cost -- I started feeling guilt about it and ultimately I

6    started giving -- I wasn't that guilty because I started paying

7    him 250 a month.  And for the last seven or eight years that is

8    my living expenses for my house.  It includes my water, my

9    electric; every utility that you have, I don't.  My cable.  And

10   my vehicle, my car, no one would be caught dead in my car.  I

11   drive a 1987 Toyota Corolla at the time that I paid cash for

12   out of my pocket to a lieutenant on the police department who I

13   think was going to go burn it, and I haven't put any money in

14   it at all.

15       When Agent Singer referred to the cost of gas and things,

16   well, since I got assigned to my position as the evidence tech

17   on the police department one of the perks of that job was that

18   they provided me with the crime scene van.  And I was allowed

19   to take that van all the time for any personal use that I had

20   as long as I stayed within the City of Alton.  And I did.  I

21   used that for my transportation.  I parked my personal car on

22   the parking lot of the Alton Police Department and it sat there

23   for over three years without even being started.  And it wasn't

24   until I was fired that they sent me a letter saying that I

25   needed to get this thing off there or else they would tow it.

1    So I had no maintenance bills on a vehicle.  I paid for no gas

2    or anything like that.  That freed up a lot of my income.

3    Q.  Okay.  What -- what about --

4    A.  And probably.

5    Q.  -- what about other kinds of expenses, credit cards or

6    things of that nature.

7    A.  The what?

8    Q.  Credit cards?

9    A.  I don't have any of those.  And I couldn't be afforded

10   credit if I would apply for some.

11       But I would like to mention personal expenses on my

12   checking account.  Like soap and things, I can assure you that

13   I buy soap like everybody else.  I don't buy anything that I

14   can't pay cash for.  And if there is some big ticket item that

15   I want and I can't pay cash for it, then I save till I get it.

16   The thing is that I'm happy with what I have, and I don't,

17   like, want to drive a Cadillac or anything like that.

18       On average, when I had my personal car and was using it, I

19   averaged 2,000 miles year on my vehicle.  Because that I live

20   downtown and I go to the gym, I go to eat, I go to work, and I

21   go gamble.  It depends on what, what impression they want you

22   to have of me that they dictate whether I work all the time or

23   gamble all the time.  I don't know how I could do everything

24   all the time.

25   Q.  Well, let me ask you:  As far as your expenses and as far

1   as your personal finances, had -- now you mentioned that the

2   IRS had put a levy or garnished your wages?

3   *A.*  Yes, they had.

4   *Q.*  Have you had other judgments?  Have you had a couple other

5   garnishments?

6   *A.*  Yes, I did.  And I'm not certain about the year.  I'm

7   certain about one thing, and that's -- it's gonna be 15 to 20

8   years ago -- I took out a $3,000 loan with HFC and I never paid

9   that loan completely back.  And I don't recall what the

10  circumstances were, divorce or whatever that it was.  But at

11  some point I think that I believed I paid it back.  And I never

12  heard from 'em, I mean, for years.

13      They sold that loan to other companies and ultimately I

14  think that Beneficial Finance ended up with that loan.  And I

15  know that I was in the evidence position so I know that it

16  couldn't have been that many years ago.  But that I got a call

17  from them and they wanted their money.  And I was, like, you

18  know, if I owe you money, just like the IRS or anyone else, if

19  you say that I owe you I guess I owe you.  And they said, well,

20  you know, how are you going to pay us back?  And I said, tell

21  me what I need to do.  And they wanted me to do -- I think

22  there's a little more to this but I'm not sure of what the

23  financial end is for lawyer firms to be collection agents,

24  but --

25  *Q.*  What happened?  What wound up happening?

1    A.   Sir?

2    Q.   What wound up happening?

3    A.   What wound up happening was that I agreed that they could

4    take the money out of my check.  It's a judgment.  But it

5    wasn't like we had this big court process to go do it.  I said

6    on the phone:  Mail it to me, I'll sign it, you can have

7    whatever.  And that started them getting back their money.

8        They're paid in full now as a result of after I got fired

9    the city owed me money for my vacation time and comp time that

10   I had accumulated.  That chunk came out to be I think like 17,

11   $18,000 of money.  Well, ultimately, them paying off my debts

12   for me I probably received two grand of that money.  Other than

13   the IRS that's the only outstanding bill that I can recall that

14   I've ever had.

15   Q.   Are you worried and concerned about -- were you prior to

16   being terminated and fired, when you were with the Alton Police

17   Department as evidence officer, say during the period between

18   2004 and April of 2007 or May of 2007 when you were terminated,

19   were you overly concerned about your finances or being in

20   financial debt?

21   A.   No.  I've never been overly concerned about it.  I always

22   know I have a paycheck coming next Thursday.  And during times

23   it's gonna make me sound very irresponsible, but the truth is

24   the truth.  During periods of time I could have the $50,000 on

25   me in that safe or at my house.  I think at one point the FBI

1    interviewed an ex-girlfriend of mine who, in fact, saw me with

2    $50,000.  Now a responsible person would have taken that money

3    and paid off their IRS deal or what they had.  And, you know, I

4    used that money as entertainment and I continued on with the

5    lifestyle that I had put myself into.  And always knowing that

6    they're getting their payments every time I get a paycheck they

7    get their payments.

8    Q.  Well, the lifestyle that you got yourself used to, wouldn't

9    that be a motive and a reason for you to start taking some of

10   this money that was available to you in the evidence room?

11   A.  Maybe when I used that word you think that lifestyle is a

12   little more grand than it actually is.  But there's nothing

13   grand about a lifestyle that allows -- that you live in a

14   250-dollar a month apartment and drive a 20 year old car and

15   walk most places that you go.

16        No.  I wasn't, like, not accustom to nothing.  But at the

17   same time, my list of wants weren't that great.  I had it made.

18   And I didn't have it made because I had money in my pocket, I

19   had it made because I had a job that I wanted since the time I

20   was six.  And because of that I spent all my time there and,

21   you know, that's -- that was the only thing I had going.

22   Q.  Now we heard testimony yesterday in regards to your

23   finances that in, I think it was '06, you took two trips to

24   Vegas one in June -- one in January and one in June.  And you

25   rented a vehicle, but no money or debit for any hotel.

1    *A.*  No.  And they picked those two instances I guess because

2    they were the most recent instances of me going to Las Vegas.

3    I've been to Las Vegas several times prior to that.

4        What I would do is I would wait for airfare to get as low

5    as it possibly could, like anybody else would.  My landlord, my

6    friend whose apartment I rent -- he lives in the basement of

7    the building and I live upstairs in; he owns the business

8    there -- and he owns a house in Las Vegas.  And I mean it's an

9    elaborate house.  It is a five bedroom, built in swimming pool,

10   double-car garage house five minutes from the strip.  And any

11   friend that he has goes there and stays there for nothing.  He

12   likes the house to be occupied to keep burglaries and things

13   down.

14       And on those occasions -- and I've gone there on occasions

15   where I've stayed in a strip -- in a hotel on the strip.  One

16   of the instances that you're referring to where I rented a car,

17   both times -- I think that one of them, I would have to check I

18   don't keep records of it, but I took a girlfriend out there and

19   I think we stayed at Treasure Island.  I don't know what my

20   room rate was, but I can assure you I paid cash for that.

21       The car renting itself, the mere fact that the agent was

22   able to find a record of it was because I probably on the

23   internet, and it would have been in my office because I would

24   need a printer to print out the receipt.  I don't have a

25   printer at home.  I would have logged on there and made the

1    details and that, and I guess secured the car with my debt

2    card.  And then when I got there just paid cash for it.  My

3    expenses of eating out and things like that in Las Vegas I pay

4    for out of my pocket.  Practically every trip that I've ever

5    taken to Las Vegas I like to have $3,000 in my pocket when I go

6    there.  I try to prepay as much of the other stuff as I can

7    before I get there, show tickets and things like that.  It's

8    not that grand and it's not.

9    Q.  Again, the fact that you like to carry a lot of cash and

10   have a lot of cash and deal in cash, some would say gives you a

11   very affluent reason and motive and you have the opportunity.

12   So, hey, this is how you are financing your gambling habit?

13   A.  I think that because we are specifically sitting here and

14   talking about the occasions that I've had more money on me than

15   I should have leads you to believe that I walked around in a

16   constant state of having 50, 60 grand at my disposal.  It is

17   not true.

18       You would have to gamble to understand the ups and downs,

19   the cycle of having -- the IRS agent showed without question

20   that in the end when you tally up the score, Mick Dooley loses

21   on the Alton Belle and he loses a great, great portion of the

22   money that he earned throughout the year.  But during times of

23   that year I had more money than I should have had also.  It's

24   deceptive in what it appears to be.

25       As an example, when the lady from the Alton Belle described

1    to you that I put a million dollars through the Alton Belle I

2    about fell out of my chair.  I couldn't believe that it was --

3    I knew that it would be high.  But in 151 hours of playing I

4    cycled that through -- well, I can assure you I didn't rob any

5    banks.  I didn't go do anything that would allow me to have a

6    million dollars to put into this machine.  It works like she

7    described.  It goes -- they count it because she says, well,

8    the money is yours.

9        In theory if you put $5 in and you rack it up to $6,000,

10   you could push cash out and you would be the proud owner of

11   $6,000.  But if you did that and you didn't continue to play

12   maybe you are not going to get the $20,000.  So it's kind of

13   weird.  You spend money to get more money when you're lucky.

14   When you are not, you don't.  And on the times that I was not,

15   I lived off of what my pay check and my future paycheck was

16   going to provide me.  So it isn't like you are describing.  I

17   don't know how to put it in any better terms.  You'd almost

18   have to live through it to do it.  And I'm not regretting

19   living through it.  I'm not sitting here telling you some story

20   that took food out of my kids mouths and I wondered what I was

21   going to eat last Tuesday.  And it was nothing like to.

22   Q.  Do you have anybody but yourself to be responsible for?

23   A.  Nope, just me.

24   Q.  And again you would -- when you feed the money into the

25   machine and if you win, you can just feed that winning back

1   into the machine.

2   *A.*  You don't have to take it out; you just continue to play.

3   Put a hundred dollars in, you go up to 500.  You go to $5.  You

4   go back up to a hundred.  If you stopped right there they would

5   say that you will gambled $200 when you only had a hundred

6   dollars.

7       Another example to help you understand the ups and downs of

8   gambling and how I can assure you that my math does not match

9   an educated person like Mrs. Singers' math because I have

10  gambler's math.  If I get on the plane with $3,000 I go to Las

11  Vegas and three days later the plane lands and I have a

12  thousand dollars then you would be lead to believe that you

13  only lost $2,000.  But that isn't true because in my other

14  pocket I have gambling winnings of $10,000.

15      Now I never had it in my hand at one time but throughout

16  that weekend on different occasions I won several thousand

17  dollars, and then I would lose that, win some more before I

18  lost it all.  Owe taxes on the 10,000 that I had in my hand and

19  suffer the 2,000 loss that I had.  So it's not -- it doesn't

20  work out mathematically like you would suspect.

21  *Q.*  Now I know it's probably a little hard for you to -- we

22  have sat through and heard testimony regarding a lot of

23  different cases with missing money.

24  *A.*  Yes.

25  *Q.*  And I can start going through and showing you the cases not

1   necessarily the ones regarding counterfeit money but just the

2   ones where money was missing.  Can you offer an explanation

3   for?

4   *A.*  I think that if I'm given enough information about all of

5   the cases that have been presented that put the focus on me,

6   that I will be able to give an explanation as to either why I

7   knew about it or didn't know about it or anything.  It's kind

8   of difficult when I don't work some of these cases.  And it's

9   kind of difficult when I'm not really sure of how they

10  materialized.  I could take care of a lot of them right off the

11  top of my head because I know that -- and I can take care of

12  all of them because I know that I didn't do anything wrong at

13  any point.

14      And, again, when you refer to me as being meticulous and

15  things like that, they make it sound like that's a calculating,

16  meticulous thing, that this guy is sinister.  It's not true at

17  all.  I try to cover myself with the things that I did in there

18  based on the history of the Alton Police Department and where

19  the focus of blame sometimes falls.

20      So I think that, yes, if you want to show me some exhibits

21  and I'll show you procedures that I took to how this money got

22  where it is or what it did.  I think you will find that I'm not

23  responsible for any of them.

24          *THE COURT:*  All right.  With that we'll take our

25  lunch.  The jurors lunches are here and when they are ready

1    we'll resume.

2         The Court is in recess.

3         Counsel, stay here for just a moment after the

4    jury's...

5    *(Following proceedings held outside presence of jury:)*

6         THE COURT:  Be seated.

7         You can step down, Mr. Dooley.  You can step down.  We

8    are through for the lunch hour.

9         All right, Counsel, just a couple of questions here as

10   I'm assembling the jury instructions.  I don't know --

11   Mr. Freese, I don't know if you have been through a trial with

12   me or not.  But what I will do is after I assemble a packet of

13   the instructions I propose to give I'll first have an informal

14   conference with you to go over them.  And then, of course, I

15   will have a formal jury instruction conference where everyone

16   can make their record.

17        Now just to be clear, I do have a few questions.  I

18   had the defendant's suggested instruction in a separate pack

19   and, as to these, do you still intend to put in some evidence

20   of recorded conversations?

21        MR. FREESE:  Um, your Honor, what I plan to put in the

22   recorded conversations to the extent that it is the tape

23   recording that was made of Lieutenant Hayes being in

24   Mr. Dooley's office.

25        THE COURT:  Now we've heard a lot of evidence on that.

1    Is there -- why would you want to put some recordings in, may I

2    ask that, so I can anticipate?

3         MR. FREESE:  Just so that the jury can have a full

4    understanding of what occurred and what he was doing or what

5    seemed to be occurring.  I have to tell you, your Honor, I did

6    not make the transcripts of that recording, the government did.

7    So I can only rely on their authenticity.

8         THE COURT:  Is there going to be an objection to that?

9         MR. SMITH:  Yes, your Honor.  Because the objection is

10   relevance.

11        You know he had access to the evidence vestibule area,

12   this is Lieutenant Hayes.  The theft didn't occur from the

13   vestibule area.  The Lieutenant Shields testified he checked it

14   all out and there wasn't anything at all improper about

15   Lieutenant Hayes being in the --

16        MR. FREESE:  Except, your Honor, he also goes into the

17   evidence vault in this tape.

18        MR. SMITH:  Correct.

19        MR. FREESE:  So I feel it is.

20        THE COURT:  He had the key, I mean.

21        MR. FREESE:  I'm sorry.

22        THE COURT:  He had that key and logged in, correct?

23        MR. FREESE:  Yes.

24        THE COURT:  What does the recording have to do with

25   that?  I'll let you argue it more, but...

Instruction discussion

1          *MR. FREESE:*  Again, I believe it goes towards as we
2    have before shown potential that there is this reporting that
3    Lieutenant Hayes -- my client was concerned about Lieutenant
4    Hayes having the key and going in.
5          *THE COURT:*  Now, is the government going to have any
6    objection to the defendant's instruction on the definition of
7    knowingly or know?
8          *MR. SMITH:*  No.  We actually went over that --
9          *THE COURT:*  That will be okay.
10          And the same thing with the definition of a scheme, is
11    there any objection?
12          *MR. SMITH:*  We went over that and that was by
13    agreement, your Honor.
14          *THE COURT:*  Okay.  Have there been any inconsistent
15    statements in this case yet?  I don't think so.
16          *MR. SMITH:*  Not to the government's.
17          *MR. FREESE:*  On hindsight, after the end of the trial
18    I'm willing to withdraw that one, your Honor.
19          *THE COURT:*  Withdrawn.
20          *MR. FREESE:*  That was in anticipation.
21          *THE COURT:*  Any objection to the instruction on the
22    defendant's statement?
23          *MR. SMITH:*  No.
24          *THE COURT:*  That will be given.
25          Any objection on the instruction on willfully; is

Instruction discussion

1    there going to be a problem with that?

2          *MR. SMITH:*  No, your Honor.

3          *THE COURT:*  All right.

4          Then that leaves me with just a couple of things here.

5    And I'll give you a proposed packet here shortly.  The

6    government had submitted an instruction number 17 which states,

7    "a false statement can be material even if the agent to whom

8    it's made know it's false".  That's the defendant's

9    instruction.  They cite a case.  I don't think there is any

10   question about the law.

11         But my question would be:  In light of the patterned

12   instruction, Government's 16, which says, "it is not necessary

13   that the statement actually have that influence or be relied on

14   by the Federal Bureau as long as it had the potential or

15   capability to do so."  Doesn't that cover that situation?  In

16   other words, isn't Instruction Number 17 just an argument?

17         *MR. SMITH:*  Well, your Honor, the reason why we came

18   up with the additional instruction is because I thought pattern

19   instruction about the potential or capability to do so didn't

20   cover the factual scenario of when the agents know it's false

21   when it's being said; anticipating the defendant's argument

22   that it couldn't have the potential because they already knew

23   it was false.

24         *MR. FREESE:*  Except, your Honor, I --

25         *THE COURT:*  But, of course, the defendant didn't know

1    that.

2              MR. SMITH:  At the time.

3              THE COURT:  Which is -- all right.  I understand what

4    your positions are on those.

5              And then you have the only other thing you have is

6    the -- you have the instruction that you gave me which is the

7    particular instruction where there is a recantation.

8              MR. FREESE:  Yes, your Honor.

9              THE COURT:  That's it.  That's all the issues that are

10   left?

11             MR. FREESE:  Yes.

12             THE COURT:  All right.

13             MR. FREESE:  Oh, no, your Honor.  They had the one in

14   regards to the embezzlement.

15             MR. SMITH:  Illegal income.

16             THE COURT:  Your argument is there is no embezzlement.

17             MR. FREESE:  That the instruction's not accurate

18   because the case they cite, the --

19             THE COURT:  Well, just rather than the case, do you

20   say there is some embezzlement here?

21             MR. SMITH:  That's the charges, your Honor.

22             THE COURT:  Right.  And what's your problem with it?

23   You don't need to tell me a case.  Just what's the problem with

24   it.

25             MR. FREESE:  My problem is that it is misleading and

Instruction discussion

1    harmful to the jury and prejudicial to the jury because he's

2    not charged, number one, with either -- not just embezzlement

3    but with filing a false tax return.  He's charged with

4    filing -- for failing to file a tax return.  The instruction

5    goes towards filing a false tax return.

6              *THE COURT:*  And embezzlement?

7              *MR. FREESE:*  And that -- yes, your Honor.

8              *THE COURT:*  Any guidance you want to give me as I

9    study this over the lunch hour?

10        *MR. SMITH:*  Well, the laws clear; that's not the

11   issue.  And the fact that if they find that money was

12   misappropriated, embezzled, whatever label you want to put on

13   it, they can consider that as far as --

14             *THE COURT:*  Of the scheme.

15             *MR. SMITH:*  Correct.

16        And they can also consider as to whether he met the

17   minimum income requirements for filing.

18             *THE COURT:*  All right.

19        Have a nice lunch, folks.  Hang close.  I'll get back

20   to you whenever the jury's ready to go.

21        Are you putting together some rebuttal for the

22   afternoon, do you know?

23             *MR. SMITH:*  Not at this point.

24             *THE COURT:*  Okay.  I'm just planning.

25                       *(Lunch recess)*

1           THE COURT:  Be seated.  We are continuing with the

2      direct examination of the defendant.

3      Q.  (BY MR. FREESE:)  Okay.  When we broke, Mick, we were

4      talking about you finances and so forth.  Now you have in the

5      past filed all of your tax returns for say 2002, 2003, 2004,

6      and 2005?

7      A.  Every year since 1978.

8           COURT REPORTER:  You will have to scoot up or scoot

9      the mic up; one or the other, please.

10          THE WITNESS:  Can you hear me now?

11          COURT REPORTER:  Thank you, yes.

12          THE WITNESS:  Do you need me to repeat?

13          COURT REPORTER:  No.

14     Q.  I'm going to hand you what is marked as Defendant's

15     Exhibit 41, 43, 44, 45 for identification and ask you to take a

16     look at those.

17          Do you recognize each of those?

18     A.  Yes.  They're my tax returns for the years you described

19     from 2004, '5, '6, and '7.

20     Q.  Are those copies that came out of your house or out of your

21     possession?

22     A.  Yes.

23     Q.  And those are ones that you had had prepared on your

24     behalf?

25     A.  Yes, I file at H and R Block every year that I can recall.

1    *Q.* And you have kept these and maintained these in your
2    possession?
3    *A.* Right.  With the exception --
4    *Q.* And these are the actual copies?
5    *A.* As far as I know, yes.
6    *Q.* May I have them.
7        *MR. FREESE:* I would like to introduce these into
8    evidence?
9        *MR. SMITH:* I have no objection, your Honor, to all of
10   them except for the 2007 return that was filed in '08 would
11   have no relevancy to this.  But all the others are fine.
12       *THE COURT:* Yes, that's true.  The 2007, that's
13   post --
14       *MR. FREESE:* I'm sorry, your Honor.
15       *THE COURT:* For the year '07.
16       *MR. FREESE:* Yes.
17       *THE COURT:* That would not be relevant to this case.
18   But all the others can be admitted.
19       *MR. FREESE:* That will be -- so Exhibit 43 would not
20   be.
21       *THE COURT:* If that's for tax year '07.
22       *COURT REPORTER:* Mr. Freese, would you give me those
23   numbers against, please.  1, 44, and 45.
24       *MR. FREESE:* Number 1, 44, and 45?
25       *MR. FREESE:* Yes, ma'am.

Direct Examination - Dooley, Mick

1   *Q.   (BY MR. FREESE:)*   Now in relation to Exhibit Number 1.

2   What year is -- tax year is that for?

3   A.   It is for the tax year of 2004.

4   Q.   No.   Or would this be for 2003 filed in 2004?

5   A.   In looking at it, it was prepared 4/14 of 2004 so it must

6   be for 2003.

7         COURTROOM DEPUTY:  Mr. Freese, I'm sorry, we have some

8   confusion about the exhibits.   Which ones were just admitted?

9         MR. FREESE:   I submitted 1, 44 and 45.

10         COURTROOM DEPUTY:   Are those the ones that were just

11   admitted or was it different ones?

12         MR. FREESE:   No.   These are the ones that I just

13   submitted.

14         COURTROOM DEPUTY:   Okay.   Thank you.

15   *Q.   (BY MR. FREESE:)*   When was that prepared?

16   A.   Date prepared 4/14/2004.

17   Q.   And show that filed?

18   A.   I'm guessing it's called an e-file.   It's filed at H and R

19   Block.   And I think they push send and it goes.

20   Q.   Okay.   You went down there and e-filed it?

21   A.   I assume that's what they called it.

22   Q.   I hand you Exhibit 44.   And ask if you -- again Exhibit 44

23   for what -- when was that prepared?

24   A.   The date prepared is 4/14 of 2005.   So I'm believing it to

25   be the taxes for 2004.

1    *Q.*  And again was this e-filed?

2    *A.*  Yeah, same person, even, did it.

3    *Q.*  May I have it.

4         *MR. FREESE:*  Permission to publish, your Honor.

5         *THE COURT:*  Well, no, let's don't take time now.  The

6    jury will get them to see.  We know he's filed his returns and

7    timely.

8    ***Q.  (BY MR. FREESE:)***  So these were prepared and e-filed prior

9    to the date -- or before the ending of the filing period?

10   *A.*  Yes.

11   *Q.*  Now your tax returns include your W-2 forms from your Alton

12   Police Department?

13   *A.*  Yes, that's my income.

14   *Q.*  And also the W-2Gs from the various gambling casinos?

15   *A.*  Yes.

16   *Q.*  I ask you to look a moment to what's marked Government's

17   Exhibit 28 -- 228, 225, 224, 227, and 226 and ask if you

18   recognize those?

19   *A.*  Yes.

20   *Q.*  Are those true and accurate copies of the bills for

21   expenditures that you made?

22   *A.*  Yes, this is what the prosecution described as high-price

23   items.

24   *Q.*  And how did you pay for all of those items?

25   *A.*  Cash.

Direct Examination - Dooley, Mick

1   *Q.*  Did you get that cash out of the evidence vault?

2   *A.*  Nope.

3   *Q.*  As part of your filing, your 2006 tax return was filed

4   late; is that correct?  In the one you filed in 2007?

5   *A.*  Yes.

6   *Q.*  It gets a little confusing.

7        You also received again the forms W-2G?

8   *A.*  Yes, every year.

9   *Q.*  I show you a portion of the W-2Gs out of your 2006 tax

10  return and ask if you recognize those?

11  *A.*  Yes.

12  *Q.*  What are they?

13  *A.*  That's the W-2G form that you get with a jackpot win.

14  *Q.*  From where?

15  *A.*  From -- in this instance the Alton Belle Casino all of

16  them.

17  *Q.*  Okay.  Can I have all of them.

18       Those were with and part of your 2006 tax return?

19  *A.*  Yes.

20           *COURTROOM DEPUTY:*  We've got to do it up here.

21           *MR. FREESE:*  I'm sorry, I forgot.

22           *COURTROOM DEPUTY:*  You will have to wait until the

23  projector warms up.  It will take just one minute.

24           *MR. FREESE:*  Okay.

25  ***Q.  (BY MR. FREESE:)***  While we're waiting:  The dates on those

1    expenditures, what are the dates on the expenditures that you

2    made?

3    A.  Well, in order here on 10/10/06 I have an expenditure of --

4    this receipt says $2,845 for a deck that I put on my apartment.

5    I paid $3,000.  Which reflects more than this, but the receipt

6    says 2845.

7    Q.  Okay.  What else?

8    A.  On 9/20/06 I have an expenditure from Rex for $1,989.

9            MR. SMITH:  Apologize, your Honor.  Just if he would

10   refer to the exhibit number for purposes of the record.

11           MR. FREESE:  This is part of Exhibit 45.  It's part of

12   the tax return.

13           MR. SMITH:  No --

14   A.  This is exhibit --

15           MR. FREESE:  I will --

16           THE COURT:  Wait.  I don't want counsel talking to

17   each other.

18           What exhibit are you referring to?

19           MR. FREESE:  Defendant's Exhibit 45 that 2006 tax

20   return.

21           MR. SMITH:  And the objection is -- I have no

22   objection to the testimony.  But he has a lot of exhibits up

23   there he is referring to.  As long as he indicates what exhibit

24   he is referring to at a particular time, we're fine.

25           THE WITNESS:  I understand.

1          *MR. FREESE:*  Right now.

2     **Q.   (BY MR. FREESE:)**  Please read off the government's exhibit

3     number.

4     *A.*  First one that I gave of the price of my deck, that one is

5     Government's Exhibit 226.

6          Government's Exhibit 227 is from Rex, and that's big

7     screen -- a big screen TV purchased on 9/20/06.

8          A hot tub purchased on 9/23 of 2006 is Exhibit 225.

9          Exhibit 224 is also a hot tub.  And I can give you an

10    explanation for those two purchases if that's necessary.  And

11    the amount of the first hot tub is $1,200; the amount of the

12    second hot tub is $1,800.

13         Also Government's Exhibit 228 on 12/17 of 2006.  It's a

14    large screen TV and the surprise $1,070.

15    *Q.*  Thank you.

16         Now during this same time period of September of 2006 did

17    you receive some winnings from the Alton Belle?

18    *A.*  Yes.

19    *Q.*  I hand you again the W-2Gs that came out of your 2006 tax

20    return Defendant's Exhibit 45 and ask if you --

21         *THE COURT:*  The system -- Mr. Freese, the system has

22    just failed.  It's probably overheated; it will have to be

23    rebooted.  That's on us, not on you.

24         So we'll come back to that.  If you have something

25    else you can cover and by that time we will have it back.

1          *MR. FREESE:*  That is no problem.

2          *THE COURT:*  That's our fault, folks.  The equipment

3    just failed.  It is not Mr. Freese's problem.

4    *Q.  (BY MR. FREESE:)*  Now Government's Exhibit 201 what is

5    this?

6    *A.*  Apple laptop computer.

7    *Q.*  And where did this come from?

8    *A.*  It originated from a search warrant on --

9    *Q.*  You need to speak up.

10   *A.*  I'm sorry.

11        It originated during a search warrant execution on Trubey

12   Street with Lee Fielding who previously testified here.

13   *Q.*  Okay.  And what occurred in relation to that laptop from

14   the time that you went on the search until the time that it

15   came into being in your home?

16   *A.*  Okay.  It's -- there's a pretty good gap there.  But

17   initially, as previous testimony from others, we were involved

18   in the U.S. Bank -- investigation of U.S. Bank robbery.  During

19   the course of that investigation we executed, I think, two or

20   three search warrants.  I'd have to refer to the report for the

21   exact dates and that.  But during the course of that my

22   responsibility is the seizure of evidence inside search

23   warrants that we do.

24        In this instance one of the bank robbers, Lee Fielding, we

25   had a search warrant for his residence and we went inside.  I

Direct Examination - Dooley, Mick

1    think it was a TRT forced entry into the residence.

2        And within seconds Mr. Fielding was apprehended in his

3    kitchen.  He made the statement that we had the right person

4    and that he did rob the bank, and that the bank robbery loot

5    was downstairs above the drop ceiling in a lockbox.  That would

6    be my responsibility to secure evidence at the scene.  I went

7    down there and, in fact, it was exactly right as he described,

8    where he described.  And I took that item as evidence.

9        During the course of that search warrant, without looking

10   at the report I'm not certain, but I would estimate 60 items

11   were taken as evidence.  Again I'm not sure because I don't

12   have the report in front of me, but during the course of that

13   search warrant one of the items was this laptop computer.  If I

14   recall correctly, and I've thought about it obviously a

15   thousand times, I think that it was in the basement originally,

16   but later was upstairs ultimately when it was decided to take

17   it as evidence because we believed that it was in fact proceeds

18   from this robbery.  I mean, it is a brand new computer sitting

19   in a bank robber's house.  We took it as evidence.  I say "we",

20   I mean, me.  But there were other officers that pointed out

21   it's existence and said, hey, we shouldn't leave it to this

22   guy.

23       I gathered up all the evidence in my search warrant that I

24   had just done.  And it consisted of two tubs, again those

25   plastic homicide tubs that I used.  That's what I transported

1    evidence back and forth from.  And inside there I have bags and

2    staplers and evidence tape, and everything I use at the scene.

3    Most of the time it doesn't get sealed there because I take

4    everything back to the station and systematically go through it

5    to keep my exhibits in order and things like that.  I transport

6    everything back to police headquarters and directly to the

7    detective division that's upstairs.

8        In that detective conference room again we've got I don't

9    know how many FBI agents.  I think I'm only familiar with Agent

10   Meyer and Agent Kelly.  There were some others there.  Alton

11   police detectives.  I took the evidence, I set it on the floor

12   inside that conference room.  And because we had so many people

13   there and so many bills, we were going to check to see if there

14   was any -- not counterfeit money, check to see if the bait

15   money.  We were going to check to see if there was any bait

16   money.  We had written the serial numbers of the bait money up

17   to the board.  And to expedite things everybody was taking

18   piles and piles of money and comparing them.  This comparison

19   went on for quite a while because there was a large sum of

20   money there.  Ultimately the money was packed into a bag.  And

21   later I'll have to get into detail, but we're talking about the

22   computer now, so I'm going to brush that with the option to

23   come back.

24       When it was completed and everything was done, I was on

25   vacation at this time and they were paying me overtime.

1    Sometimes they think that that's, you know, killing the city

2    and other times they're real generous.  It doesn't never matter

3    to me, I was doing it for free.

4        I was told by my supervisor, he told me to take the

5    evidence downstairs and whenever I get back from vacation take

6    care of it.  The bulk of my stuff was done.  It takes me a lot

7    longer to get my supplements and things together because of my

8    exhibit numbers.  And that's what I did.

9        I went down to the vault and took the evidence back outside

10   into my van, drive down into the garage.  And then I entered

11   into the evidence vestibule.  And I opened up the door and,

12   with my foot, kept the door open while I took the two tubs of

13   evidence and set them into the evidence vault immediately to

14   the right between the sliding shelves and the door.  I put both

15   of them there.  There's not much space for anything else and

16   when I turned around there was the computer.

17       I took the computer to set it up on top of the plastic tubs

18   that I had the box just resting on top of, but it would slide

19   off into the floor.  So, conveniently, I put it right on the

20   shelf right there.  The shelves, as you have seen, all slide

21   the length of the room down there.  But when you first walk in,

22   where the log-in sheet is, that is a stationary file.  Well,

23   the one immediately to its right is where I set this computer.

24   And I went back on vacation.

25       As they pointed out, I'm confident that I went back to the

1    police department for something or another practically every

2    day.  Usually that something or another involves me taking

3    evidence out of the slam lockers and logging them into the

4    vault itself.  I do that because if it gets backed up, if

5    patrol has a good day, what we refer to, and all the evidence

6    lockers fill they will call me to come down and empty the

7    evidence lockers.  And if I can just spend a couple minutes a

8    day emptying the evidence lockers and putting it into the vault

9    it's not as bad as being gone for a week and have this big

10   mountain of stuff that has to be put in the vault.

11       So I come back from vacation and I'm logging things

12   into the vault and I'm stepping over these tubs that are

13   essentially in my way.  If I'm going to place -- what comes to

14   mind is arson evidence and sex assault evidence, that's in Isle

15   1 and that's off to the right.  As we seen in the video, to the

16   left is where the cash locker is.  So, I stepped over this

17   evidence for, I know, several days.  And finally at some point

18   I realize, hey, I got to stop what I'm doing -- and I don't

19   recall what it was I was doing but I get assignments quite

20   frequently -- and I have to take care of this bank robbery

21   evidence.  And that's what I did.

22       I opened up the evidence door.  I grabbed the two

23   tubs, and I drug them into my office because that's where my

24   bar coding thing is and that's where I have to get my whole

25   report together.  And for several hours I went through and I

1    marked the exhibit numbers on the bags and I wrote my report.

2    In the course of doing a search warrant, you also have to do a

3    search warrant return.  And what that involves is notifying the

4    judge that issued the search warrant of the items that you took

5    in the search warrant.  Typically, I think -- I'm not certain

6    whether you're supposed to leave one at the scene or not, but

7    generally they know that we've been there.  And regardless, you

8    have to do a return to the judge.  So when I handwrite my

9    reports, and I do that --

10         *MR. SMITH:*  Yes, your Honor, I've lost track as to

11   what question this pertains to.

12   *A.*  To the computer, the Apple.

13         *THE COURT:*  But you're objecting to the narrative?

14         *MR. SMITH:*  Correct.

15         *MR. FREESE:*  Okay.

16   *Q.*  How did you wind up with the apple computer?

17   *A.*  That's what I'm getting at.  And I will jump to that.

18         *THE COURT:*  Just ask a more precise question.  I don't

19   think the fault is so much with his answer.  It's you need to

20   ask a question that would then prompt a discrete answer.

21   *Q.*  Yes, sir.  Okay.  The Apple computer you did not -- how did

22   you miss logging it in?

23   *A.*  Okay.  I missed logging that in by when I went in to get

24   the evidence for the bank robbery to do my report, apparently,

25   previously I had done something farther down the aisle that

1    caused the accordion style shelves to close and made this

2    computer out of my view because I know had I seen it I would

3    have added it to the amount of junk that I had to take into my

4    office.

5        After I wrote my report and records returned to it me, they

6    type my report into the LAWMAN system, they give me a copy of

7    the typed report and for me to sign and have a supervisor sign.

8    And they give me a copy of my original handwritten report back.

9    I was filling out the search warrant return based solely on

10   that report.  That is why when you look at the record you will

11   see that there's no record of this computer on that search

12   warrant return.  It's at this point an entire accident.

13   Everything I've described up to this point, okay.

14       Well, I finish with that.  I return it.  They return the

15   search warrant.  A couple days later, again I don't know how

16   much time elapsed, I'm doing something in there and I rotate

17   the shelves and low and behold here's this computer.

18       And I'll tell you right now what I should have done is I

19   should have just made a supplement, say that whatever my last

20   exhibit was, let's suppose it was 98, I'll just make a

21   supplement saying it is 99 and then I'll notify the judge, hey,

22   man, that is a mistake.

23   Q.  But did you do that?

24   A.  Nope.  I didn't do that.

25   Q.  What did you do?

1    *A.*  I analyzed the -- what I believed to be the potential of

2    the evidence of that computer, again the person that we had in

3    custody, and I wrote it off as being nonconsequential.  I knew

4    from previous history inside that vault that when there was a

5    disposition of a case -- because I've destroyed dumpsters full

6    of evidence -- that sometimes you can't give it back to the

7    victim, sometimes you don't know who the victim is.  There's

8    lots of reasons after the disposition of a case within after 30

9    days where they don't have the opportunity to appeal.  We have

10   to find final destination.

11   *Q.*  So what did you wind up doing?

12   *A.*  With that computer I just -- I was working on another

13   project for the police department and that involved vehicle

14   tracking devices, and I decided that this computer was going to

15   be used for that.  I had previously tried that with some other

16   computer.  And you could put my computer knowledge in a

17   thimble.  But I had this real great idea that it was going to

18   work and I didn't -- I couldn't use the laptop at the police

19   department because I was afraid that if I plugged it in somehow

20   it would do something to the server.  Apparently now I know

21   from other conversations it wouldn't do nothing but work.

22   *Q.*  Were you afraid that they would find out that it had been

23   evidence that you had taken?

24   *A.*  I don't know that you could even find that out.  And that

25   would have been the farthest thing from my mind.  And the

1    reason that I took it home was to hook it up to my internet

2    service because if something is going to break I'd rather that

3    break because the police department shut down because I put

4    some foreign computer on to the server.

5    Q.   What was your purpose in -- what were you wanting to do

6    with that computer?

7    A.   What I wanted to do with the computer, and had talked about

8    with several detectives and states attorneys, was I wanted a

9    computer solely devoted to vehicle tracking devices.  And what

10   that is is something that comes in various sizes, about the

11   size of a cigarette pack, and you slap it on the bottom of a

12   drug dealers car and you could log on to the internet and in

13   real-time on some of the ones that are available you can show

14   exactly where they drive, how long they stop, and you can

15   develop a pattern from that.  You can get a printout of that

16   activity.  And that was my intent.

17        Inside the evidence vault where only two keys exist to get

18   in there, there is a terminal for a computer.  It would be

19   right below that camera that shows on to the cash tracking

20   area.  And the object was going to be to have that computer in

21   the up-right position -- originally the object was just to have

22   a computer there devoted solely for this deal where the

23   detectives who were working on cases that we had it on we could

24   all walk in there without any outside people seeing who we were

25   focusing on.

1    *Q.*  Was there a computer in there at this point in time?

2    *A.*  No.

3    *Q.*  A laptop?

4    *A.*  No, there was no computer hooked to that at all.

5    *Q.*  Now did you use the laptop -- did you do some exploring for

6    the GPS system of the laptop?

7    *A.*  Yeah.  And I used that laptop.  I'm not suggesting that I

8    didn't.  It was at my house for I'm not even sure how long.  I

9    guess we could look at the first log-in date and when it was

10   taken and we could deduct how long I actually had it.  I can

11   assure you that I had the other tower computer even longer than

12   that at my house with the same purpose in mind.

13   *Q.*  Why did you have that one?

14   *A.*  I'm sorry.

15   *Q.*  The tower, how and why did you get that one?

16   *A.*  I got it for the same reason.

17   *Q.*  And how?

18   *A.*  In the evidence vault.  I want to say at the end of the log

19   in '04, they're by year, I found this computer.  It had nothing

20   on it, no markings, no bar code.  Which is not uncommon for

21   evidence that's old to have been there and not been purged out

22   yet.  When you heard the officers sit here and describe how we

23   did a final inventory and now we know what's in that, that's

24   not true at all.  We were in the initial stages of getting that

25   vault organized to the manner in which it should be.

Direct Examination - Dooley, Mick

1          So I seen this laptop tower computer and I think that it

2     had a post-it sticker on it saying Little Rick, Little Richard,

3     which I assume to be the password of that tower.  I took it

4     home, I tried to log on it; I couldn't get passed the first two

5     seconds.  When the computer guy was up here the other day he

6     said that it went into safe mode or something.  Well, it wasn't

7     from any computer skills of mine.  I just kept trying different

8     things that never worked.  I approached Bazzell, our computer

9     whiz, on busting the code for that thing so that it could be

10    used.  And it -- in discussing with him what my intent was with

11    it, he was like, it ain't going to work anyway, forget it.

12         I think what happened there was he didn't understand what I

13    was saying because I know now anybody with internet service can

14    do exactly what I'm trying to describe to you.  But he thought

15    when I said dedicated computer for it I think he thought we

16    need to buy a satellite and everything else.  But anyway, that

17    computer didn't work.  I still had it at my house.

18         At some point I put the computer -- to take it back to the

19    police station I threw it in the back of my crime scene van.

20    Also at that time in the crime scene van is two vacuum sealers

21    that I had taken home from the evidence vault that were

22    destined to a dumpster that I was going to have an electrician

23    mound in there for me.  But they went back to the police

24    department also.

25    Q.  Let me ask:  Was your intent on either of those computers

1    to keep them permanently in your home as yours and not return

2    them to the police department?

3    A.  No.  No.  Had they worked like I wanted them too they would

4    have been back there the next day and we would have been using

5    them.

6    Q.  When you found out they couldn't work --

7    A.  I pretty much --

8    Q.  -- the laptop?

9    A.  -- abandoned the whole thing.

10   Q.  Why didn't you bring it back?

11   A.  Huh?

12   Q.  When you found out the laptop didn't work why did you not

13   just return it?

14   A.  At the time that I found that it didn't work, I guess it

15   just wasn't convenient for me to bring it back.  As when I

16   found out that the tower computer didn't work, I didn't

17   immediately stick it under my arm and go back to the police

18   station.  It sat in my house.  I knew where it was going.  It

19   was going back.  I have no need for it.  I have a computer.

20   Q.  Now, it would stand to logical reason and deduction that if

21   you took --

22          MR. SMITH:  Objection to form of the question.

23          MR. FREESE:  I'm getting to the question.

24          THE COURT:  Well, let's have a question.

25   Q.  (BY MR. FREESE:)  Because you took these two items does

1    that mean that you also took the money?

2    *A.*  No, but.

3    *Q.*  Was that a fear and concern of yours when the investigation

4    started?

5    *A.*  This issue of a computer never entered my mind until the

6    time that I was setting in the interview room being interviewed

7    by Lieutenant Shields and Agent Kelly of the FBI.

8        Previously they had asked me I think within my first

9    initial contact with them they said:  Do you have a computer at

10   your house?

11       And I said, I have two.  And you are welcome to do anything

12   you want with them any time you want.  At no point have I ever

13   not been 1,000 percent cooperative with the police.  And I

14   looked upon that as part of their investigation.  Of course

15   they're gonna -- actually, I thought it was kind of silly.  I

16   thought, do you seriously think I'm going to steal money from

17   the evidence vault and e-mail my buddy and say, hey, man I

18   stole money from the evidence vault.  But if you want to check

19   my computer you can check anything you want.

20       And they were like, okay.

21       And that's what we did.  Bazzell had been to my house

22   before because he worked on my computer.  And they were

23   unhooking that computer while I reached under the bed and got

24   the laptop computer.  It was right there.

25   *Q.*  Now you signed a consent form for the search for the -- of

Direct Examination - Dooley, Mick

1   the computers?

2   *A.*  I think I gave them verbal consent to come and search the

3   house.  And then after they had the computer they wanted

4   consent to search it's hard drive and stuff, and I was like,

5   sure.  And...

6   *Q.*  Did you read it?

7   *A.*  No.

8   *Q.*  Have you seen and done many of these search warrants?

9   *A.*  Thousands.

10   *Q.*  And did it even dawn on you that the phrase "the owner of

11   the property" may have been in there?

12   *A.*  No, I didn't think about it.  To me that's equivalent to

13   renting a car.  When you rent a car you sign your name at the

14   bottom of it, you don't read the lease agreement.  You know

15   what you are doing, you're in the car.

16      I knew what I was doing, I was giving them consent to look

17   on there about any incriminating thing they could find about me

18   and this bank robbery money.  I signed the bottom of it just

19   like I signed the bottom of the consent to search my personal

20   safe inside my vault.  You can read either one of them, I knew

21   what they were.

22   *Q.*  In fact, the search warrant for the safe inside the vault

23   had nothing on there in regards to ownership?

24   *A.*  Coincidently it don't, but I never read either one of them.

25   They told me it was a consent to search and that's all I needed

1    to know.

2    *Q.*  And your denial of having the laptop to Lieutenant Shields

3    and Agent Kelly was that too because of fear?

4    *A.*  That was a nightmare.

5        And let me describe that if I'm allowed to.  I was -- came

6    into the interview room.  I hadn't been there for I think

7    several weeks.  And I thought that the investigation was

8    progressing to a point where, honestly, I was on administrative

9    leave with pay at the time.  And I anticipated every day that

10   they would call me for me to come back to work, but they called

11   me to be interviewed again.  That's what I did.

12       I came in, sat in the interview seat, and very shortly into

13   the interview they started questioning me about my computers.

14   They kept saying, you know, where did you get -- so much so

15   that finally I was like, is there something on my computer that

16   you want?  Because it was vague questioning about the computer.

17   I'm like, is there something on there you feel I need to

18   explain?  I felt like they thought child porn was on there or

19   something.

20       And he was like, no, where did you get the computer?  And

21   as soon as he said "where did you get the computer," I knew

22   exactly where I got the computer.  And up to that point,

23   believe me I would have had a better story or something.  But,

24   I mean, I was like, oh, no, this computer came out of the

25   evidence vault.  And not only did it come out of the evidence

1    vault but it came out of a bank robbery case that there's

2    stolen money on that they're solely here for.  I know what it

3    looks like.

4        I interviewed thousands of people.  I'm telling you if you

5    didn't jump to the conclusion that I also took this money if I

6    said that I had this computer, it wouldn't matter if I had it

7    for what I deem to be a legitimate reason or not a legitimate

8    reason, I knew where it was going to go.

9        So I attempted to avoid that completely.  And in doing so,

10   I lied.  I told them a story about getting the computer at the

11   Galleria.  I said that I registered it.  When I said

12   "registered it" I think that they misunderstood what I meant.

13   I meant that when I first turned that computer on, being the

14   first person, you can't progress beyond that without putting in

15   your name, address, and all that stuff.  And I think that that

16   might be registering it with Apple.  I'm not sure.  But I know

17   you can't do nothing until you, like, do that.  And I had done

18   it.

19   Q.  Was your basis and fear of why you lied to them?

20   A.  Yeah.  The basis and fear of me lying was what they would

21   deduct from that.  And so I continued with this story in spite

22   of their insistence that, well, we know where this computer

23   came from.  This went on I don't know how long; it wasn't no

24   half hour.  But I know that we could probably, through math,

25   figure out how long it was because they went and did a search

1   at my house after that.

2       But at some point in that interview I told him that I had a

3   receipt in the top drawer and you can come and get it.  I don't

4   know what I was going to do when they got there and it wasn't

5   there.  Then, they were like, okay.

6       Then they started asking me about the drug cabinet.  And

7   they said, you know, when you put items of evidence in the

8   drug -- and I said, hey, wait a minute guys.  Let's go back to

9   this computer.  I think you know that that computer is not

10  mine.  And I want to tell you how I got the computer and why I

11  lied to you about the computer.  And I did, I explained to them

12  what I've just explained to you.

13      And their response was, oh, okay, we understand.  We see

14  how you would think that, but we're not going to do that.  And,

15  you know, but, you know, at that point I thought well --

16          *MR. SMITH:*  Objection at this time, your Honor, to

17  narrative.  I think it's time for a new question.

18          *THE COURT:*  I think it would be.

19          Next question.

20  *Q.  (BY MR. FREESE:)*  Now let me ask you a question in regards

21  to the money from the U.S. Bank robbery that was in the

22  envelope in a -- or in a evidence bag that was in a plastic

23  bag.

24  *A.*  Uh-huh.

25  *Q.*  It was full of ones?

Direct Examination - Dooley, Mick

1    A.  Yep.

2    Q.  And obviously it could not be pulled out through that small

3    slot that we saw?

4    A.  Right.

5    Q.  Now when you counted -- when that money was counted and it

6    was sorted and compared with the bait money?

7    A.  Uh-huh.

8    Q.  There were numerous people around, correct?

9    A.  Yeah, a room full.

10   Q.  And you bagged the money right then?

11   A.  Yep.

12   Q.  And what did you do?  How did all the ones come into be in

13   there?

14   A.  Okay.  When I executed that search warrant in particular

15   that was at some motel in St. Louis.  I don't recall the name

16   of it.  But when I was there, there was a gym bag; and inside

17   this gym bag was this zipped plastic bag that you have seen in

18   court already that had tons of money in it.  I mean, just

19   bursting with money.  And I seized -- photographed it where it

20   was at.  So if we had my pictures from that it will verify what

21   I'm telling you here.  I took the money and all the items that

22   were taken in that search warrant back to police headquarters.

23       And that's where we did what we did, the comparisons and

24   things.  Towards the end of that we had taken the money and

25   piled it in the denomination.  Sergeant Simmons described that

1    there was the ones, the fives and tens, the fifties, the

2    hundreds all the way down.

3        I was standing at the end of the table where I had all the

4    search warrant stuff at my feet.  And I took the money from --

5    I'll have to look at the bags I think to tell you, but I took

6    one pile of money and stuck it in the paper bag like I always

7    do.  And I 99 percent of the time write what's on the bag --

8    what's in the bag on the outside of the bag.  And that's

9    because I have every expectation in the world that I'm going to

10   be on the stand describing what Exhibit Number Two is and I

11   don't have to look through my report and that --

12   Q.  Excuse me.  I want to hand you Government's Exhibits 103

13   and 105?

14   A.  Okay.

15   Q.  These are the bags that we're talking about?

16   A.  And I'm not certain about the order in which I filled these

17   bags.  But as an example, this one, found inside Brink's

18   lockbox hidden in the basement ceiling.  That's the one above

19   the washer and dryer of the Lee Fielding residence.  I filled

20   the bag and, as I always do, I turned the top of the bag.  I

21   think in this instance I ran two staples over it.  So there was

22   a stapler over there.  And I put the evidence tape on it, and I

23   signed the evidence tape, 99 percent of the time at the same

24   time, maybe not.  But I put my initials on it and did it.  I

25   put it off to the side.  And the next bag was the bag that came

1    out of the gym bag in the search warrant at the other location

2    in St. Louis.

3        They were doing something with the high denomination bills

4    still, even though we knew what the total count was.  And I

5    wrote on the outside of the bag what was anticipated to be

6    inside the bag "$9,460 in Ziploc bag found in side of St. Louis

7    Blues gym bag."  I took the Ziploc bag and I filled them with

8    the one-dollar bills.  They were right there right where I was

9    standing.  I zipped it closed and I stuffed it in this bag.

10       As they finished with the other bills, I took them and I

11   threw them on top.  I folded the bag over.  I don't remember if

12   I stapled it or not.  I would almost believe that I did, just

13   because I did this one, but.  As I put the evidence tape across

14   the top of it -- evidence tape comes in a roll -- and obviously

15   the initial pieces of evidence tape require less of a circle

16   than the ones toward bottom.  But as you get close to the

17   bottom of the roll it gets harder to manipulate.  And when I

18   say harder I don't mean it takes five people.  But if you have

19   ever used contact paper to put on your kitchen this is contact

20   paper times ten.  When it touches something it's stuck.

21       And I put the evidence tape on there.  It was screwed up.

22   It was bubbled and it was crooked.  I didn't pay any attention

23   to it, I reached right and picked up some scissors and I cut it

24   right off.  When I had it off I folded it, I put this tape on

25   here.  And if you look at these you'll see this evidence tape

1   ain't the same.  There is no white stripe on it.  I didn't know

2   that until studying this in court from the other day.  But

3   after I had that sealed, I never done anything else with it.

4   It was written on the outside, written on the inside.  I didn't

5   fill out a cash tracking form.  I've never filled out --

6          *MR. SMITH:*  Objection.  A narrative.  It is again time

7   for another question.

8   *Q.  (BY MR. FREESE:)*  Okay.

9          *THE COURT:*  Now, Mr. Freese, just ask questions.

10  There's no need for me to have to do this again.  Not one more

11  time.

12     So just ask questions just like any witness.

13  *Q.  (BY MR. FREESE:)*  Now did you remove any of the money out

14  of either of those bags?

15  *A.*  No.

16  *Q.*  Do you know who did?

17  *A.*  No.

18          *MR. FREESE:*  Is this okay to use now?

19          *COURTROOM DEPUTY:*  Yes, it is on.

20  *Q.  (BY MR. FREESE:)*  Okay.  I want to go back again a minute

21  to your income and your expenditures.  And I'm showing you the

22  W-2G forms from the Alton Belle.

23     And on September 10th 2006 how much money did you get out

24  of the Alton Belle?  Do you need me to read it?  Was it 3200?

25  *A.*  Um, as soon as I see where it's wrote I'll know it's wrote

1    in the same spot.

2    Q.   Right here on the side.

3    A.   Yes.   $3,200 on one of them, date 9/19.

4    Q.   On 9/19?

5    A.   And then there's one above it for the same date I think

6    9/19 for.

7    Q.   For how much?

8    A.   For $2,000.

9    Q.   And on 9/19 again how much?

10   A.   $7,500.

11   Q.   And this is cash that you actually got out?

12   A.   Yes, I always take my winnings in cash.

13   Q.   On 9/21 how much?

14   A.   9/21, $6,400.

15   Q.   And on 9/4 how much did you get?

16   A.   $2,500.

17   Q.   And then going -- so these would have provided you more

18   than enough money for the expenditures that you made in

19   September?

20   A.   Yeah.   They're within like a day or two of the win.

21   Q.   Then in December, December 17th?

22   A.   $3,200 December 17th.

23   Q.   And again sufficient for your expenditures in December?

24   A.   Yeah, on that exact same day that was the purchase of the

25   big screen TV.

Direct Examination - Dooley, Mick

1   *Q.*  Now we saw a video last week of your activity on

2   February 15th in the vault.  And at this time I would like to

3   play it again so you can explain to the jury what your actions

4   were after -- 'cause Lieutenant Bazzell had described your

5   actions, but I would like you to explain to the jury.

6          *THE COURT:*  Is this the same tape that we saw this

7   morning?

8          *MR. FREESE:*  Yes, sir.

9          *THE COURT:*  All of it?

10         *MR. FREESE:*  At least the portion of it, your Honor.

11         *THE COURT:*  It's up to you.

12  *A.*  Wait a minute, what's the date on this one?

13  *Q.*  This is for 2/15/2007.

14  *A.*  That's not the same we saw this morning.

15         *AGENT:*  This is not the same one you had this morning.

16  That's the cash locker.  That's not what you had this morning.

17         *MR. FREESE:*  I'm sorry.  Oh, no, I thought he was

18  asking if it was Officer Bazzell this morning.  This is not the

19  one that I showed this morning.

20      I misunderstood what you said, your Honor.  I thought you

21  were asking if it was Officer Bazzell that I was referring to

22  that was here this morning.

23         *THE COURT:*  Play whatever it is you wish.

24         *COURT REPORTER:*  I need to know the exhibit number.

25         *AGENT:*  415.

Direct Examination - Dooley, Mick

1          *THE COURT:*  What is the exhibit number?

2          *AGENT:*  415.

3          *THE COURT:*  Exhibit number 415.  That is a recording

4    of what?  What date are we talking about?

5          *MR. FREESE:*  Start --

6          *THE COURT:*  Mr. Freese, what date are we talking

7    about?

8          *MR. FREESE:*  2/15 of '07.

9          *THE COURT:*  2/15 of '07.  All right.

10         Ms. Singer is going to be nice enough to play that for

11   us.

12         *MR. FREESE:*  That would be number 34.

13         *AGENT:*  You want number 34 played?

14         *MR. FREESE:*  Yeah.

15         *THE COURT:*  All right.  Here we go.

16         *(Clip 34 from Exhibit 415 played to the jury.)*

17   *Q.*  And I want you to be able to explain everything that you're

18   doing once it slows down.

19   *A.*  This is going to be Sunday the weekend before.

20   *Q.*  February 15th?

21         *THE COURT:*  That's not the Sunday before the 16th when

22   all of this comes down, which is in April.

23         We are back in February, right?

24   *Q.*  This is February.

25   *A.*  Oh, I'm sorry.

1              *MR. SMITH:*  All right.  Let me --

2    *A.*  Okay.

3              *MR. SMITH:*  I just want to check his log to make sure

4    we're all on the same...

5              *MR. FREESE:*  Apparently, he got to continue to skip

6    around to catch the correct numbers.  So we're starting with

7    February 15th at about 4:04 in the afternoon.

8         *(Portion of Government's Exhibit 415 played to the jury).*

9    *A.*  I take it that that's me.  I'm certain that it is because

10   who else could be in there, huh?

11        I'm going -- I'm going past the area of the camera which

12   means I'm going to the homicide evidence, the refrigerator

13   evidence, or the fingerprint evidence.  There's some IA,

14   internal affairs, information there also, but nothing past that

15   point that you see me right now.

16        I haven't seen me exit that, but I'm re-entering.

17        And now it looks like I'm leaving.  And I can't tell if

18   there's something in my left hand or not, I think there

19   probably is.  I don't know.  If there is something in my hand,

20   or was, I would have to guess it would be fingerprint related

21   because that was the area that I walked toward.  But if I

22   checked my computer maybe there would be something maybe a case

23   that I had or something.  Again this is February and I'm in

24   there constantly.

25        I keep seeing me enter and go to the left but I don't see

1    me walk out every time.

2            THE COURT:  You are walking out now.

3    A.  Okay, now I am.

4        And I'm carrying a box.  And it looks like in the

5    background there is a box on this table that wasn't on the

6    table in the previous frames.  I'm not certain how that got

7    there.  But the cabinet that contains the drugs and the money

8    hasn't been moved during this clip that I've just watched.

9    It's in its closed position.

10           MR. FREESE:  Now go to Number 35.

11           AGENT:  (Complying).

12       (Clip 35 of Government's Exhibit 415 played to jury.)

13   A.  Now it is closing so I probably am putting something in one

14   of the shelves farther down that you can't see.  And like I

15   said, it's like an accordion.  If I don't see me there closing

16   that then I must be closing something farther down.  And it's

17   accordion closed.

18       And is this that same date?

19   Q.  This is 2/16.

20   A.  So it's the next --

21           THE COURT:  Wait a minute.  We said 2/15.  Is it 2/16

22   or 2/15?

23           MR. FREESE:  The first was -- Number 34 was 2/15.

24   Number 35 is 2/16.

25           THE COURT:  Well, we are a day later.  Okay.  2/16.

1    *A.*   I thought it did record when there was a motion.

2          *THE COURT:*  Just answer his questions.

3          *THE WITNESS:*  Oh, I'm sorry.

4          *MR. FREESE:*  Um, go to this would be on number -- go

5    to this would be Number 3 -- I'm sorry, Number 4.  It is still

6    2/15.  A date of February 15th.  Number 4 coming up.

7          *(Clip 4 from Government's Number 415 played to jury.)*

8    *A.*   Okay.  I'm putting some drug evidence back in that's

9    obviously up high.  And I had it in my hand and it's put in a

10   box and I've got another one, and I'm putting it in there.  I

11   think I still have something in my hand.

12   *Q.*   We'll go back over it.  Okay.

13   *A.*   Behind -- the area that I'm looking at right now is behind

14   the drug cabinet.  And what I do there a lot of times is

15   I'll -- I prefill out lab sheets that go to the lab to make

16   analysis for drug cases.  And I like to do that as soon as I

17   get it out of the storage -- out of the slam lockers.  So if I

18   get a case and I know there's dope in it and I know it's going

19   to go to the lab, then while I still have it in my hand I get

20   this bar code thing saying it is going to the vault like box

21   20 -- Isle 20 Box B.  And then I paperclip it to its original

22   lab sheet and instead of putting it in 20 Box B, I put it on

23   this shelf right behind here.  And when I get enough of them

24   then I take them to the lab.  Sometimes I let them accumulate

25   on the hooks that you see inside my office.

1      On the bottom of the blackboard I have hooks and I'll hook

2   drug evidence on there and I'll hook currency to go to the

3   Treasurer's Office so that I don't just keep running back and

4   forth with one trip for one item.  But I think that that's what

5   I'm doing here.  That's either items that came back from the

6   lab or are going to the lab and I'm looking at them.  I don't

7   know what else it could be right there.

8      In a second it looks like a turn around and get a ladder

9   and I put it where it's supposed to go in that box.

10      So that right there almost makes me think the box was

11   sitting there and that the camera didn't catch the part where I

12   start.  When -- what I'm watching here is just my day-to-day

13   activity.  And I -- specifically I wouldn't know without a case

14   number or without...

15   *Q.*  Okay.

16      Let's go to February 17th.  It will be one, two, I can do

17   multi now or one at a time?

18      *THE COURT:*  It is going to be one and two on

19   February 17th?

20      *MR. FREESE:*  Yes, sir.

21      Along with Numbers five, seven, and eight.  And

22   they're all February 17th of 2005.

23      *AGENT:*  In that order?

24      *MR. FREESE:*  I mean seven.

25      *AGENT:*  In that order?

1          *THE COURT:*  2007.

2              *MR. FREESE:*  2007, right.

3      *(Portions of Government's Exhibit 415 played to jury.)*

4    *A.*  I can tell what I was doing was emptying the drug cabinet.

5    I'm taking all the drugs out of the cabinet to ultimately

6    destroy.

7          When my lieutenant looked at that he was in complete shock,

8    and obviously he hasn't been down there when I've conducted any

9    business because I have to take them out to find out what cases

10   are in each one of those boxes.  If they're not going to be

11   prosecuted cases, if the time limit has expired, if some of

12   them have been there since 1990.  I don't know.  But what my

13   idea was is the whole cabinet was filled and I was going to

14   condense the active files into the boxes starting up at the top

15   because that's the ones that are going to get addressed next.

16         In doing that you can see in the background there is boxes

17   all on the floor.  I take them out of the drug cabinet.  I walk

18   them into my office.  It's the only place that I can hit them

19   with a bar code.  That's how they got in there to begin with.

20   Everything that got in that cabinet came through the slam

21   locker, through my office, and then into that locker.  It comes

22   out for all kinds of reasons.  In this instance, it's coming

23   out because I intend on purging this drug cabinet.  And in the

24   normal course of doing that I have to look up each case number

25   that's got a bar code on it, find out what the disposition is,

1   if it can be destroyed, and I keep a list of those.

2      When I've accumulated enough of them I get a court order

3   for their destruction.  And then I would go, as I have in the

4   past, get Sergeant Cooly and he would along with me would go

5   and, where they incinerate dogs, we would incinerate the drug

6   evidence.  And when he wasn't quite certain of the steps that

7   it took to get that it's because it's not his job anyway.

8   Q.  Let's go ahead and play it and describe what's going on

9   frame by frame.

10   A.  Okay.

11   Q.  What are you doing there?

12   A.  I'm walking from where the boxes have been piled to -- I'm

13   walking back.  There's -- this video is motion sensitive, as

14   they've described, and I think there's bigger gaps in my travel

15   time than this appears and possibly I'm getting stuff out of my

16   office that I've done something with the bar coding for, chain

17   of custody, or kept some of the evidence or put them in the

18   garbage bags and garbage cans.

19   Q.  Let's go on and see what...

20   A.  I keep making trips.  I know that during the course of me

21   trying to destroy all of the drug evidence it was not done in

22   any one setting at all.  As a matter of fact --

23   Q.  Okay.  Now you are opening the --

24   A.  Now I'm opening --

25   Q.  Now there is a box down there on the shelf.

1    A.  That box, again I can't tell what it is from right here,

2    but based on the fact that I know I'm destroying drug evidence

3    I believe that to be the vault safe box, the box that contains

4    money.  It's the only one left in there and I don't know why I

5    would leave one on the shelf towards the bottom.

6        There's what I've done is I've filled up those boxes with

7    cases.  So a lot of drug evidence in those boxes actually came

8    from others.  They might have two or three things and I will

9    put them all into box A.  And that is what is being done.

10       In the, and I keep loading this back up.  And I think you

11   can start to see that some of the boxes that I'm putting in

12   there appear to be empty.  And that's because those items of

13   evidence have been deemed to be destroyed.  Or I'm still in the

14   process of seeing whether or not they can be destroyed and

15   they're in those big garbage cans that when we saw the

16   vestibule area you could see that that's what it was.

17           THE COURT:  Okay.  Now we're on?

18           MR. FREESE:  I'm sorry, your Honor.

19           THE COURT:  Where are we going now?

20           MR. FREESE:  We are going to Number Two, still 2/17.

21        (Portion of Government's Exhibit 415 played to jury.)

22   A.  It is a lot when we stopped or something happened in

23   between those times.

24       That's me taking items out of the drug cabinet, sorting

25   them, moving boxes, drinking soda.

1    *Q.*  Now I've left with -- now, I'm back with it.  I left with a

2    piece of paper and an envelope which leads me to believe it's

3    an evidence processing request and that the envelope is the

4    dope.

5             *THE COURT:*  Is that all of that particular session?

6             *MR. FREESE:*  Yes.

7             Well, Number five, seven, and eight.  2/17 still.

8          *(Portions of Government's Exhibit 415 played to jury.)*

9    *A.*  I don't think that's the same day.  I don't have the same

10   shirt on.

11            *THE COURT:*  All right.  I'll ask the operator.  Let's

12   stop it right there.

13            So the record is clear, what date is this?

14            *MR. FREESE:*  This is Number Five is 2/17 '07.

15            *MR. SMITH:*  Five is February 17th.

16            *AGENT:*  And Number Two is a different day.

17            *MR. SMITH:*  And Number Two is.

18            *THE COURT:*  All right, we'll take a recess and get a

19   chance to get the evidence lined out.

20            The Court's in recess.

21                         *(Recess)*

22            *THE COURT:*  We will continue with the direct.

23            *MR. FREESE:*  And, your Honor, for the record I need to

24   make a little correction as to the video and --

25            *THE COURT:*  Go right ahead.

1          MR. FREESE:  -- and also offer my apologies to the

2     Court and jury.  But unfortunately I misread a couple of lines

3     because of the darkness.  So I apologize.

4          THE COURT:  All right.  Well, just make the

5     corrections that you need the make.

6          MR. FREESE:  Okay.  The film Clip Number Two for

7     2/17/07 was not 2/17, it was actually 2/15 .

8          THE COURT:  That would be to the 15th.

9          MR. FREESE:  Correct, your Honor.

10         THE COURT:  And the jury will have that with them when

11    they deliberate.

12         MR. FREESE:  And we are now going to look at Clip

13    Three which is 2/17/07 starting at 11:05 in the, um, evening.

14    Hold on, your Honor, I'm sorry.  I'm going to start with Number

15    Eight, film Clip Number Eight for 2/17/07.

16         THE COURT:  And it starts at what time?

17         MR. FREESE:  It starts at 6:14 p.m.

18    A.  Am I to continue with the narrative?

19    Q.  Yes.

20         (Portion of Government's Exhibit 415 played to jury.)

21    A.  I'm opening the drug cabinet again.  You can see in the

22    background that this is an ongoing process because there's

23    drugs sitting on the table back behind the drug cabinet.  I

24    think you said it was 6 p.m.  I've got headphones on so I was

25    probably off work actually.  I wouldn't go back there with

1    headphones on while I was working because I wouldn't be able to

2    hear the phone.

3         And I'm doing what I described throughout.  I'm getting rid

4    of drug evidence.  The only path for that evidence to take is

5    from that drug cabinet to my office in order to be deposited in

6    them barrels ultimately to be burned.  I don't know what I'm

7    looking for.  If you would have stopped me that day right when

8    that was happening I could tell you exactly what I'm doing.

9         Here I am moving more boxes that are filled.  I have one

10   thing in my hand and I'm leaving to the direction of my office.

11   And I come back and I don't look like I have that item any

12   more, whatever it was.  It has to be drugs or a chance that

13   it's dope.

14        That's an empty box.  And I've emptied one and I'm walking

15   back into my office with that box to get it emptied.  Again

16   there is a big time delay.  I'm not just running back and

17   forth.  I don't know how much time expires through this.

18   Q.  Okay now that would have been -- cover the period of

19   6:14 p.m. to 7 p.m. on 2/27/07.

20        Now we're going to look at Clip Number Seven which covers

21   the period of.

22             MR. SMITH:  Correction, your Honor.  That's 2/17/07.

23             MR. FREESE:  That's what I thought I said.

24             MR. SMITH:  You say 2/27.

25             MR. FREESE:  I'm sorry.  2/17.  Thank you.

Direct Examination - Dooley, Mick

1            We're now going to look at Clip Number Seven for

2    7:14 p.m. to 8 p.m. on February 17th of 2007.

3        *(Portion of Government's Exhibit 415 played to jury.)*

4    A.   Okay.  In the course of that hour I'm continuing with what

5    I was doing.  I just grabbed two boxes out of the drug cabinet

6    and put them on the floor outside there.  I'm going through

7    drug evidence there.

8        I don't know what I'm doing.  I'm just unloading all that.

9        I've taken all those boxes out of that cabinet numerous

10   times and replaced them.

11   Q.   Now describe what's going on.

12   A.   I'm walking off with one of the boxes.  No, I'm not.  I'm

13   gonna put it back in the drug cabinet.  No, I'm taking it with

14   me to my office, two boxes filled with drugs.

15       Now I'm back.  And I don't know if I brought them back to

16   there.  Moving those envelopes.  Without seeing them I can't

17   begin to tell what you they are.

18   Q.   Would that be heading towards your office?

19   A.   Yeah, but it's hard to tell because when I'm coming back

20   here maybe I'm stacking them on the floor between the shelf

21   unit and the wall before I get to the door.  If I saw a picture

22   of me coming out of the vestibule with that box that I moved

23   I'd say, yeah, I'm going to that office.  Right now it looks

24   like I'm just unloading them back on to the floor.

25   Q.   But because of the time lapse you could be taking them over

Direct Examination - Dooley, Mick

1    to your office?

2    *A.*   Yeah.   Either of which is just general work in the course

3    of the day of getting the drug evidence purged.

4    *Q.*   Now we're going to look at Clip Number Five for 8:06 p.m.

5    to 9 p.m. on February 17th of 2005 -- of '07; February 17th of

6    '07.

7           *(Portion of Government's Exhibit 415 played to jury.)*

8    *A.*   Again, as you've seen me do when I had that blue shirt on,

9    I'm taking it all out.   And I think what's happening is I'm

10   getting interrupted in this task and I don't want to leave it

11   all out on the floor and I keep putting it back.   I don't know.

12           Now its half filled again, and I just --

13   *Q.*   Now we're starting it from frame by frame.

14   *A.*   Okay.   Now the drug cabinet is half filled with boxes and I

15   assume the other half is on the floor.   What's missing is in

16   the garbage cans in the vestibule area after I've hit them with

17   the bar code to have them destroyed.

18        These boxes are still filled and they're in about the

19   midhead high shelves.

20        Taking two at a time.   And I don't see me going here so I'm

21   assuming that I'm going to my office area with them or I'm

22   dropping them on the floor between the door and this drug

23   cabinet.

24        Now every box is almost gone.   That box that's left I just

25   assume that it is the cash box.   And I say that because I'm

1    pretty confident that I'm purging drugs here and there wouldn't

2    be no drugs in that cash box.

3        I've closed it.

4    Q.  Okay.  Now we'll go to Clip 29 which is 9:14 p.m. to

5    10 p.m, again on February 17th 2007.

6             THE COURT:  Now stop.  Stop.  Stop.  You say

7    February 14th?

8             MR. FREESE:  Seventeenth.  February 17th.  It's

9    9:14 p.m.

10            THE COURT:  All right.

11            MR. FREESE:  To 10 p.m.

12            THE COURT:  Thank you.

13       (Portion of Government's Exhibit 415 played to jury.)

14   A.  Okay.  I'm continuing with what I was --

15   Q.  She's going to let it play out.  And then when we come back

16   to do it?

17   A.  Okay.

18   Q.  What all basically can you tell that you were doing there?

19   A.  The entire time they've looked at this screen, regardless

20   of the day or what color shirt I'm wearing, I've been taking

21   drugs out of the drug cabinet.  And I know from looking at the

22   vestibule photos or video that I'm going into my office with

23   these boxes and I'm finding a destination for the drugs.

24       Some of the drugs will be put back in the cabinet in a

25   different box because I'm trying to minimize the amount of

1   boxes in this cabinet, to fill it up again.

2   Q.  Okay.

3   A.  And some of the drugs will be put in the barrels that, I

4   ended up with, I think, 4 barrels.

5   Q.  Now let's look at Clip Three again February 17th 2007 at

6   11:05 p.m. to 12 midnight.

7       *(Portion of Government's Exhibit 415 played to jury.)*

8   A.  Same deal.  I had emptied it on the last frame, I guess,

9   and now I'm filling it back up.  But you can see that most of

10  these are empty now.  I would say the top two rows probably

11  have drugs in them and the rest of them don't.

12      So I was able to condense that entire cabinet of boxes from

13  the drugs that weren't going to be needed and weren't needed,

14  to the top two rows of boxes.  This is just a systematic thing

15  that goes on whether its guns, dope, regular evidence.

16      Here I am messing with keys and unlocking it.

17  Q.  Okay.

18          *AGENT:*  Do you want me to go frame by frame?

19          *MR. FREESE:*  Yes, please.

20          *THE COURT:*  What are we going to do now?

21          *MR. FREESE:*  Frame by frame.

22  **Q.  (BY MR. FREESE:)**  Explain what you are actually doing.

23  A.  I'm putting the filled box on the top shelf.  There's

24  already six other boxes up there.  And now I think that they're

25  empty, from what I can see from this angle.  And the angle that

Direct Examination - Dooley, Mick

1    I'm tilting the boxes.  I'm filling them -- putting them back

2    in there to be filled up with new drug evidence as it comes in.

3        It's still not completed.  The destruction of those drugs

4    that just came out of those boxes is not completed.  That will

5    be done after the tedious task of hitting them with the bar

6    codes and finding out if they can be destroyed, and ultimately

7    destroying them with a witness in the incinerator.

8    Q.  Okay.  Now let me ask you --

9        MR. FREESE:  That's it.  Thank you.

10       AGENT:  You are welcome.

11   **Q.  (BY MR. FREESE:)**  Would it appear in some of these videos

12   that you are taking them out of the viewing area and into your

13   office where there is no camera; is that correct?

14   A.  Yes.  There's no other path for them to take other than

15   that.

16   Q.  Where -- is there a laptop or anything in the evidence room

17   where you can do the bar coding right there under the camera?

18   A.  No.

19       At one time -- I think Lieutenant Hayes tried to describe

20   that to you -- when we first started the bar code system in

21   order to get everything in the vault bar coded and not just as

22   it gets sent on it ways start bar coding new evidence, we

23   wanted it all done at once.

24       And he had hired one of the policeman's wives to come in,

25   Joanie Gordon, and I think that Bazzell hooked up a computer

1   right underneath this camera.  There's a counter top with the

2   internet access.  And I think that she sat in that location for

3   days and days and bar coded evidence to be put back on to the

4   shelf.  We were trying to get rid as much evidence as was

5   possible so she would have less to bar code.

6       But other than that period of time, and that couldn't have

7   been more than maybe a month's time, there's never been another

8   computer inside that vault that was used for police work

9   throughout our network.

10  Q.  Okay.  So you have to take the evidence out of the area to

11  work on it?

12  A.  Yes.  And that's not the first time that it's out of that

13  area.

14      It comes out of the slam locker into my office and then to

15  its destination in the vault.

16  Q.  And so that's nothing unusual?

17  A.  That is absolutely day-to-day activity.  Nothing suspicious

18  about it at all.  Even the hours in which I'm doing it aren't

19  suspicious when you look at the fact I'm in there all the time

20  doing just exactly that.  I'm not sure what the allegation here

21  is at the pictures that I'm viewing.

22  Q.  Are you -- well, you are there late at night, you are there

23  at midnight taking things out of the cabinet that contains the

24  money and the drugs.  Why didn't you do that in your normal

25  eight-hour day?

Direct Examination - Dooley, Mick

1    *A.*   And sometimes I do.  Normally my eight-hour day is ate up

2    with day-to-day things and whatever activities I have going.

3    Sometimes I'm not in the office, period.  Sometime I have

4    plenty of time to work on those, and I do.

5        I have a list that I make the beginning of each month and

6    those are the tasks that I'd like to try to accomplish

7    throughout that month; sometimes it works, sometimes it don't.

8    *Q.*   I'm going to show you what's marked as Government's

9    Exhibit 464.  And explain the purpose for that sign of "put

10   keys in pocket?"

11        *MR. SMITH:*   You have to switch.

12   *A.*   I'm not seeing it.

13        *THE COURT:*   Linda, he is trying to show something on

14   the overhead.

15        *MR. FREESE:*   I didn't realize, your Honor.

16        *COURTROOM DEPUTY:*   I have to know to change it back.

17        *MR. FREESE:*   Okay.

18   *Q.*   Explain the "put keys in pocket"?

19   *A.*   "Put keys in pocket" comes from me locking my keys in the

20   evidence vault.  I did it, I think we have the total count, of

21   six times.  When what is happening there is I have all my keys

22   on a key chain.  And when I come into the -- when we instituted

23   this drug cabinet, I would come in, I would unlock the drug

24   cabinet, and I would spread the doors open as you just seen.

25   And when you spread those doors open the keys are now out of

1   your site and you see that I'm back and forth doing things.

2      As soon as I walk out of the evidence vault the door locks

3   behind me and I've now locked my keys in the vault.  I have

4   never had my keys in my hand and sat them down while I was

5   doing something or anything.  As soon as I walk in I stick them

6   in my pocket except when I have the occasions to unlock the

7   drug cabinets.  So because it is such a big to do because of me

8   having to go to the chief or deputy chief, or both of them,

9   actually.  I always believed I had to have both of them to

10  access that lockbox to get the other key.  I put this note up

11  for a while and that didn't help either because not only can

12  you not see your keys when your doors are open you can't see

13  the note that's reminding you to put them in your pocket.  You

14  know, I wouldn't lock the drug cabinet when I left on these

15  occasions and so that failed also.

16     Probably of the six times that I am shown on the

17  administration log sheet obtaining the key to the vault, all

18  times it was because I locked them in there.  And probably the

19  last two was with this reminder.  Also as you go out of the

20  vault itself I have another reminder right on the door to put

21  the keys in my pocket.

22  *Q.*  But it didn't always work?

23  *A.*  No, it did not.

24  *Q.*  Now I noticed on the film that once or twice when you left

25  the camera area apparently going back to your office to do work

1    with the evidence, you did not lock the cash locker.  Are there

2    times you have left the cash locker opened and unlocked for any

3    period of time?

4    A.  Yes.  All the time.  I'm actually shocked that I've locked

5    it this many times as documented here because of the problems

6    that I had in the past with locking it.  But I always assumed

7    because it was underneath this camera and it is in a locked

8    room that it wasn't, like -- I thought it was a joke them

9    spending as much money as they did to put cabinets on it to be

10   locked.  Yes, not always did I lock the drug cabinet.

11   Q.  I'm going to show you Government's Exhibit 453 and ask if

12   you recognize that.

13   A.  Yep.  As you, when you are standing in the vestibule area

14   of the evidence room that door to the right is the vault door.

15   And I think the glare is keeping you from seeing the words

16   "vault entrance".  Up in that top corner is the camera.

17   There's a coat rack here.  And this cart is what I use all the

18   time.

19   Q.  I'm going to try to zoom in.  I don't know if it will work

20   or not.

21       There is a sign of some type on that coat rack?

22   A.  Yeah.  That is a sticker that says, uh, "evidence door" --

23   "evidence van" I think.  If it doesn't say that, then it's one

24   or the other.

25   Q.  And what was that for?

1   *A.*  When I initially took over the duties of vault custodian

2   there was a six-month gap, as they described, between Sergeant

3   Gillispie being the evidence officer and me being the evidence

4   officer.  And during the course of that six months the lockers

5   still had to be emptied.  And theoretically they were supposed

6   to be emptied and put into the vault like I do day-to-day, but

7   they would assign detectives to do it.  They would be like

8   today is your day.  Whoever's turn was in the hole they had to

9   empty the slam lockers and they had to take the evidence and

10  put it in the vault.

11         *MR. SMITH:*  Objection to narrative.

12         *THE COURT:*  Asked and answered.

13  *Q.  (BY MR. SMITH:)*  What specifically does that sign say and

14  what's it for?

15  *A.*  It says "vault door key" and "evidence van key".

16  *Q.*  And what would happen on that?

17  *A.*  It was because they left them right there so that the

18  officers could.

19  *Q.*  They left what right there?

20  *A.*  They left the vault door key there and the evidence van key

21  there.

22  *Q.*  Are you familiar with the old cash safe that was in the

23  evidence?

24  *A.*  Yes.

25  *Q.*  And you heard testimony from Sergeant Gillispie that it was

Direct Examination - Dooley, Mick

1    a combination, is that correct?

2    A.  Yes.

3    Q.  Do you know whether or not it had a regular or was there a

4    lock to it as well that required some kind of key?

5    A.  I never accessed that safe ever.  The door was always open.

6    And I think that it was combination but it was -- it wasn't the

7    dial type it was the push-button combination.  Again --

8    Q.  But to your knowledge did it require a key?

9         MR. SMITH:  Objection foundation.  He has to establish

10    knowledge.

11         THE COURT:  Well --

12         MR. FREESE:  I have --

13         THE COURT:  I don't know.  But he can answer the

14    question:  Did it require a key.

15         THE WITNESS:  I don't know.

16         THE COURT:  Next question.

17    Q.  On April 16th of 2007 after the discovery of the additional

18    missing money you were requested to turn in your keys; is that

19    correct?

20    A.  Yes.

21    Q.  And did you have occasion at that time while you were

22    turning it in to go back down to the vestibule area outside in

23    the hallway with Sergeant Simmons?

24    A.  Yes.

25    Q.  And did you make an entry into the evidence vestibule area?

1    *A.*  Well, we didn't enter but we opened the door.

2    *Q.*  What was the purpose of opening the door?

3    *A.*  When I was told to give my keys and my access to the vault

4    to Lieutenant Hayes I gave him my prox card because it had to

5    be recalculated to keep me from going in there.  And I gave

6    him, I believe, the vault door key.  And I think I gave him the

7    slam locker key at that time; and I may not of at that initial

8    time.

9       Then an hour or so later I was like, well, I had my keys to

10   do something.  And I was, like, the intent is obviously to keep

11   me out of the evidence area and I have a key that will access

12   it where my prox card doesn't, the outdoor -- the outside

13   vestibule door.

14      I didn't want to go down there myself and make sure that

15   was the right key, because you can see me fumbling for keys

16   when I don't know what's what.  I seldom use it.  I had

17   Sergeant Simmons go with me.  We walked down there underneath

18   the camera that's out in the hallway.  I tried the key, opened

19   the door, it worked.  I took it off my key ring along with

20   either the slam locker key, if I hadn't already given to it

21   Lieutenant Hayes, and I walked upstairs and gave it to the

22   lieutenant.

23   *Q.*  Now I'm gonna show you Page 671 from Government's

24   Exhibit 247.  This is the prox card register for the period of

25   4/16/07.  And I ask that you go down this list here and tell me

Direct Examination - Dooley, Mick

1    if you find anything that says forced --

2    A.  You are going to have to pan back so I can see the whole

3    sheet.  And maybe slide the paper down so I can see the top.

4    Q.  Okay, well the top is 4/14?

5    A.  Okay.  Sorry.

6    Q.  4/16 starts right there.

7        Do you see anything that says forced entry or anything of

8    that nature?

9    A.  No.  And it would have to be later than that because I can

10   see that I'm making prox card entries.

11   Q.  And I show -- 672?

12   A.  Okay, it's getting later in the day.  And at 11:14 is my

13   last prox card entry into that office.

14   Q.  Again --

15   A.  And no there's no forced entry.

16   Q.  Is there anything that shows forced entry?

17   A.  No.

18   Q.  I'm going to hand you what's marked as Government's

19   Exhibits 360, 347, 338, 344, 356, and 353 and ask you if you

20   recognize those.

21   A.  Well, I recognize the top page of all of these as being

22   receipts that I give Tammy Kruss at the treasurer's office

23   whenever I make deposits at the treasurer's office.

24       Signature of hers and mine on all of these on the top

25   sheet.  Leading me to believe that at some point there was drug

1   evidence -- drug money proceeds forfeitures that were deposited

2   at the treasurer's office on each of these cases.

3   Q.   Now in regards to those cases, we heard testimony earlier

4   that in your office after your dismissal, a few months later,

5   they found an envelope tacked up on your bulletin board.

6       Can you explain that envelope that was tacked up there and

7   how they relate to those cases?

8   A.   Yes.  It wasn't a envelope, it was all the envelopes.  And

9   it was envelopes that contained counterfeit currency.  It was

10  the currency that was located when it was cut open by the

11  treasurer's office for each of these cases.

12      What I had done was take a envelope approximately this

13  size, and you can see it in the photo.  I wrote the case number

14  that corresponds with each case that I think is in front of me.

15  And actually I know from this discovery that there was actually

16  seven envelopes at the time.  Six when they found them.  The

17  other envelope as this story progresses I'll tell you where it

18  went.  But, yes, that's --

19  Q.   Explain -- okay.

20      Now the envelope that they found tacked up there, it was

21  partially covered by a piece of paper?

22  A.   In the photo that they show, yes.  But that's not where I

23  kept it.  I mean, we're talking inches here.  But what they've

24  done is after they found that and found it to be suspicious

25  they put it back up and essentially staged that picture to show

Direct Examination - Dooley, Mick

1   that that's where they had located.  The reality is that it was

2   off to the corner of that bulletin board on the bottom right.

3   Q.  Okay.  It was in plain view?

4   A.  Well, I knew where it was.  I stuck it there with a note on

5   it.

6   Q.  Could there have been other papers that may have been

7   tacked up and put up there?

8   A.  Oh, yeah.

9   Q.  Were you trying to hide anything?

10  A.  Absolutely not.  It's right there.

11      Hide it from who?  From me.  I know exactly where I put it

12  and I know exactly what it was.

13  Q.  It was described that they found was similar to envelopes

14  that are used for film negatives and not regular evidence

15  envelopes?

16  A.  The term evidence envelopes encompasses any envelope that

17  you put evidence in.  We're not particular on those things

18  other than when we do elimination prints for some person we

19  require that that is put in a giant envelope this size, and

20  that's for filing purpose in my office.  And it keeps the

21  officers from folding up the elimination prints that are used

22  at the lab to prepare fingerprint evidence.  Other than that

23  packaging, any envelope that you grab constitutes evidence --

24  an evidence envelope.

25      The envelopes you're describing coincidently did correspond

1   with the size and type that I put the counterfeit money in that

2   Debbie uses, the patrol division takes crime scene pictures

3   with film.  I use digital camera and I've never had the

4   occasion -- they're not putting the film in there, they're

5   putting the negative in there.  The negative comes back from

6   the photo processing place and its sorted by case number into

7   these manila envelopes, and that's what she files in the office

8   upstairs.

9       It would be easy for someone --

10          *THE COURT:*  Let me stop you.  No narratives.

11      Ask and answer.  Ask and answer.

12          *MR. FREESE:*  Yes, sir.

13          *THE COURT:*  Quickly.

14  **Q.  (BY MR. FREESE:)**  So again your process on these cases when

15  you were ready to take the money over to the treasurer's office

16  what would you do?  What was -- what did you do with these

17  cases?

18  *A.*  Okay.  With any case that comes in?

19  *Q.*  No, let's stick with these cases.

20  *A.*  With these cases in particular, when I received them I pull

21  them out of the slam locker.  They've been sealed as evidence

22  by an officer.  He's put a bar code on them.  When I get that

23  there's usually --

24  *Q.*  Take one case and identify what you did with it.

25  *A.*  Okay.  I'm going to use the one that's?

Direct Examination - Dooley, Mick

1    Q.  Any one of those there.

2    A.  And I'm using Government's Exhibit 353 and its Case Number

3    05-10982.  That is a drug actions case involving several

4    suspects where $2,084 was taken as evidence by Officer

5    Stinnett.  I don't know without reading this entire report what

6    the --

7    Q.  Okay.  Now --

8    A.  -- what it is.

9    Q.  Now, you had the evidence envelope with the money in it; is

10   that correct?

11   A.  Well, at this point Officer Stinnett.

12   Q.  I'm just talking about what you did with that when you went

13   over to the treasurer's office.

14   A.  Okay.

15       When I went to the treasurer's office I would have had this

16   supplement that I've already handwritten out, anticipating the

17   deposit of $2,084.

18   Q.  What else would you take besides the receipt; would you

19   take the envelope with the money in it?

20   A.  Yes.  I would take the original envelope that the officer

21   had the money in, paperclip it to the supplement to the volume

22   of supplements that I was taking to Tammy that day.  I would

23   walk over and plant them on her desk.

24   Q.  And what would occur at that point?  You gave them to her,

25   what would she do?

1    *A.*  She would pick up the envelope -- she'd clear her desk,

2    pick up the envelope and opposite the side of the officer's

3    seal evidence tape she'd cut the bottom of the envelope, dump

4    the money on to her desk and count it.

5    *Q.*  And what would happen to the envelope that you had when you

6    delivered it?

7    *A.*  I kept those envelopes.

8    *Q.*  And what did you do with them?

9    *A.*  I brought them back to the police department and I put them

10   in a larger envelope, or a bag I think in some instances, and I

11   put the date on them as for the deposit that I made at the

12   treasurer's office.

13       So, for example, if I deposited 20 drug --

14   *Q.*  Use that.  Use that particular one.

15   *A.*  Well, without following you all the way through I don't

16   know if I can.  But I came back to the Alton Police Department.

17   Because this contains counterfeit money it's not the standard

18   drop off that normally encounters.  Normally, I drop her the

19   money, it matches the amount of money that's supposed to be in

20   the envelope; she signs the receipt; I sign the receipt; I take

21   the bag that the original money came in and I come back to the

22   police department with it.  In this instance that I have in my

23   hand says I had given her what I purported to be $2,084.

24       When I say "I purported", I don't know.  All I know is the

25   officer tagged it.

Direct Examination - Dooley, Mick

1   *Q.*   Now when it was cut open, did you not find that amount of

2   money in there?

3   *A.*   No.   In this instance the one that I have in my hand, it

4   says, "Upon counting the currency in the above sealed evidence

5   bag which was purported to contain $2,084 it was determined to

6   actually contained $2,098."   That don't make sense.

7      However, a check with a counterfeit pen -- oh, okay, a

8   check with a counterfeit pen, visual inspection, revealed a

9   counterfeit 50-dollar bill bringing the actual amount of

10  deposit to $248.

11  *Q.*   Now when you were done there you went and you took the

12  envelope back to your -- along with others back to your office,

13  correct?

14  *A.*   Yes.

15  *Q.*   Did -- who was your supervisor at that time?   Would it have

16  been Sergeant Simmons or Lieutenant Hayes?

17  *A.*   It would been Sergeant Simmons.   However, in his absence or

18  presence, I can tell you it was Sergeant Burt Bush.   Sergeant

19  Simmons didn't begin approving records in the detectives

20  division until December of '05 I believe.

21  *Q.*   What would you do, was there any supplement that was

22  drafted?

23  *A.*   Supplement that was drafted in reference to the counterfeit

24  money is the receipt itself.   At this point.

25  *Q.*   Did you make any supplement or any report to your

1  supervisor; did you notify any of your supervisors?

2  A.  Oh, yeah.  I showed lots of people the counterfeit money.

3  Q.  Did you make a report to your supervisor and said we found

4  some money?

5  A.  Yes.  A verbal, hey, we have counterfeit money in these

6  cases.

7     In the instance that we're describing here I can see by the

8  date, it's 7/18 of '05, and she already --

9  Q.  So the question is:  Did you write up a supplement to it or

10 what did you do with that supplement there that was signed by

11 and you Mrs. Kruss?

12 A.  I was told to take the counterfeit money and hold it for

13 Debbie.

14 Q.  Who told you that?

15 A.  Either Lieutenant Hayes or Sergeant Burt Bush, whoever I

16 reported it to.

17    And I would guess that it would be Lieutenant Hayes because

18 that's something that he would say just hold on to that for

19 Debbie for right now and then tell me what it is he wants me to

20 do.

21 Q.  What about any supplement report?

22 A.  The supplement is the receipt itself that describes the

23 fact there is counterfeit money.  I made a copy of that

24 supplement and I made a copy of the counterfeit bills.  I put

25 them in a folder.  I took the counterfeit bills and I put them

Direct Examination - Dooley, Mick

1   in an envelope and I wrote the corresponding case number in the

2   top right-hand corner of that.  I had three of them at the

3   time.

4   Q.  Okay.  Now let me ask you a question.  Did you -- did --

5   why is not Lieutenant Hayes' signature on your supplemental

6   reports?

7   A.  Because he didn't sign it?

8   Q.  I'm sorry.

9   A.  I guess he didn't sign it.

10  Q.  You left a copy with him?

11  A.  After I made a copy of this, yes, I gave -- give him my

12  reports to be approved whether it's a found wallet or a murder.

13  Q.  And you would hand write those?

14  A.  I hand write all my reports.  My typing ability is

15  terrible.

16  Q.  Was there a reason you just didn't take it to the clerical

17  staff or records clerks, whoever normally types up these

18  reports, and give them the handwritten supplement?

19  A.  I could have done that and I've done it in the past, but I

20  think their system requires handwritten reports to bear a

21  supervisor's signature before they type them into LAWMAN.

22  Because this supplement bears an original signature, they would

23  also file this into the case file.

24  Q.  You are saying you write handwritten supplements.  Did you

25  go and put them into the file yourself?

Direct Examination - Dooley, Mick

1   A.  No.  Why would I do that?

2   Q.  To cover your tracks in regards to the money.

3   A.  That's not covering tracks, that's making tracks.  That's

4   substantiating steps I had taken.  I didn't know what direction

5   this investigation was going to go.  At the present that I was

6   told to hold them for Debbie what they're referring to is

7   sending counterfeit money to the secret service.

8       My instructions when I took over the job was that if we had

9   a suspect we didn't send it to the secret service.  If we had a

10  suspect then we sent it -- wait a minute.  If we don't have a

11  suspect, we send it immediately.  If we do have a suspect, then

12  I'm waiting to the direction of the detective who is assigned

13  the case to send the money to the secret service.

14      An example of that would be if we obtained counterfeit

15  money from the Alton Belle.  Typically that's where it gets

16  filtered from.

17  Q.  Let me ask you -- I'm sorry, I'm going to cut you off.

18      I'm going to hand you what's been previously marked as

19  Defendant's Exhibits 34, 37, 38, 39, and 40; and ask if you

20  recognize those.

21  A.  Yes.

22  Q.  Take a look at them.

23  A.  I know exactly what they are.

24  Q.  Can you tell me what they are?

25  A.  This is the original evidence envelope corresponding to

1   each of the cases that I took to the treasurer's office.

2   Q.   Now, is your initials or your name or anything related to

3   you on there?

4   A.   On these envelopes?

5   Q.   Yes.

6   A.   No.   There would never be.   It is not my evidence.

7   Q.   Then who -- how do you know those are the same ones?

8   A.   I've seen evidence envelopes for 24 years.

9   Q.   I understand.   But how do you know those envelopes belong

10   to those cases and those were the envelopes you took over to

11   the treasurer's office?

12   A.   I know I took them to the treasurer's office because the

13   bottom is cut and if I look at the bar code on each of these

14   envelopes it will give an evidence number.

15   Q.   Take -- what one do you have in your hand here?

16   A.   The one I have in my hand here is 17637 --

17   Q.   Defendants number what?

18   A.   Defendant's Number 38.

19   Q.   Okay.   And how can you tie that up to an individual case?

20   A.   Well, if I look at Government's Exhibit 338 -- I think

21   that's a three -- the case numbers correspond being 05-17637.

22   There's two pieces -- two envelopes that came off of this case.

23   As I go down to the chain of custody on this report I see that

24   Exhibit Number 5786 corresponds with this exhibit here, which

25   is four one-dollar bills with a total value of $4 seized from

1    Jonas Wheeler.

2    Q.  Now is there any other way that you can identify that?  Is

3    there any kind of evidence number or anything like that?

4         MR. SMITH:  The government agrees to admit all this to

5    move along.

6         THE COURT:  Oh, okay.

7         Move it into evidence.

8         MR. FREESE:  Thank you.

9         THE COURT:  That completes the foundation on these

10   exhibits.  They've been offered previously.  It would be

11   Defendants 34, 37, 38, 39, 40 they're admitted.

12    (Exhibit Dft's 34, 37, 38, 39 and 40 received in evidence)

13        MR. FREESE:  Thank you.

14   Q.  (BY MR. FREESE:)  Now I'm gonna ask you take this one,

15   Defendant's Exhibit 40.  And is that the evidence tape seal on

16   that bag?

17   A.  Up at the top.  Yeah.  That's where the officers tagged

18   this evidence in this bag; in this instance it's Dustin

19   Christner.  He's got his initials on the edge of it.  He's

20   stretched the evidence tape across the seal itself and it's

21   pristine.

22   Q.  Where is the cut on the bag?

23   A.  On the bottom of the bag, as Tammy described.  Also a

24   potato chip bag in there.

25   Q.  I hand you Defendant's Exhibit 37 and ask you, again, if

Direct Examination - Dooley, Mick

1   that seal -- just if the seal is intact.

2   A.   Yes.

3   Q.   And the officer's initials, the service number?

4   A.   I believe this is on-- Jim Hunter J-D-H.   I could confirm

5   that easily by looking at the report and the exhibit number.

6   And, again, he's wrote the amounts on the outside of the

7   envelope.   And you can see that the evidence seal is over the

8   amounts that he wrote.

9   Q.   Do these evidence bags, defendant's exhibit, correspond

10  then with the government's exhibits as to the cases that went

11  over to the treasurer's office?

12  A.   Not all of the cases.   But, yes, the cases, and

13  particularly the ones --

14  Q.   These ones that are here?

15  A.   Yes.

16  Q.   Okay.   And the seals are intact?

17  A.   Are all of them.

18      And the only defect I see in any of these bags is the

19  defect put there by Tammy when she cut the bottoms off.

20  Q.   And I notice that one of them is a plastic bag.

21  A.   Yeah.   And that's common.   That's one of the drug unit

22  guys.

23          MR. FREESE:   Your Honor, I would request permission to

24  publish.

25          THE COURT:   No.   We will show those to the jury when

1    you argue your case.  They will get all these exhibits.  We

2    just are running out of time.

3    *Q.  (BY MR. FREESE:)*  Now -- I'll go ahead and take these back.

4        Again why did you preserve these bags?  Was that to protect

5    yourself in case down the road you were charged with taking

6    evidence?

7    *A.*  No.  Actually, when I initially made deposits at the

8    treasurer's office I had no one to show me what was to be done

9    to perform that function.  I wrote out receipts because I'd

10   never given anybody something that I didn't have a receipt for

11   at the police department, a found wallet or something like

12   that.  I printed out receipts for the money.  I knew she was

13   going to accept the money.

14       *THE COURT:*  No.  Answer that question.  Not that

15   explanation, that question:  Why did you keep these envelopes?

16   *A.*  I did it so that there wouldn't be any question that the

17   money that I deposited would correspond with my supplements and

18   the fact that they had opened it.

19   *Q.*  Now again when you brought those over -- these exhibits

20   over to the treasurer's office they were in -- except for the

21   cut at the bottom they were -- the seals were still intact?

22   *A.*  Yes.

23   *Q.*  And again can you -- do you have any explanation if the

24   seal was intact and the envelope was closed how the counterfeit

25   money may have gotten in there?

Direct Examination - Dooley, Mick

1   *A.*   I don't know.  I -- my investigative skills lead me to

2   believe that the person that sealed the bag sealed them in

3   there because the bag hasn't been tampered with from the time

4   that it was opened.

5   *Q.*   Okay.  Now again there's been evidence of several of your

6   supplemental reports being found in the files without a

7   supervisor's signature.  Can you explain that.

8   *A.*   I can explain it in that I gave my supplements to my

9   supervisor to sign, and after that I don't know of their path.

10  Sometimes the supplements are so common, and in this instance

11  that might be one of them -- I know lab sheets are -- where

12  they just forward them to the secretary who stamps them.  And

13  they don't actually sign them and then they get sent to records

14  and they get filed and typed into LAWMAN.  I'm not sure of its

15  path after I part with it.

16  *Q.*   Is there -- can you explain why there was one case where

17  $2,000 of the evidence money was found to be counterfeit and

18  was forwarded on to the secret service and all of these cases

19  were not.

20  *A.*   Yes, I can explain that by explaining that two cases that I

21  know of with at least $2,000 got forwarded to the secret

22  service and that is because I was told to do so at the time.

23  *Q.*   By whom?

24  *A.*   By Lieutenant Hayes.  Both instances.

25  *Q.*   Well, in both instances had you -- there was a -- in this

Direct Examination - Dooley, Mick

1   instance that the government introduced evidence there was a

2   typed report signed by both you and Lieutenant Hayes.  Can you

3   explain why the others are not?

4   A.  Well, if it's a typed report signed by me and Lieutenant

5   Hayes then that means that they typed it after I had off of my

6   original receipt.  And then they're just giving it back for

7   supervisor's approval and mine.  So it would arrive in my desk

8   in a big pile of stuff and I would write my name on it.

9   Q.  Can you explain if -- are there any supplements -- blank

10  supplements that may have been signed by you with no

11  information on there?

12  A.  You will have to show me that -- you will have to show me

13  what you are talking about before I can answer that because I

14  sign all kinds of things.  Sometimes I'll just sign a whole

15  pile of supplements knowing that I'm going to be filling them

16  out with some information on whatever else.

17  Q.  And, again, perhaps your management might be a little what

18  you call a little happen --

19        MR. SMITH:  Objection.  Leading.

20        THE COURT:  That would be a leading question.

21  Q.  (BY MR. FREESE:)  How would you characterize your

22  management of -- in your operations as far as the clerical end

23  of making reports and following through to make certain that

24  they get?

25  A.  Efficient.

Direct Examination - Dooley, Mick

1   *Q.*  Do you feel it's efficient when they didn't have the signed

2   supplements by supervisors?

3   *A.*  I'm required to turn my supplements into a supervisor for

4   his signature.  I don't stand there and see that he signs my

5   supplements.  I depart with that supplement the second I give

6   them to them.

7      In these instances I didn't part with them because he

8   hadn't told me what was going to happen next.  There was two

9   option to happen --

10       *THE COURT:*  Wait a minute.  The answer is:  You were

11  efficient.

12     Ask your next question.

13       *MR. FREESE:*  Thank you.

14  **Q.  (BY MR. FREESE:)**  As we stand here now, again, did you have

15  anything to do with removing any money from any envelopes or

16  any other place from the Alton Police Department evidence

17  vault?

18  *A.*  No.

19  *Q.*  Did you have anything to do with placing or substituting

20  any money with counterfeit money?

21  *A.*  No.  And I couldn't.

22  *Q.*  And can you offer any explanation of why -- I believe you

23  had one case where you were turning in -- gonna return to the

24  victim over $2,000 but found 1900 to be counterfeit.  Do you

25  remember that case?

Direct Examination - Dooley, Mick

1   A.   Yes, I do.   It was --

2   Q.   And --

3   A.   Can you --

4   Q.   Explain -- do you know why the 1900 was not found in the

5   money cabinet?

6   A.   Why it wasn't found in the money cabinet?

7   Q.   Correct.

8   A.   It's counter --

9   Q.   And why it wasn't found until much later?

10   A.   It's counterfeit money, it wouldn't be in the money

11   cabinet.

12   Q.   Why wasn't it up on the board with the others to say "see

13   Debbie"?

14   A.   Oh.   I don't know.   I would have to see the case and see

15   when it in and see what -- I would have to look at that.   I

16   know that the case you are talking about involved Dana

17   Williams; I know that from the discovery.   And I know that I

18   had given her that money out in the lobby of the police

19   department.   And I know that I subsequently -- I think Sergeant

20   Dorsey is who I would have reported that to, and I think that

21   he's the one that lined up the court order to adjust the

22   amounts.

23   Q.   What did you do with the 1900 in counterfeit money?

24   A.   It's still there.

25   Q.   Still where?

1    *A.*  Well, I don't know where it is you are saying.

2    *Q.*  Where was it that you put it?

3    *A.*  I'm not certain because I don't know where they say they

4    recovered it.

5    *Q.*  I'm not worried about where they say they recovered it.

6        To the best of your knowledge do you remember where you put

7    it?

8    *A.*  No, I don't.

9        *MR. FREESE:*  At this point, your Honor, I have nothing

10   else.

11       *THE COURT:*  We will have cross examination.

12                    <u>**CROSS EXAMINATION**</u>

13   ***Q.   (BY MR. SMITH:)***  Mr. Dooley, you have testified many, many

14   times state and federal court, correct?

15   *A.*  Yes.

16   *Q.*  You have taken classes in interrogation tactics, correct?

17   *A.*  Yes.

18   *Q.*  And you believe that in this particular investigation that

19   you were more skilled in interrogation tactics than Special

20   Agent Jonathan Kelly and Lieutenant Shields?

21   *A.*  Never have I said that.

22   *Q.*  Well, let me direct your attention to May 16th of 2007.  Do

23   you recall having a meeting with Chief Sullivan of the Alton

24   Police Department?

25   *A.*  What's the date?

1          *THE COURT:*  5/16/07.

2          *MR. SMITH:*  Correct.

3     *A.*  No, I don't think I recall that.

4     *Q.*  Do you recall questioning the interrogation skills of

5     Special Agent Jonathan Kelly and Lieutenant Shields when

6     talking with Chief Sullivan?

7     *A.*  I think you are referring to a conversation me and him had

8     at my residence, not at the police department, and, no, I did

9     not --

10    *Q.*  When do you recall the date of that conversation?

11    *A.*  I don't recall the date.  I recall the chief saying it on

12    the stand where we were.

13    *Q.*  Wasn't that the same date where you told Chief Sullivan

14    that, if I get indicted I'm gonna tell them that Lieutenant

15    Hayes did it with me so we'll both get indicted?

16    *A.*  Yes.  And I did tell him that.  Not in the tone in which

17    you are using now.  And I told other officers that too.  And I

18    can tell --

19    *Q.*  So if you get indicted, you are going to come in and say

20    that Lieutenant Hayes did it with you so you would both get

21    indicted?

22    *A.*  You are taking it out of context.

23    *Q.*  Isn't that what you just said you said?

24    *A.*  But I also add it wasn't --

25          *MR. FREESE:*  Your Honor, he --

Cross Examination - Dooley, Mick

1   *A.*   -- in that context.

2         *THE COURT:*  This is cross examination.

3         *MR. FREESE:*  He also already answered he took it out

4   of context.

5         *THE COURT:*  The objection is overruled.  It is cross

6   examination.

7   *Q.   (BY MR. SMITH:)*  You are an experienced law enforcement

8   officer; doesn't that alone constitute obstruction of justice

9   pointing the finger of someone else falsely just because you

10  get indicted?

11  *A.*  You are a making a serious matter out of a joke.  And

12  obviously I've been indicted and I haven't said he was doing it

13  with me.

14  *Q.*  Did you consider it a joke to tell the chief of police that

15  if you get indicted you are going to come in and say that

16  Lieutenant Hayes did it with you?  Did you consider that a

17  joke?

18  *A.*  Yes.  In the context -- you are not letting me explain the

19  context that it was said.  He thought it was a joke, too.  He

20  left.

21  *Q.*  You have testified many, many, many times under oath.  Have

22  you ever lied under oath?

23  *A.*  No.

24  *Q.*  You have also had legal training, correct?  Legal training.

25  You have indicated on direct examine you have legal training.

1   Haven't you had specific legal training studying the mental
2   states of criminal offenses?
3   A.   Oh, that, yeah.  I thought you said legal training like an
4   attorney or something; no.
5   Q.   Now on direct examine you said if you have a suspect you
6   did not contact the secret service.  Do you recall saying that?
7   A.   Involving counterfeit money?
8   Q.   Correct.
9   A.   Yes.  Absolutely.  And I can explain to you that.
10  Q.   What federal entity investigates all counterfeiting
11  activity?  The United States Secret Service?
12  A.   Absolutely.
13  Q.   If counterfeiting is found, counterfeit bills, evidence of
14  counterfeiting, aren't most of those always prosecuted in
15  federal court?
16  A.   Oh, I don't know.
17  Q.   You don't know?  How long have you been an officer, sir?
18  A.   For 24 years.  And I've never prosecuted someone in federal
19  court for counterfeiting.
20  Q.   So you thought it was the right thing to do in when all
21  this counterfeiting was found not to contact the United States
22  Secret Service?
23  A.   It isn't that I thought it wasn't the right thing to do, I
24  was following the procedure of the police department; that I
25  can explain to you and clear it up.

1    *Q.*  I'm going to show you Government's Exhibit 207, inventory

2    receipt for seizure of the computers at your apartment on

3    April 27th, correct?

4    *A.*  Yes.

5    *Q.*  You signed it, correct?

6    *A.*  Yes, that's what...

7    *Q.*  Just to point out, you had your own personal desktop

8    computer there also, correct?

9    *A.*  Right.  Two computers.

10   *Q.*  I'm going to show you a copy of Government's Exhibit 200.

11   Do you recall this?

12   *A.*  Yes, I do.  I saw it earlier.

13   *Q.*  Several times.

14       I don't want to belabor this, but you signed it --

15   *A.*  Yes.

16   *Q.*  -- twice, correct?

17   *A.*  Absolutely.

18   *Q.*  There's a time of 11:30, time of 11:30, and your initials

19   at 12:21 merely an hour later, correct?

20   *A.*  That's after we got back.

21   *Q.*  So you had to read this, hold it at least twice?

22   *A.*  I held it at least twice.  I don't recall reading it at

23   all.  I know what it is.

24   *Q.*  All right.  So you have indicated you have had training of

25   mental states of criminal offenses, correct?

Cross Examination - Dooley, Mick

1    A.   Okay.

2    Q.   Now where it says, "the above computer, computer equipment,

3    and storage media is used exclusively by me, jointly by myself

4    and whoever, I am the owner of this equipment and as such have

5    complete access and use of it?"

6    A.   I see where it says that.

7    Q.   Is that false?

8         Is that false that you signed it indicating you were the

9    owner of that computer on April 27th?

10   A.   Yes.

11   Q.   And if you recall back to that date Jonathan Kelly,

12   Lieutenant Shields and Mike Bazzell came to your apartment,

13   correct?

14   A.   Yes, I invited them there.

15   Q.   Steve Shields asked you for both of your computers, do you

16   recall that?

17   A.   No, I don't.

18   Q.   Do you recall his testimony?

19   A.   Not really.

20   Q.   All right.

21   A.   But if you say that's what he said, then that's what he

22   said he said.  However, when he first addressed me they said,

23   do you have a computer at your house.  And I said, yes, I have

24   two.  No attempts to hide it at all.

25   Q.   No attempt to hide?

1    A.   No attempts to hide that computer at all.

2    Q.   You have already indicated on direct examination that when

3    you seized that computer from Lee Fielding's house --

4    A.   Mmm hmm.

5    Q.   -- you were told and you knew that this might have been

6    purchased with proceeds from the bank robbery?

7    A.   I didn't even need to be told.   I surmised that standing

8    there.

9    Q.   Now on April 27th you've got a federal agent and the

10   Illinois State Police in your apartment, and they have now

11   asked you for this computer that you now know you are going to

12   give away, give over stolen property?

13   A.   No.

14   Q.   It's stolen, correct.   You stole it?

15   A.   That's not true.

16   Q.   You didn't steal it?

17   A.   It's not true what you are saying and it's not true that

18   they asked for that computer.

19   Q.   "Let's not mince words, I stole this computer".   Did you

20   say that?

21   A.   No.

22   Q.   You did not say that?

23   A.   I do not recall saying that.   However, in the proffer when

24   he questioned me on it and said that I said it; I said, if

25   that's what you say I said, then, that's what I said.

Cross Examination - Dooley, Mick

1       I don't remember what I said.  I was lying about the

2   computer's existence and how it got to my house and everything

3   else.  And I don't recall what words I used to describe that

4   possession.  But I cleared it up before I left that room.

5   Q.  Let's be clear.  Did you steal this laptop computer?

6   A.  No.

7           MR. FREESE:  Your Honor, I'm going to object.  It's

8   been asked and answered several times.

9           THE COURT:  It has, but it's cross examination.

10          MR. FREESE:  But he's already answered it.

11          THE COURT:  It's cross examination.  He can make his

12  point.  The objection is overruled.

13  Q.  (BY MR. SMITH:)  So it was not a big deal to you that

14  you've got a federal agent and the Illinois State Police asking

15  for this out of your apartment?

16  A.  They weren't asking for that computer.  I gave them that

17  computer.

18  Q.  Let's assume they're not asking for it?

19  A.  Okay.

20  Q.  Let's make that hypothetical jump?

21  A.  Okay.

22  Q.  Was it a big deal for you that you are giving away

23  something you have taken?

24  A.  No, not at all.  I voluntarily gave it to them.  That was

25  before I even got there.

1    Q.  All right.  As law enforcement do you understand the

2    concept of standing?

3    A.  Standing?

4    Q.  Standing.  Legal standing?

5    A.  Oh.

6    Q.  Not standing on your feet; legal standing?

7    A.  I'm not sure.

8    Q.  Have you ever heard a concept that basically to have

9    standing to agree to have somebody take something like a laptop

10   you've got to have an interest, a legal interest, in the

11   property.  You have never heard that?

12   A.  I'm not following your --

13   Q.  Why would somebody give consent to take something that

14   wasn't even their's?  Why did you sign something saying consent

15   to search by owner, I'm the owner of this equipment.  It says

16   consent to search by owner.  It doesn't say consent to search

17   by thief.

18   A.  I never read it.  I knew what it was they were asking.  And

19   I said, you can have whatever you want.

20   Q.  On May 18th -- we've got extras, sorry.  There we go -- did

21   you tell the FBI and Illinois State Police that your Apple

22   laptop computer was purchased by you at the Galleria mall in

23   St. Louis, Missouri?

24   A.  Initially, yes, I did.

25   Q.  Was that a lie?

1   *A.*  Yes, it was.  Just as I described.

2   *Q.*  On May 18th of 2007 did you tell the FBI and the Illinois

3   State Police that you had purchased that laptop approximately

4   one to two years ago?

5   *A.*  I told them that and every sentence that was attached to

6   it.  Just as I've described it.

7   *Q.*  We'll get to them.

8       Was that a lie?

9   *A.*  Absolutely.

10  *Q.*  Did you tell them on May 18th -- and you knew it was a

11  federal investigation, didn't you?  The FBI was there.

12  *A.*  You bet I did.  At the point that I'm making these lies I

13  knew exactly who I was speaking to.

14  *Q.*  All right.

15      Did you tell the FBI and the Illinois State Police that you

16  paid approximately $2,000 cash for the laptop?

17  *A.*  I'm sure I did.

18  *Q.*  And at the time was that a lie?

19  *A.*  Yes.

20  *Q.*  On May 18th of 2007 did you tell the FBI and the Illinois

21  State Police that you registered your laptop computer with

22  Apple?

23  *A.*  Yes.

24  *Q.*  And I heard your explanation on it?

25  *A.*  Well, yeah, I don't know what registering is.  But I

Cross Examination - Dooley, Mick

1   purported that to be mine, absolutely.

2   Q.  On May 18th 2007 did you tell the FBI and the Illinois

3   State Police that you were alone when you purchased the laptop

4   and you had your receipt at home showing the purchase?

5   A.  Yes, in the top dresser drawer.

6   Q.  And was that a lie?

7   A.  Yes.

8   Q.  While we're at it, on direct examination did you testify

9   that you were always cooperative with the federal

10  investigation?

11  A.  Yes.

12  Q.  All right.  Are telling lies to the FBI and the Illinois

13  State Police within your definition of being cooperative?

14  A.  Correcting them is.

15  Q.  You indicated, falsely, that the receipt was located in the

16  top drawer of your dresser, did you not?

17  A.  Yes.

18  Q.  You were shown this receipt?

19  A.  Okay.

20  Q.  Same receipt, correct?

21  A.  I guess.  Oh, no, I was referring to something different.

22  I thought you meant the receipt to --

23  Q.  Weren't you a shown a receipt showing the purchase of the

24  laptop by Lee Fielding on May 18th of 2007 by the FBI and the

25  Illinois State Police?

1   A.   I may have been but I'm not sure.

2   Q.   You don't recall seeing the receipt?

3   A.   I don't recall.

4   Q.   Well, and at least from the government discovery you have

5   seen the receipt, all the stuff we've turned over to you?

6   A.   Yeah 7,000 something pages.  I don't recall that

7   specifically, but I'm sure it was in there.

8   Q.   And you have seen it during the trial?

9   A.   I see it right now.

10   Q.   All right.  Now you see what that laptop cost?

11   A.   Yes, $1,999.

12   Q.   Out of human curiosity, when you were lying to the FBI and

13   the Illinois State Police that you paid $2,000 for the laptop,

14   how did you know that that laptop was worth $2,000?

15   A.   I have no idea.  Obviously, I never purchased one and I

16   just made up that figure that looked like --

17   Q.   I'll bet --

18   A.   -- it would have cost.

19   Q.   I'll bet you when you brought it home you researched it to

20   see what it was worth, didn't you?

21        MR. FREESE:  Your Honor, I'm going to object.  That's

22   speculation on the part of the government.

23   A.   Even if I --

24        THE COURT:  On those grounds, overruled.

25   A.   Even if I did --

1          *MR. FREESE:*  It's also calling, I believe, your Honor,

2     that it is asking for a -- whether or not he did.

3          *THE COURT:*  On that ground, overruled.

4     *Q.  (BY MR. SMITH:)*  Whether you were shown a receipt on May 18

5     of 2007 or told about a receipt, you recall a conversation

6     about a receipt?

7     *A.*  Yes.

8     *Q.*  That's when things almost started turning around, isn't it?

9     *A.*  I told them I had a receipt in my dresser.

10    *Q.*  You were shown a receipt or they talked to you about a

11    receipt from Lee Fielding, correct?

12    *A.*  I'm not sure.

13    *Q.*  You don't remember?

14    *A.*  I'm not sure.

15    *Q.*  Big day.

16    *A.*  It was a big day.

17    *Q.*  All right.

18         Do you recall after a conversation about a receipt or being

19    shown a receipt, did you tell the FBI and the Illinois State

20    Police that the receipt could not be true because you had

21    purchased that laptop from an Apple store in the Galleria mall?

22    *A.*  I don't specifically remember that statement.  However, I

23    don't question the fact that we were debating back and forth as

24    to whether or not they knew the owner of that computer.

25    *Q.*  Would it be fair to say you didn't fess up right away when

Cross Examination - Dooley, Mick

1    they showed you the receipt?

2    A.  The showing of a receipt, which I don't recall seeing, had

3    nothing to do with me deciding to tell the truth.

4    Q.  Yeah, we'll get there in a minute.

5        So you don't deny you might have said that, and you don't

6    deny if you did say it it's certainly false?

7    A.  It would certainly be false.  And I did make reference to

8    the Galleria mall where I had purchased this computer.  And I

9    told you my intent behind that.

10   Q.  And after you were shown a receipt or there was a

11   conversation about the receipt, did your conversation and lies

12   continue to the FBI and the Illinois State Police?

13   A.  They continued up to the point that I told them the truth.

14   Now I don't know to the extent that this went on.  I may have

15   said that.  I don't recall specifically.

16   Q.  For the record it indicates that you stated to the FBI and

17   the Illinois State Police that the Apple store had records

18   showing the sale of the laptop, too?

19   A.  I don't recall saying that, but I can't imagine me alluding

20   to that to try to bolster my lie.

21   Q.  Push came to shove.  Ultimately, did you say:  Let's go

22   guys, I'm gonna take you to my apartment and I'm gonna show you

23   my receipt as proof that it's my laptop computer?

24   A.  Not in the manner that you just said it.  But, yes, I had

25   agreed that they could come to my house and get that receipt.

1  I told you that.

2  Q.  Do you recall the steak dinner?  Do you recall mention of

3  Lieutenant Shields saying:  I'm gonna buy you a steak dinner if

4  that's really your laptop, but you and me both know I'm not

5  going to be buying you that steak dinner?

6  A.  I recall that when he was on the stand; I don't recall it

7  that day of the interview, no.

8  Q.  Now after, sir, that you had finally offered to take him to

9  your apartment to show them the receipt, did -- you finally did

10  admit to stealing the computer?

11  A.  Yes -- no.  I mean, hold on, I did not admit to stealing

12  the computer; I admitted to lying about the computer.  And as I

13  look at this up on the screen here I never ever said that I

14  stole a computer from Lee Fielding's residence.  When I

15  described how I became in possession of that computer it was

16  from the police evidence vault not from his residence.

17  Q.  Where did it come from?

18  A.  Well, it came from the Apple store before it got to him,

19  but I didn't say I took it from the Apple store.  I took it

20  from where it was at, in the evidence vault.

21  Q.  The Apple Macintosh you seized from the Lee Fielding search

22  warrant, correct?

23  A.  Mmm hmm.

24  Q.  Ultimately did you indicate to the FBI and the Illinois

25  State Police that you really didn't purchase the laptop, you

1   didn't register it or have any receipts for it?

2   A.  I told them that I didn't purchase it.  And I still

3   maintain I registered it if what I'm describing is registering

4   it.

5   Q.  So you would not have said that on May 18th to the FBI and

6   Illinois State Police that you didn't register it?

7   A.  No, no, no.  And I'm using that as a play on words here.

8   Ultimately I told them what I described to you about the truth

9   of that computer and why.

10  Q.  Did you tell them that you were told to seize the laptop as

11  evidence because it may have been purchased with proceeds from

12  the bank robbery?

13  A.  I probably explained that.  But as I also had said, I

14  didn't need nobody to, like --

15  Q.  You understand that was going to be a federal prosecution?

16  A.  Bank robbery, yes.

17  Q.  So, no doubt that you understood if that was purchased with

18  proceeds from the bank robbery that that was potential

19  evidence --

20  A.  Yes.

21  Q.  -- for that bank robbery?

22  A.  And I collected it as such.

23      You are implying that I knew it's final destination at the

24  time that I saw it in that house, and I did not.

25  Q.  Do you recall your testimony in the direct examination and

Cross Examination - Dooley, Mick

1    you indicated that ultimately you wrote it off as being

2    nonconsequential?

3    A.   Yes.   That computer, that's what I did.   I don't know that

4    my words are appropriate for what I will describe, but.

5    Q.   Now you've turned in an inventory of the search warrant to

6    a court where you or some other officer goes under oath and

7    says this is what was seized?

8    A.   Yeah.

9    Q.   Were you the one that made the oath on that?

10   A.   No.

11   Q.   So you just caused someone else to make a false oath before

12   a judge, correct?

13   A.   They didn't know it was false because they didn't know it

14   wasn't on there.

15   Q.   You knew it was false?

16   A.   Yeah.

17   Q.   All right.   So you didn't cause them to make a false oath

18   before a judge?

19   A.   And actually if we go back, at the time that I wrote the

20   search warrant return I did not know it was false.

21   Q.   Is it all that uncommon to amend a search warrant return?

22   A.   I've never amended one, but I'm sure it wouldn't be

23   difficult.

24   Q.   That would have fixed the lie, wouldn't it.

25   A.   There wasn't a lie at that point, there was no lie to fix.

Cross Examination - Dooley, Mick

1   *Q.*  You've got something that you took from the Lee Fielding

2   search warrant where a declaration was made before a judge that

3   that all of this stuff that was seized was on this inventory;

4   and that computer was not on that inventory, was it?

5   *A.*  No.

6   *Q.*  That's not false?

7   *A.*  At the time I didn't know it to be false.  When I filled

8   out the search warrant return I hadn't discovered that the

9   computer wasn't added to the list of things.  I didn't see it

10   for days.

11   *Q.*  At whatever time you figured it out, you still could have

12   gone back and fixed it and amended it to prevent the false --

13   *A.*  Yes.

14   *Q.*  -- entry in court records?

15   *A.*  I described that to the jury when I said that, correct.

16   *Q.*  You deny making that statement on May 18th --

17   *A.*  On May 18th --

18   *Q.*  -- of 2007?

19   *A.*  I'm not denying that I made that statement.  I don't recall

20   making that statement.  I remember that statement coming up

21   during the proffer and I owned up to that statement by saying

22   that if that's what Lieutenant Shields said I said, then,

23   that's what I said.

24   *Q.*  Let's go back one more time.  Did you steal this laptop

25   computer?

1   *A.*   No.   Your definition of stealing and mine, I'm sure, aren't

2   the same.

3   *Q.*   Okay.

4       Show you Government's Exhibit 205.   Do you recognize that

5   photo?

6   *A.*   Yeah.   I didn't at first, but, yes, I do.

7   *Q.*   Does that fairly and accurately depict a photograph of a

8   wireless router system that you had set up in your apartment in

9   2007 at the time that the laptop was in your apartment?

10  *A.*   Yes.

11      *MR. SMITH:*   Government moves for the admission of

12  Government's Exhibit 205.

13      *THE COURT:*   It will be admitted.

14      *(Exhibit Gvt's 205 received in evidence)*

15  *Q.*   Sir, the only reason for that wireless router to be in your

16  apartment is so you can use the Apple Macintosh laptop for the

17  internet?

18  *A.*   That's what I used it through, but no, that was not for

19  that purpose.   That was there first.   The router was there

20  before the Apple even was -- before the robbery even happened.

21  *Q.*   Okay.   I don't want to belabor this point, you have a

22  desktop?

23  *A.*   Yes.

24  *Q.*   If you had any issues on researching GPS or anything else

25  you could have used that desk stop?

1    *A.*  I used the one at any my desk at work for 90 percent of all

2    that.

3    *Q.*  Now the desktop is hard wired.  You don't need a wireless

4    router to gain access to the internet if you've got your

5    desktop.  It goes straight from the wall to your desktop into

6    the wireless router, sends out -- you could use laptops.

7    *A.*  And, no --

8    *Q.*  Who else is using a laptop?

9    *A.*  No.

10   *Q.*  The only purpose for that wireless router is that you can

11   use this laptop that's not yours?

12   *A.*  No, it served that purpose but that was not it's purpose.

13   *Q.*  Well, okay.

14       You made a lot of personal use through this laptop that

15   wasn't yours.

16   *A.*  No, I used that for personal things.

17   *Q.*  You used this laptop to plan trips to Las Vegas, didn't

18   you?

19   *A.*  Actually I used my work computer to do that, and then I

20   looked it up again on there.  Like I said, if I make

21   arrangements -- if I make a -- I don't know what the word is.

22   If I book a car at home on that computer, I go to work and

23   print out the receipt, so it would be a combination of two.

24       But without question I loaded personal pictures on that

25   computer.  I visited websites on that computer.  The Amino

Cross Examination - Dooley, Mick

1   Black thing and work related and not work related stuff.   I

2   never purported any differently.

3   Q.  Well, did you, in fact, research financial ruin?

4   A.  Financial ruin I can't come up with.  The only thing I can

5   think of is I saw that on that episode of the guy that screams

6   about all of your stocks.  And he is like:  Look up financial

7   ruin and you will see Exxon on there, or something.  And I must

8   have typed it in.  I don't know what the context was behind

9   that.

10  Q.  Did you testify on direct examination that you really

11  weren't concerned about your personal finances and pretty much

12  lived paycheck to paycheck?

13  A.  Probably.  That would probably describe it more accurately.

14  Q.  That would be inconsistent with someone worried about

15  financial ruin, would it not?

16  A.  To type in financial ruin?  What would you expect to gain

17  by typing in financial ruin?

18  Q.  Do you recall having a conversation with Deputy Chief

19  O'Guinn regarding the events on May 18th 2007?

20  A.  Yes, I do.

21  Q.  And did you admit to Deputy Chief O'Guinn that you had lied

22  to the FBI and the Illinois State Police?

23  A.  I told him exactly what I've told the jury here.

24  Q.  Well, didn't you tell Deputy Chief O'Guinn that you stole

25  the laptop?

1   *A.*  No.  No, I did not.  And when I saw that he wrote that I

2   couldn't believe it.

3   *Q.*  Oh, he's -- okay.

4      Now, the computer.  You understand that the value of a

5   computer in criminal investigations.  Computers are a big deal

6   now in criminal investigations, are they not?

7      All the information on a computer are you aware -- don't

8   you, as experience law enforcement, know all of the

9   investigative information you can get on a computer; how

10  important computers are?

11  *A.*  I know that they can be used to retrieve information that

12  the suspect thinks he deleted and, yes, all the information

13  will be there.

14  *Q.*  Identities of potential co-conspirators might be found?

15  *A.*  Depending on what the crime was used with the computer,

16  yes.

17  *Q.*  As you see it's been analyzed from this case but e-mail

18  communications potentially about planned criminal activity, can

19  that be found on a computer?

20  *A.*  I believe so.

21  *Q.*  Information as to assets and other proceeds of criminal

22  activity could be found on a computer, could it not?

23  *A.*  If they were put on there.  I think you could retrieve

24  anything on a computer.  I couldn't, but I think it could be

25  done.

1   *Q.*  All right.  And yet you're telling the jury that you felt

2   that this was inconsequential.  Is that your testimony?

3   *A.*  My testimony is that when I discovered that I had not added

4   that computer to the list of things, I didn't feel that that

5   was the breaking point of what was going to convict Lee

6   Fielding.  I can give you an example of other cases in which we

7   flushed marijuana down the toilet without mentioning it in the

8   report because we weren't charging him with marijuana.

9   *Q.*  Let me ask you, sir:  You knew it was a federal bank

10  robbery prosecution, no doubt, correct?

11  *A.*  Yes; absolutely.

12  *Q.*  Now do you feel it's your prerogative as evidence officer

13  to decide what is consequential or inconsequential, or do you

14  think you ought to check with the federal prosecutor who is in

15  charge of the federal prosecution?

16  *A.*  We are describing two different things here.

17  *Q.*  Oh no we're not.

18  *A.*  When I'm at the scene I'm making exactly those decisions

19  what's going to be taken as evidence.

20  *Q.*  You already seized it as evidence?

21  *A.*  I agree.  With what you are saying --

22  *Q.*  No, I'm talking about the point where you decided you had

23  seized it as evidence.  You didn't log it in, did you?

24  *A.*  No.

25  *Q.*  There's no record of this computer being seized at the

1   scene in the LAWMAN system or anywhere in that police

2   department?

3   A.  Right.  I already described that.

4   Q.  All right.  No, I'm talking about the point where you

5   decided to take it out of the evidence vault; take all of the

6   documentation that went with it --

7   A.  There was no.

8   Q.  -- take it to your house; turn it on; sign on as you; use

9   it for personal use.  I'm talking about that point in time.

10  When you made that point in time that this was inconsequential

11  that you turned it on and forever changed the evidentiary value

12  of this computer, was that your decision to make that it was

13  inconsequential or the federal prosecutor in charge of the

14  prosecution?

15  A.  Well, I made the decision.  It may not have been mine and

16  obviously if I had it to do over again I would take a different

17  path.  But...

18  Q.  Do you recall having a conversation with Special Agent

19  Jonathan Kelly and Lieutenant Shields on April 26th of 2007,

20  the first of three interviews?

21  A.  As we go on I will recall that.  I did have an interview.

22  Q.  You recall there were three interviews?

23  A.  Yeah.

24  Q.  Sound about right April 26th, April 27, and May 18th?

25  A.  Yes.

1  *Q.*  All right.  Do you recall telling Special Agent Jonathan

2  Kelly and Lieutenant Shields that you never stoled anything

3  from the Alton Police Department that they were holding as

4  evidence?

5  *A.*  Yes.

6  *Q.*  Was that, sir, on April 26th 2007 a false statement?

7  *A.*  No, because again it's -- I don't feel that I stole that

8  computer.

9  *Q.*  The time I put on a copy of Government's Exhibit 70, the

10  e-mail you got.  As an experienced detective for the Alton

11  Police Department, have you investigated a lot of fraud, fraud

12  schemes?

13  *A.*  I don't think I have.  I may have worked the crime scene

14  itself but the investigation division does the investigations.

15  So I'm not certain what you are referring to.

16  *Q.*  You have never investigated frauds in your career?

17  *A.*  Give me an example and I'll tell you if I have.

18  *Q.*  Well, there is everything from bank frauds to credit card

19  frauds, to mail frauds, to wire frauds?

20  *A.*  So far, no, I've not investigated any of the things you

21  have described; to my knowledge.

22  *Q.*  Misrepresentations over a period of time or embezzlements

23  over a period of time, that would be a fraud in your

24  experience, would it not?

25  *A.*  Sure.

Cross Examination - Dooley, Mick

 1   *Q.*   Okay.  Now in your experience, sir, does the success of a

 2   scheme to defraud depend on the ongoing concealment of the

 3   scheme?

 4   *A.*   Well, I'm sure that it would or it would be done, it would

 5   be over.

 6   *Q.*   Now you got that e-mail on April 6th 2007, correct?

 7   *A.*   Yes.

 8   *Q.*   And you saw that the motion activated video in the evidence

 9   vault that within the same hour of this being sent you're in

10   the vault, in the cash locker within the vault.  Do you recall

11   that?

12   *A.*   I've been -- I didn't know that that was corresponding to

13   this.

14   *Q.*   You didn't?

15   *A.*   No.  When it showed the view inside the vault and that that

16   was supposed to correspond to this.  And I'm not even certain

17   on which day I received this.

18        This is when it was sent, correct?

19   *Q.*   That's correct.

20        Well, do you recall telling FBI Agent Jonathan Kelly and

21   Lieutenant Shields that as soon as you got this e-mail you

22   started pulling and preparing the evidence?

23   *A.*   Probably did.  Yeah, I probably told them that.  I don't

24   know that I meant like within that second.

25   *Q.*   And just to be clear, this is the Olin Credit Union robbery

1    evidence?

2    A.   Okay.

3    Q.   All right.  And there's no doubt you knew this was a

4    federal prosecution?

5    A.   Well, yeah, and specially -- if there was any question that

6    would be cleared up as soon as I knew the FBI was gonna

7    retrieve the evidence.

8    Q.   You knew it when you seized the money?

9    A.   Sure.  I think all of our bank robberies have been

10   prosecuted in the federal venue just so we can add time to the

11   offender.

12   Q.   All right.  Now do you recall seeing the motion activated

13   video of the cash locker within the vault for the time period

14   after you got this e-mail?

15   A.   I'm not certain when I got that e-mail but, yes, I saw

16   that; what you had.

17   Q.   All right.  And do you recall, sir, that you were in there

18   the next time after the 6th on Sunday April the 8th?

19   A.   I'm in there every day.

20   Q.   Well, no, actually from the video you weren't in there on

21   April 7th, were you?

22   A.   Oh, I don't know.  I didn't see the video of April 7th.

23   Q.   You have had the discovery, have you not?  You have

24   probably looked at it very carefully, have you not?

25   A.   When we were given those videos I think that my attorney

Cross Examination - Dooley, Mick

1   told me that you said there was nothing sinister in them and

2   that you had them.  I never looked over them.  I know what I've

3   done in there.  I don't have to look at video to see if I had

4   done anything wrong.  I've not done anything wrong.

5   Q.  Do you dispute that you were in the cash locker in April

6   8th?

7   A.  No.  I don't dispute that I was in there at any time you

8   want to put me in there.

9   Q.  We will get to that in a couple minutes.

10      Do you dispute, sir, from the video that on April 9th which

11  is the Monday you are only taking out one envelope?

12  A.  Was it in reference to this case?

13  Q.  Can't tell you, sir?

14  A.  In reference to anything.

15  Q.  We can't tell what's on that envelope you are pulling out?

16  A.  Okay.

17  Q.  But do you dispute from the video that you are in there

18  only pulling one envelope out on April 9th?

19  A.  I don't dispute anything that video shows.

20  Q.  Do you dispute that on April 10th, the Tuesday, you are not

21  in the cash locker.

22  A.  If there's no picture of me being in there then I wasn't in

23  there.

24  Q.  All right.  On direct examination do you recall saying,

25  computers don't lie?

1    *A.*   What did I say it in reference to?

2    *Q.*   Well, it was actually with regard to the LAWMAN system.

3    *A.*   Oh, that was in reference to the bar coding.  The chain of

4    custody.

5    *Q.*   Right?

6    *A.*   Yeah.

7    *Q.*   Would the same be true as far as motion activated camera,

8    don't lie?

9    *A.*   Well, I don't know, that one didn't appear to be too

10   accurate to me.

11   *Q.*   Now from the video if you were in there on the 6th; you

12   were in there again on April 8th; you weren't in there, except

13   for one envelope, on the 9th.  Where was the cash from the Olin

14   Credit Union robbery from April the 8th until the time you

15   turned it over to Special Agent Melanie Jiminez on April 10th

16   of 2007?

17   *A.*   If I've got my dates correct --

18   *Q.*   I can help you.  The 10th is a Tuesday that's the day you

19   turn it over.  The 9th is a Monday.  The 8th when you are in

20   the locker you are off work, it is a Sunday.

21   *A.*   That Sunday I remember specifically and I'll tell you why.

22   That Sunday was when Captain Waldrup, his wife and children

23   came into the evidence vestibule so that we could retrieve a

24   case for him to take back to the FBI academy.  And during that

25   time the evidence in this case was setting in tubs inside the

Cross Examination - Dooley, Mick

1    evidence vault to the right of the door where I retrieved them

2    when Melanie Jiminez showed up the following day or whatever

3    day she showed up.

4         *THE COURT:*  No, not if.  She showed up Tuesday.

5    *A.*  Okay.

6    *Q.*  Correct.

7    *A.*  She showed up Tuesday, okay.

8    *Q.*  Now you are saying that you are storing all of this money

9    where?

10   *A.*  In the plastic tubs that you saw me take them out of in the

11   video when I handed them to her.

12   *Q.*  From the time you -- the latest time you could have gotten

13   them out of the cash locker was April 8th of 2007 that's a

14   Sunday.  You didn't turn them over to Special Agent Melanie

15   Jiminez until Tuesday, correct?

16   *A.*  Okay.  So look at the chain of custody and show me the time

17   that I swiped it with the bar code.

18   *Q.*  2:30 on April 9th on Monday?

19   *A.*  On Monday.

20   *Q.*  Correct.

21   *A.*  And I couldn't have done that until Bazzell got the FBI

22   thing plugged into the computer for me to do.  I think that I

23   had that evidence staged, ready to hit with the bar code --

24   *Q.*  You didn't mean staged?

25   *A.*  Yeah, I mean staged as --

1   *Q.* What do you mean by staged?

2   *A.* I'm telling you that.  I mean staged as in ready to be hit

3   with the bar code prior to putting the chain of custody on it.

4   I gathered it all up, stage it together, and it was in waiting

5   for me to get that done.

6   *Q.* Where was the cash from the bank robbery stored from after

7   7 p.m. on Sunday April the 8th until you turned it over on

8   April 10th?

9   *A.* If there's no video of me getting in the cash vault, then

10   it has to be in the plastic tubs with the rest of the evidence.

11   *Q.* So did you leave all of that money not secured in the cash

12   locker from the 8th through the 10th?

13   *A.* If I didn't get in there then I would have had to.  And you

14   say "not secured".  That's a play on words.  It's in the vault

15   itself, right inside the vault, right inside the door where I

16   stack evidence all the time.

17   *Q.* Cash is supposed to be in the cash locker?

18   *A.* Cash, drugs, any of it inside that vault.

19   *Q.* Let's go ahead and jump to the Tuesday April 10th.  Now

20   Melanie Jiminez shows up?

21   *A.* Okay.

22   *Q.* Why didn't you open the second Rubber Maid tub?

23   *A.* I did open the second Rubber Maid tub.  And now we are

24   going to debate the accuracy of the video you watched.  There

25   is no way she could check off the bar code numbers of the

1    second tub without me reading off the number.  And I can't see

2    through the tub.  And therefore I say that we need to view that

3    again.  There's no way she could obtain the bar code numbers of

4    the evidence in that second tub without me having read it to

5    her.

6    Q.  Really?

7    A.  Yeah.

8    Q.  All right.  Now when did you check out on LAWMAN all this

9    evidence?

10   A.  I don't know, what's it say.

11   Q.  Well, you remember, don't you?  April 9th, the day before

12   you had it all ready?

13   A.  I don't know.  I have to look at the chain of custody to

14   tell you that.

15   Q.  Maybe this will refresh your memory.  Let me show you my

16   copy of one page of Government's Exhibit 1 all ready in

17   evidence.  Now if you don't dispute the accuracy of that, do

18   you, sir?

19   A.  In reference to these case numbers?

20   Q.  Ah, well what is that, sir?  You prepared it, right?

21   A.  Yeah.

22   Q.  What is that?

23   A.  It's a supplemental.

24   Q.  All right.  That you prepared.

25       When did you prepare it?

1    *A.*  Oh, I'm not sure when I prepared it.  I'm sure right here

2    where I say I prepared it on this date and time 4/9/07 at 1900

3    hours.

4    *Q.*  Okay.  What's on that?

5    *A.*  So what's the question?  This is bar codes the evidence

6    numbers.

7    *Q.*  Now you had already printed this out for Special Agent

8    Melanie Jiminez -- let me show you this one that's signed.

9         Now that's your signature, correct?

10   *A.*  Yeah.

11   *Q.*  Now you had this all right printed out before Melanie

12   Jiminez even got there?

13   *A.*  Yeah, I think I had the whole thing ready for her as I

14   explained to her on the phone.  I even asked her if she wanted

15   her name on it and that's why her name is printed underneath

16   where she ended up signing.

17   *Q.*  You just testified to the jury how would you know all the

18   numbers of all the evidence unless you pulled out all the

19   evidence bags, did you not?

20        Wasn't this on the table?

21   *A.*  I think that's what she used to check them off with.  Are

22   you implying that I read the numbers off of a piece of paper

23   instead of pulling them out of the --

24   *Q.*  I can't imply, sir.  I can only ask.

25   *A.*  Let's look at the video and clear that up.

1    *Q.*  We have, sir.

2    *A.*  Let's look at -- I mean, I wasn't looking for that when you

3    showed me the video.

4    *Q.*  So you're -- we will just leave it that your testimony is

5    that you did open the second Rubber Maid tub and did pull out

6    every single piece of evidence and read off every single bar

7    code?

8    *A.*  I see no other way for her to have completed that list.

9    *Q.*  Now that means, sir, does it not, that you would have had

10   to physically handle and pick up every one of those pieces of

11   evidence, including the tampered bags?

12   *A.*  Twice.  Because once we found out that the tampering

13   occurred at the Alton Police Department then you have to

14   realize that at one point I took it out of the evidence vault,

15   hit it with the bar code; and at another point I picked it up

16   and read the number off to her and put it in the plastic tub.

17   *Q.*  Were you in a hurry?

18   *A.*  Not at all.  And they asked me that during my interview

19   before.  And you can hear on the telephone I'm as accommodating

20   as can be.

21   *Q.*  All right.  Do you recall telling Chief Sullivan and the

22   Alton Police Department that Melanie Jiminez was in a hurry so

23   you did not closely examine the evidence?

24   *A.*  No.

25   *Q.*  You don't recall that, sir?

1   *A.*   No.   But I recall a conversation in which he asked me if I

2   was in a hurry, implying that she said I was in a hurry and

3   that's how I snuck this past her or something.

4   *Q.*   Now did you ultimately tell Chief Sullivan, and at later

5   time Special Agent Jonathan Kelly and Lieutenant Shields, that

6   the Olin Credit Union evidence was obviously tampered with so

7   you would have seen the damage had it been like that at the

8   Alton Police Department.

9        Do you recall saying that?

10  *A.*   I think that if I didn't say that I certainly alluded to

11  that I believe I would have seen that.

12  *Q.*   To many people at different times?

13  *A.*   I'm not sure of who, when.   But as I sat here now and

14  explain it to you, knowing that this needs to be accurate, I'm

15  saying that when I went over there and looked at the evidence

16  that night, knowing that that's what I was looking for, it

17  didn't jump out and jump on me any more than it did Melanie --

18  which she overlooked it also.   But when you say it is taped at

19  the bottom, you look at the bottom there's tape there.

20  *Q.*   But you are testifying to the jury that on April 10th in

21  the evidence vestibule area you physically picked up each

22  envelope?

23  *A.*   Yeah, for the second time that day.   And did not see it.

24  I'd have stopped everything right then.

25  *Q.*   And let's go back just a little bit.   When you pulled the

Cross Examination - Dooley, Mick

1    Olin Credit Union robbery evidence out of a box in the cash

2    locker, you had to sort through all of the other cash bags that

3    are intermingled in that box, correct?

4    A.  Picked them up and look straight at the bar code.

5    Q.  You have to pick them up.  Examine them.

6    A.  I don't examine them.  I pick them up and look at the bar

7    code.  That's what I'm interested in.

8    Q.  They're not all neat in a row.  You have to pick them up

9    and turn them around?

10   A.  Flip the bar code up and look at it.  Same thing she did.

11   She handled them several times before she found this flaw.

12   Q.  So on April 8th do you think you took the Olin Credit Union

13   robbery evidence out of the cash locker in the vault on

14   April 8th?  Do you think you did it then?

15   A.  I don't know, look at the video and whatever it shows me

16   doing is what I did.

17   Q.  I can't testify, sir.  But you are in there --

18   A.  The only --

19   Q.  -- on April 8th --

20   A.  -- box.

21        COURT REPORTER:  Gentleman.

22        MR. FREESE:  Your Honor, I'm going to object.

23        THE COURT:  Wait a minute.

24        MR. FREESE:  Asked and answered several times.

25        THE COURT:  No, no, no.

Cross Examination - Dooley, Mick

1        What we've got here is the witness will have to answer

2   the question that the lawyer puts to him.  You don't get to

3   make a speech, you get to answer his questions.

4        *THE WITNESS:*  Okay.

5        *THE COURT:*  And you are going to have to wait and let

6   my very excellent court reporter catch up.

7        The objection is overruled.  Ask your next questions or

8   rephrase the last question; your option.

9   *Q.  (BY MR. SMITH:)*  Whenever you took the Olin Credit Union

10  robbery evidence out of the cash locker it had to be somewhere

11  in time between April 6th and April 10th, correct?

12  *A.*  Okay, yes.

13  *Q.*  You were in the box going through all of the cash bags,

14  correct?

15  *A.*  Maybe.  It could have been on the top.  I don't know.

16  *Q.*  All right.  Now the U.S. Bank bags would have been there in

17  there at the same exact time, correct?

18  *A.*  Yes.

19  *Q.*  And weren't those obviously tampered with also?

20  *A.*  Not obviously because I didn't notice it at first.

21  *Q.*  Well, didn't you tell Chief Sullivan that you thought the

22  damage was obvious?

23  *A.*  No, I don't know if I told him that.  But if I made any

24  reference to that damage it would be very obvious that that's

25  not in the day-to-day handling of those evidence bags.  Yeah it

Cross Examination - Dooley, Mick

1    would be very obvious that that's the hole that's been put

2    there.

3    Q.   We've been through these.  Government's Exhibit 653, do you

4    remember that evidence?

5    A.   Yeah, we're back on the Olin robbery now, right?

6    Q.   Right.  Do you remember that specific evidence?

7    A.   Well, I know, yeah, I know evidence to that case.

8    Q.   And do you recall receiving it in evidence?  Do you recall

9    receiving the money in evidence?  You got it, didn't you?

10   A.   Yeah.

11   Q.   You put it in the cash locker, didn't you?

12   A.   Sure.  Chain of custody will verify that.

13   Q.   And this was from the pants pockets of Clarence Thomas.

14   And he was a bank robbery, right?

15   A.   Yes.

16   Q.   And that was seized during the execution of a federal

17   search warrant, was it not?  Do you recall that?

18   A.   Yes.

19   Q.   Government's Exhibit 651, do you recall that evidence, sir?

20   A.   Yes.

21   Q.   And wasn't this, in fact, seized by you at the time on

22   June 19th of 2006?  Does that sound about right?

23   A.   I'm confident it is.  I could clear that with my report,

24   but, yes.

25   Q.   Wasn't that a room of Montez Fuller, another bank robbery?

1    *A.*   Okay.

2    *Q.*   Do you remember that?

3    *A.*   Yeah.

4    *Q.*   Now?

5    *A.*   Econo Lodge --

6    *Q.*   No doubt in your mind that you understood that this was

7    federal evidence for a federal prosecution?

8    *A.*   Yes, any time there's a bank robbery we charge them

9    federally and it's a federal crime.

10   *Q.*   2900.  Government's Exhibit 650 did you remember that?

11   *A.*   Yes.

12   *Q.*   Wasn't that seized again during the execution of a federal

13   search warrant by you at the scene of the Econo Lodge over in

14   St. Louis, Missouri?

15   *A.*   Right.  Same case right.  Yes.

16   *Q.*   This was concealed in a spare toilet paper roll, was it

17   not?

18   *A.*   I remember that because Lieutenant Hayes was the one who

19   actually located that.

20   *Q.*   Turned it over to you at the scene?

21   *A.*   Yes.

22   *Q.*   You documented it and put it in the cash locker?

23   *A.*   Yes.

24   *Q.*   June 19th 2006, correct?

25   *A.*   Okay.

Cross Examination - Dooley, Mick

1    *Q.*  652.  Do you recall receiving this in evidence?

2    *A.*  Yes.  I'm saying yes to all these because I know that

3    that's the bank robbery evidence.  And specifically I never

4    seen it in that form, but I'm --

5    *Q.*  I understand.

6    *A.*  Yeah.

7    *Q.*  Do you recall this being recovered from a cell phone by

8    William Brandtly, Officer Brandtly and --

9    *A.*  I'm sure his report will indicate that.

10   *Q.*  There is no doubt you knew that that was for a federal bank

11   robbery prosecution?

12   *A.*  Yes.  All of this evidence is in a federal bank robbery

13   prosecution; both bank robberies.

14   *Q.*  April 16th *[sic]* 2007, the FBI discovers that the Olin

15   Credit Union robbery evidence was not what it should be,

16   correct?

17   *A.*  Yes.  That's Friday right?

18   *Q.*  No, that's April 13th, Friday.  You can't forget it.

19          *THE COURT:*  You said 16th.

20   *A.*  You said 16th.  I think you are referring to the 13th.

21          *MR. SMITH:*  No, I apologize.

22   *Q.*  April 13th --

23   *A.*  Okay.

24   *Q.*  -- you're in the cash locker on Saturday April 14th?

25   *A.*  Don't doubt that.

1  *Q.*  Do you recall seeing the video?

2  *A.*  I don't doubt it at all.

3  *Q.*  All right.  And is it your testimony that neither

4  Lieutenant Hayes or Chief Sullivan gave you a direct order to

5  stay out of the vault and stay out of the cash locker?

6  *A.*  I definitely never got a direct order from the chief of

7  police.  I never saw him after I left that U.S. Bank.

8      Lieutenant Hayes did tell me and Simmons Friday night when

9  we wanted to do an inventory of a cash locker to not get in the

10  cash box, they would do the inventory Monday.

11  *Q.*  You are saying he never told you that before?

12  *A.*  I'm saying he told me that Friday night the 13th.

13  *Q.*  Well, you recall testifying on direct examination that when

14  Hayes came up to you, you said ran down the hall?

15  *A.*  Uh-huh.

16  *Q.*  And you have copied the evidence vault register, correct?

17  *A.*  Right.

18  *Q.*  And what did you say?  Didn't you say, you're busted?

19  *A.*  Yeah, he caught us copying that.  Knowing that we were

20  coping it to keep him from stealing it.

21  *Q.*  So you are saying Lieutenant Hayes was going to steal it?

22  *A.*  He was -- he came down there to make a copy of that vault

23  log sheet.  That's what he told Sergeant Simmons.  And we were

24  making a copy of it because I didn't want it to disappear if

25  something bad happened down the road.

Cross Examination - Dooley, Mick

1    *Q.*  All right.  And hadn't you already testified on cross

2    examination today regarding your statement to Chief Sullivan

3    that if I get indicted I'm going to say that Hayes did it with

4    me so we both get indicted?  Didn't you testify following that

5    that you are not accusing Hayes of anything?

6    *A.*  Yes.

7    *Q.*  All right.  Now aren't you telling this jury that you are

8    accusing Hayes of trying to steal that evidence vault register?

9    *A.*  No, that ain't what I said at all.

10   *Q.*  Do you recall telling Lieutenant Hayes and Deputy Chief

11   O'Guinn on that Monday, April 16th, during the early audit of

12   the U.S. Bank robbery evidence out of the cash vault they held

13   up the bags and you said it was probably just a tear.  Do you

14   recall saying that?

15   *A.*  I think that you are -- did you just say the chief deputy?

16   I think you mean Simmons Sergeant, Simmons and Hayes.  And,

17   yes, I do remember that conversation.  But, no, I didn't look

18   at what they were talking about when they said that.

19   *Q.*  Okay.  To expedite things, the U.S. Bank robbery evidence,

20   you seized most of it?

21   *A.*  Probably, yeah.

22   *Q.*  Just to expedite things, a copy of Government's Exhibit 656

23   the $9,460.  You seized that on October 23rd 2006 in

24   St. Charles, Missouri, did you not?

25   *A.*  Yes.

1    *Q.*  Wasn't that in the hotel room of Jason Moses?

2    *A.*  Okay.

3    *Q.*  Wasn't he a bank robber?

4    *A.*  Absolutely.

5    *Q.*  And you certainly understood that that was federal evidence

6    for a federal bank robbery case?

7    *A.*  I understand that all evidence in this case is a federal

8    bank robbery case.

9    *Q.*  Let me show a copy of my notation, the same as Government's

10   Exhibit 655; $9,821.  At the end of the day 9,000 gone only 821

11   left, correct?

12   *A.*  Yes.

13   *Q.*  You seized it, correct?

14   *A.*  Yes.

15   *Q.*  Wasn't this seized from the search warrant of Lee Fieldings

16   residence?

17   *A.*  Yes.

18   *Q.*  All right.  Wasn't that money seized at the same time you

19   took this laptop?

20   *A.*  Exactly.

21   *Q.*  Same search warrant?

22   *A.*  Exactly.  As I explained in that interview.

23        *MR. SMITH:*  We can't find the originals.  I'm sure

24   they are here.

25        *THE COURT:*  I'll bet Linda --

Cross Examination - Dooley, Mick

1          MR. SMITH:   I can move on.

2    Q.  (BY MR. SMITH:)  Let me show you what is in essence the

3    same as Government's Exhibit 333, 329, 331.  I just don't have

4    the actual photos.  Ricky Shaw.  The death investigation

5    September 19th 2006.

6        Do you remember going there?

7    A.  After being given the discovery of this case and while

8    setting in here, yes, I do remember being there.

9    Q.  You didn't recall it before then?

10   A.  No.  As a matter of fact --

11   Q.  How many death investigations have you been on in the past

12   few years?

13   A.  Lots.

14   Q.  And this was ugly.  I'm not going to go into details, but

15   wasn't this ugly?

16   A.  Well, your definition of ugly and mine is two different

17   things.

18       But at the same time, I never seen the deceased in this

19   investigation.  He was removed by the coroner before I got

20   there.

21   Q.  Now this gallon milk jug was full of currency and was

22   placed into your evidence van, and you seized it on

23   September 19th 2006, correct?

24       I'm gonna, with great assistance, help.

25       Government's Exhibit 329?

Cross Examination - Dooley, Mick

1   *A.*  I remember that specifically.  That right there is what

2   jogged my memory to this whole deal was the duct tape around

3   that glass.

4   *Q.*  And do you dispute, sir, that that jug never came back, was

5   never logged into evidence by you at the Alton Police

6   Department?

7   *A.*  I dispute that.  It did come back to the Alton Police

8   Department.  And -- but I don't dispute that it was never

9   logged in by me.

10  *Q.*  There is an old phrase "where's the money".

11  *A.*  And my explanation is that I don't know.  And I would love

12  the expand upon that, but I feel you are not going to give me

13  the opportunity to.

14  *Q.*  It was supposed to be logged into LAWMAN?

15  *A.*  Yes.

16  *Q.*  This is clearly after the LAWMAN system started in

17  February 2005, correct?

18  *A.*  Absolutely.

19  *Q.*  Evidence policy was that you were to log that in and note

20  the amount of money that was in there and the denominations of

21  the bills, correct?

22  *A.*  You are referring to a cash tracking form, and I've never

23  filled one of those out, but --

24  *Q.*  You are exempt?

25  *A.*  I don't know that I'm exempt.  I've never filled one out.

Cross Examination - Dooley, Mick

1    I know --

2    Q.  Is there a purpose -- well, I'll get ya there.

3        Is there a purpose for logging in the specific

4    denominations of bills; is there a purpose for that policy on

5    the cash tracking form?

6    A.  I'm not sure what that purpose is other than to force the

7    officers to count out the cash.

8    Q.  Make sure it is right and also prevent tampering because

9    there is a certain listing of the right number of

10   denominations?

11       MR. FREESE:  Your Honor, he is answering his own

12   question.

13       THE COURT:  No, no.  This is cross examination.  He

14   can challenge the witness.

15       Now you have to answer his question.

16   Q.  (BY MR. SMITH:)  Is it correct?  Isn't that the reason?

17   A.  No.  I don't -- well, the answer is I don't know the true

18   reason.  I don't know.

19   Q.  But you didn't have to follow it?

20   A.  I'm sorry.

21   Q.  But you didn't have to follow the policy?

22   A.  Not in that instance, no.  I don't know that I haven't had

23   to.  But I've never filled one of those out.  Their --

24   Q.  Okay.  Okay.  I'll give you that.

25   A.  I'm sorry.

1   *Q.*  Did you have to follow your evidence policy manual that

2   Lieutenant Hayes testified about and Chief Sullivan about?

3   *A.*  The one they testified about I never seen until this

4   discovery came out.

5   *Q.*  You never helped them put it together?

6   *A.*  No.

7   *Q.*  You are the evidence custodian, they come up with an

8   evidence policy on the handling of evidence and you're telling

9   us, this jury, you have never seen it before?

10  *A.*  That's absolutely, correct.  And you will know that they

11  never printed that thing out until one of their interviews

12  after I was already fired.

13  *Q.*  Where is the change?  Government's Exhibit 331, where is

14  it?

15  *A.*  I don't know.

16  *Q.*  Did you seize it?

17  *A.*  It was taken from the residence.

18  *Q.*  Did you log it into LAWMAN?

19  *A.*  No, we described that.

20  *Q.*  No we are -- we were talking about the cash; this is the

21  change?

22  *A.*  Nothing in this investigation will reflect that I had

23  anything do with it.  However, I admit to you that I took that

24  evidence into my van and transported it back to police

25  headquarters.

1    *Q.*  Have you described the computer, Government's Exhibit 334,

2    as a piece of found property from a case in 2004?

3    *A.*  Yes.

4    *Q.*  Now do you dispute that this is the computer that you

5    seized from the Ricky Shaw death investigation on

6    September 19th of 2006?

7    *A.*  Knowing what I know now, no, I don't dispute it at all.

8    *Q.*  Was it ever logged into LAWMAN?

9    *A.*  No.  I just said none of that evidence was.

10   *Q.*  It's not yours, is it?

11   *A.*  Never claimed it was mine.

12   *Q.*  This isn't yours, is it?

13   *A.*  Never claimed it was mine.

14   *Q.*  I'm sorry, but you just told the jury under oath that you

15   never claimed this was yours?

16   *A.*  That's right.  I've never claimed that was mine.  Asked me

17   if I had a computer, I said there was two of them.  If I had

18   yours there I would have said I had three of them.

19   *Q.*  Did you forget all the lies.

20   *A.*  Forget them?  No.  I admitted and I corrected them before I

21   left that room.

22        *MR. SMITH:*  Your Honor, for economy and scale I think

23   I'm going to try and wrap this up, just for your planning

24   purposes, within ten minutes.  I don't know how much time?

25        *THE COURT:*  Ladies and gentlemen, I don't want you to

Cross Examination - Dooley, Mick

1   have to come back next week.  Would it be a problem if we stay

2   over a few minutes this afternoon?  I'll accommodate you.  I'm

3   gonna do whatever is best for the jurors, but...

4          All right.  As best I can tell, I've taken a vote, and

5   the vote is 14 to zip that we stay a few extra minutes.  Am I

6   right on that?

7                *(Jurors indicating in the affirmative)*

8          *THE COURT:*  All right.  A few extra minutes.

9          *MR. SMITH:*  I'm going to cut this way short.

10  **Q.  (BY MR. SMITH:)**  Government's Exhibit 661, $115 came into

11  your vault, your cash locker, in March of 2007, correct?

12  You've looked at the discovery, you've read the reports?

13  *A.*  No, I haven't.  And I would like to see that.

14  *Q.*  You haven't looked at the discovery for the prosecution of

15  your own case?

16  *A.*  7,800 pages.  If I wanted to look at it I couldn't.

17  It's --

18  *Q.*  Do you recall the testimony that there's continuous video

19  of the cash locker from the time this was seized and indicated

20  by you that it was placed in the vault until the missing bank

21  robbery money was discovered on April 16th.  This was actually

22  discovered later.  But while you were -- still had access to

23  the cash locker this money disappeared?

24  *A.*  Okay.  I'm not disputing that.

25  *Q.*  No one else could have gotten into the cash locker,

Cross Examination - Dooley, Mick

1    bypassed the motion sensitive cameras, and taken that money out

2    of the vault, could they?

3    A.   I don't know.   I never seen the video.   And I have -- I

4    think that if you would hand me the report I can give you an

5    explanation for its whereabouts.

6    Q.   I'm going to try to quickly go through something else.

7        You got suspended and ultimately terminated and ended up

8    making ends meet by handling the door at Fast Eddie's, correct?

9    A.   No, that's what I do now.   Back then I lived off of the

10   stocks that I had bought and I cashed them out.

11   Q.   Because the -- you didn't get much back from the Alton

12   Police Department because the Internal Revenue Service picked

13   up all of it?

14   A.   Yes.

15   Q.   And at the time you were supposed to file a federal income

16   tax return you had over $14,000 in back taxes that remained due

17   from 2003, '4, and '5, did you not?

18   A.   I guess.   I'm not --

19   Q.   And when you were on the boat gambling in 2006 did you

20   elect to pull the lever, make the gamble, instead of paying

21   your taxes?

22   A.   Yes.   The same as people that need --

23   Q.   How long have you worked at Fast Eddie's?

24   A.   I've probably been there seven, eight months.

25   Q.   Okay.   How often do you work?

1   *A.*   I work Friday night, Saturday night, Sunday night, and

2   early Monday morning.

3   *Q.*   How many hours a week?

4   *A.*   I don't know.  But I turn in my paychecks to the court

5   supervision people.  And I'd say 20, between 24, 25 hours a

6   week.  I'm not certain.

7   *Q.*   And how does that do financially for you?

8   *A.*   I guess if I needed more money I could work more hours.

9   *Q.*   So -- sir?

10  *A.*   I'm sorry.

11  *Q.*   I said, sir.  Did you tell pretrial services that you were

12  unemployed and had no current sources of income?

13  *A.*   Yes.  And at the time that that was filled out when I went

14  to pretrial services for my arraignment in Benton that's

15  exactly the case.  They told me that I needed to be employed in

16  the next day.  Probably that day I secured a job at Fast

17  Eddie's.

18  *Q.*   When you go to rodeos, horse shows, the announcer has a

19  phrase "you better be getting it on your mind" when your horse

20  has to get ready to come into the ring next.

21      Now you indicated on direct examination that filing a tax

22  return following the discovery of the missing evidence was just

23  simply not on your mind, correct?

24  *A.*   Right.

25  *Q.*   All right.  And you indicated that you thought the light

1    bulb went on sometime in August or September of 2007, correct?

2    A.   Whatever date I received that letter from the IRS.

3    Q.   You're already aware you are under federal investigation,

4    correct?

5    A.   Yes.   As was everybody in this case.

6    Q.   All right.   Now, was that a pretty hot and big light bulb

7    that you just figured out you hadn't filed a tax return and you

8    are aware you are under federal investigation?

9    A.   Yeah, I explained that.

10   Q.   Did you file an extension of time to file in August or

11   September when that light bulb went on?

12   A.   No, huh-uh.

13   Q.   Didn't occur to you?

14   A.   You know what, honestly, it didn't.   But at the same time,

15   I was like, well, they got my stuff.   They know they have my

16   stuff because they are researching my past taxes.   Trust me I

17   knew I needed to file my taxes.   And like I described earlier,

18   when it was over I figured they'd give me my stuff and I'd go

19   file.

20   Q.   On direct examination you testified that you can only get

21   so many ATM withdrawals on a particular day and you would be

22   out gambling.   Do you recall that testimony?

23   A.   Yeah, that's true.

24   Q.   And you recall you couldn't get any more money.

25   A.   Yeah.   One trans --

Q.  So you indicated on direct examination, did you not, you
had to come back to the vault to the police department to get
more money?

A.  I have on occasion, yes.

Q.  And you said it was out of your personal safe?

A.  Yep.

Q.  And you didn't think there was anything wrong about keeping
what say $10,000 of personal cash in the evidence vault of the
Alton Police Department?

A.  No.  I would keep that in my locker at work.  I didn't take
the money from something else to put it in there.  I took steps
to make sure it was clear if I got hit by a car.

Q.  And you never told anybody about it?

A.  Well, no.

Q.  You could have asked:  It's okay if I keep personal
property in -- lots of extra cash of mine in your evidence
vault?  Did you ever ask the Chief, Deputy Chief, Lieutenant
Hayes?

A.  But if it was my evidence vault I guess I could do whatever
I wanted in there.  You just described it as being my evidence
vault.

Q.  Is that the way you felt, sir?

A.  No.

Q.  That you could do whatever you wanted?

A.  Not at all.  And my job performance reflects that.

Cross Examination - Dooley, Mick

1   *Q.*  You had no cash hordes, did you?

2   *A.*  No.

3   *Q.*  You had no cash hordes in your apartment or anything else.

4   Do you remember saying that a May 18th 2007 with Special Agent

5   Jonathan Kelly and Lieutenant Shields that you didn't keep cash

6   hordes?

7   *A.*  No.  They asked me if I had any right then, and I said, no,

8   I did not.  They were doing a search warrant at my house.  And

9   they were asking me for other places to look other than where

10  they had already looked I guess.

11  *Q.*  Do you recall saying on direct examination, sir,

12  quote-unquote, I didn't do anything wrong at any point?

13  *A.*  Yeah.  I don't know what I said that in reference to, but

14  if you refresh my mind I will recall that.

15       *THE COURT:*  Just today.  What he is talking about your

16  direct examination.

17       *THE WITNESS:*  Oh, yeah.  Again I don't know what

18  context I said that in, but.

19  *Q.*  You didn't think it was wrong to lie to the FBI?

20  *A.*  I corrected that.

21  *Q.*  You didn't think it was wrong to steal a laptop computer?

22  *A.*  That was the lie that I corrected.

23  *Q.*  Well, I'm not talking about the lie, I'm talking about the

24  theft?

25  *A.*  I didn't steal it.

1    *Q.*  You didn't think it was wrong not to document the seizure

2    of all the money from the Ricky Shaw death investigation?

3    *A.*  Yes.  And again, you won't let me explain.

4    *Q.*  All right.  The $9,460 you testified on direct you put all

5    the ones in the Ziploc bag but all the other higher

6    denomination currency you didn't put it in the Ziploc bag, you

7    just stuffed it in.  Is that your testimony?

8    *A.*  Yes.  And that's a fact.

9    *Q.*  You didn't feel like it was more important to secure the

10   hundred dollar bills and the 50-dollar bills than the

11   one-dollar bills.

12   *A.*  The ones were being secured because the others were still

13   being looked at and they were all secured with equal security,

14   and that plastic bag did not add to the security of that piece

15   of evidence.

16   *Q.*  All right.  On the video that was played on direct

17   examination February of '07, do you remember the video that was

18   just played?

19   *A.*  Okay.

20   *Q.*  You took every single box out of that cash locker except

21   for one?

22   *A.*  Okay.

23   *Q.*  How many boxes had cash in the cash locker?  How many

24   boxes?

25   *A.*  At that point, two boxes had cash in there.

1    *Q.*  So you pulled out one of the two boxes in February of 2007

2    that had cash?

3    *A.*  No.  I just don't think you can see that on the video.  I

4    think that box is behind the other one.  I would have no need

5    for the cash box to be out; I'm purging drug evidence.

6         *MR. SMITH:*  One second.  Your Honor, that's the cross

7    examination of Mick Dooley by the government.

8         *THE COURT:*  Redirect, any?

9                    **REDIRECT EXAMINATION**

10   *Q.  (BY MR. FREESE:)*  I'll try not to be as exuberant as the

11   U.S. attorney.

12      Now, again, they have tried to make --

13        *THE COURT:*  You are going to have to be a little more

14   exuberant and step up the pace.

15        *MR. FREESE:*  I will.

16   *Q.  (BY MR. FREESE:)*  They are trying to make out of you that

17   you're nothing but a habitual liar.

18        Now my question is:  Are you a -- did you lie and make

19   a lie to the federal agent and the Illinois State Police agent?

20   *A.*  As I've explained many times here, yes, I did.  I lied.  I

21   told you the lie; I told you why I corrected the lie; and what

22   was behind the lie.

23   *Q.*  And isn't the fact that because you are sitting here today

24   charged with all these crimes and, as a matter of fact, at the

25   way the U.S. attorney went on about the laptop was the reason

Redirect Examination - Dooley, Mick

1   you were afraid to tell them about the laptop?

2   A.  The conclusion that the investigators drew from the laptop

3   incident is exactly the conclusion that I anticipated they

4   would draw, which is why I lied about it.  I see what it looks

5   like and that's just not true.

6        THE COURT:  Quickly.

7   Q.  (BY MR. FREESE:)  Again, why are you now -- why, were you

8   willing to finally admit that you took the laptop?

9   A.  Because it wasn't like finally admitting.  The whole thing

10  was silly, it was stupid, it was not to be believed.  I lied

11  about it because I knew what they would deduct by their logic

12  because their logic is essentially mine, I'm a policeman and so

13  are they.  And I don't think you have to be to make that jump.

14  And I didn't want that to be made.

15  Q.  Now when you've said that you did not feel that the laptop

16  was going to be needed any more in the Lee Fielding case?

17  A.  Mmm hmm.

18  Q.  Lee Fielding at the time of the search warrant and the

19  arrest had made quite a few incriminating statements in regards

20  to the bank robbery, had he not?

21  A.  It was a slam dunk when we walked in the door he gave up

22  everything.

23  Q.  And Lee Fielding actually did plead guilty, did he not?

24  A.  I assume that he did.  I think he was in the stand and said

25  that he did.

Redirect Examination - Dooley, Mick

1    *Q.* Even though you acknowledge that -- okay, the government

2    says you stole the laptop and stole the other computer.  You

3    say you did not?

4    *A.* Right.

5    *Q.* In your mind how can you -- they're saying, well, it wasn't

6    yours, it was evidence, you took it home.  And I think that's a

7    concept that most people would try to understand.  How can you

8    sit here and say that you did not steal it?

9    *A.* For exactly that reason.  If all you knew was that it

10   wasn't mine and it was at my house I can see how you would

11   deduct that I stole it.  Stealing something in my mind involves

12   the thought of permanent deprivation, the thought of taking

13   something without the anticipated return or anything else.  It

14   was not my personal use for this computer.  I was taking that

15   computer to be used for the police department.  It should have

16   been in the felony prosecution of Lee Fielding.  I'm not

17   challenging that at all.

18       But the fact that it had not made it to that point as an

19   oversight on my part.  I -- again, if I would have seen it

20   there I would have logged it like everything else.  Several

21   days lapse.  There it was.  It was sitting there.  I didn't

22   know what to do with it.  Actually, I did.  I had a great use

23   for it.  I was in the process by virtue of the other computer

24   to making these vehicle tracking things.

25   *Q.* Now again you acknowledge that you did take the laptop?

Redirect Examination - Dooley, Mick

1          *MR. SMITH:*  Objection.  Cumulative.

2          *THE COURT:*  We've been through all this.  Get on with

3    it.

4    ***Q.   (BY MR. FREESE:)***  As you sit here, did you take, again, any

5    money out of the evidence vault at any time for yourself?

6    *A.*  No, other than like we described my personal money from my

7    safe.  I mean, I take that.

8    *Q.*  Have you --

9    *A.*  And evidence money, no, absolutely not.

10          *MR. FREESE:*  Nothing else, your Honor.

11          *THE COURT:*  All right.  You may step down, sir.

12          Do you have any more witnesses?

13          *MR. FREESE:*  None, your Honor.  The defense rests.

14          *THE COURT:*  The defense rests.

15          Does the government have any rebuttal.

16          *MR. SMITH:*  No, your Honor.

17          *THE COURT:*  Very well.

18          Ladies and gentlemen, you have heard all the evidence.

19    I'm going to send you home for the evening.

20     *(Subsequent court proceedings not ordered for transcription.)*

21                              -oOo-

22

23

24

25

1                      REPORTER'S CERTIFICATE

2          I, Molly N. Clayton, RPR, Official Court Reporter for the

3     U.S. District Court, Southern District of Illinois, do hereby

4     certify that I reported with mechanical stenography the

5     proceedings contained in pages 1 - 189; and that the same is a

6     full, true, correct and complete transcript from the record of

7     proceedings in the above-entitled matter.

8

9                 DATED this 18th day of November, 2008.

10

11                                    *s/Molly N. Clayton, RPR*

12                      _____

13                            Molly N. Clayton, RPR