IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

_____ )
**UNITED STATES OF AMERICA,**             )
                                          )
                         Plaintiff(s),    )
                                          )
        vs.                               )   Case No. **08-30010-GPM**
                                          )
**MICKEY L. DOOLEY,**                     )
                                          )
                         Defendant(s).    )
_____ )

## TRIAL VOLUME/DAY I

BE IT REMEMBERED AND CERTIFIED that heretofore on  **9/3/08**, the same being one of the regular judicial days in and for the United States District Court for the Southern District of Illinois, Honorable G. Patrick Murphy, United States District Judge, presiding, the following proceedings were recorded by mechanical stenography; transcript produced by computer.

### APPEARANCES:

*FOR PLAINTIFF:* **Steven D. Weinhoeft and Norman Smith**, Assistant U.S. Attorneys - Fairview Heights, 9 Executive Drive, Suite 300, Fairview Heights, IL 62208

*FOR DEFENDANT*: **Gordon E. Freese** of Law Offices of Gordon E. Freese, 222 South Central Avenue, Suite 1004, St. Louis, MO 63105-3509

*REPORTED BY*:  **Molly N. Clayton, RPR**, Official Reporter for United States District Court, SDIL, 750 Missouri Ave., East St. Louis, Illinois 62201, (618)482-9226,
                    *molly_clayton@ilsd.uscourts.gov*

1                    <u>INDEX OF WITNESS EXAMINATION</u>

2                                    <u>DX</u>        <u>CX</u>       <u>R-DX</u>      <u>R-CX</u>

3     *Bazzell, Michael ..............612        740        772*
      *Bazzell, Michael ..............1433       1454       1456*
4     *Christner, Dustin .............867        872*
      *Cole, Jason ...................795        799*
5     *Cooley, Jerry .................1483       1503*
      *Daly, Tom .....................923        933        936*
6     *Dooley, Mick ..................1515       1643       1698*
      *Durborow, Deirdre .............213        229        241*
7     *Fielding, Lee .................912        916        922*
      *Franke, John ..................888        891*
8     *Fuchs, Frank ..................938        959*
      *Gillespie, Richard ............850        858        866*
9     *Hayes, David ..................1166       1234*
      *Hunter, James .................876        885*
10    *Jimenez, Melanie ..............273        304        342*
      *Kaus, Tammy ...................1458       1470       1476*
11    *Kelly, Jonathan ...............1365*
      *Kunkel, April .................578        589        592*
12    *Lukowski, Jon .................776*
      *Marshall, Deborah .............1358       1363       1364*
13    *Metzler, Michael ..............594        606        611*
      *Meyer, Michael ................346        381        385*
14    *O'Guinn, Jody .................961        985        1016*
      *Pulido, Marcos ................810        814*
15    *Shields, Steven ...............1275       1325       1357*
      *Simmons, Jason ................388        479        564*
16    *Singer, Kimberly ..............1368       1394       1399*
      *Stinnett, Seth ................782        791*
17    *Sullivan, Chris ...............1017       1066       1165*
      *Sullivan, Chris ..........................           1272*
18    *VanBaketes, Pete ..............163        190        210*
      *Velloff, James ................902*
19    *Waldrup, Scott ................1506       1511       1514*
      *Warlick, Vincent ..............893        898        900*
20    *Weirich, Jason ................800        806*

21                         <u>INDEX OF EXHIBITS</u>

22    <u>EXHIBIT</u>                <u>DESCRIPTION</u>        <u>Id'D</u>        <u>Rcv'd</u>

23    *Gvt's 1A        Dooley's reports from Olin 165              166*
                       *Community Credit Union*
24                     *robbery and supplemental*
                       *case file*
25    *Dft's 1         2003 tax return ..........1572*

1                           **INDEX OF EXHIBITS**

2     **EXHIBIT**                    **DESCRIPTION**          **Id'D**      **Rcv'd**

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---|---|---|---|
| Gvt's 2 | Indictment: 06-30117-GPM; US v. Montez Lamar Fuller, Clarence Thomas, Phillip Timothy Bailey, Bonnie Louise Brown | 215 | 215 |
| Dft's 2 | Audio Recording Conversation Deft & FBI Agent Jimenez | 208 | |
| Gvt's 3 | Manila Evidence Envelope "Evidence #8892 Currency 2006 016514 Armed Robbery"" Supposed to have $796.00, had $21.00 Case 2006-016514 Exhibit 28 | 289 | 290 |
| Gvt's 4 | Manila Evidence Envelope "Evidence #8894 Currency 2006 016514 Armed Robbery" Supposed to have $2,900.00, had $27.00  Case 2006-016514 Exhibit 29 | 289 | 290 |
| Gvt's 5 | Manila Evidence Envelope "Evidence #8895 Currency 2006 016514 Armed Robbery" Supposed to have $119.00, had $8.00  Case 2006-016514 Exhibit 13 | 289 | 290 |
| Dft's 5 | Citations & Awards | 1523 | 1524 |
| Gvt's 6 | Manila Evidence Envelope "Evidence #8776 Currency 2006 016514 Armed Robbery" Supposed to have $300.00, had $3.00  Case 2006-016514 No exhibit number | 290 | 290 |
| Gvt's 12 | Photo of Closeup of Front of Manila Evidence Envelope; Case 2006-016514, Evidence #8894, Exhibit 29 | 351 | 351 |
| Gvt's 13 | Photo of Front of Manila Evidence Envelope; Case 2006-016514, Evidence #8894, Exhibit 29 | 351 | 351 |
| Gvt's 14 | Photo of back of Manila Evidence Envelope; Case 2006-016514, Evidence #8894, Exhibit 29 | 351 | 351 |

**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 15 | Photo of Closeup of back of Manila Evidence Envelope; Case 2006-016514, Evidence #8894, Exhibit 29 | 351 | 351 |
| Gvt's 16 | Photo of Closeup of inside of Manila Evidence Envelope; Case 2006-016514, Evidence #8894, Exhibit 29 | 351 | 351 |
| Gvt's 18 | Photo of Manila Evidence Envelope; Case 2006-016514, Evidence #8894, Exhibit 29, and Contents as found by FBI | 351 | 351 |
| Dft's 19 | 4/13/07 Telephone call-Jimenez, Simmons & Dooley | 337 | 337 |
| Gvt's 20 | Photo of Front of Manila Evidence Envelope; Case 2006-016514; Evidence #8892, Exhibit 28 | 351 | 351 |
| Gvt's 22 | Photo of Close-up of Front of Manila Evidence Envelope; Case 2006-016514; Evidence #8892, Exhibit 28 | 351 | 351 |
| Dft's 22 | Evidence Room Register from Lt. Hayes | 549 | 549 |
| Dft's 24 | timeline | 507 | |
| Gvt's 25 | Photo of back of Manila Evidence Envelope; Case 2006-016514; Evidence #8892, Exhibit 28 | 351 | 351 |
| Dft's 26 | Agent Jimenez's report | 314 | 316 |
| Gvt's 27 | Photo of Inside of Manila Evidence Envelope; Case 2006-016514; Evidence #8892, Exhibit 28 | 351 | 351 |
| Dft's 27 | Lt. Hayes' Record of Vacation times | 1244 | 1246 |
| Gvt's 29 | Photo of Manila Evidence Envelope; Case 2006-016514; Evidence #8892, Exhibit 28 and Contents as found by FBI | 351 | 351 |
| Dft's 29 | Memo sent to Lt. Sheilds from Chief Sullivan | 1086 | |
| Gvt's 30 | Photo of Front of Manila | 351 | 351 |

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---|---|---|---|
| Evidence Envelope; Case 2006-016514; Evidence #8895, Exhibit 13 | | | |
| Dft's 30 | Lab report ...............1329 | | 1329 |
| Gvt's 31 | Photo of Close-up of Front 351 of Manila Evidence Envelope; Case 2006-016514; Evidence #8895, Exhibit 13 | | 351 |
| Dft's 31 | Lab report of fingerprint 1331 analysis | | 1332 |
| Gvt's 33 | Photo of back of Manila ...351 Evidence Envelope; Case 2006-016514; Evidence #8895, Exhibit 13 | | 351 |
| Dft's 33 | DOJ Consent to search form1345 | | 1346 |
| Dft's 34 | Evidence bag .............1464 | | 1636 |
| Gvt's 36 | Photo of inside of Manila .351 Evidence Envelope; Case 2006-016514; Evidence #8895, Exhibit 13 | | 351 |
| Dft's 37 | Evidence bag .............1464 | | 1636 |
| Gvt's 38 | Photo of Manila Evidence ..351 Envelope; Case 2006-016514; Evidence #8895, Exhibit 13 and Contents as found by FBI | | 351 |
| Dft's 38 | Evidence Bag .............1464 | | 1636 |
| Gvt's 39 | Photo of Front of Manila ..351 Evidence Envelope, Case 2006-016514; Evidence #8776, No Exhibit Number | | 351 |
| Dft's 39 | Evidence Bag .............1464 | | 1636 |
| Dft's 40 | Evidence bag .............1464 | | 1636 |
| Dft's 41 | Prox card registry .......1438 | | 1438 |
| Gvt's 42 | Photo of back of Manila ...351 Evidence Envelope, Case 2006-016514; Evidence #8776, No Exhibit Number | | 351 |
| Dft's 42 | Video of inventory on ....1446 4/16/2007 | | |
| Gvt's 44 | Photo of back of Manila ...351 Evidence Envelope, Case 2006-016514; Evidence #8776, No Exhibit Number | | 351 |
| Dft's 44 | 2004 tax returns .........1572 | | |
| Gvt's 45 | Photo of Manila Evidence ..351 Envelope, Case 2006-016514; Evidence #8776, No Exhibit | | 351 |

| | | | |
|---|---|---|---|
| 1 | *Number and Contents as found by FBI* | | |
| 2 | **INDEX OF EXHIBITS** | | |
| 3 | **EXHIBIT** | **DESCRIPTION** **Id'D** | | **Rcv'd** |
| 4 | *Dft's 45* | *2007 tax returns ........157* | *2* | |
| | *Gvt's 55* | *chain of custody report Olin168 Credit Union robbery* | | *170* |
| 5 | *Gvt's 61* | *Video of vestibule, Dooley 280 and Jimenez 4/10/2007* | | *281* |
| 6 | *Gvt's 70* | | | *820* |
| 7 | *Gvt's 74* | *Summary of Missing Money: 1320 June 2007* | | |
| 8 | *Gvt's 99* | *chain of custody report U.S168 Bank robbery* | | *170* |
| 9 | *Gvt's 100A* | *Dooley's reports from U.S. 166 Bank robbery* | | *166* |
| 10 | *Gvt's 101* | *Indictment: #06-30160-DRH: 924 U.S. v. Jason Shane Moses,* | | *924* |
| 11 | | *Lee Marlin Fielding a/k/a "Bono", Eric James Lavergne* | | |
| 12 | *102* | *Bar Code for Alton Police 1286 Department Case #2006-29793,* | | |
| 13 | | *Evidence #10195 ISP Exhibit 29* | | |
| 14 | *Gvt's 102* | | | *1287* |
| | *Gvt's 103* | *Brown Paper Evidence Bag, .362 Alton Police Department Case* | | *362* |
| 15 | | *#2006-29793, Evidence* | | |
| 16 | | *#10189, Bag Supposed to have Contained $9,460.00* | | |
| 17 | *Gvt's 104* | *Ziploc Bag of (5) Bundles of385 $100.00: $500.00, From* | | *386* |
| 18 | | *Exhibit 103, Found at Alton Police Department in* | | |
| 19 | | *Presence of Mickey Dooley, Sgt. Simmons, and Lt. Hayes* | | |
| 20 | *Gvt's 105* | *Brown Paper Evidence Bag, .362 Alton Police Department,* | | *362* |
| 21 | | *Case #2006-29793, Evidence* | | |
| 22 | | *#10195, Bag Supposed to have Contained $9,821.00* | | |
| | *Gvt's 108* | *Photo of Evidence Barcode,1286 Alton Police Department Case* | | *1286* |
| 23 | | *#2006-29793, Evidence #10195* | | |
| 24 | | *(Exhibit 102)* | | |
| | *Gvt's 110* | *Photo of Front of Brown ...361 Paper Bag, Case #2006-29793,* | | *361* |
| 25 | | *Evidence #10195* | | |

**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 111 | Photo of Front of Brown ...361<br>Paper Bag, Case #2006-29793,<br>Evidence #10195 and three<br>stacks of U.S. currency | | 361 |
| Gvt's 112 | Photo of Side of Brown Paper...361<br>Bag, Case #2006-29793,<br>Evidence #10195 cut on the<br>side of the bag | | 361 |
| Gvt's 113 | Photo of Side of Brown Paper...361<br>Bag, Case #2006-29793,<br>Evidence #10195 cut on the<br>side of the bag | | 361 |
| Gvt's 116 | Photo of Three Stacks of U.S...361<br>Currency from Case<br>#2006-29793, Evidence Bag<br>#10195: $321.00, $200.00,<br>$300.00:  $821.00,  supposed<br>to have contained $9,821.00 | | 361 |
| Gvt's 117 | Photo of Front of Brown ...361<br>Paper Bag, Case #2006-29793,<br>Evidence #10189 | | 361 |
| Gvt's 118 | Photo of Front of Brown ...361<br>Paper Bag, Case #2006-29793,<br>Evidence #10189 | | 361 |
| Gvt's 120 | Photo of Front of Brown ...361<br>Paper Bag, Case #2006-29793,<br>Evidence #10189  Close-up of<br>Bar Code Label | | 361 |
| Gvt's 121 | Photo of Front of Brown ...361<br>Paper Bag, Case #2006-29793,<br>Evidence #10189 | | 361 |
| Gvt's 122 | Photo of Front of Brown ...361<br>Paper Bag, Case #2006-29793,<br>Evidence #10189 | | 361 |
| Gvt's 123 | Photo of Back of Brown Paper...361<br>Bag, Case #2006-29793,<br>Evidence #10189, Closeup of<br>Mickey Dooley's Initials | | 361 |
| Gvt's 125 | Photo of Back of Brown Paper...361<br>Bag, Case #2006-29793,<br>Evidence #10189, Closeup of<br>Mickey Dooley's Initials | | 361 |
| Gvt's 128 | Photo of Side of Brown Paper...361<br>Bag, Case #2006-29793,<br>Evidence #10189, Side of Bag<br>Cut | | 361 |

<u>**INDEX OF EXHIBITS**</u>

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---|---|---|---|
| Gvt's 129 | Photo of Side of Brown Paper Bag, Case #2006-29793, Evidence #10189, Side of Bag Cut | 361 | 361 |
| Gvt's 130 | Photo of Front of Brown ...361 Paper Bag, Case #2006-29793, Evidence #10189 and Ziploc Plastic Bag Containing U.S. Currency | | 361 |
| Gvt's 132 | Photo of Stacks of U.S. ...361 Currency next to Ziploc Plastic Bag from Brown Paper Bag, Case #2006-29793, Evidence #10189 | | 361 |
| Gvt's 140 | Guitar Center Receipt from 915 Lee Fielding for purchase of Apple Macbook Pro for $1,999.00 on 10/23/2006 | | 915 |
| Gvt's 145 | Photo of US Bank robbery ..185 money in gym bag from search warrarnt when money was recovered | | 186 |
| Gvt's 146 | Photo of US Bank robbery ..185 money in gym bag from search warrarnt when money was recovered | | 186 |
| Gvt's 147 | Photo of US Bank robbery ..185 money in gym bag from search warrarnt when money was recovered | | 186 |
| Gvt's 200 | Illinois State Police ....1300 Consent to Search by Owner, Signed by Mickey Dooley, 04/27/2007, Consent for McIntosh MacBook Pro, Gateway CPU, and Hotmail Account ISP Exhibit 57 | | 1300 |
| Gvt's 201 | Apple MacBook Pro Laptop ..740 Serial No: W86342L5VWW Obtained per Consent Search 04/27/2007  ISP Exhibit 19 | | 740 |
| Gvt's 205 | Photo Linksys wireless ...1661 router | | 1661 |
| Gvt's 207 | Illinois State Police ....1306 Evidence and Inventory Receipt for McIntosh MacBook | | 1306 |

1          *Pro, Power Supply, and*
           *Gateway CPU, signed by*
2          *Mickey Dooley 04/27/2007*

3                          **INDEX OF EXHIBITS**

4    <u>**EXHIBIT**</u>              <u>**DESCRIPTION**</u>         <u>**Id'D**</u>      <u>**Rcv'd**</u>

5    *Gvt's 209*      *Search Warrant for Mickey* 1316       1317
                     *Dooley's Residence 315 Belle*
6                    *Ave, Alton, IL*
     *Gvt's 211*      *MacBook Pro User's Guide,* 1317       1317
7                    *CD's and Warranty*
                     *Information -found pursuant*
8                    *to Search Warrant of Mickey*
                     *Dooley's Residence*
9                    *05/18/2007 ISP Exhibit 45*
     *Gvt's 213*      *Form W-2 for Mickey Dooley* 1317       1317
10                   *for 2006 from City of Alton,*
                     *IL- found pursuant to Search*
11                   *Warrant of Mickey Dooley's*
                     *residence 05/18/2007 ISP*
12                   *Exhibit 45*
     *Gvt's 214*      *Form 1099-Misc for Mickey* 1317       1317
13                   *Dooley for 2006 from Alton*
                     *Gaming Company - found*
14                   *pursuant to Search Warrant*
                     *of Mickey Dooley's residence*
15                   *05/18/2007 ISP Exhibit 45*
     *Gvt's 215*      *Several Form W-2G for Mickey* 1317       1317
16                   *Dooley for 2006 from Alton*
                     *Gaming Company found rubber*
17                   *banded together in the "Tax"*
                     *Folder with the Calculator*
18                   *printout (Ex 232 and 233) -*
                     *found pursuant to Search*
19                   *Warrant of Mickey Dooley's*
                     *residence 05/18/2007 ISP*
20                   *Exhibit 45*
     *Gvt's 216*      *Form W-2G for Mickey Dooley* 1317       1317
21                   *for 2006 from Treasure*
                     *Island, Las Vegas, NV found*
22                   *rubber banded together with*
                     *Group Ex. 215A - found*
23                   *pursuant to Search Warrant*
                     *of Mickey Dooley's residence*
24                   *05/19/07 ISP Exhibhit 45*
     *Gvt's 217*      *IRS Notice to Mickey Dooley* 1317       1317
25                   *dated July 24, 2006 for*
                     *additional tax due on tax*

1    year 2004 - found pursuant
     to Search Warrant of Mickey
2    Dooley's residence
     05/18/2007 ISP Exhibit 46
3                    **INDEX OF EXHIBITS**

4    **EXHIBIT**              **DESCRIPTION**        **Id'D**        **Rcv'd**

5    *Gvt's 218        IRS Notice to Mickey Dooley* 1317           *1317*
                       *dated March 5, 2007 for*
6                      *additional tax due on tax*
                       *year 2004 - found pursuant*
7                      *to Search Warrant of Mickey*
                       *Dooley's residence*
8                      *05/18/2007 ISP Exhibit 45*
     *Gvt's 219        IRS Notice to Mickey Dooley* 1317           *1317*
9                      *dated April 2, 2007 for*
                       *additional tax due on tax*
10                     *year 2005 - found pursuant*
                       *to Search Warrant of Mickey*
11                     *Dooley's residence*
                       *05/18/2007 ISP Exhibit 45*
12   *Gvt's 220        IRS Notice to Mickey Dooley* 1317           *1317*
                       *dated April 28, 2007 request*
13                     *for contact telephone*
                       *numbers - found pursuant to*
14                     *Search Warrant of Mickey*
                       *Dooley's residence 05/17/07*
15                     *ISP Exhibit 45*
     *Gvt's 221        IRS Notice to Mickey Dooley* 1317           *1317*
16                     *dated April 28, 2007 for*
                       *additional tax on the tax*
17                     *years 2003 and 2004 - found*
                       *pursuant to Search Warrant*
18                     *of Mickey Dooley's residence*
                       *05/18/2007 ISP Exhibit 45*
19   *Gvt's 222        IRS Publication 3498 The .* 1317           *1317*
                       *Examination Process -*
20                     *foundpursuant to Search*
                       *Warrant of Mickey Dooley's*
21                     *residence 05/17/07 ISP*
                       *Exhibit 46*
22   *Gvt's 223        IRS Form 9465, Installment* 1317           *1317*
                       *Agreement Request - found*
23                     *IRS Form 9465, Installment*
                       *Agreement Request - found*
24                     *05/18/2007 ISP Exhibit 46*

25

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 224 | Receipt from Atlantis Pool #22719, Purchase of Hot Tub $1,800.00, signed by Mickey Dooley - found pursuant to Search Warrant of Mickey Dooley's residence 05/18/2007 ISP Exhibit 45 | 1317 | 1317 |
| Gvt's 224 | Receipt, Atlantis Pools, #22719 | 1575 | |
| Gvt's 225 | Receipt from Atlantis Pool #22723, Dated 09/23/2006, Purchase of Hot Tub $1,200.00, signed by Mickey Dooley - found pursuant to Search Warrant of Mickey Dooley's residence 05/18/2007 ISP Exhibit 45 | 1317 | 1317 |
| Gvt's 225 | Receipt, Atlantis Pools, #22723 | 1575 | |
| Gvt's 226 | Receipt from Doug Haufe, #3815, Dated 10/10/2006, Purchase of Deck/Fence/Roof/Wire for Hot Tub, $2,845.00, for Mickey Dooley - found pursuant to Search Warrant of Mickey Dooley's residence 05/18/2007 ISP Exhibit 45 | 1317 | 1317 |
| Gvt's 226 | Receipt, Doug Haufe, #3815 | 1575 | |
| Gvt's 227 | Receipt from REX, #074245, Dated 09/20/2006, Purchase of LCD 13 IN TV $2,130.52, signed by Mickey Dooley - found pursuant to Search Warrant of Mickey Dooley's residence 05/18/2007 ISP Exhibit 45 | 1317 | 1317 |
| Gvt's 227 | Receipt, REX, #074245 .... | 1575 | |
| Gvt's 228 | Receipt from Sears, ...... Salescheck #020211578861, Dated 12/22/2006, Purchase of Magnavox 50 IN DLP TV, $1,070.99, Purchaser: Mickey Dooley - found pursuant to Search Warrant of Mickey Dooley's residence | 1317 | 1317 |

1          *05/18/2007 ISP Exhibit 45*

2                    **INDEX OF EXHIBITS**

3     **EXHIBIT**              **DESCRIPTION**        **Id'D**      **Rcv'd**

4     *Gvt's 228*     *Receipt, Sears, .........1575*
                      *#020211578861*

5     *Gvt's 229*     *Receipt from Target, .....1317*     *1317*
                      *#2-6338-0078-0071-4756-8,*

6                     *Dated 12/04/2006 $65.41 -*
                      *found pursuant to Search*

7                     *Warrant of Mickey Dooley's*
                      *residence 05/18/2007 ISP*

8                     *Exhibit 45*

      *Gvt's 232*     *Folder Labeled "Tax" - found1317*    *1317*

9                     *pursuant to Search Warrant*
                      *of Mickey's Dooley's*

10                    *residence 05/18/2007 ISP*
                      *Exhibit 45*

11    *Gvt's 233*     *Calculator tape printout of1317*    *1317*
                      *amounts added up to*

12                    *$57,820.00 - found pursuant*
                      *to Search Warrant of Mickey*

13                    *Dooley's residence*
                      *05/18/2007 ISP Exhibit 45*

14    *Gvt's 234*     *Rex Receipt Invoice 0742561317*    *1317*
                      *for $117.80, sold to Mickey*

15                    *Dooley 09/22/2006, Rec'd*
                      *from REX Appliance, Alton,*

16                    *IL*

      *Gvt's 235*     *Two Form W-2G for Mickey .1317*    *1317*

17                    *Dooley for 2006 from Alton*
                      *Gaming Company - found*

18                    *pursuant to Search Warrant*
                      *of Mickey Dooley's residence*

19                    *05/18/2007 ISP Exhibit 45*

      *Gvt's 240*     *Photo of Mickey Dooley's .1288*    *1289*

20                    *Personal Safe in the*
                      *Homicide Section of the*

21                    *Alton Police Department*
                      *Evidence Vault*

22    *Gvt's 241*     *Photo of Locker 20 and ...1281*    *1281*
                      *Boxes, Budweiser Box on the*

23                    *Second to Bottom Shelf,*
                      *Right Side*

24    *Gvt's 246*     *Money vault safe envelope .977*    *977*

      *Gvt's 247*     *Vault Access Log (Prox Card623*    *628*

25                    *and Proximity Card Issue*
                      *List*

1                          <u>INDEX OF EXHIBITS</u>

2    <u>EXHIBIT</u>                    <u>DESCRIPTION</u>          <u>Id'D</u>        <u>Rcv'd</u>

3    *Gvt's 248*          *Alton Police Department ...970*        *970*
                          *Evidence Vault Key Log*
4    *Gvt's 249*          *Alton Police Department ...448*        *449*
                          *Evidence Room Register*
5    *Gvt's 250*          *Budweiser Box from Alton .1283*       *1283*
                          *Police Department Evidence*
6                         *Vault ISP Exhibit 21*
     *Gvt's 251*          *Voucher for $2.50 from Alton1290*
7                         *Belle Casino 1/18/06*
     *Gvt's 252*          *FoodSaver Plastic Bag ....1288*       *1289*
8                         *"Property of Mick Dooley"*
                          *"10,000" ISP Exhibit 25*
9    *Gvt's 253*          *Cassette Tape labeled ....1290*
                          *"Dooley evidence, 1/23/05,*
10                        *28, my office on vacation."*
     *Gvt's 276*          *Alton Police Department ...638*        *638*
11                        *Report #2003-114: Full Chain*
                          *of Custody*
12   *Gvt's 277*          *Plastic Evidence Bag, Alton650*        *651*
                          *Police Department Case*
13                        *#2003-114, Evidence #2638*
                          *and U.S. Currency $8.10 ISP*
14                        *Exhibit 10*
     *Gvt's 278*                                                *1432*
15   *Gvt's 280*          *Alton Police Department ...638*        *638*
                          *Report #2003-4390: Full*
16                        *Chain of Custody*
     *Gvt's 281*          *Manila Evidence Envelope, .652*        *652*
17                        *"Suspect - Young, Randy"*
                          *Alton Police Department Case*
18                        *2003-4390, Evidence #1503*
                          *ISP Exhibit 14*
19   *Gvt's 282*          *Manila Evidence Envelope, .652*        *653*
                          *"Suspect - Colbert, John"*
20                        *Alton Police Department Case*
                          *2003-4390, Evidence #1502*
21                        *ISP 14*
     *Gvt's 283*                                                *1432*
22   *Gvt's 284*          *Alton Police Department ...638*        *638*
                          *Report #2003-6080 and*
23                        *Supplemental Case File and*
                          *Full Chain of Custody*
24   *Gvt's 285*                                                 *820*
     *Gvt's 286*                                                *1432*
25   *Gvt's 288*          *Alton Police Department ...638*        *638*

1      **INDEX OF EXHIBITS**

2   <u>**EXHIBIT**</u>                    <u>**DESCRIPTION**</u>          <u>**Id'D**</u>        <u>**Rcv'd**</u>

3   Report #2004-40699: Full Chain of Custody

4   *Gvt's 289*        *Plastic Evidence Bag, Alton651*        *651*
                       *Police Department for Case*
5                      *#2004-40699, Evidence #2656*
                       *ISP Exhibit 12*
6   *Gvt's 290*                                              *1432*
    *Gvt's 292*        *Alton Police Department ...638*        *638*
7                      *Report #2004-42953: Full*
                       *Chain of Custody*
8   *Gvt's 293*        *Plastic Evidence Bag, Alton649*        *650*
                       *Police Department Case*
9                      *#2004-42953, Evidence #2637,*
                       *Contains checkbook and*
10                     *papers should have also had*
                       *$1,000.00  ISP Exhibit 9*
11  *Gvt's 294*                                              *1432*
    *Gvt's 296*        *Alton Police Department .{P638*        *638*
12                     *Report #2005-5652: Full*
                       *Chain of Custody*
13  *Gvt's 298*        *Plastic Evidence Bag Alton 645*        *646*
                       *Police Department Case*
14                     *#2005-5652 and $4.00 ISP*
                       *Exhibit 2*
15  *Gvt's 301*        *Alton Police Department ...638*        *638*
                       *Report #2005-5654:  Full*
16                     *Chain of Custody*
    *Gvt's 304*        *Alton Police Department ...638*        *638*
17                     *Report #2005-6688:  Full*
                       *Chain of Custody*
18  *Gvt's 306*        *Counterfeit U.S. Currency: 654*        *655*
                       *(3) Hundreds, (2) Fifties:*
19                     *$400.00; Case #2005-6688,*
                       *Evidence #4781: found with*
20                     *Gov't Exhibit 305, in Gov't*
                       *Exhibit 307 ISP Exhibit 15B*
21  *Gvt's 307*        *Plastic Evidence Bag, Item 654*        *655*
                       *#1, Alton Police Department*
22                     *Case #2005-6688, Evidence*
                       *#4781 ISP Exhibit 15A*
23  *Gvt's 308*        *Plastic Evidence Bag, Item 655*        *656*
                       *#2, Alton Police Department*
24                     *Case #2005-6688, Evidence*
                       *#4782 ISP Exhibit 16*

25

1                          <u>INDEX OF EXHIBITS</u>

2      <u>EXHIBIT</u>                    <u>DESCRIPTION</u>              Id'D         Rcv'd

3      *Gvt's 309*        *Counterfeit U.S. Currency;* 655            656
                          *Evidence #4782; Case*
4                         *#2005-6688, found in Gov't*
                          *Exhibit 308: (10) Hundreds:*
5                         *$1,000.00 ISP Exhibit 16A*

       *Gvt's 311*        *Alton Police Department ...*638            638
6                         *Report #2005-10612:  Full*
                          *Chain of Custody*

7      *Gvt's 316*        *Alton Police Department ...*638            638
                          *Report #2006-49:  Full Chain*
8                         *of Custody*

       *Gvt's 317*        *Manila Evidence Envelope, .*669            670
9                         *Alton Police Department Case*
                          *#2006-49, Evidence #7304 &*
10                        *#7305 ISP Exhibit 58*

       *Gvt's 319*        *Alton Police Department ...*638            638
11                        *Report #2006-28669:  Full*
                          *Chain of Custody*

12     *Gvt's 320*        *Manila Evidence Envelope, .*671
                          *Alton Police Department Case*
13                        *#2006-28669 and U.S.*
                          *Currency $8.00, Evidence*
14                        *#9983*

       *Gvt's 321*        *Manila Evidence Envelope, .*670            670
15                        *Alton Police Department Case*
                          *#2006-28669, Evidence #9982,*
16                        *Supposed to have Contained*
                          *$575.00*

17     *Gvt's 321*                                                   672

       *Gvt's 323*        *Alton Police Department .{P*638           638
18                        *Report #2007-3063:  Full*
                          *Chain of Custody*

19     *Gvt's 324*        *Plastic Evidence Bag, Alton*644           645
                          *Police Department Case*
20                        *#2007- 3063, Evidence*
                          *#11227, and U.S. Currency of*
21                        *$7.30 ISP Exhibit 1*

       *Gvt's 326*                                                   638

22     *Gvt's 328*        *Alton Police Department ...*638           638
                          *Report #2006-26772:  Full*
23                        *Chain of Custody*

       *Gvt's 329*        *Photograph from Alton Polic*778          779
24                        *Department Case #2006-26772,*
                          *showing jug covered in duct*
25                        *tape*

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 330 | Photograph from Alton Police Department Case #2006-26772, showing six baby jars of marijuana | 778 | 779 |
| Gvt's 331 | Photograph from Alton Police Department Case #2006-26772, showing bottles of Simply Orange Orange Juice full of U.S. coins | 778 | 779 |
| Gvt's 332 | Photograph from Alton Police Department Case #2006-26772, showing an open safe | 778 | 779 |
| Gvt's 333 | Photograph from Alton Police Department Case #2006-26772, showing six bags of marijuana | 778 | 779 |
| Gvt's 334 | Dell Computer Tower Found in APD Evidence Van | 468 | 468 |
| Gvt's 337 | Photo of Bulletin Board Above Mickey Dooley's Desk at the Alton Police Department, Evidence Custodian Office, re: Manila Envelopes on Bulletin Board | 596 | 597 |
| Gvt's 338 | Alton Police Department Case #2005-17637 Report and Supplemental Case File | 1295 | 1296 |
| Gvt's 339 | Alton Police Department Case #2005-17637:  Full Chain of Custody | 638 | 638 |
| Gvt's 340 | Envelope marked 05-17637, Contained Counterfeit Currency: (4) Hundreds, (7) Fifties, (6) Twenties: $870.00 ISP Exhibit 103 | 598 | 598 |
| Gvt's 342 | Alton Police Department Case #2005-3629: Full Chain of Custody | 638 | 638 |
| Gvt's 344 | Alton Police Department Case #2005-3580 Report and Supplemental Case File | 1295 | 1296 |
| Gvt's 345 | Alton Police Department Report #2005-3580:  Full Chain of Custody | 638 | 638 |

1
## INDEX OF EXHIBITS

2
| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 346 | Envelope marked 05-3580, .. Contained Counterfeit Currency: (3) Hundreds, (2) Fifties, (4) Twenties: $480.00 ISP Exhibit 105 | 598 | 598 |
| Gvt's 347 | Alton Police Department Case #2005-21005 Report and Supplmental Case Files | 1295 | 1296 |
| Gvt's 348 | Alton Police Departmant .{ Report #2005-21005:  Full Chain of Custody | P638 | 638 |
| Gvt's 349 | Envelope marked 05-21005, .. Contained Counterfeit Currency: (3) Hundreds: $300.00 ISP Exhibit 106 | 598 | 598 |
| Gvt's 351 | Alton Police Department ... Report #2005-10940:  Full Chain of Custody | 638 | 638 |
| Gvt's 352 | Envelope marked 05-10940, .. Contained Counterfeit Currency: (3) Twenties, (3) Tens: $90.00 ISP Exhibit 107 | 598 | 598 |
| Gvt's 353 | Alton Police Department Case #2005-10982 Report and Supplemental Case File | 1295 | 1296 |
| Gvt's 354 | Alton Police Department ... Report #2005-10982:  Full Chain of Custody | 638 | 638 |
| Gvt's 355 | Envelope marked 05-10982, .. Contained Counterfeit Currency: (1) Fifty dollar bill: $50.00 ISP Exhibit 108 | 598 | 598 |
| Gvt's 356 | Alton Police Department .. Report #2004-30775, Report and Supplemental Case File | 1295 | 1296 |
| Gvt's 357 | Alton Police Department ... Report #2004-30775: Full Chain of Custody | 638 | 638 |
| Gvt's 358 | Envelope marked 04-30775, .. Containing Counterfeit Currency:  (1) One hundred dollar bill: $100.00, ISP Exhibit #104 | 598 | 598 |

**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 360 | Alton Police Department Cases #2005-25439 and #2005-25451, Reports and Supplemental Case Files | 1295 | 1296 |
| Gvt's 361 | Alton Police Department Report #2005-25451: Full Chain of Custody | 638 | 638 |
| Gvt's 362 | Alton Police Department Report #2005-25439:  Full Chain of Custody | 638 | 638 |
| Gvt's 371 | | | 638 |
| Gvt's 372 | Alton Police Department Case #2005-18951, Evidence Plastic Bags #5902 and #5905 and U.S. Counterfeit Currency $1,900.00: Fourteen (14) One hundred dollar bills, Two (2) Fifty Dollar bills, Twenty (20) Twenty dollar bills, and Case Paperwork, found in Dooley's APD Office | 604 | 604 |
| Gvt's 373 | Alton Police Department Case #2005-18951, One (1) U.S. Twenty Dollar Bill found with Gov't Exhibit 372 | 604 | 605 |
| Gvt's 380 | Cash Tracking Form for Alton Police Department Case #2005-10982 | 785 | 786 |
| Gvt's 400 | City of Alton, IL Financial Status Report for Periods Ending 10/30/2003, 09/30/2003, 06/30/2005, 06/30/2006, and 6/30/2007 | 983 | 984 |
| Gvt's 401 | Alton Police Department General Order: G5-3/3 Evidence and Property Management | 1062 | 1063 |
| Gvt's 402 | Alton Police Department Manual of Rules and Regulations | 1059 | 1060 |
| Gvt's 403 | Certificate of Training LETAC to Mick Dooley for 16 hours of Property & Management for Law Enforcement | 1061 | 1061 |

1                          <u>INDEX OF EXHIBITS</u>

2       <u>EXHIBIT</u>                <u>DESCRIPTION</u>           <u>Id'D</u>         <u>Rcv'd</u>

3       *Gvt's 405*        *Video Showing Process of ..964        964*
                          *Obtaining Extra Alton Police*
4                          *Department Evidence Key*
        *Gvt's 406*        *Photo of Alton Police ....1038       1038*
5                          *Department's Evidence Vault*
                          *Key and Evidence Cash/Drug*
6                          *Locker 20 Key*
        *Gvt's 407*        *Photo of Closeup of Alton 1038       1038*
7                          *Police Department's Evidence*
                          *Vault Key*
8       *Gvt's 408*        *Photo of Closeup of Alton 1038       1038*
                          *Police Department's Evidence*
9                          *Vault Key- Shows Double Cut*
        *Gvt's 409*        *Photo of Closeup of Alton 1038       1038*
10                         *Police Department's Evidence*
                          *Cash/Drug Locker 20 Key*
11      *Gvt's 410*        *Photo of Closeup of Alton 1038       1038*
                          *Police Department's Evidence*
12                         *Cash/Drug Locker 20 Key*
        *Gvt's 411*        *Photo of Alton Police .....984        985*
13                         *Department's Tactical*
                          *Response Team  Vehicle*
14                         *Purchased with Federal Funds*
        *Gvt's 412*        *Photo of Inside of Alton ..984        985*
15                         *Police Department's Tactical*
                          *Response Team Vehicle*
16                         *Purchased with Federal Funds*
        *Gvt's 415*        *CD of Locker 20 Camera ....680        683*
17                         *Activity 02/15/2007 -*
                          *04/15/2007*
18      *Gvt's 417*        *Printout from Bazzell of ..681        683*
                          *Dates and Times that*
19                         *correspond with Exhibit 415*
        *Gvt's 420*        *Photo of Outside of Alton 1042       1043*
20                         *Police Department*
        *Gvt's 421*        *Photo of Outside of Alton 1042       1043*
21                         *Police Department*
        *Gvt's 422*        *Photo of Alton Police ....1042       1043*
22                         *Department, Community Room*
                          *Door From Lobby*
23      *Gvt's 423*        *Photo of Alton Police ....1042       1043*
                          *Department, Closeup of*
24                         *Community Room Door for*
                          *Lobby*

25

1                        INDEX OF EXHIBITS

2   EXHIBIT                 DESCRIPTION          Id'D        Rcv'd

3   Gvt's 424      Photo of Community Room to1042          1043
                   Adm. Area Door #1
4   Gvt's 425      Photo of Alton Police ....1042          1043
                   Department, Adm. Area Door
5                  #1
    Gvt's 426      Photo of Alton Police ....1042          1043
6                  Department, Closeup Adm Area
                   Door #1
7   Gvt's 427      Photo of Alton Police ....1042          1043
                   Department, Adm. Area
8                  Entrance Door #1
    Gvt's 428      Photo of Alton Police ....1042          1043
9                  Department, Adm. Area Supply
                   Closet
10  Gvt's 429      Photo of Alton Police ....1042          1043
                   Department, Adm. Area Supply
11                 Closet
    Gvt's 430      Photo of Alton Police ....1042          1043
12                 Department, Adm. Supply
                   Closet Showing Key Ring
13                 Location
    Gvt's 431      Photo of Alton Police ....1042          1043
14                 Department, Adm. Supply
                   Closet Showing Key Ring
15                 Location
    Gvt's 432      Photo of Alton Police ....1042          1043
16                 Department, Lock Box Key
    Gvt's 433      Photo of Alton Police ....1042          1043
17                 Department, Secure File Room
                   Door
18  Gvt's 434      Photo of Alton Police ....1042          1043
                   Department, Secure File Room
19  Gvt's 435      Photo of Alton Police ....1042          1043
                   Department, Secure File Room
20  Gvt's 436      Photo of Alton Police ....1042          1043
                   Department, Key Box with Key
21  Gvt's 437      Photo of Alton Police ....1042          1043
                   Department, Key Box
22  Gvt's 438      Photo of Alton Police ....1042          1043
                   Department, Open Key Box
23  Gvt's 439      Photo of Alton Police ....1042          1043
                   Department, Adm. Area
24                 Entrance Door #2

25

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 440 | Photo of Alton Police ....1042 Department, Adm. Area Entrance Door #2 | | 1043 |
| Gvt's 441 | Photo of Alton Police ....1042 Department, Closeup of Adm. Area Entrance Door #2 | | 1043 |
| Gvt's 442 | Photo of Alton Police ....1042 Department, Hallway to Evidence Room | | 1043 |
| Gvt's 443 | Photo of Alton Police ....1042 Department, Evidence door & Patrol Evidence Station | | 1043 |
| Gvt's 444 | Photo of Alton Police ....1042 Department, Evidence door & Patrol Evidence Station | | |
| Gvt's 445 | Photo of Alton Police ....1042 Department, Evidence door & Patrol Evidence Station | | 1043 |
| Gvt's 445 | | | 1043 |
| Gvt's 446 | Photo of Alton Police ....1042 Department, Patrol Evidence Station | | 1043 |
| Gvt's 447 | Photo of Alton Police ....1042 Department, Patrol Evidence Station | | 1043 |
| Gvt's 448 | Photo of Alton Police ....1042 Department, Patrol Slam Lockers | | 1043 |
| Gvt's 449 | Photo of Alton Police ....1042 Department, Patrol Slam Lockers | | 1043 |
| Gvt's 450 | Photo of Alton Police ....1042 Department, Patrol Evidence Station | | 1043 |
| Gvt's 451 | Photo of Alton Police ....1042 Department, Evidence Room Vestibule | | 1043 |
| Gvt's 452 | Photo of Alton Police ....1042 Department, Evidence Room Vestibule to Vault Door | | 1043 |
| Gvt's 453 | Photo of Alton Police ....1042 Department, Vault Door and Office | | 1043 |

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 454 | Photo of Alton Police Department, Vestibule, Sally Port, and Evidence Work Room | ....1042 | 1043 |
| Gvt's 455 | Photo of Alton Police Department, Vestibule Slam Lockers and Office | ....1042 | 1043 |
| Gvt's 456 | Photo of Alton Police Department, Patrol Evidence Computer Station | ....1042 | 1043 |
| Gvt's 457 | Photo of Alton Police Department, Vestibule Slam Lockers | ....1042 | 1043 |
| Gvt's 458 | Photo of Alton Police Department, Evidence Vault | ....1042 | 1043 |
| Gvt's 459 | Photo of Alton Police Department, Vestibule Camera | ....1042 | 1043 |
| Gvt's 460 | Photo of Alton Police Department, Vault Storage Shelves | ....1042 | 1043 |
| Gvt's 461 | Photo of Alton Police Department, Vault Storage Shelves | ....1042 | 1043 |
| Gvt's 462 | Photo of Alton Police Department, Vault, Locker 20 Camera | ....1042 | 1043 |
| Gvt's 463 | Photo of Alton Police Department, Locker 20, Cash/Drug Locker | ....1042 | 1043 |
| Gvt's 464 | Photo of Alton Police Department, Cash/Drug Locker "Put Keys in Pocket" | ....1042 | 1043 |
| Gvt's 465 | Photo of Alton Police Department, Locker 20, Cash/Drug Locker | ....1042 | 1043 |
| Gvt's 475 | Memo from Sullivan to City Treasurer re: Evidence Fund $780.00 to Peterson Group | 1041 | 1042 |
| Gvt's 476 | The Peterson Group Invoice 975 #150118, to Alton Police Department, $780.00, November 10, 2004 | | 975 |
| Gvt's 477 | Alton Police Department Memo, March 31, 2005, re: New Cash Tracking Form | ..1047 | 1047 |

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---|---|---|---|
| Gvt's 500 | Certified Lack of Record for Mickey Dooley for 2006, 1040 U.S. Individual Income Tax Return | 1375 | 1375 |
| Gvt's 501 | Certified 2006 U.S. Individual Income Tax Return Form 1040 for Mickey Dooley, filed with the IRS on November 5, 2007 | 1376 | 1376 |
| Gvt's 504 | IRS Form 9452, Filing Assistance Program (2006 Filing Requirements for Most People) | 1373 | 1374 |
| Gvt's 507 | Schedule of Deposits to Mickey Dooley's US Bank Account during 2006 | 1386 | 1387 |
| Gvt's 508 | Schedule of Expenditures from Mickey Dooley's US Bank Account during 2006 | 1386 | 1387 |
| Gvt's 509 | Schedule of Alton Belle ATM Withdrawals/Expenditures from Mickey Dooley's US Bank Account during 2006 | 1386 | 1387 |
| Gvt's 510 | Schedule of Non-Alton Belle ATM Withdrawals/Expenditures from Mickey Dooley's US Bank Account during 2006 | 1386 | 1387 |
| Gvt's 511 | Schedule of VISA Expenditures from Mickey Dooley's US Bank Account during 2006 | 1386 | 1387 |
| Gvt's 512 | Schedule of Fees Charged to Mickey Dooley's US Bank Account during 2006 | 1386 | 1387 |
| Gvt's 520 | Treasury Regulation Section 1.6072-1, Time for filing returns of individuals, estates, and trusts | 1371 | 1372 |
| Gvt's 521 | United States Code Title 26, Subtitle F, Chapter 77, Section 7503, Time for performance of acts where last day falls on Saturday, Sunday, or legal holiday | 1372 | 1372 |

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 550 | Photo of Front of Evidence #11227 Envelope with US Currency and Coins, APD Case #2007-3063, as found during 04/23/07 - 04/26/07 Locker 20 Audit | 640 | |
| Gvt's 551 | Photo of Back of Evidence #11227 Envelope with US Currency and Coins, APD Case #2007-3063, as found during 04/23/07 - 04/26/07 Locker 20 Audit | .640 | 640 |
| Gvt's 552 | Photo of Item #1, Envelope with US Currency, APD Case #2005-5652, as found during 04/23/07 - 04/26/07 Locker 20 Audit | 640 | 640 |
| Gvt's 553 | Photo of APD Report Case #2005-5652 with Post-it Notes, as found during 04/23/07 - 04/26/07 Locker 20 Audit | ..640 | 640 |
| Gvt's 554 | Photo of Front of Evidence #2653 Envelope with US Currency, APD Case #2003-6080, as found during 04/23/07 - 04/26/07 Locker 20 Audit | 640 | 640 |
| Gvt's 555 | Photo of Front of Evidence #2653 Envelope with US Currency, APD Case #2003-6080, as found during 04/23/07 - 04/26/07 Locker 20 Audit | 640 | 640 |
| Gvt's 556 | Photo of Back of Evidence #2653 Envelope with US Currency, APD Case #2003-6080, as found during 04/23/07 - 04/26/07 Locker 20 Audit | .640 | 640 |
| Gvt's 557 | Photo of US Currency, Four (4) One dollar bills, APD Case #2003-6080, as found during 04/23/07 - 04/26/07 Locker 20 Audit | 640 | 640 |

1                           **INDEX OF EXHIBITS**

2   **EXHIBIT**                    **DESCRIPTION**          **Id'D**        **Rcv'd**

3   *Gvt's 558*        *Photo of Blank Supplemental*640                      *640*
                       *Report APD Case #2003-6080,*
4                      *as found during 04/23/07 -*
                       *04/26/07 Locker 20 Audit*
5   *Gvt's 559*        *Photo of Front of Evidence* 640                      *640*
                       *#2637 Envelope, APD Case*
6                      *#2004-425953 and Blank*
                       *Supplemental Report, as*
7                      *found during 04/23/07 -*
                       *04/26/07 Locker 20 Audit*
8   *Gvt's 560*        *Photo of Front of Evidence* 640                      *640*
                       *#2638 Envelope with US*
9                      *Currency and Coins, and*
                       *Blank Supplemental Report,*
10                     *APD Case #2003-114, as found*
                       *during 04/23/07 - 04/26/07*
11                     *Locker 20 Audit*
    *Gvt's 561*        *Photo of Cut, Evidence #2636*40                      *640*
12                     *Envelope with US Currency*
                       *and Coins, APD Case*
13                     *#2003-114, as found during*
                       *04/23/07 - 04/26/07 Locker*
14                     *20 Audit*
    *Gvt's 562*        *Photo of Blank Supplemental*640                      *640*
15                     *Report, APD Case #2003-114,*
                       *as found during 04/23/07 -*
16                     *04/26/07 Locker 20 Audit*
    *Gvt's 563*        *Photo of US Currency and ..*640                      *640*
17                     *Coins, APD Case #2003-114,*
                       *as found during 04/23/07 -*
18                     *04/26/07 Locker 20 Audit*
    *Gvt's 564*        *Photo of Front of Evidence* 640                      *640*
19                     *#2656 Envelope, APD Case*
                       *#2004-40699, as found during*
20                     *04/23/07 - 04/26/07 Locker*
                       *20 Audit*
21  *Gvt's 565*        *Photo of Cut, Evidence #2656*40                      *640*
                       *Envelope, APD Case #2004-*
22                     *40699, as found during*
                       *04/23/07 - 04/26/07 Locker*
23                     *20 Audit*
    *Gvt's 566*        *Photo of Blank Supplemental*640                      *640*
24                     *Report, APD Case*
                       *#2004-40699, as found during*
25                     *04/23/07 - 04/26/07 Locker*
                       *20 Audit*

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---------|-------------|------|-------|
| Gvt's 567 | Photo of Identifying Sheet: APD Case #2003-4390, Evidence #1502, 1503 | 640 | 640 |
| Gvt's 568 | Photo of Cut, Evidence #1502 Envelope, APD Case #2003-4390 | 640 | 640 |
| Gvt's 569 | Photo of Cut, Evidence #1502 Envelope, APD Case #2003-4390 | 640 | 640 |
| Gvt's 570 | Photo of Blank Supplemental Report, APD Case #2003-4390 | 640 | 640 |
| Gvt's 600 | | | 1386 |
| Gvt's 601 | Treasure Island Casino ... Records for Mickey Dooley | 1392 | 1392 |
| Gvt's 602 | Alton Gaming Company (Alton Belle) Casino Records for Mickey Dooley and Affidavit | 1359 | 1359 |
| Gvt's 604 | City of Alton Payroll .... Records for Mickey Dooley | 1390 | 1391 |
| Gvt's 605 | Business Records ......... Declaration: City of Alton, IL Payroll Department | 1390 | 1391 |
| Gvt's 628 | Chart of APD Case #2003-1146, Evidence #2638 | 656 | 656 |
| Gvt's 629 | Chart of APD Case ......... #2003-4390, Evidence #1502 | 656 | 656 |
| Gvt's 630 | Chart of APD Case ......... #2003-4390, Evidence #1503 | 656 | 656 |
| Gvt's 631 | Chart of APD Case ......... #2003-6080, Evidence #2653 | 656 | 656 |
| Gvt's 632 | | | 1432 |
| Gvt's 633 | Chart of APD Case ......... #2004-40699, Evidence #2656 | 656 | 656 |
| Gvt's 634 | Chart of APD Case ......... #2004-42953, Evidence #2637 | 656 | 656 |
| Gvt's 635 | | | 1432 |
| Gvt's 636 | | | 1432 |
| Gvt's 637 | Chart of APD Case ......... #2005-5652/5654 | 656 | 656 |
| Gvt's 638 | Chart of APD Case ......... #2005-6688, Evidence #4781 | 656 | 656 |
| Gvt's 639 | Chart of APD Case ......... #2005-6688, Evidence #4782 | 656 | 656 |
| Gvt's 640 | Chart of APD Case ......... #2005-10612, Evidence #5137 | 656 | 656 |

 1                          <u>INDEX OF EXHIBITS</u>

 2     <u>EXHIBIT</u>                  <u>DESCRIPTION</u>          <u>Id'D</u>        <u>Rcv'd</u>

 3     *Gvt's 641*          *Chart of APD Case .........656*      *656*
                            *#2005-10612, Evidence #5138*
 4     *Gvt's 642*          *Chart of APD Case .........656*      *656*
                            *#2005-10612, Evidence #5139*
 5     *Gvt's 643*                                               *1432*
       *Gvt's 644*                                               *1432*
 6     *Gvt's 645*                                               *1432*
       *Gvt's 646*                                               *1432*
 7     *Gvt's 647*                                               *1432*
       *Gvt's 648*                                               *1432*
 8     *Gvt's 649*                                               *1432*
       *Gvt's 650*          *Chart of Olin Credit Union 293*      *293*
 9                          *Robbery, Case #2006-16514*
                            *Evidence #8894*
10     *Gvt's 651*          *Chart of Olin Credit Union 291*      *291*
                            *Robbery, Case #2006-16514*
11                          *Evidence #8892*
       *Gvt's 652*          *Chart of Olin Credit Union 303*      *303*
12                          *Robbery, Case #2006-16514*
                            *Evidence #8776*
13     *Gvt's 653*          *Chart of Olin Credit Union 294*      *294*
                            *Robbery, Case #2006-16514*
14                          *Evidence #8895*
       *Gvt's 654*                                               *1432*
15     *Gvt's 655*                                               *1432*
       *Gvt's 656*                                               *1432*
16     *Gvt's 657*          *Chart of APD Case #2006-49 656*      *656*
                            *Evidence #7305*
17     *Gvt's 658*          *Chart of APD Case .........656*      *656*
                            *#2006-28669 Evidence #9982*
18     *Gvt's 659*          *Chart of APD Case .........656*      *656*
                            *#2006-28669 Evidence #9983*
19     *Gvt's 660*          *Chart of APD Case #2007-306656*      *656*
                            *Evidence #11227*
20     *Gvt's 661*          *Chart of APD Case #2007-660656*      *656*
                            *Evidence #11638*
21     *Gvt's 670*          *Summary of Missing Money: .356*      *356*
                            *April 13, 2006*
22     *Gvt's 671*          *Summary of Missing Money: .360*      *361*
                            *April 16, 2006*
23     *Gvt's 672*          *Summary of Missing Money: .641*      *642*
                            *April 23-26, 2006*
24     *Gvt's 673*          *Summary of Missing Money: .658*      *658*
                            *April 27, 2006*

25

1
## INDEX OF EXHIBITS

2
| **EXHIBIT** | **DESCRIPTION** | **Id'D** | **Rcv'd** |
|---|---|---|---|
| *Gvt's 674* | | | *1322* |
| *Gvt's 675* | *Summary of Missing Money: .667 July 6, 2007* | | |
| *Gvt's 676* | *Summary of Missing Money: .581 Counterfeit Money* | | *582* |
| *Gvt's 685* | *Chart Diagram of Alton ....401 Police Department* | | *402* |
| *Gvt's 686* | *Chart Diagram of Alton ....401 Police Department: Area Around Locked Key Box* | | *402* |
| *Gvt's 687* | *Chart Diagram of Alton ....402 Police Department: Evidence Room Area* | | *402* |

1                            **MISCELLANEOUS**

2                                                    **PAGE**

3    *Closing argument, defense*                     *1810*
     *Closing argument, government*                  *1750*
4    *Closing argument, rebuttal*                     *1840*
     *Instruction discussion*                        *1566*
5    *Instruction, discussion*                         *910*
     *Instructions, final*                           *1732*
6    *Instructions, preliminary*                       *105*
     *Motions*                                          *30*
7    *Opening Statement, Defense*                      *151*
     *Opening Statement, Prosecution*                  *120*
8    *Venire 1-18 voir dire by Court*                   *36*
     *Venire 1-18 voir dire by defense*                 *72*
9    *Venire 1-18 voir dire by prosecution*             *64*
     *Venire 19-27 voir dire by Court*                  *85*
10   *Venire 19-27 voir dire by prosecution*            *99*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *(Court convened 9/3/08 at 8:00 a.m.)*

2      *(Following proceedings held outside presense of jury venire:)*

3          *COURTROOM DEPUTY:  United States of America versus*

4    *Mickey Dooley*, Case No. 08-30010, is called for trial.

5          Will the attorney's identify themselves for the

6    record?

7          *MR. SMITH:*  Good morning, your Honor.  Norm Smith on

8    behalf of the U.S. attorney's office, ready to proceed along

9    with co-counsel.

10         *MR. WEINHOEFT:*  Steve Weinhoeft, your Honor.

11         *MR. SMITH:*  Also present, Special Agent Jonathan Kelly

12   of the Federal Bureau of Investigations and Lieutenant Shields

13   of Illinois State Police.

14         *MR. FREESE:*  Good morning, your Honor.  Gordon Freese

15   present for the defendant Mickey Dooley, and Mr. Dooley is

16   present.

17         *THE COURT:*  Mr. Freese, Mr. Dooley, good morning.

18         We are assembled before the jury is sent to us.  They

19   are going through the process of the movie that each juror

20   sees.

21         We did have one small matter, the government's motion

22   in limine.  Now, I looked at this, and basically, the motion

23   says that there will be government witnesses that it is

24   anticipated the defense will attack and is concerned about the

25   manner or the method by which the defense might attack these

1   government witnesses.  There are several rules and they've been

2   cited.

3        I do want to bring to everyone's attention that

4   Federal Rule 608 was amended in 6000 -- or in 2003 with respect

5   to the limitation on extrinsic evidence.  And this is one of

6   those amendments that's not so well understood.  But generally

7   speaking, the limitation on extrinsic evidence has been

8   strictly limited to apply only in those instances where the

9   witness's character for truthfulness is attacked.  There are

10  any number of other ways that a witness's character might be

11  attacked other than for truthfulness and the comments give us

12  several examples of that.  Now, I'm not going to say too much

13  more about that.

14       The motion is broad and the Court takes it rather as

15  a -- oh just a flare, if you will, to the Court and to counsel

16  that this might be an issue.  There is nothing specific here

17  set out other than asking the Court to follow the rules of

18  evidence, which the Court, of course, will.

19       MR. WEINHOEFT:  And your Honor, if I may?  I've spoken

20  with Mr. Freese and part of the intention of filing the motion

21  was to get some discussions going with defense to try and

22  narrow the issues, and we have actually agreed on several of

23  the issues already.  I think there are two that may be

24  problematic, and Mr. Freese has asked if we can wait until

25  possibly a little later to address those issues.

1          THE COURT:  What we will do is -- of course a motion

2     in limine really is extraordinary relief.  You are asking the

3     judge to rule something out of evidence before there's any

4     context involved, and in certain instances that is proper, but

5     here, of course, I couldn't do that.  So I simply take the

6     motion under advisement.  And if there comes a time where

7     either party anticipates that something is about to happen

8     which you feel or you think relates to the matters embraced by

9     the motion, then stop, I'll excuse the jury, and we'll talk

10    about it.  But the defendant's given a lot of latitude, of

11    course, in a criminal prosecution to attack the credibility of

12    the witnesses.

13          Now, I think everyone's familiar with our jury

14    selection procedures.  I'll ask the jurors some questions, and

15    then I will give counsel an opportunity to ask some questions,

16    too.  And you know how we exercise our challenges.

17          Now, I was just informed that Juror Number 14, that's

18    Ann Huber.

19          Is that right, Linda?

20          Look, she's one of the marshal's employees downstairs

21    whose intimately involved in just about everything that goes

22    on.  My inclination is just not to even have her come up.

23          Does anybody have any objection to that?

24          MR. SMITH:  The government has no objection.

25          MR. FREESE:  The defense has no objection.

1          THE COURT:  Okay.  Linda, as soon as she comes up,

2     just have her go.  I think our accounting procedure is such

3     that she has to actually come up.

4          COURTROOM DEPUTY:  Come up and be sworn.

5          THE COURT:  As soon as she is sworn, you can tell her.

6          So Juror 14 won't be on our list.

7          All right.  I think you will have a few minutes to get

8     up and stretch, make a run to the restroom, if you like, and

9     get back in here.  Hopefully the jurors will get a good running

10    start.

11         Court's in recess.

12                            (Recess)

13       (Following proceedings held in presence of Venire 1 - 36)

14         COURTROOM DEPUTY:  United States of America versus

15    Mickey Dooley.  Case number 08-30010-GPM is called for jury

16    trial.

17         Will the parties identify themselves for the record?

18         MR. SMITH:  Good morning, your Honor.  Norm Smith here

19    on behalf of the U.S. attorney's office with co-counsel.

20         MR. WEINHOEFT:  Good morning, Steve Weinhoeft.

21         THE COURT:  Good morning.

22         MR. FREESE:  Good morning, your Honor.  Gordon Freese

23    here for the defendant.  Present.  Mickey Dooley.

24         THE COURT:  Good morning, Mr. Dooley.

25         Good morning, ladies and gentlemen.  Thank you so much

1   for being here and being timely.  I'm going to take just a few

2   minutes and outline what we're going to be doing here.

3        My name is Patrick Murphy.  I've been here for just

4   about -- well, working on 11 years.  This is not my home.  But

5   I'm starting to understand that you folks don't really talk

6   funny.  And I can understand just about everything you say.

7        I want you to know just a few things.  Relax.  This is

8   your courthouse.  I'm not one of those judges that is looking

9   to embarrass someone or make someone feel ill at ease or to

10   unnecessarily exercise my authority.  I seldom have occasion to

11   do that.

12        It's through your generosity, your hard work, that the

13   taxes are paid that pay for this place.  All of the people that

14   work with me here are paid for with your tax dollars, and you

15   pay my salary, too.  So I have nothing but the warmest feelings

16   for you folks.

17        The process will be that we're going to select 12

18   regular jurors and two alternates to try this case.  We're

19   going to go the rest of this week, today, Thursday, and Friday.

20        Monday the jurors will not be here.  I reserve that

21   day for hearing the motions and the sentencings that have to go

22   on each week.  If we don't do that, we get so far behind it's

23   almost impossible to catch up.  The jurors will come back

24   Tuesday, and we will finish this case next week.

25        Now, I know that some of you have had some experience

1    in courts where matters drag out and they don't get done.  My

2    judgment is almost never wrong on these matters.  We finish

3    cases when I say we will finish them.

4           I'll promise you this, too, there will be no one that

5    will waste your time.  Your time will not be wasted.  I commit

6    to that.

7           And if at any time during these proceedings, tomorrow

8    or today, whenever, if someone is uncomfortable, if you need to

9    take a break, let me know, raise your hand or do something, and

10   we will stop.  This is important business and we are going to

11   take care of it, but it's not an athletic event where we see,

12   you know, how long we can punish ourselves before we pass out.

13   So we will take what we need to take to -- time to make you

14   comfortable.

15          Now the first order of business will be shortly my

16   deputy clerk will administer the oath to you which says you

17   will answer questions truthfully about your qualifications to

18   serve as a juror.  Then I'll ask each of you a few questions.

19   Then I will let the government ask you a few questions, and

20   then the defense will ask you a few questions.

21          The way to look at this, if you think about it, is

22   that you're interviewing someone for the most important job you

23   would ever interview a person for.  The way I see the world,

24   that would be if you are putting someone behind the counter to

25   operate the cash register at the business that you have spent

1          *MR. SMITH:*  The government does agree.

2          *THE COURT:*  Mr. Freese, do you agree that though are

3    the jurors that have been properly selected and the alternates?

4          *MR. FREESE:*  The defense does agree.

5          *THE COURT:*  Julie, do you have our preliminary

6    instructions ready?

7          *COURTROOM DEPUTY:*  Do you want me to tell these folks

8    and get started?

9          *THE COURT:*  Get the 12 jurors in here.  What I'll do

10   is impanel this jury, and I'll give you a few minutes to get

11   your props together for our opening statements.

12          All right.

13                            *(Recess.)*

14        *(Following proceedings held in presence of jury:)*

15          *THE COURT:*  The Court is now in session.  The next

16   order of business is, the deputy clerk will administer the oath

17   that will make these jurors a jury.  When you take this oath,

18   you will become officers of the court.

19          Linda, if you would.

20                  *(Oath administered to jury.)*

21          *THE COURT:*  All right.  Ladies and gentlemen, if you

22   are a visual learner, you can follow on the screen.  I will

23   also read it to you, but just relax.  These instructions, you

24   will see, will kind of give you a little help on how we're

25   going to conduct ourselves over the next few days.

1          Members of the jury, what I will now say is intended

2     to serve as an introduction to the entire trial of this case.

3     It is not a substitute for the detailed instructions on the law

4     which I will give to you at the end of the case and before you

5     retire to deliberate on your verdict.

6          During the trial and beginning with these preliminary

7     instructions, you will hear me use a few terms which you may

8     not have heard before.  Let me now briefly explain some of the

9     most common to you.

10          You will sometimes hear me refer to "counsel."

11     "Counsel" is another way of saying lawyers or attorneys.  I

12     will sometimes refer to myself as the "Court."  The prosecution

13     and the defendant are sometimes called the "parties" to this

14     case.

15          When I sustain an objection, I am excluding that

16     evidence from this trial for good reason.  When you hear that

17     I've overruled an objection, I am permitting that evidence to

18     be admitted.  When we say "admitted into evidence" or "received

19     into evidence," we mean that this particular statement or this

20     particular exhibit is now part of the trial and may be

21     considered by you in making the decisions you must make at the

22     close of this case.

23          The term "burden of proof" or "sustaining its burden

24     of proof" means the obligations of proving it's case -- in this

25     trial, the government's obligation to produce burden of proof

1    beyond a reasonable doubt on the charges in the superseding

2    indictment.

3           This is a criminal case commenced by the United

4    States, which I may sometimes refer to as the "prosecution" and

5    sometimes as the "government," against Mickey Dooley, to whom I

6    may refer as the "defendant."

7           The case is initiated by way of a superseding

8    indictment.  Mickey Dooley, the defendant, is charged with

9    multiple felony crimes.  You should understand that an

10   indictment is simply a charge by the government to begin a case

11   and that it is not, in any sense, evidence of the allegations

12   or statements it contains.

13          Now let me ad lib here just a minute.  The government,

14   when it makes its opening statement, may very well decide to

15   tell you with more specificity just exactly -- or maybe not so

16   is exactly, what the charges are.  But at any rate, when you

17   deliberate, you will have a copy.  But it would be wasteful and

18   mind-numbing to try to read all that to you right now.

19          The government has the burden or obligation to prove

20   each of the essential elements of the crimes charged to you

21   beyond a reasonable doubt.  The purpose of this trial is to

22   determine whether or not the government can meet this burden or

23   obligation.

24          I instruct you that you must presume that Mickey

25   Dooley, the defendant, is not guilty of the crimes charged in

1    the superseding indictment.

2                    *(Clerk speaking with Judge).*

3              THE COURT:  If I didn't read this, Mickey Dooley, the

4    defendant, has pleaded not guilty to the charges contained in

5    the superseding indictment.

6              The trial will proceed in the following order:  First,

7    the parties had the opportunity to make opening statements.

8    The government may make an opening statement at the beginning

9    of the case.  The defendant may make an opening statement

10   following the opening statement for the government or may

11   postpone the making of the opening statement until the close of

12   the government's case.  The defendant is not obligated to make

13   an opening statement.  What is said in the opening statements

14   is not evidence.  The opening statements simply serve as an

15   introduction to the evidence which the party making the opening

16   statement intends to produce during the trial.

17             Second, after any opening statements the government

18   will introduce evidence which it feels supports the charges

19   contained in the superseding indictment.

20             Third, after the government has present its evidence,

21   the defendant may present evidence, but he is not obliged to do

22   so.  The burden or obligation, as you will be told many times

23   during the course of this trial, is all on the government to

24   prove each and every element of the offense charged beyond a

25   reasonable doubt.

1        The law never imposes on a defendant in a criminal

2    case the burden of calling any witnesses, producing any

3    exhibits, or introducing any evidence.

4        A defendant is presumed to be innocent of the charges.

5        Fourth, after all the evidence has been received, in

6    other words, after all the witnesses have testified and after

7    all the exhibits have been admitted, I will give you orally and

8    in writing the final instructions concerning the laws which you

9    must apply to the evidence received during the trial.  Those

10   instructions will be much more detailed than these I am giving

11   you now.

12       Fifth, each party will be given the opportunity to

13   present argument to you in support of its case.  This is called

14   "closing argument."  What is said in the closing argument is

15   not evidence, just as what is said in the opening statements is

16   not evidence.  The closing arguments are decide to present to

17   you theories and conclusions of the parties as to what the

18   evidence has shown and what inferences may be drawn from the

19   evidence.

20       You will then retire to consider your verdict.  Your

21   verdict must be unanimous.  All 12 of you must agree to it.

22       I'm going to ad lib here, but the two alternates will

23   remain in the court, in the building, talking to no one.  And

24   in the event that a juror retires while they're deliberating,

25   the first alternate will step in so it will go.

1          You must keep an open mind to both sides during this

2     trial.  As you know, there are generally two sides to both

3     stories and you must not make up your mind about any of the

4     questions in this case until you have heard each piece of

5     evidence and all of the law which you must apply to that

6     evidence, in other words, until you begin your deliberations.

7          Your purpose as jurors is to find and determine the

8     facts.  Under our system of justice, you are the sole judge of

9     the facts.  If at any time I should make any comment regarding

10    the facts or you think I'm making some comment about a piece of

11    evidence, you are at liberty to disregard it totally.

12         It is especially important that you perform your duty

13    of determining the facts diligently and conscientiously, for

14    ordinarily, there is no means of correcting an erroneous

15    determination of the facts by a jury.

16         On the other hand, and with equal emphasis, I instruct

17    you that the law as given by the Court in these and other

18    instructions constitutes the only law for your guidance.  It is

19    your duty to accept and to follow the law as I give it to you,

20    even though you may disagree with the law.

21         You are to determine the facts solely from the

22    evidence admitted in the case.  This evidence consists of the

23    testimony of witnesses and exhibits received.  Questions asked

24    by the lawyers are not evidence, for the evidence consists of

25    the witnesses' answers to the questions, not the questions

1    themselves.

2           As I said earlier, statements and arguments of counsel

3    are not evidence.  Counsel, however, may enter into agreements

4    or stipulation of facts which are not in dispute, and when they

5    do so, you may accept the facts as stipulated by counsel.

6           Let me stop and ad lib.  "Stipulation" is just

7    legalese for agreement.  If the parties agree something is so,

8    we would not want to waste our time by making someone prove

9    something that we all agree.  We might as well say we agree

10   that this is true.  The law being ancient and old says we

11   stipulate that something is so.

12          Okay.  I may also tell you that I'm taking judicial

13   notice of certain facts, and you, then, may accept those facts

14   as true.  An explanation:  Life is such that there are certain

15   things that are irrefutably true and the list of those things

16   is endless.  For instance, the city of St. Louis, Missouri is

17   on the west side of the Mississippi River.  We know that.

18   There's no need to call in a geographer or a surveyor to prove

19   that is the case, or that water freezes at 32 degrees

20   Fahrenheit or that earth has one moon, and it goes on and on

21   and on.  So the Court could just say, ladies and gentlemen, I

22   take judicial notice of the fact that the city of St. Louis is

23   located on the west side of the Mississippi River, and we have

24   saved three hours of testimony from a surveyor.  I'll let you

25   know if that happens.

Instructions, preliminary

1          It's always up to you, however, to decide what facts

2     are established by the evidence and what inferences are to be

3     drawn from the evidence.

4          The parties may, sometimes, present objections to some

5     of the testimony or exhibits.  It is the duty of the lawyer to

6     object to evidence which he or she believes may not properly be

7     admitted, and you may not be prejudiced against a lawyer who

8     makes objections or against the party he or she represents.

9          An objection is the only proper way to request a

10    ruling from the court concerning evidence.  At times I may

11    sustain objections or direct that you disregard certain

12    testimony or exhibits.  You must not consider any evidence to

13    which an objection has been sustained or which I have

14    instructed you to disregard.

15         Do not read any news accounts about the case in any

16    newspaper or watch any such news accounts on the television or

17    listen to any such news accounts on the radio.  You must not

18    consider anything you may have read or heard about the case

19    outside of this courtroom, whether before or during the trial

20    or during your deliberation.

21         Do not attempt any independent research or

22    investigation about this matter.  Your decision in this case

23    must be based solely and exclusively upon the evidence received

24    during the trial and not upon anything else.

25         Let me ad lib.  Ladies and gentlemen, this instruction

1    over the years has become more important.  When I was a

2    youngster, the only way we got our information was through the

3    one little local newspaper that came at night.  I can remember

4    when we got TVs for the first time.  And you know what it is

5    now.  Everyone is an independent researcher or so they think.

6    Don't do it.  Just don't do it.  There are very good reasons

7    why the law requires this, and I just ask that you stay off

8    your computers and your Google searches until after the trial

9    is over.  I don't have time to do these things twice.

10           You may have already heard the terms "direct evidence"

11   and "circumstantial evidence."  "Direct evidence" is generally

12   the testimony of a person who claims to have actual and direct

13   knowledge of a fact -- for example, the testimony of an

14   eyewitness who claims to have seen an event.  "Circumstantial

15   evidence" is generally testimony of a chain of facts which may

16   lead to a conclusion of some kind.  In the event, the law makes

17   no distinction between direct evidence and circumstantial

18   evidence.  In considering the evidence here in this trial, you

19   should give it such weight or importance as you think it

20   deserves, whether it's called "direct" or "circumstantial

21   evidence" and make the deductions and reach the conclusion to

22   which your experience and commonsense lead.

23           Let me just give you an example.  If you are outside

24   on Missouri Avenue and it starts raining and you are there and

25   you can see the rain, feel the rain, and I think you can smell

1    the rain.  That's direct evidence that it was raining on

2    Missouri Avenue.

3         If you are inside this courthouse and you can hardly

4    see outside and you see people coming in with their umbrellas

5    and their rain coats on, that's circumstantial evidence that

6    it's raining outside.

7         Now, in attempting to determine the facts in this

8    case, you may be called upon to judge the credibility of the

9    witnesses who testify in this trial.  In deciding whether or

10   not to believe what a witness has said, I suggest that you

11   consider the intelligence of a witness, the ability of the

12   witness to have seen or heard what the witness said was seen or

13   heard, the ability of the witness to remember what happened,

14   any interest that the witness might have in how this case is

15   decided, and whether the testimony is reasonable.

16        You are free to believe all of what a witness or

17   exhibit says, some of it, or none of it.  I will address this

18   subject again after you have heard all of the evidence in the

19   trial.

20        No statement, ruling, remark, or comment which I may

21   make during the course of this trial is intended to indicate my

22   opinion as to how you should decide the case or is intended to

23   influence you in any way in your determination of the facts.

24        At times I may ask questions of witnesses.  If I do

25   so, it is for the purpose of bringing out matters which I feel

1    should be brought out and not in any way to indicate my opinion

2    about the facts or to indicate the weight I feel you should

3    give to the testimony of the witness so questioned.

4         I may also find it necessary to admonish the lawyers,

5    and if I do, you should not show prejudice towards a lawyer or

6    the client of that lawyer because I found it necessary to

7    correct him or her.  That is so rare that I have to do that I

8    can't even recall that.  These are all very professional people

9    and that will not happen in this case, I'm sure, so...

10        At times during this trial it will be important for me

11   to confer privately with the lawyers and others about various

12   evidentiary and procedural issues.  During these conferences,

13   both here at the bench and in my chambers, it is not our

14   intention to hide anything from you, but simply to determine

15   how certain issues should be handled.  Please be patient with

16   us during any such delays we are only taking care to insure

17   that the trial is being conducted fairly.

18        The example I like to give to explain this, because I

19   hate delay, is that the old time carpenters had their saying,

20   "measure twice, cut once."  Sometimes there will be things that

21   I'm not sure about that I want to talk to the lawyers about.

22   What I'm doing is I'm taking two measurements because I don't

23   want to cut in the wrong place.

24        At times you will be required to wait in your jury

25   room while I'm required to hear and decide other matters from

Instructions, preliminary

1    other cases not connected with this one.  These delays are

2    unavoidable.  I do everything I can to keep these interruptions

3    to a minimum, but can never avoid them entirely, so please be

4    patient.  This is not likely to happen, but it could.  The

5    Southern District of Illinois consists of 38 counties.  There

6    are four United States district judges.  Our docket is

7    completely current.  We take care of our business.

8         You are not to concern yourself in any way with the

9    sentence which the defendant might receive if you should find

10   him guilty.  Your function is solely to decide whether the

11   government has sustained or carried its burned of proving the

12   charge to you beyond a reasonable doubt.  If, and only if, you

13   find the defendant guilty will it become the duty of the Court

14   to pronounce sentence.

15        The attorneys and the parties will not speak with you

16   because I have instructed them that they must not.  When you

17   see one of the lawyers in the hallway, for example, and he or

18   she does not speak with you, that lawyer is not being rude,

19   cold, or unfriendly, but doing what I have ordered all the

20   lawyers to do.  It does not look appropriate to one side or the

21   other of this case to be speaking with any of you no matter how

22   innocent or trivial that conversation might in fact be.

23        Until this case is submitted to you to begin your

24   deliberations, you must not discuss it with anyone at all, even

25   with your fellow jurors.  After it is submitted you must

1    discuss the case only in the juror room with your fellow

2    jurors.  It is important that you keep an open mind and not

3    decide any issue in the case until the entire case has been

4    submitted to you and you will be instructed regarding the law

5    which you must apply to the evidence.

6          Please keep a few key principles in mind as we begin

7    this trial.  Your job is to decide all the factual questions in

8    this case, like who should be believed and who should not be

9    believed.  I will decide all of the legal questions in this

10   case, like what testimony or exhibits are received into

11   evidence and which are not received.  Please do not concern

12   yourself with the legal questions.

13         The defendant has pleaded not guilty and is presumed

14   to be innocent of the crimes charged.  As such, the defendant

15   is not required to produce any evidence whatsoever.  By

16   bringing the superseding indictment, moreover, the government

17   has accepted the responsibility of proving the guilt of the

18   defendant to each of you unanimously beyond a reasonable doubt.

19         Finally, do not discuss this case with anyone and keep

20   an open mind regarding each issue in the case until all the

21   evidence has been received.  At that time I will be able to

22   give you the complete and final instructions which you must use

23   to guide you in reaching your decisions.  Then, and only then,

24   will you be fully prepared to begin your deliberations and

25   reach your verdict.

1          The Court will permit jurors to take notes during the
2    course of this trial.  There are a number of reasons for my
3    decision.  You, of course, are not obliged to take notes.  If
4    you do not take notes, you should not be influenced by the
5    notes of another juror.  Rely upon your own recollection of the
6    evidence.

7          Note-taking must not be allowed to interfere with the
8    ongoing nature of the trial or distract you from what happens
9    here in court.  Notes taken by any juror, moreover, are not
10   evidence in the case and must not take precedence over the
11   independent recollection of the evidence received in the case.
12   Notes are only an aid to recollection and not entitled to any
13   greater weight than actual recollection or the impression of
14   each juror as to what the evidence actually is.  Any notes
15   taken by any juror concerning this case should not be disclosed
16   to anyone other than a fellow juror.

17         As I always tell jurors, there are several great
18   divides in life, male and female, young and old, there's also a
19   great divide when it comes to note-taking.  There is A note
20   takers and there's B note takers.  The A note taker was that
21   girl in the seventh grade who was always the best English
22   student, probably the best student, that made those beautiful
23   outlines.  Remember that girl, Roman Numeral I, major topic,
24   capital A, little A?  You remember that person, that's your A
25   note taker.

1              I'm absolutely sure that would be this one and that

2     one.  Might have even been this one, but I'm not so sure

3     (indicating law clerk, courtroom deputy, court reporter,

4     respectively).

5              For my part, I was a B note taker.  My notes consists

6     largely of just unintelligible diagrams and notes and boxes and

7     circles and what have you.  Whatever makes you comfortable, do

8     it.  Okay?

9              Now, Mr. Smith, do you need a few minutes to set up

10    your props for your opening statements or are you prepared to

11    go?

12             *MR. SMITH:*  Not long, we are hooking up a computer, so

13    just a couple minutes.

14             *THE COURT:*  All right.  We will just wait on you.

15             Ladies and gentlemen, you can stand up, stretch out.

16             Does anybody need to run in here and maybe take a

17    restroom break before we get started?  All right.  My note

18    taker needs to do that.

19                              *(Recess)*

20             *THE COURT:*  Be seated, please.

21             We will have the opening statement from the United

22    States.

23             Mr. Smith, you may proceed.

24             *MR. SMITH:*  Thank you.  May it please the Court.

25             *THE COURT:*  It does.

                    Opening Statement, Prosecution

1            MR. SMITH:  United States of *America versus Mickey L.*

2    *Dooley.*  Before we get started I'd like to introduce the case

3    agents.  First off, Special Agent Kimberly Singer is with the

4    Internal Revenue Service, criminal investigation division.

5    Special Agent Jonathan Kelly is with the Federal Bureau of

6    Investigations.  Lieutenant Shields, Steve Shields, is with the

7    Illinois State Police.  There were three case agents on this

8    investigation primarily from three different agencies.

9            I work for the United States attorney's office.  We

10   prosecute federal criminal cases.  I'm working with -- my

11   pleasure to work with assistant United States attorney Steve

12   Weinhoeft.

13           The judge talked to you a little bit about

14   note-taking.  And every night when I go home and I'm going over

15   my kids homework, I look at what they've taken as far as notes

16   for their class, and I encourage my kids to take note-taking

17   just like I encourage myself.  You have heard what the judge

18   said, but I do encourage you because this is complicated to the

19   extent that there is a lot of evidence, and it makes it easy to

20   keep track on which evidence pertains to which count.

21           But we're here pursuant to a federal grand jury's

22   indictment of Mickey L. Dooley in an eight-count indictment.

23   I'm going to go through each of the eight counts.

24           That's the Alton Police Department.  You will learn

25   that Mickey Dooley was a long-time police officer for the Alton

1    Police Department, and in March of 2004 he became the evidence

2    custodian of the Alton Police Department.  That gave him unique

3    access, basically sole access, to the evidence vault, what was

4    kept in the evidence vault.  And then you will see that there

5    was a special place in that evidence vault where money and

6    drugs were kept, a cash locker, if you will.  He had unique

7    access to the cash locker.

8         You will learn that starting in 2004 Mickey Dooley

9    helped himself to the money that was being held as evidence for

10   federal cases and for state cases awaiting trial.  He helped

11   himself.  And except for a motion-activated camera that was up

12   in the evidence vault, he had unsupervised access, 24 hours a

13   day.

14        You will see that the indictment charges him, while he

15   was an Alton Police Department police officer, it charges him

16   with committing thefts and making lies.

17        Here is an e-mail that started the unfolding of and

18   the revealing of Mickey Dooley's thefts from the police

19   department.  You will see that he received an e-mail from

20   Lieutenant David Hayes from the Alton Police Department.  You

21   will hear David Hayes; he will testify.  He's informing Mick

22   Dooley that the FBI needs some of the evidence for an upcoming

23   federal bank robbery trial.  "Melanie Jiminez of the FBI called

24   on Friday and said the trial is set for Montez Fuller on

25   May 15th, 2007 and they -- the FBI -- want to come and look at

1     and pick up our evidence in this case."

2            What's Mickey Dooley going to do?  He's already stolen

3     some of that evidence.  You will see that following receipt of

4     that e-mail, at least by April 8th, two days later, on a Sunday

5     of 2007, he removes the evidence from the cash locker.  You

6     will see it on the motion-activated video.  You will see that

7     following the 8th, money from the bank robbery never goes back

8     into that locker, it's off camera.

9            Thereafter, you will see that Mickey Dooley came up

10    with a plan on how to conceal his theft and turn over the

11    evidence to the FBI so that he wouldn't get caught.  And he

12    could continue to commit thefts out of the evidence vault.

13           Special Agent Melanie Jiminez of the FBI was coming to

14    pick up the federal bank robbery trial evidence Montez Fuller,

15    Clarence Thomas, and Bonnie Louise Brown.  That particular

16    evidence pertained to Count 3 of that indictment.  You will see

17    money was stolen from the Community -- Olin Community Credit

18    Union in Alton, Illinois.  Some of that bank robbery money was

19    recovered, and in fact, Mickey Dooley, as evidence technician,

20    recovered a lot of it.  It went into the vault and it was

21    stolen.

22           On April 10th, a Tuesday, Detective Mickey Dooley

23    conceals the theft of money and transfers the tampered evidence

24    to FBI Special Agent Melanie Jiminez, who will probably testify

25    this afternoon.  And you will see how he concealed the

1    tampering from Melanie Jiminez.

2          Special Agent Melanie Jiminez of the FBI took that

3    evidence and took it back and locked it up in the FBI

4    headquarters, gathered further evidence for another bank

5    robbery that was Count 1 of the same indictment, came back on

6    Friday the 13th, and opened it up and discovered the tampering.

7          They put the crime revealed and the crime concealed

8    because you will see what Mickey Dooley does after that point

9    in time.  He blames the FBI.  The FBI did it.  He didn't steal

10   it, the FBI did.

11         You will see a chronological unfolding of lies and

12   that was a lie.  The Alton Police Department was notified of

13   the tampered evidence from the Olin Community Credit Union

14   robbery.  You will see that they came over and visibly

15   inspected it.  And they were going to do an audit that

16   following -- no, April 13th was on a Friday.  Friday 13th.

17   They were going to do an audit of the cash locker in the vault

18   that following Monday.

19         You will learn that everyone was ordered, and

20   particularly Mickey Dooley, who had access, was ordered to stay

21   out of the vault over the weekend and to stay out of the cash

22   locker over the weekend.

23         You will see the motion-activated camera.  Mickey

24   Dooley is in that cash locker in the vault, contrary to the

25   direct orders of the police chief, on Saturday April 14th,

1    2007.  He's back in the vault on that Sunday April 15th of

2    2007.

3           This is a overall schematic of the Alton Police

4    Department.  You are going to learn more than you ever wanted

5    to know about the inner workings and layout of the Alton Police

6    Department.  That particular area is where Mickey Dooley worked

7    within the Alton Police Department.  That's the blow-up.  You

8    see Dooley's office, the evidence vault area here, and the

9    locked cash drug locker right there.

10          You will see the motion-activated cameras here in the

11   vault, here in the evidence vestibule, and the limited access

12   at every point.

13          Coming from that specific direction, that's a

14   photograph going down the hallway.  You will note the first

15   door says "patrol evidence station."  That's where the police

16   officers that seize evidence, other than Mick Dooley, go and

17   place the evidence in.

18          This is a controlled access to the evidence vestibule

19   area.  This is how Mickey Dooley, unless he comes in through

20   the garage, goes in through this door right here.

21          Then we can go back.  That door is right there.  See

22   that?

23          You will see there's proxy card access that limits

24   access throughout the Alton Police Department.  Where the proxy

25   card is on which door determines who has access to that

1    particular door.  Proxy cards are nothing more than a card that

2    provides access to particular doors.

3              In this case, proxy card access to the area for the

4    evidence vestibule area and the evidence vault was limited to

5    Mickey Dooley, the chief, Chief Sullivan, Deputy Chief O'Guinn,

6    Captain Waldrup, or Sergeant Simmons.

7              Now you understand why I'm talking about the notes.

8              Inside the area where the police officers go, you will

9    see this is where they place the evidence.  They're called

10   "slam lockers."  Once I place the evidence in, you turn the

11   knob, nobody can get in, it's secured.

12             Going around the other side where Mickey Dooley

13   worked, this is the backside of that.  Mickey Dooley opens up a

14   particular locker, grabs the evidence out, and then unleases --

15   releases the lock so that that particular locker can be used

16   for other evidence.

17             Then he is supposed to log it in, into the LAWMAN

18   system, which we will learn about.  And then it goes in the

19   evidence vault, right there.

20             That's the evidence vault.  That's the

21   motion-activated camera, which today you will see a video of.

22             Through the evidence door, that's a very protected

23   part of the Alton Police Department.  There's only a handful of

24   people that have access to that door.

25             You will see Mickey Dooley, as the evidence

1    technician, has a key.  That's it.  Except for one other key.

2    That key, you will see later on, is secured, hidden, in a

3    different area for the Alton Police Department.

4         To go through that door, it's got to be Mickey Dooley,

5    somebody with Mickey Dooley, or the chief or deputy chief of

6    that Police Department who accesses the other key.

7         You open the door.  See that piece of paper right

8    there, that log?  That log will be admitted into evidence.

9    When you go in there, whether Mickey Dooley takes you in,

10   whoever goes in there, whoever goes in there, has to log in.

11   Inside the evidence vault, that's a motion-activated camera

12   right there.  This is the backside of that cash locker where

13   all the money and the drugs are kept.

14        Camera.  This is front side of the cash locker where

15   all the money and drugs are kept or are supposed to be kept

16   according to department policy.  It's locked.

17        Who has a key?  Or had a key at the time?  The

18   evidence technician Mickey Dooley.

19        Only one other key to this door is in existence.  That

20   key, again, hidden, locked up, in a separate, secured part of

21   the administration area of the Alton Police Department.  If

22   somebody wants that key -- which didn't happen -- but if

23   somebody wants that extra key, they have to go to the chief or

24   deputy chief and get at least one other person to go along with

25   them, which would be Captain Waldrup or Sharon Cook, his

1    secretary.

2         That's the lock on the cash locker that contained the

3    cash and the drugs, or more appropriately, was supposed to

4    contain the cash.  Locker 20.

5         All right.  Remember me talking about the extra key?

6    If Mickey Dooley didn't have the key, there's only one other

7    key in existence for the evidence vault and for the cash locker

8    within the evidence vault.  That is hidden in this

9    administrative area.  It's in that particular door, which has

10   limited access.  It's keyed; it's special keyed.  You want to

11   go in that door, you need Chief Sullivan, Deputy Chief O'Guinn,

12   the secretary Sharon Cook, or Captain Waldrup, who all worked

13   back in that area.  Otherwise, you are not getting in.

14        All right.  Now, inside that door, suppose you have

15   gotten in, inside, there is a key box right here.  Now, it's

16   locked, and in this particular photo there is a key.  That key

17   isn't kept there.  That key is hidden.  That key is hidden in a

18   protected area within the administrative area of the Alton

19   Police Department and is moved from time to time to different

20   locations.

21        I know where it is now.  It's changed over time.  And

22   I suspect you will learn where it is now and then they will

23   move it.  So to get into the file room and get into that key

24   box, one, you'd have to have access to that door and you would

25   have to have that special key.  You want that key, again, you

1    have got to go to the chief, the deputy chief, the secretary

2    who works with the chief and deputy chief, or Captain Waldrup.

3         You are in the box.  All right?  You somehow got in

4    the specially locked file room door, you went elsewhere and got

5    the key, you are in the box.  The evidence vault key was kept

6    in a sealed envelope with evidence tape.  That evidence tape

7    required double signatures.  It's gonna have to be the chief or

8    deputy chief as one of those signatures, and then Captain

9    Waldrup or Sharon Cook, then it's resealed.

10        Any time that seal is broken, a log is kept.  We're

11   going to show you that log.  When that key was accessed, how

12   many times, and exactly what for.  Because if it's not that

13   key, it's Mick Dooley's key, the defendant.

14        This is the key to the evidence vault.  Again, Mick

15   Dooley -- Mickey Dooley, the defendant, had one and the other

16   one was locked in that box.

17        This is the cash locker key.  Dooley had one and the

18   only other one was locked in that box.  You will learn that on

19   a couple of occasions, Mickey Dooley left this key to his

20   supervisor when he was away on vacation.  You will learn that

21   Mickey Dooley has repeatedly said he never gave his cash locker

22   key to anyone, to nobody else.  That's the evidence vault key.

23        Now we will go to Count 1.  There is eight counts, so

24   indulge me, and we will be done way before lunch.

25        On April -- it's a false statement during an FBI

1    investigation.  Simple as that.  It's lying to law enforcement

2    during a federal investigation.

3         "On April 27th 2007 in Madison County Mickey L. Dooley

4    did knowingly and willfully make a materially false statement

5    to Special Agent Jonathan Kelly of the Federal Bureau of

6    Investigations and Lieutenant Steve Shields of the Illinois

7    State Police in a matter within the jurisdiction of the

8    executive branch of government."

9         "The FBI, with the assistance of the Illinois State

10   Police, were investigating the disappearance of evidence from

11   the evidence vault of the Alton Police Department, which

12   included money that had been seized and retained as evidence in

13   federal bank robbery prosecutions."

14        "Mickey L. Dooley falsely represented to Special Agent

15   Jonathan Kelly and Lieutenant Steven Shields that he was owner

16   of a Macintosh MacBook Pro laptop computer," a laptop if you

17   will.  "Whereas, Mickey L. Dooley fully knew at the time that

18   he had stolen that laptop computer during the execution of a

19   search warrant at the residence of" -- that "LF" stands for Lee

20   Fielding -- "Lee Fielding is now a convicted bank robber and

21   will be here to testify.  During the execution of a search

22   warrant being in furtherance of the execution of the bank

23   robbery."

24        What's the false statement?  First, April 27th 2007

25   FBI and Illinois State Police are looking for Dooley's

1    financial records.  They found evidence of counterfeiting, they

2    are looking for evidence of counterfeiting so they are looking

3    to see what computers he has.

4           So April 27th he says he has a Macintosh MacBook Pro.

5    Where is it found?  It's found under his bed at his residence.

6    It's that computer.  That's the Macintosh computer that the

7    evidence will show that Mickey Dooley stole during the

8    execution of a search warrant.

9           This is the specific false statement.  It's an

10   Illinois State Police consent to search by owner.  "The above

11   computer and computer equipment and storage media is used

12   exclusively by me, jointly by myself and whoever.  I am the

13   owner of this equipment."

14          The evidence, ladies and gentlemen, is going to show

15   that's a lie.  That's a material lie you will hear during a

16   federal investigation.

17          Mickey Dooley signed it, he initialed it, dated it,

18   put the time on it, said I'm the owner of that laptop.  That is

19   Count 1 of the indictment.  Signed by Mick Dooley, the

20   defendant.

21          Count 2, another false statement by the defendant

22   Mickey Dooley during a federal investigation.  This time a

23   little bit later on May 18th of 2007.  "Mickey Dooley knowingly

24   and willfully made a material false statement to Special Agent

25   Jonathan Kelly of the FBI and Lieutenant Steve Shields of

1    Illinois State Police in a matter within the jurisdiction of

2    the executive branch of the United States, an FBI

3    investigation."

4         "The FBI, with the assistance of Illinois State

5    Police, were, again, investigating the disappearance of money

6    from the evidence vault of the Alton Police Department.  Mickey

7    Dooley falsely stated to both Jonathan Kelly of the FBI and

8    Lieutenant Steve Shields of the ISP that he had purchased an

9    Apple laptop computer, whereas he knew at the time that that

10   was a false statement."

11        And he knew that he didn't buy it, he stole it.  And

12   he stole it when he seized it as evidence during a search

13   warrant.  Simple as that.  Again, same laptop computer.

14        "On May 18th Mickey Dooley told the FBI and the

15   Illinois State Police that the Apple laptop computer was

16   purchased by him from an Apple store at the Galleria Mall in

17   St. Louis, Missouri."

18        You will learn that on that day, that was lie number

19   one.  He kept going.  Then he said that the laptop was

20   purchased by him approximately one to two years ago.  The lies

21   continue.

22        Then he stated he paid approximately $2,000 cash for

23   the laptop.  In a way, it is a half-truth.  It was clearly a

24   lie by him.  What's interesting is, you will actually in

25   evidence, see a receipt, but you will see a photo of the

1  receipt here in a couple of minutes.  The laptop cost the bank

2  robber $1,999.

3       Now, I don't know how Mickey Dooley knew that that

4  laptop was worth $2,000, but it was.  But the fact that he paid

5  it, he didn't pay for it.  You will learn that the bank robber

6  paid for it.  And he paid for it using cash he got from the

7  bank robbery.  The lies continue.

8       Dooley stated that he registered the laptop computer

9  with Apple.  You will see the evidence that that's not true.

10 It's another lie.

11      Then he stated, again to the FBI and the Illinois

12 State Police, that he was alone when he purchased the laptop,

13 and he had his receipt at home showing the purchase. Another

14 lie.

15      Then he stated the receipt was specifically located in

16 the top draw of his dresser at his apartment.  Well, you are

17 going to see evidence that that wasn't true.  He kept lying.

18 Another lie.

19      You are going to see this in a -- this is a receipt

20 10/23/06, the customer happens to not be Mickey Dooley.  It's

21 Lee Fielding.  Lee Fielding is the bank robber.  And again,

22 Apple MacBook Pro $1,999.

23      Something had happened between the first time they got

24 laptop, you will learn, and May 18th when they were talking to

25 him about the laptop.  And what happened was Lee Fielding, the

1    bank robber, decided to cooperate.  He decided to proffer to

2    the federal agents.  Fortuitously, the agents and some of the

3    local police knew about the ongoing federal investigation of

4    money disappearing from the Alton police vault, and they also

5    knew about the investigation of Mickey Dooley.  Lee Fielding

6    said, you know, I don't see the laptop in the discovery.  And I

7    used some of the bank robbery money to buy the laptop.

8         Well, you will learn about some great police work in

9    going to Apple and using the serial number and they could

10   backtrack to where it went in the Guitar Center, they got the

11   receipt.  They see the receipt and it looks like it's the same

12   exact serial number of the computer that they got from Mickey

13   Dooley that he said was his.

14        What did they do?  Well, they confronted Mickey Dooley

15   with the receipt on May 18th of 2007.  You are saying it is

16   your laptop, but look at this.  Well, Dooley stated the receipt

17   could not be true because he had purchased the laptop from the

18   Apple store in the Galleria Mall.

19        His lies continue.  Then he stated the Apple store

20   would have a record showing the sale of his laptop to him.

21   Another lie.  You will learn that by this point in time, the

22   investigators are questioning their own evidence in their mind,

23   saying is a model number a serial number?  Dooley was

24   convincing.

25        Dooley actually offered to take the agents right to

1    his apartment and he was going to show them the receipt as

2    proof that that was his laptop.  He lied again.

3         It got to the point where, where are you going to go

4    from there?  It wasn't there.  He couldn't take them and show

5    them the receipt.  So he finally admitted stealing the laptop

6    computer.  That was his first statement that becomes a

7    confession.

8         He admitted stealing the computer specifically from

9    Lee Fielding's residence during the execution of a search

10   warrant.  You will hear evidence that he did not purchase the

11   laptop.  He didn't register it like he said he did.  He didn't

12   have any receipts of the purchase of the laptop like he said he

13   did.  It's all unfolding.

14        He admitted to the FBI and to the Illinois State

15   Police that he was told to seize the laptop as evidence because

16   the laptop may have been purchased with proceeds from the bank

17   robbery.  The evidence will show that that's premonistic, if

18   you will, because it was.

19        Ultimately, at the end of the day on May 18th 2007, he

20   told Lieutenant Steve Shields and Special Agent Jonathan Kelly,

21   "Let's not mince words.  I stole that laptop computer."

22        Going on to Count 3, well, "on or about May of 2004

23   and continuing through on or about April 16th of 2007 in

24   Madison County within our district, Mickey Dooley did engage in

25   a scheme to defraud the City of Alton Police Department and the

1   citizens out of the Southern District of Illinois out of their

2   right to honest services of the evidence officer of the Alton

3   Police Department to preserve the integrity of evidence being

4   stored in connection with criminal investigations and

5   prosecutions.  The scheme to defraud involved the misuse of his

6   position for private gain and involved the foreseeable use --

7   foreseeable use of interstate wire communications in the

8   ordinary course of business of the Alton Police Department.

9           "As evidence officer, Mickey Dooley was designed -- or

10  designated -- excuse me -- to operate the evidence storage

11  system for the Alton Police Department.  As evidence officer,

12  Mickey Dooley was accountable for the control of all property

13  accepted or stored in the evidence vault."

14          It's him.  He's the one that's accountable.

15          "Currency being held as evidence was required to be

16  kept in a separate, locked cabinet" -- that's Locker 20 that

17  you saw -- "and was under constant video surveillance by

18  motion-detection cameras.  Currency or any articles with a

19  value of $100 or more were required to be tagged,

20  electronically bar coded" -- you will see many of them -- "as

21  evidence prior to the end of a shift during which the property

22  was obtained."

23          "Secondly, as evidence officer, Mickey Dooley

24  maintained an electronic record-keeping system that was

25  required to reflect the current location of all property."

1          Let me stop you there.  You will learn about a
2    wonderful computerized system called the LAWMAN system.  And
3    all of the police reports are transferred ultimately from the
4    type -- their handwritten reports, into the LAWMAN system, and
5    that's how they keep track of where everything is where it's
6    supposed to be where it goes.
7          "It keeps track of the date and time when the property
8    was received or released the character the type and amount of
9    property, the chain of custody for each item from the time the
10   property was stored until it's destruction or other final
11   disposal."
12         We go on.  As I indicated, this is in Count 3 of the
13   indictment.  "At all times there were only two keys in
14   existence to the evidence vault.  Mickey Dooley had possession
15   of one of the vault keys and the other vault key was kept
16   locked in a hidden and secured administration area."  Like you
17   saw.
18         "At all times there were only two keys in existence
19   for the money locker and the locked evidence vault.  Mickey
20   Dooley had possession of one of the money locker keys and the
21   other one" -- as you saw -- "was hidden and locked in the
22   secured administration area."
23         Staying with Count 3 of the indictment.  "The
24   defendant Mickey Dooley in furtherance of a scheme to defraud
25   the Alton Police Department and the citizens of the Southern

1    District of Illinois violated evidence and property management

2    procedures, misappropriated evidence for personal gain, and

3    thereby, deprived the community out of the right to honest

4    services of the evidence officer of the Alton Police

5    Department, to preserve the integrity of evidence being stored

6    in connection with criminal investigations and prosecutions."

7         And you will hear witnesses tell you about the

8    devastating impact this had on prosecutions, and particularly,

9    federal bank robbery prosecutions.

10        Staying with Count 3 of the indictment, "On or about

11   April 6th 2007 an interstate wire communication was used.  That

12   is an e-mail transmission to Mickey Dooley directing him to

13   gather evidence being held at the Alton Police Department

14   evidence vault to return to the FBI for a federal bank robbery

15   prosecution."

16        "Mickey Dooley's concealment of his misappropriation

17   of evidence was incidental to an essential part of his scheme

18   to continue his employment and further misappropriate evidence.

19   Mickey Dooley knew that the FBI would be seeking the return of

20   evidence in the ordinary course of business, and therefore, the

21   use of telephones or e-mail transmissions would naturally occur

22   in the ordinary course of business."

23        The FBI is going to come get it's evidence.  There's

24   only two ways that's going to happen.  They're going to call or

25   send an e-mail.  In this case Special Agent Melanie Jiminez

1    called and an e-mail was then sent to Mickey Dooley.

2         Ordinary course of business.  That in e-mail that

3    you've already seen.  Melanie Jiminez of the FBI is going to

4    come.  She needs the evidence for the federal bank robbery

5    prosecution.  That is Count 3 of the indictment.

6         It's stipulated in this case that the e-mail

7    transmission, in fact, crossed state lines.  It involved use of

8    the Internet and crossed state lines.

9         Count 4 of the indictment -- we're getting there.

10   "Corruptly attempting to conceal an object.  The same laptop

11   computer, with the intent to impair its availability for use in

12   an official proceeding.  From on or about October 24th 2006

13   through the 27th day of April 2007 in Madison County, within

14   our district, Mickey Dooley did corruptly attempt to conceal an

15   object, an Apple laptop computer, with an intent to impair its

16   availability for use in an official proceeding."

17        The laptop, as you will learn, was under his bed at

18   his residence.  It was concealed.  You will learn that it was

19   evidence for a federal bank robbery prosecution.

20        "On or about October 24th 2006, Mickey Dooley, as

21   evidence custodian for the Alton Police Department,

22   participated in the execution of the search warrant of Lee

23   Fielding's residence."

24        He knew it was a bank robbery prosecution.  He knew

25   that it would ultimately be prosecuted federally.  He removed

1    the Apple laptop computer from the residence, never logged it

2    in.

3            Do you remember the LAWMAN system?  It was never

4    logged in as evidence, as he was required to do.

5            "At the time Mickey Dooley seized the computer, he was

6    aware that the laptop computer was potential evidence in a

7    future proceeding involving the prosecution of a bank robbery."

8            And again, as you have heard April 27th we got that

9    laptop back.  Same laptop.

10           The evidence will show -- remember his statement,

11   Special Agent Jonathan Kelly and Lieutenant Steve Shields of

12   ISP -- he admitted that he was told to seize the laptop as

13   evidence because the laptop may have been purchased with

14   proceeds for the bank robbery.  He took it, the evidence will

15   show, and he knew it was evidence.

16           That's Count 5 of the indictment.

17           Count 4, excuse me.

18           Count 5, disposal of money that had been stolen from

19   the Olin Credit Union.  On or about June 19th 2006 to the 10th

20   day of April in Madison County, within our district, Mickey

21   Dooley disposed of approximately $4,056 of United States

22   currency which had been stolen from the Olin Credit Union,

23   knowing that the money had been stolen from the Olin Credit

24   Union."

25           And it's going to be agreed to in this case that the

1    Olin Credit Union had it's accounts insured by the National

2    Credit Union Administration Board, which is, you will learn, a

3    jurisdictional issue for federal prosecutions.

4         What will the evidence show as far as why did Mickey

5    Dooley, as evidence custodian for the Alton Police Department,

6    know that the money was for the bank robbery?  Well, it goes

7    back to this specific federal case, again, that specific count,

8    and here's the money.  And you know how he knew?  The evidence

9    will show that he seized it.  In this particular case, seized

10   by Mick Dooley.  At the end of the day you will see that it was

11   supposed -- this particular evidence was supposed to have $119.

12   When the -- he gave it to the FBI and the FBI looked at it,

13   what was left?  $8 and a funny looking piece of paper shaped

14   like a dollar bill.

15        Same robbery evidence, another piece of evidence,

16   again, seized by Mickey Dooley.  When he transferred it to the

17   FBI and the FBI looked at it, what was left?  $21.  What was

18   supposed to be in there, what was checked into the vault?  $796

19   of recovered bank robbery money.

20        The evidence will show that when it was given to the

21   FBI, it had 21 $1 bills, another funny looking piece of paper.

22        What's interesting is when it was seized, it had six

23   $1 bills.  So the evidence will show that the thief, whoever

24   you may think the thief to be -- and we will prove it's Mickey

25   Dooley -- but the thief took out all of the 20s, all of the

1    hundreds, all the 50s, and stuffed one-dollar bills back in.

2           Mickey Dooley seized that evidence.  He's the one that

3    placed it into the evidence vault, the evidence will show.

4           More evidence, same bank robbery.  $2,900.

5    Hundred-dollar bills, $50 bills, recovered as evidence for the

6    Olin Credit Union property that was being prosecuted in federal

7    court.  When Mickey Dooley gave it to the FBI what did it have

8    in there?  No 50s, no one hundreds, 27 $1 bills, and two funny

9    looking pieces of paper.

10          More evidence for the federal bank robbery

11   prosecution.  This time there was supposed to be three $100

12   bills.  At the end of the day when it's turned over to the FBI,

13   instead of three one-hundreds, it's got three ones.

14          That was Count 5 of the indictment.  That he disposed

15   of money knowing it had been stolen from the Olin Credit Union.

16   It was locked up in the vault, he gave it to the FBI, and

17   between the time he locked it up in the vault and he gave it to

18   the FBI, the money was gone, and it was doctored up to look

19   like it was still enough money in there.

20          Count 6, disposal of money that had been stolen from

21   another bank, the U.S. Bank.  This is a separate federal

22   criminal prosecution that was pending and ongoing.  "On or

23   about October 24th 2006 through the 10th day of April 2007 in

24   Madison County, within our district, the defendant Mickey

25   Dooley disposed of -- more money this time -- approximately

1  $18,588 of United States currency which had been stolen from

2  U.S. Bank, knowing that the property had been stolen from U.S.

3  Bank."

4  Again, there won't be an issue that U.S. Bank, for the

5  federal nexus, if you will, had its deposits insured by the

6  Federal Deposit Insurance Corporation.

7  This is the pending indictment for U.S. Bank.  Do you

8  see that ladies and gentlemen?  United States of America versus

9  Jason Shane Moses, Lee Marlin Fieldings, Eric James Laverne.

10  Now, how did he know?  How did the evidence technician

11  Mickey Dooley know that the money was the bank's?  In this

12  particular case, it's $648.  Officer William Brandtly seized it

13  and he gave it to Mickey Dooley on October 30th of 2006.  648

14  went into the vault, 648 went into the cash locker maintained

15  by Mickey Dooley.  Disappeared.  All gone.

16  More evidence, same bank robbery.  This time $9,460.

17  At the end of the day, what's discovered left in the cash

18  locker within the evidence vault controlled by Mickey Dooley

19  was only $500.  Mickey Dooley personally seized that money from

20  the hotel room of bank robber Jason Moses on October 3rd 2006.

21  He's the one that personally placed it into the vault.

22  More money.  More money missing.  More evidence.

23  More evidence gone.  In this case $9,821 was seized.

24  Now, it was seized by Mickey Dooley, and it was seized during

25  the execution of his search warrant at Lee Fielding's

1    residence.  Do you remember that name?  At the end of the day

2    $821 are left, $9,000 is gone.  This is the same residence that

3    Mickey Dooley stole the laptop from.  Laptop stolen, money

4    stolen.

5          Count 7, "Misapplication of property under the care,

6    custody, and control of a local government -- that would be the

7    Alton Police Department -- that receives federal funds.  From

8    on or about May of 2006 through the 17th day of April 2007

9    again, in Madison County, within our district, while employed

10   as the evidence custodian for the Alton Police Department,

11   Mickey Dooley intentionally misapplied property valued at

12   $5,000 or more" -- you are going to learn it is much more than

13   $5,000 -- "that was under the care custody and control of the

14   Alton Police Department."

15         It was actually under the care custody and control of

16   Mickey Dooley.  And during the same time period for federal

17   jurisdiction purposes, the Alton Police Department receives

18   over $10,000 in the same 12-month period in federal assistance

19   funds.  And you will see evidence that it greatly exceeds that,

20   they get a lot of federal money.

21         I'm not going to go through them all.

22         We're going to introduce a lot of evidence.  Apart

23   from the two federal bank robbery prosecutions, there is a

24   whole lot of other evidence that's gone, the evidence will

25   show.  This particular case $638.33 cents was placed into the

1    vault; it's all gone.  575 placed into evidence; it's all gone.

2    $702 placed into evidence; only $8 is left.

3         Now look at that.  No -- well, yeah, there is six ones

4    and one $2 bill.  See that $2 bill?  At the end of the day when

5    they discovered theft, there was a $2 bill.  Problem is, there

6    wasn't a $2 bill originally.

7         The thief, you will see evidence, has to have the

8    time, the unmonitored access, if you will, to come and go with

9    the evidence, to spend a lot of time to take money out and put

10   money in, and then take further steps to conceal the theft.

11        482.30, different case.  At the end of the day $7.30

12   is all that's left.

13        Interestingly enough, it's somebody that takes a time

14   to sort through the bills, take the higher denomination bills

15   out, keep the lower denomination bills there.  Takes time.

16        You will learn about the Ricky Shaw death

17   investigation.  Police responded to a dead body call on

18   September 19th 2006.  Death investigations being a higher

19   priority, you will learn, more people come to them.  Mickey

20   Dooley, as evidence technician, personally goes to them.  The

21   chief of police of Alton personally goes to those.

22        You will see evidence that that was a milk jug found

23   at the scene.  That milk jug was stuffed with United States

24   currency.  Mickey Dooley took it from the scene, and it was

25   never logged in at the Alton Police Department.

1          These are orange juice containers, you will learn,

2     that are filled with change.  Two are completely full and one's

3     partially full.  Taken by Mickey Dooley at the scene, never

4     logged into evidence.  Disappears.

5          Drugs never logged into evidence.  Disappears.  A

6     computer was seized at this particular location.  Never logged

7     into evidence and didn't disappear.  That was found in the back

8     of his evidence van.

9          Let's talk about this case a second.  I think in every

10    case you are always looking for that one piece of evidence.  In

11    this particular case, you will learn, that we had continuous

12    motion-activated video in the evidence vault for just a limited

13    period of time.  So if we were to look, like the agents did,

14    for any evidence that was placed into the evidence vault for

15    when we had continuous video, this one was such a case.  Not as

16    much money as the bank robberies, but such a case.

17         $115 was placed into the evidence vault or purportedly

18    placed into the evidence vault.  You will see evidence that not

19    a single human being went to that cash locker from the time

20    that that $115 was seized and placed into evidence until the

21    camera -- the tape of the camera, if you will, was seized.

22    Continuous video.  During that entire time period there's only

23    one person that goes into the cash locker.  Only one.  All keys

24    aside, who had access, didn't have access, only one person, the

25    defendant Mickey Dooley.

1          Again, not going to go through all this now, but apart

2     from all the missing evidence, what the federal investigation,

3     with the assistance of the Illinois State Police, revealed was

4     all kinds of counterfeit currency, all kinds of counterfeit.

5     Sometimes it looks like it's put in to replace real money.

6     Lots of counterfeit.

7          You will learn that -- you will hear from the seizing

8     officers that the money that was found in evidence, the

9     counterfeit, wasn't the same money that the officers turned in.

10    Wasn't the same money that they seized and gave to Mickey

11    Dooley.

12         You will see -- you will learn that some of it looks

13    like monopoly-money quality.  More counterfeit.

14         You will learn that as part of the policies and

15    procedures of the Mickey Dooley, if he had counterfeit

16    currency, was supposed to report it to his supervisor and

17    ultimately turn it over to who?  The United States Secret

18    Service.  The evidence will show, why?  Because the Secret

19    service investigates counterfeit currency to try to lead to

20    manufacturers.

21         You will learn that with all, except for one instance,

22    Mickey Dooley did not disclose or turn over the counterfeit

23    currency to the United States Secret Service.  Hidden.  You

24    will learn that some of it was hidden behind papers tacked up

25    on his bulletin board in his office.

1          Count 8, last count, almost done.  "During calendar

2     year 2005, in Madison County, within our district, Mickey

3     Dooley, a resident of the Southern District of Illinois had and

4     received gross income in excess of the minimum filing

5     requirement of for that year of $8,450.  Filing individually,

6     not married.  And by such gross income, the law required Mickey

7     Dooley to file federal income tax return with respect to the

8     gross income received following the close of calendar year 2006

9     and on or before April 17th 2007."

10          And you are looking, thinking I made a mistake or the

11     grand jury is a mistake.  It's not.  It's usually April 15th,

12     unless April 15th falls on a holiday or weekend, then it kicks

13     over to the next weekday, which in this case was April 17th.

14          "And he was required to make the return" -- as you all

15     know -- "to the Internal Revenue Service, stating specifically

16     the items of gross income, deductions, and et cetera.  Mickey

17     Dooley willfully did fail to make an income tax return in a

18     timely manner to the director of the Internal Revenue Service."

19          You will learn, you will hear, he was required to file

20     a return.  You will learn that he made greatly in excess of the

21     minimum filing requirements.  And when the Internal Revenue

22     Service checked, he had not properly filed, certification of

23     lack of record, Mickey Dooley.

24          You will learn that after he was aware that he was

25     under federal investigation, after he was aware that the

1    Internal Revenue Service was a part of the investigation, he

2    filed a return.  You will learn that that doesn't count as far

3    as failure to file a return.

4         Ultimately, instead of April 17th the investigation

5    continued onward, in another over six months later, he filed

6    it, he signed it, he filed it.  It's dated October 30th of

7    2007, and at the end of the day, the Internal Revenue Service

8    received it in early November.

9         Why evidence.  Motive.  You will hear evidence that

10   Mickey Dooley loved to gamble.  Spent most of his free time

11   gambling.  Not a crime.  Not a crime unless the money's not

12   yours.  You will learn that from 2006, the boat ended up --

13   this is the Argosy up in Alton, he was up being about two

14   blocks or so from where he lives -- the Argosy was ahead at the

15   end of the year, at the end of the day, so to speak, $48,424.

16   The evidence will show that with everything that was being

17   withheld from his paycheck, that's more than he brought home.

18   That's not counting eating, all the other stuff, 48424.

19        Now the -- you will hear from the lady that works in

20   accounting at the Argosy, and he had jackpots for that year of

21   in excess of $57,000.  What that means, at least, is for 2006,

22   he actually lost over $105,000.  Now he could have taken 57 and

23   put it back in, so at the end of the day it's 48424.  48,000 at

24   the end of the day, over a million dollars total of actual just

25   gambling, gambling, gambling.  Credits, minus, credits.  Then

1    there is jackpots, the big winnings, he re-gambles the

2    jackpots.  At the end of the day, he's down over $48,000.

3         Something else interesting happened -- lots of

4    interesting things happened during this investigation, but

5    Mickey Dooley had a conversation with the chief of police of

6    the Alton Police Department.  Chief Sullivan.  You will meet

7    Chief Sullivan.  He is going to testify.  And Mickey Dooley,

8    the defendant, said, "If I get indicted, I'm going to go in and

9    say that Lieutenant Hayes did it with me so we'll both be

10   indicted."  He is going to accuse somebody else.  You will hear

11   evidence that he told the chief that.

12        Ultimately, at the end of the day, relative to the

13   charges, we will show that Mickey Dooley as an Alton police

14   officer stoled [sic] -- one of the thefts he's admitted to, the

15   other thefts he hasn't.  He lied.  The lies he's admitted to.

16        This is part of -- there will be evidence that this is

17   part of the oath that Mickey Dooley took when he wanted to be

18   an Alton police officer, not dissimilar from any other police

19   department.  "As a law enforcement officer, my fundamental duty

20   is to serve mankind, to safeguard lives and property, to

21   protect the innocent against deception, the weak against

22   depression or intimidation, and the peaceful against violence

23   or disorder, and to respect the constitutional rights of all

24   men to liberty, equality, and justice.  I recognize the badge

25   as a symbol of public faith, and I accept it as public trust to

1   be held so long as I am true to the ethics of the police

2   service.  I will constantly strive to achieve these objectives

3   and ideals, dedicating myself before God to my chosen

4   profession... law enforcement."

5          At the conclusion of all the evidence -- and we will

6   do it as quickly as we can -- at the end of our case, it will

7   be shown to you beyond a reasonable doubt that Mickey Dooley,

8   as a police officer of the City of Alton and specifically as

9   the evidence custodian, violated that oath.  He violated the

10  public trust that was placed with him, and he deprived the

11  community out of their right to the honest services of a police

12  officer by stealing, by lying, and by failing to preserve the

13  integrity of evidence that's needed so much for court.

14          Thank you.

15          *THE COURT:*  All right.  Ladies and gentlemen, we will

16  resume at 1:35.  That will give you an hour and 15 minutes for

17  lunch.  Be careful.  I think Linda will have some directions

18  for you in the jury room as to where you might go.

19          Be aware.  Don't be trying to think about the case

20  while you are trying to navigate around this area.  And we will

21  resume promptly at 1:35.

22          Mr. Freese, are you going to make an opening statement

23  at 1:35?

24          *MR. FREESE:*  Yes, your Honor.

25          *THE COURT:*  Then we will have the defendant's opening

Opening Statement, Prosecution

1    statement at 1:35.

2              The court's in recess.  Have a good lunch.

3                        *(Lunch recess)*

4              THE COURT:  Be seated, please.

5         Ladies and gentlemen, I hope you had a nice lunch,

6    found your way around.

7              Have you got the mics on now, Linda?

8              COURTROOM DEPUTY:  I just turned them on.

9              THE COURT:  Mr. Freese, are you ready to make your

10   opening statement for the defense?

11             MR. FREESE:  Yes.

12             THE COURT:  Then you may proceed.

13             MR. FREESE:  Well, how do you top that?  I mean, from

14   the way the government has talked and presented the case, it

15   would appear, wouldn't it, that you might as well just go home,

16   go back there, say he's guilty and let's go home.

17             They seem to have presented a very strong, formidable

18   argument that Mr. Dooley has committed crimes and false claims.

19   In fact, Mr. Smith started off very animusly, the United States

20   of America versus Mickey L. Dooley.  And then you can see all

21   the evidence they've got amassed sitting there, boxes and

22   boxes.  Nice, beautiful pinpoint exhibits to show you, designed

23   to convince you that Mr. Dooley, a 20-year officer of the

24   police department, has committed all kinds of crimes.

25             Well, as the saying goes, looks can be deceiving.  You

Opening Statement, Defense

1    can't judge a book by its cover.  And I'm not making those

2    comments lightly or flippantly.

3         The whole case, all eight counts, is nothing but

4    circumstantial evidence.  No one has seen Mr. Dooley take

5    anything.  They talk about that they have video.  The videos

6    they have is Mr. Dooley doing his job.  Mr. Dooley had a right

7    to be going into that evidence room.  And he certainly had a

8    right to be going back there into the cash box.  There's

9    nothing that shows that he went back there and took money out.

10   Circumstantial.

11        Basically what the government is saying is, well, gee,

12   we've got money missing, and it would be hard to figure out who

13   did it, so since we can't figure out who did it, it's got to be

14   Mr. Dooley because he's the evidence officer, so let's tag him

15   and pin it on him.  That's pure and simple the government's

16   case.

17        I'm not going to try and try the case in my opening

18   statement by going through everything.  But a few points I want

19   to make -- again, remember, this is all circumstantial.  And

20   circumstantial evidence can be deceiving.

21        Just very briefly, again, using the little scenario

22   that Judge Murphy used this morning that if you see people

23   coming in with water on their umbrellas or rain coats, you can

24   pretty much gather and infer from circumstantial evidence that

25   it's raining.  But I was hit by it because Monday morning when

1    I was reading the newspaper, um -- I also happened to like

2    reading the comics, and I found this.  And I find it very

3    interesting.  It's hard to read.  But the young boy is standing

4    at the door with the door open.

5            *COURTROOM DEPUTY:*  We can enlarge that for you.

6            *MR. FREESE:*  Okay.  Thanks.

7            And he can tell that it's raining.  And he says, "It's

8    not supposed to rain on Labor Day," but then he sees the sun

9    coming out.  And he just says, "That's just dad did a cannon

10   ball into the pool."

11           Now, I'm not trying to make light of this.  But I

12   think that very much shows what's happened here.  There's all

13   kinds of circumstantial evidence that would make it appear that

14   Mr. Dooley committed these crimes.  But just as you can see,

15   that isn't always the case.

16           The government says that Mr. Dooley didn't file a tax

17   return.  Well, he filed one.  He filed it late.  Admittedly, it

18   wasn't April 15th, April 17th, it was the end of October.  But

19   the government didn't tell you was that for a period of time,

20   the government had all of his financial forms and tax forms

21   during an investigation.  Admittedly, they did not take them

22   prior to April 17th.  By then, though, Mr. Dooley had

23   everything prepared, but then his whole career of 20 years as

24   an outstanding police officer was being questioned or

25   challenged.  He was very concerned about what was happening to

1    him, his future, and the last thing on his mind was filing a

2    tax return.  But he did it once he got the papers back.

3         And by the way, he did get a refund.  So I mean, it

4    was to his benefit to file.  He got a refund.  And Mr. Dooley

5    every year filed a tax return.  He's always filed a tax return.

6    There was some excuse for failing to file it on time.  He did

7    file it.  He filed them in previous years.  So there is not a

8    history of tax evasion.

9         What's happening is, if you noticed, eight counts.

10   Eight counts.  Again, the government can't prove who took that

11   money so they're going to build every kind of case they can

12   imagine against Mr. Dooley, and they're going to throw in

13   everything.  They're going to try to throw in the kitchen sink.

14   The more they can throw at you, the more you are going to say,

15   well, gee, this guy's got to be guilty.

16        What they didn't tell you is that Mr. Dooley didn't

17   have sole access to the evidence locker room.  That key was

18   available.  You're going to find that the so-called secure

19   system was far from secure.  The key was checked out several

20   times.  Most of the time it was because Mr. Dooley locked his

21   keys in the vault and so had to get the other one.  But their

22   system that they claim was fool proof and required, required

23   the chief, the deputy chief and/or the secretary, two of them,

24   to sign, you are going to find from that log that one time

25   somebody had Officer Dooley sign to get the key that was

1  secured.  That is the evidence.

2          So they took care of their own system.  Anybody could

3  have gone in there.  The evidence will be that nobody asked

4  Officer Dooley to sign the envelope to reseal the key in there.

5  But this was the chief and the deputy chief.

6          The key to the cash box inside, they talk about how

7  it's secure in the safe, a different place.  What they didn't

8  tell you was that originally, it was in a sealed envelope,

9  according to their concept, separate from the other key.  When

10  all of this came about, the evidence will show that Lieutenant

11  Shields and another officer went to get the key.  What do you

12  know, the key that was in the sealed envelope for the cash box

13  wasn't the cash box key.

14          Now people in command, the chief, deputy chief, sealed

15  it, signed it, but it was never the cash box key.  The cash box

16  key was hanging on a tag inside the closet, or wherever it was,

17  so that anybody could have grabbed it.  It was also a key that

18  was possible to be duplicated.

19          Sole access?  Evidence will show that on numerous

20  occasions Lieutenant Hayes went into that evidence vault, not

21  necessarily always did Officer Dooley give them keys.  Evidence

22  is going to show that there were times Officer Dooley, when he

23  was on vacation, was concerned and set up a tape recording

24  which would show and does show that Lieutenant Hayes was in

25  there while he was gone.

1          That is evidence.  That is something contrary to what

2     the government here failed to tell you.

3          They also failed to tell you that this was not the

4     first time.  Prior to Officer Dooley becoming the evidence

5     officer, there have been other monies missing from the Alton

6     Police Department.  One case involved $5,000 from the Alton

7     Belle case and another involved some other money that was

8     investigated and as well as a whole series of guns and rifles.

9     This was investigated by the Alton Police Department and the

10    Illinois State Police Department.  But, gee, they couldn't find

11    anybody to pin it on because Officer Dooley hadn't been the

12    evidence officer at the time.  And they investigated it for two

13    years.

14         Is that such a clear case against Officer Dooley?  And

15    I call him Officer Dooley because I respect who he is and what

16    he was.  You are going to see from his record, the number of

17    citations and commendations that he received.  A 20-year

18    veteran working on some of the very serious cases in our area.

19         Officer Dooley did not steal a laptop.  And he did not

20    steal it out of the residence during the execution of a search

21    warrant.

22         Number one, it was brought out of the house possibly

23    by Lieutenant Hayes.  There is indications from the

24    investigating report that he was the one identified as carrying

25    it out.

1          Number two, the evidence will show that it was put in

2    there with all of the other evidence and was eventually

3    overlooked.  It will also be indicated to you that contrary to

4    the government, that laptop was not and never became any

5    essential part of any legal proceeding.  In fact, at one point

6    Lieutenant Hayes told Mr. Dooley that he didn't need to worry

7    about it, it wasn't important evidence.  But, gee, the

8    government forgot to mention that this morning, didn't they?

9          Officer Dooley, when he signed the consent form back

10   in April to search his house, signed it after they came back.

11   He, Officer Dooley, told -- if Lieutenant Shields will

12   acknowledge the truth -- that he was asked if you have any

13   computers he said, yeah, there was two at home.  He directed

14   them right to them.  He wasn't concealing a laptop under the

15   bed.  He had it stored there, but that's not concealing it.

16         At that time Lieutenant Shields had no idea of any

17   significance to that laptop.  Officer Hayes signed a consent

18   form without reading it.  He just signed his name to it.

19         It was not highlighted, by the way, which the

20   government highlighted it for your purposes, but it certainly

21   wasn't highlighted to show now you are saying that you own

22   this.  No, they just said, here, sign this.  He said, sure,

23   I've got nothing to hide.  So he did.  Is that lying to an

24   investigator?  He showed them where it was at.  Is that lying?

25         By the way that indictment is what they call a

1    "superseding indictment."  Originally, there was only seven

2    counts.

3         MR. SMITH:  Objection as to relevance, your Honor.

4         THE COURT:  Well, probably.  I can't tell.  I'll let

5    him finish his opening statement.  It possibly has some

6    relevance.

7         MR. FREESE:  They had only charged him with one count

8    of lying from the second time they interviewed him in May, but

9    since then they decided to up it so they threw in this one from

10   April.  Again, let's dump everything we can on this man with 20

11   years police experience.

12        Did he lie on that first interview?  No.  When they

13   came to the second interview, Officer Dooley eventually

14   admitted during that second interview that, yeah, it's not

15   mine.  He did not say I stole it out of the house.  He did not

16   say I stole it during the execution of the search warrant.  And

17   he made the statement within ten, 15 minutes of the time they

18   began questioning him again.  By which time they already knew

19   that it was not his.  Were they deceived?  No.  They weren't

20   running out trying -- they didn't stop the interview with

21   Officer Dooley and go do some more searching.

22        They asked him.  He denied it.  They said it was his.

23   They go on to some other things, questioning him on some other

24   things.  And he says, look, let's back up a minute.  I think

25   you guys know that that laptop is not mine.  I denied it was

1     because I was afraid if I admitted it, you would think I took

2     the money as well.

3           Is that lying and deceiving an investigator who

4     already knew?  Lieutenant Shields, um, and Agent Kelly would

5     like you to think it is, but they already knew.  They knew.

6     That's why they came back to talk to him.

7           I can't imagine what proof they have.  They claim

8     they've got all of these nice video recordings showing that he

9     went back there.

10          First of all, I'm a little confused.  It almost seemed

11    like to me, unless I misunderstood Mr. Smith, that he's saying

12    once Officer Dooley found out that the FBI was coming to get

13    the money and the other evidence for the bank robbery, he

14    hurried up and went in the vault to take the money.  Does that

15    make sense to you?  Does it make sense that an officer with 20

16    years experience would take the money that he, himself, seized

17    in a robbery knowing that it's going to trial, knowing it has

18    to be opened and do it?  The opportunity would have been more

19    available to him at the time of the search and pocketed some of

20    it and who would know.

21          It doesn't make sense, does it?  If you start looking

22    at the evidence, if you start analyzing it, remove all of the

23    glamor, remove all the fine, beautiful pinpoint and color

24    graphs that the government went through an expense to make, and

25    look at the evidence.  Look at what they are.  Keep your mind

Opening Statement, Defense

1    open.

2          Officer Dooley will be testifying.  He will tell you

3    it looks, again, on this, but there, again, it's not

4    necessarily raining.  It could just be that dad did a

5    cannonball into the pool, and it looked like rain, but it's

6    not.

7          The government, you are going to need to put their

8    feet to the fire.  Make 'em prove it beyond a reasonable doubt.

9    We will be able to show that there's other people that had

10   motive and opportunity with the key.

11         The government likes to make a big deal out of Officer

12   Dooley's gambling.  Yeah, he gambles a lot.  The evidence is

13   going to show that he has very little expenses by way of living

14   expenses.  He's single, has an extremely inexpensive apartment,

15   has very -- no other real expenses.  Makes a decent salary.  So

16   he spends a lot of gambling.  That's his joy and his hobby.

17   But he's got to money to do it.  He wins, he loses.

18         You are going to hear evidence that he has spent all

19   kinds of money, fixes up this place, buying stuff.  Well, it

20   also coincides with times that he's won at the gambling tables

21   at the casino.  That's not proof that he took anything.  No

22   proof.

23         There are other officers on the Alton Police

24   Department evidence will show that also have -- are addicted to

25   gambling.  One is even barred from casinos who also happens to

1    have access to the keys.

2         There's times, you will see, that Officer Dooley was

3    absent whether he was at a training academy, on vacation, that

4    others still signed in.

5         And the government also -- I think they failed to say

6    that the entrance into the evidence hallway area, they said it

7    has to be by proxy card.  You swipe it, it records who went in

8    and out.  That's true.  The proxy card registrations will be

9    shown.  But I think the government failed to mention that that

10   door can be opened with a key and that key doesn't register who

11   goes in and out.  Gee, I think they forgot that again.

12        There's a lot of things they forgot to tell you

13   because it doesn't fit their little theory, because then they

14   would have to look some place else other than Officer Dooley.

15   And they wouldn't want to do that because that would mess up

16   their whole scenario.  The Alton Police Department certainly

17   doesn't want all the publicity, so it's easier to dump it on

18   one man and get him thrown out.

19        But look and question over the next several days who

20   has time, who had access at different times, who made maybe

21   inconsistent statements.

22        Did that e-mail really cause any scheme to occur?

23   That e-mail would have been sent whether or not Officer Dooley

24   was the evidence officer or not.  It had nothing to do -- and I

25   don't think the government can begin to show, how it had any

1    furtherance of a scheme because he was required to turn over

2    the evidence to the FBI.

3           It's going to be shown that the FBI didn't even bother

4    really examining the evidence when they picked it up from

5    Officer Dooley.  They didn't notice anything wrong.  They had

6    it a week, they didn't notice it.

7           Is it raining or is it an illusion?  That is what I

8    ask you to consider during this time.

9           And you have a awesome and tremendous responsibility

10   because into your hands, is committed the fate, the life, the

11   integrity of this man over here, a man whose been accused

12   without full evidence.  There is no DNA to show his

13   involvement, there's no fingerprints to show his involvement,

14   there's no pictures showing that he took stuff.  It's all

15   circumstantial.

16          Is it raining or did dad jump into the pool?

17          Thank you.

18          THE COURT:  Thank you.  And the government will call

19   its first witness.

20          MR. WEINHOEFT:  Thank you, your Honor.  The government

21   calls Detective Pete VanBaketes.

22          THE COURT:  How do you pronounce his?

23          MR. WEINHOEFT:  VanBaketes.

24          THE COURT:  The clerk will administer the oath to our

25   first witness.

1         COURTROOM DEPUTY:  Do you solemnly swear that the

2    testimony you are about to give shall be the truth, the whole

3    truth, and nothing but the truth, so help you God?

4         THE WITNESS:  I do swear.

5         COURTROOM DEPUTY:  Would you state your name and spell

6    your last name for the record?

7         THE WITNESS:  My name is Peter D. VanBaketes.

8         Am I too loud?

9         COURTROOM DEPUTY:  No.

10        THE WITNESS:  I'll spell the last name for you.  V as

11   in Victor, A-M, as in Mary, B as in boy, A-K-E-T-E-S,

12   VanBaketes.

13        COURTROOM DEPUTY:  Are you going to need him to draw?

14        MR. WEINHOEFT:  No.  Thank you.

15                       **<u>DIRECT EXAMINATION</u>**

16   *Q.  (BY MR. WEINHOEFT:)*  Good afternoon, sir, could you please

17   tell us your business or occupation?

18   *A.*  I am a police detective for the City of Alton.

19   *Q.*  How long have you worked for a the City of Alton as a

20   police officer?

21   *A.*  Almost ten years.

22   *Q.*  Tell us about your current position and the nature of your

23   present assignment.

24   *A.*  I am a general case detective in the investigations bureau

25   and have been for approximately three years.

1   Q.  What are the nature of your duties as a general case

2   assignment with the Alton Police Department?

3   A.  Investigate and assist in investigations of felony crimes.

4   Q.  And in that capacity did you have the occasion to

5   participate in two bank robbery investigations?

6   A.  In 2006, yes, sir.

7   Q.  Yes.  And one of those occurring June 16th 2006 from the

8   Olin Credit Union located 3553 College Avenue, Alton, Illinois?

9   A.  That's correct, sir.

10  Q.  And was the second bank robbery a bank robbery which

11  occurred from the U.S. Bank located at 2627 State Street, Alton

12  Illinois, on October 20th of 2006?

13  A.  That's correct, sir.

14  Q.  In your capacity of working on both of those investigations

15  and participating in those investigations, have you had the

16  occasion to become familiar with the case files and the reports

17  in both of those cases?

18  A.  Yes, sir, both cases.

19  Q.  And in both of those cases, did the -- first of all, do you

20  know detective -- former detective -- Officer Mick Dooley?

21  A.  Yes, sir, I worked with Mick Dooley.

22  Q.  And you see him present in court today?

23  A.  Yes, sir.

24  Q.  Could you please point to him and identify an article of

25  clothing he is wearing?

1   *A.*  He is seated directly there wearing a dark suit and white

2   shirt.  I can't tell what color tie.  That is Mick Dooley.

3       Hi Mick.

4           *THE COURT:*  He has identified the defendant.

5   *Q.  (BY MR. WEINHOEFT:)*  Did you have occasion to go through

6   the Olin Credit Union robbery and the U.S. Bank robbery to

7   identify specific police reports that were authored and signed

8   by Mickey Dooley?

9   *A.*  On both cases, that's correct.

10          *MR. WEINHOEFT:*  Permission to approach, your Honor?

11          *THE COURT:*  You have it.

12  *Q   (BY  MR.  WEINHOEFT:)* Detective, I'm going to hand you what

13  I've previously marked for identification purposes first as

14  Government Exhibit 1A and Government Exhibit 100A.  Can you

15  take a look at those documents and tell me if you recognize

16  them?

17  *A.*  I do recognize them.  These appear to be the original

18  supplemental reports from Officer Mick Dooley on the -- this is

19  the Olin Community Credit Union police documentation from

20  Officer Mick Dooley.  It appears to be originals.

21  *Q.*  What government?

22  *A.*  Exhibit 1A.

23  *Q.*  And have you gone through those and reviewed those prior to

24  coming to court?

25  *A.*  I have seen those, yes, sir.

1   *Q.*  And do you recognize those signatures on those original

2   reports to be that of Mick Dooley?

3   *A.*  Yes, sir, as well as his DSN of 8302.

4   *Q.*  What is the DSN?

5   *A.*  It is an identification for police purposes.  I am 9901,

6   according to City of Alton.

7   *Q.*  And would you look at the next exhibit?

8   *A.*  Exhibit 100A, I have seen these previously.  These are the

9   original supplemental reports from Mick Dooley from the U.S.

10  Bank robbery from October the 20th 2006.

11  *Q.*  Those reports narrate and summarize from Mr. Dooley his

12  actions and involvements in both of those investigations?

13  *A.*  That's correct, sir.

14  *Q.*  And all of those reports were original reports signed by

15  him, correct?

16  *A.*  Yes, sir.

17      *MR. WEINHOEFT:*  I move for the admission at this time,

18  your Honor, 1A and 100A.

19      *MR. FREESE:*  No objection.

20      *THE COURT:*  Admitted.

21      *(Exhibits Gvt's 1A and 100A received in evidence)*

22  ***Q.  (BY MR. WEINHOEFT:)***  Detective, could you tell us what a

23  chain of custody is?

24  *A.*  An evidence chain of custody -- for example, as a police

25  officer, if I respond to a crime scene and I locate any kind of

1    evidence whatsoever, I have to document it.  It is the formal

2    documentation of evidence from the time that it is initially

3    located and identified at a crime scene or other place, from

4    the time it is seized and placed into evidence storage, to the

5    time it is presented in court.  It is official documentation

6    that, um, is designed to keep evidence from being tampered

7    with, keep it from being stolen.

8        It provides accuracy also when it comes to court.  We know

9    exactly who found it who seized it who tagged it and who placed

10   it into what evidence storage area.  That's -- it keeps things

11   very accurate come court time.

12   Q.  It is fair to say that the chain of custody is the complete

13   continuity and possession, it accounts for the whereabouts of

14   the evidence at all times from the time it is seized up until

15   the moment of final disposition?

16   A.  That is exactly correct.

17   Q.  Tell us about that process, is that a process that occurs

18   on every piece of evidence that is recovered by the Alton

19   Police Department?

20   A.  Every piece of evidence that is recovered, official

21   documentation is to from the time it's discovered and

22   identified as evidence, again, to the time of court

23   disposition.  The documentation must be as quickly as possible

24   and as accurate -- absolutely accurate.

25   Q.  And with respect to the two investigations that you

1    participated in, the Olin robbery and the U.S. Bank robbery,

2    were the chain of custody completed as standard protocol on

3    those two cases?

4    A.  On both cases, yes, sir.

5    Q.  Detective, I'm handing you what's been previously marked

6    for identification purposes as Government's Exhibit 99,

7    pertaining to the October 20th robbery of the U.S. Bank, and

8    I'm handing you what's been marked Government's Exhibit 55 of

9    the June 16th robbery of the Olin Credit Union, I'd ask you to

10   look at those two documents and tell me if you have seen those

11   before?

12   A.  I have seen them before, yes, sir.

13   Q.  What are they?

14   A.  The chain of custody record from both incidents.  The

15   Exhibit 99 is the chain of custody documentation for the U.S.

16   Bank incident, and Exhibit Number 55 is the chain of custody

17   documentation for the Olin Employees Credit Union

18   investigation.

19   Q.  In the process of documenting and recording the actual

20   chain of custody itself, is that an objective process that

21   requires no opinions or interpretations or analysis by the

22   person receiving the evidence?

23   A.  The actual documentation, itself, no, any officer can --

24   Q.  Just objective facts?

25   A.  -- can -- exactly.  Where, when, and what have I got here.

1     That's what you document.

2     Q.  And the chain of custodies that you're holding for Exhibits

3     5 and 99, those chain of custody records, are the receipt or

4     transfer of evidence?

5     A.  That's correct, sir.

6     Q.  Are those chain of custody entries made at or near the time

7     that evidence was either received or transferred?

8     A.  That is policy.  That is what's supposed to happen, at or

9     very near the time of the evidence transfer.

10    Q.  The chain of custody entries on those documents made by the

11    persons who are actually involved in receiving and transferring

12    the evidence?

13    A.  That is correct.

14    Q.  And is this action of receiving and transferring evidence a

15    regular occurring activity that occurs at the Alton Police

16    Department?

17    A.  Daily.

18    Q.  Is it also a routine activity to keep a record of the chain

19    of custody document for each time evidence is transferred or

20    received?

21    A.  Yes, that's correct.

22          MR. WEINHOEFT:  At this time I would move for the

23    admission of Exhibits 99 and 55.

24          MR. FREESE:  No objection.

25          THE COURT:  Admitted.

1        *(Exhibits Gvt's 55 and 99 received in evidence)*

2      **Q    (BY  MR.  WEINHOEFT:)** Sir, could you please focus your

3      attention first on the Olin Credit Union robbery on June 6 of

4      2006 and briefly summarize, if you would, the nature of that

5      investigation, leading as to what evidence was recovered?

6      *A.*  I will try, briefly.

7         Folks, on June 16th of 2006 three black males entered the

8      Olin Employees Credit Union in Alton, Illinois.  These three

9      black males were later identified as Montez Fuller, Phillip

10     Bailey and Laveda Brown.  Their identity was partially obscured

11     from masks or do-rags, various things, that they were wearing.

12     They were later identified.

13        However, two of the young subjects jumped over the counter

14     and began rifling through the teller drawers as one subject

15     stayed in the lobby.  They were armed.  It was clearly a bank

16     robbery according to all the witnesses.

17        After obtaining a very large amount of money from the

18     teller drawers they fled, obviously, out of the business and

19     entered a silver or gray Chevy Cavalier.  There was a witness

20     pulling into the bank parking lot, his name was Michael

21     Drainer.  And obviously, he recognized what he saw because he

22     saw three black males that their identity was obscured, jumping

23     into a vehicle, and he believed that he was witnessing a bank

24     robbery in progress.

25        He stayed in his vehicle and followed this vehicle at his

1    own peril, by the way.  There was -- one of the rear seat

2    passengers did open a door and shoot at his vehicle after they

3    recognized that he was following this vehicle down Route 3.

4    But Mr. Drainer did call 911.  He was at a location where it

5    did go to the East Alton dispatch center, but there was a

6    dispatcher that got that information to his police officers and

7    there was multiple East Alton police officers that were in the

8    area at that time.

9        Through several interviews it was discovered that this

10   vehicle was driven by Bonnie Brown at the time.  It then

11   stopped at the Eastgate Plaza, which is just off of Route 3,

12   where a transfer of some of the money and of some of the people

13   actually entered into a 1995 gold GMC Yukon.

14       Bonnie Brown then stayed in the gray car and took some of

15   the bank robbery loot money with her.  An alert East Alton

16   police officer had pulled her over on Route 3, maybe a mile and

17   a half, 2 miles down the road, just based on the vehicle

18   description, the silver or gray Cavalier, just an investigative

19   stop and saw -- discussed this with a woman who was very

20   nervous at the scene, and also there was kind of large amounts

21   of crumpled up bills in plain view and her purse.

22       Obviously she was not able to explain this and several of

23   these bills were bait money from the bank robbery.  So she was

24   taken into custody at the scene.  Through several interviews

25   with Bonnie Brown, the identification of the identity of Montez

1    Fuller, Phillip Bailey and Laveda Brown were discovered.

2    Q.  That was through an interview?

3    A.  Multiple interviews with Bonnie Brown, who was seen fleeing

4    the Eastgate Plaza and later admitted to her involvement in

5    this.

6    Q.  Now, the investigation and the initial parts of it, was the

7    FBI participating in the investigation of this bank robbery?

8    A.  The FBI and the U.S. marshals office, yes, sir.

9    Q.  And there was a federal investigation because this bank was

10   insured by the National Credit Union Association; is that

11   correct?

12   A.  Federally insured financial institution, yes, sir.

13   Q.  After Bonnie Brown ultimately confessed and named Montez

14   Fuller as her boyfriend, did officers have the occasion to

15   identify the vehicle he was currently in and locate him at the

16   Econo Lodge Hotel near the Edward Jones dome?

17   A.  The marshals did locate the gold '95 GMC Yukon that was at

18   the Edward Jones dome in St. Louis.  There was a -- I'm sorry,

19   U.S. marshals and detectives then they went to the Econo Lodge,

20   and actually got search warrants for room 216 and 214 where

21   they contacted a Montez Fuller.

22   Q.  Let me stop you there.  Could you tell us, just briefly,

23   what a search warrant is and the representative roles of the

24   parties in law enforcement when a search warrant is executed?

25   A.  Certainly.  There was search warrants procured for this

1    motel based on all of the information that was provided by

2    Bonnie Brown, as well as other witnesses, to substantiate her

3    claim that these people were involved and that they were

4    presently at this location.  Information was discovered about

5    the GMC Yukon.  It did belong to Montez Fuller.  They used that

6    information of probable cause, the U.S. marshals, to obtain

7    search warrants for the apartments that Montez Fuller and a

8    relative, Clarence Thomas, were supposed to be in.

9    Q.  Tell me the roles of the police officers during the

10   execution of the search warrant.

11   A.  There are multiple roles.  Obviously, some search warrants

12   are dangerous, and then you may use a tactical response team or

13   a SWAT team, if you will.  Other officers are -- that are not

14   on the entry team, that are not there to secure the scene and

15   make sure that there are no dangers, immediate dangers.  Some

16   officers come by when the scene is secure to search for

17   evidence, and still there are other officers that are there to

18   talk to possible witnesses and/or defendants.

19   Q.  Let's focus on the role of the evidence officer.  In a

20   major case such as this, does the evidence officer have a role

21   during the execution of search warrant?

22   A.  To search, locate, and document, and seize any evidence as

23   found.

24   Q.  What is the significance of having the evidence officer

25   there as it relates to the chain of custody?

1   *A.*  It's easier to have the evidence officer there.  You have

2   one person that can look at it in its place, photograph it,

3   process it, if need be, there, and/or tag it, bag it, and, take

4   it.  You have one person taking custody of that evidence.

5   *Q.*  And then that evidence would go directly into the vault?

6   *A.*  Supposed to go directly into the vault, yes, sir.

7   *Q.*  And that would eliminate anybody else from being in the

8   middle of the transportation of evidence?

9   *A.*  That's correct.

10  *Q.*  Let's talk about evidence that was recovered at the Econo

11  Lodge and let's focus specifically on cash and four, in

12  particular, items of cash that were obtained at the Econo

13  Lodge.  Can you tell us what items of evidence were recovered?

14  *A.*  Yes, sir.  In Room 216, that was being occupied by Montez

15  Fuller and a later identified black female, they located $796

16  on the floor near the closet of that bedroom.  That cash was

17  photographed, seized, and later transported to headquarters by

18  Officer Dooley.

19      There was also $2,900 located in a toilet paper roll inside

20  in the core.  It was bundled up inside in the core and it had

21  since been wrapped over to conceal that that toilet paper roll

22  was indeed being used to house that cash.  But it was also

23  located and seized by Detective Dooley at the time.

24      Also in Room 214, rather, there was a young man that was

25  identified as Clarence Thomas, and he is a relative of Montez

1    Fuller, there was $119 that was seized from his person.

2    Q.  And was there any money recovered from a girlfriend, a

3    female acquaintance of Montez Fuller.

4    A.  There was.  I don't know how to pronounce her name.  Her

5    last name is Gilkey, Eujoya Gilkey.  She was also present.

6    Later during an interview with this young lady, she told

7    Detective Brandtly, who was interviewing her, that she had

8    received $300 cash from Montez Fuller, and she had hid it in

9    her cell phone.  Detective Brandtly did go in and seize that

10   property and seize that money as possible proceeds from the

11   robbery.

12   Q.  To make sure our record is clear, for the spelling of

13   Mrs. Gilkey's first name, is that E-U-J-O-Y-A?

14   A.  That's what I believe is the correct spelling.

15   Q.  Very good.

16   A.  I don't know how to pronounce that.

17   Q.  Now, after this -- and so the total sum of those four

18   exhibits adds up to $4,115; is that correct?

19   A.  That's correct, sir.

20   Q.  How is the count done on that money, is that -- can you

21   tell us how the count was done?

22   A.  The --

23   Q.  The inventory?

24   A.  The count, as far as -- I have not seen the cash tracking

25   forms on these.  All of the money except for the -- I

1    apologize, the money was seized by Detective Dooley, and I

2    believe that he counted the money at the scene and later then

3    tagged it, bagged, it and transported it to headquarters.

4    Q.  My point is, verifying the count is his responsibility?

5    A.  That's right.

6    Q.  I'd like to review the chain of custody entries for each of

7    these items.  If I could first turn your attention to

8    Government's Exhibit 55, the chain of custody for the Olin

9    Credit Union robbery.  Directing your attention to Page 21?

10   A.  Yes, sir.

11   Q.  And focusing on that first exhibit, the $796 that was

12   recovered?

13   A.  Yes, sir.

14   Q.  If you would, please walk us through each step of the chain

15   of possession and the chain of custody for this particular

16   item?

17   A.  Again, that money was located and identified as possible

18   evidence on the 19th of June during the search warrant at this

19   motel in St. Louis.  At that time -- it is in multiple officers

20   reports, as well as Mick Dooley's reports, he did locate and

21   seize that money as possible evidence on that date and time.

22   However, the chain of custody shows that Mick Dooley entered

23   this into the Alton Police evidence vault on June 27th at

24   approximately 10:20 a.m.

25       The next chain of custody --

1   *Q.*  If I could stop you right there.  There is an eight-day gap

2   between when he seized and when he booked it into the vault, is

3   there any explanation in that chain of custody or any

4   documentation in the chain of custody where that evidence was

5   at for those eight days?

6   *A.*  There is no documentation and I have no explanation for

7   that.

8   *Q.*  What's the next step in the chain of custody?

9   *A.*  The next is on April 9th of 2007, it was removed from the

10  vault for the purpose of being inspected by the Federal Bureau

11  of Investigations for court purposes.

12  *Q.*  I'd like to turn your attention next to that $2900 exhibit

13  that you referenced, Page 23 of the chain of custody report?

14  *A.*  Yes, sir.

15  *Q.*  If you would, also, please walk us through the chain of

16  custody on that particular item?

17  *A.*  Again, in police documentation in the case reports that

18  money was seized, was located and identified as possible

19  evidence on the 19th of June 2006 during that search warrant as

20  well.  However, the first chain of custody we have is Officer

21  Mick Dooley placing it into the evidence vault at the Alton

22  police headquarters of June 27th of 2006 at approximately 2300

23  hours.  So shortly after the $700 was placed into evidence so

24  was this, or so the chain of custody was made on it.

25  *Q.*  And this document also references that Dooley, himself,

1    personally, seized this money at the scene?

2    A.   Officer Mick Dooley, yes, sir.

3    Q.   And again, there is an eight-day window where that money is

4    not accounted for in this chain documentation?

5    A.   There is no documentation from the 19th to 27th as to where

6    that money was at.

7    Q.   After it was originally booked in on the 27th of June '06

8    what is the -- what is the next step?

9    A.   The next documentation, again, is on April 9th 2007 where

10   it was removed from the vault for the purposes of Federal

11   Bureau of Investigations's court purposes.

12   Q.   I'd like to take your attention next to the third item of

13   money evidence you described.  $119, reference Page 22 on the

14   chain of custody form?

15   A.   Yes, sir.

16   Q.   Again, can you tell us who originally obtained this

17   evidence at the scene of the crime?

18   A.   That was evidence officer Mick Dooley and that was also on

19   the 19th of June 2006 during said search warrant.

20   Q.   And what's the next step in the chain of custody for this

21   particular item?

22   A.   Again, on June 27th of 2006 at 10:25 a.m. this was logged

23   in as evidence into the Alton Police evidence vault.

24   Q.   Again, there is an eight-day window where the chain is not

25   accounted for?

1    *A.*   That's correct, sir.

2    *Q.*   Is that unusual?

3    *A.*   In my experience, yes.

4    *Q.*   And what's the final entry for the chain for the $119?

5    *A.*   As well as the other two items, on April 9th 2007 they were

6    removed from the vault for the purpose of handing over to the

7    FBI for courtroom purposes.

8    *Q.*   And finally, I'd like to take your attention to that fourth

9    item of evidence you referenced, that $400 that was recovered,

10   Page 13 of the chain documentation, would you please describe

11   how that evidence was seized and processed and what steps it

12   went through?

13   *A.*   That evidence was actually seized by Detective Brandtly,

14   Detective Bill Brandtly.  During an interview with the owner,

15   Mrs. Gilkey, she stated that she had, again, been given $300

16   from Montez Fuller.  Detective Brandtly believed that these

17   three $100 bills may have been proceeds of the crime, bank

18   robbery loot, so he got into her cell phone and seized them as

19   evidence.

20   *Q.*   If I could interrupt you there for one moment, you just

21   used the phrase "proceeds of a crime."  Could you define that

22   phrase for us?

23   *A.*   Loot.  Anything that -- well, in this case, the bank

24   robbery loot, the cash that was stolen, that's obviously

25   proceeds of the crime.  A good example during this incident, a

1   lot of the people that benefited from this cash, these people

2   that robbed the bank, they used some of this money to buy

3   jewelry, squandered it at bars, anything, clothing items,

4   jewelry, items they bought with this money that they had stolen

5   from the bank, obviously, would be proceeds from the crime.

6   And if we had reason to believe it was, we would seize that as

7   evidence.

8   Q.  So this money was seized from Ms. Gilkey, not because she

9   participated in the robbery, but because it was evidence of the

10  robbery?

11  A.  It was very possibly evidence of the robbery, yes, sir.

12  Q.  And that's what you mean when you use the word "proceeds"?

13  A.  That's correct.

14  Q.  You indicated that the property was originally seized by

15  Detective Brandtly on 6/19.  He placed it into a temporary

16  storage locker, when?

17  A.  Locker 6 on 6/20 of 2006, on the next day.

18  Q.  What's the next step in the chain of custody?

19  A.  The following day, the day after that on June 21st, Mick

20  Dooley transferred this evidence from Locker Number 6 to the

21  evidence vault at 8:42 a.m.

22  Q.  So at that point the evidence officer has documented that

23  he received it on the 21st?

24  A.  That's correct.

25  Q.  And then what's the last step in the chain?

1    A.   Again, on April 9th of 2007 it was removed from the

2    evidence vault by Officer Dooley to be given to the Federal

3    Bureau of Investigation.

4    Q.   So with respect to each of these four exhibits of money,

5    three of them were personally recovered from the scene by the

6    defendant and no one else was in the chain; is that correct?

7    A.   Correct.

8    Q.   And as for the fourth one, the chain of custody

9    documentation shows that he verifies that receipt of that item

10   on the 21st?

11   A.   That's correct.

12   Q.   All right.

13        I'd like to take your attention now to the second bank

14   robbery, the U.S. bank robbery that occurred on October 20th of

15   2006.  Are you familiar with that investigation from

16   participating in it?

17   A.   Yes, sir.

18   Q.   Again, if you would briefly summarize the nature of the

19   investigation which lead to the recovery of the financial

20   evidence?

21   A.   I will try.

22        That is very involved and actually very interesting bank

23   robbery.  First things first, on August 12th of 2006 a man

24   named Rodney Brown and a man named Jason Moses escaped from a

25   jail in Morris County, Texas.  It was found through multiple

1    interviews later that there were several people that assisted

2    in this escape.  They were Kavita Chapman, Johnny Mack, Rodney

3    Brown, himself, Lee Fielding and Eric Laverne, as well as a

4    girlfriend of Eric Laverne who was later identified as Ashley

5    Brown.

6        But it was a very detailed plan, it was actually what's

7    called an "over-the-wall escape."  They actually climbed a wall

8    and dug through concertina wire to escape.  They fled to a

9    parking lot where several associates left a getaway car.

10       To make a long story short, they eventually made their way

11   back to Alton where they hid out with this Jason Moses in

12   various unoccupied apartments that they knew of.  Jason Moses

13   was not familiar with the Alton area.  He was just somebody

14   that had befriended Rodney Brown in jail and made the escape

15   with him.

16       On October the 20th of 2006, however, these people had

17   planned a bank robbery.  Now we have slightly conflicting

18   reports.  The plan may have been for the Liberty Bank, which

19   was approximately a block away, but it ended up being the U.S.

20   Bank and the plan goes something like this:

21       Jason Moses, who was not well-known in the Alton area, they

22   essentially dressed him up as a clown.  They shaved part of his

23   head and died the rest of his hair bright red and provided a

24   plaid jacket and other various, for lack of better word, goofy

25   looking clothing so he could go into this bank and be

1    unnoticed.

2        They also bought road flares and concocted and made what

3    appeared to be a dynamite bomb around his waist, including

4    speaker wire that was protruding from the flares to look like

5    electronic ignition switches and whatnot.  He was also armed

6    with a pistol.

7        The other parties, their jobs were to stay in the area and

8    two of the persons, Lee Fielding and Eric Laverne, they had

9    basically what they call "throw-away phones."  They bought some

10   minutes phones or some cheap phones from a local Wal-Mart and

11   right before this incident occurred, they made two 911 calls to

12   the Alton Police Department claiming that there was some odd

13   occurrence happening on -- at or near a bank that was

14   completely across town.

15       Oddly enough, it was the Olin Employees Credit Union, which

16   is completely on the east side of town.  It was found out,

17   through interviewing all of these people, that they were trying

18   to create an emergency with the police to get as many police

19   officers heading toward the opposite side of town while they

20   were presently robbed U.S. Bank.

21       It went off without a hitch.  They actually did use the two

22   911 calls.  It worked to a degree.  Jason Moses, dressed as a

23   clown, a clown armed with a bomb and a handgun, did go into the

24   bank and went into a manager's office and went directly to the

25   safe and made away with over $60,000, I believe.  I've got the

1    figures here.

2        They met in a nearby park where vehicles were exchanged and

3    Rodney Brown made a quick getaway.  Lee Fielding and Jason

4    Moses got in other vehicles and left very quickly.

5        Eric Laverne was left to get rid of the vehicle that was

6    actually driven to the bank, which there were witnesses that

7    identified this bluish-green Lumina as being the suspect

8    vehicle.  An alert police officer, Tony Bumpers, saw this

9    vehicle traveling southbound on an alley street in Alton

10   shortly after this, and obviously, a pursuit -- a pursuit

11   occurred after that.

12       We did not get Eric Laverne from the vehicle, but we did

13   get -- find the vehicle, seize the vehicle, and from that, we

14   were able to identify Eric Laverne and later Rodney Brown and

15   all of the players involved in this incident.

16       I told you I was long-winded, I apologize.

17   Q.  All right.  Fast forwarding three days from the date of the

18   robbery on the 20th to the 23rd, did the investigation

19   ultimately lead to where Mr. Moses was hiding out?

20   A.  Yes, the Intown Suite.  We had a confidential informant who

21   stated that he had direct knowledge that Rodney Brown and a

22   white male named Jason Moses had direct involvement in this and

23   he would take to us where Jason Moses was at.

24   Q.  Was Moses captured?

25   A.  Moses was captured by Alton Police detectives, U.S.

1    marshals, and may have been other law enforcement officials

2    there as well.

3        He was attempting to jump out of a third-story window to

4    evade arrest, but he was captured and there was evidence taken

5    from his apartment.

6    Q.  That's my next question.  What evidence was obtained in his

7    hotel room at the time?

8    A.  There was, specifically, a blue St. Louis Blues gym-style

9    bag that contained a clear plastic bag, which contained a very

10   large sum of money, which was later determined to be Jason

11   Moses' cut.

12   Q.  I'm handing you what's been marked for identification

13   purposes as Government's Exhibit 145, 146, and 147.  Would you

14   please take a look at those photographs and tell me if you

15   recognize those?

16   A.  I do recognize these.

17   Q.  Do those fairly and accurately depict the money as it was

18   packaged and as it was contained in photographs --

19   A.  From the photographs that I've seen, yes, sir, this is an

20   accurate depiction of what was seized out of that motel room on

21   that evening.

22       MR. WEINHOEFT:  At this time, your Honor, I'd move for

23   the admission of Government 145, 146, and 147.

24       MR. FREESE:  No objections, your Honor.

25       THE COURT:  Admitted.

1        *(Exhibits Gvt's 145, 146, and 147 received in evidence)*

2     **Q     (BY  MR. WEINHOEFT:)** If you would, referencing the chain

3     of custody for this $9,460 that was recovered -- I believe

4     that's on Page 18.  Can you tell us about the chain of evidence

5     and what happened to this money once it was recovered?

6     A.  This money was seized by Officer Dooley during that

7     incident on the 23rd of October.  Again, as the evidence

8     officer, he would have been required for photographing in place

9     and properly securing it and transporting it to headquarters.

10        He did; however, the first date that I have on this chain

11    of custody was October 31st wherein Officer Dooley placed it

12    into the vault.  This was seized on October 23rd.

13    Q.  And it was seized by Dooley at the scene?

14    A.  By Officer Dooley at the scene.

15    Q.  There were no other individuals who were involved in the

16    chain of custody of this particular item; is that correct?

17    A.  Not before then.  Officer Mike Bazzell -- it looked like he

18    seized it -- I'm sorry, he transferred it on April 16th from

19    the vault to the Federal Bureau of Investigations.

20    Q.  As part of this investigation?

21    A.  As part of this investigation, yes, sir.

22    Q.  Now, was there additional investigation beyond Mr. Moses

23    that led to a defendant by the name of Lee Fielding?

24    A.  Yes, Lee Fielding was early on identified as a possible

25    suspect in this, and a search warrant was conducted at his

1    house in Alton at 630 Trueby Street in Alton.

2    Q.  What date was that?

3    A.  That was October 24th, that was the following day.

4    Q.  That was actually just after midnight the day of 23rd and

5    just after midnight on the 24th; is that correct?

6    A.  Yes, sir.

7    Q.  And did you participate in the execution of that warrant?

8    A.  I was on the tactical response team and did participate in

9    the search warrant.

10   Q.  Can you tell us about any evidence, cash evidence, that was

11   found at Lee Fielding's home?

12   A.  There was small lockbox located in the basement up in the

13   ceiling.  I didn't actually discover it, but I had heard other

14   officers -- Officer Mick Dooley talking about it.  It was

15   $9,821, later found out by myself that it was hidden in a

16   lockbox in the basement of that house.

17   Q.  With reference to the chain of custody for this particular

18   item, is there any reference to the seizing of a Apple

19   Macintosh computer?

20   A.  No, reference, no, sir.

21   Q.  Is there anything in any of Dooley's -- in his original

22   report that references seizing an Apple Macintosh laptop

23   computer?

24   A.  Not in any of the documentation I've seen.

25   Q.  Are there any supplemental reports by Officer Dooley

1   referencing an Apple Macintosh computer?

2   *A.*  I have not seen any supplementation.  I don't believe any

3   exists.

4   *Q.*  No reference in the chain forms either?

5   *A.*  No, sir.

6   *Q.*  How about in the receipt from the execution of the search

7   warrant?

8   *A.*  There is no record whatsoever of a Apple Macintosh laptop

9   during that investigation or during that search warrant, none.

10  *Q.*  Let's talk about the chain of custody, then, for the items

11  that were recovered.  You mentioned the $9,821, tell us about

12  how it was recovered, who recovered it?

13  *A.*  That was -- what page are we on, sir?

14  *Q.*  Page 19, I'm sorry.

15  *A.*  That was recovered at the scene by the evidence officer

16  Mick Dooley.  It was $9,821 in a lockbox hidden in the ceiling.

17  I believe Lee Fielding made those spontaneous statements that

18  was his cut from this, and I believe he led officers and

19  Detective Dooley to the location of it.  It was seized by Mick

20  Dooley on 10/24, but it was not logged into our chain of

21  custody until October 31st by Mick Dooley.

22  *Q.*  And again, no other individuals in the chain of custody for

23  this item, solely the defendant?

24  *A.*  That is the only documentation.  There is no other

25  documentation whatsoever, no.

1   *Q.* And ultimately, when Lee Fielding was arrested there was

2   additional money on him.  Could you please explain that process

3   and who seized that money and the chain of custody for that

4   last exhibit?

5   *A.* During interviews with Mr. Fielding he led Detective

6   Brandtly know, again, that he had cash in his property; it was

7   $648.  Detective Brandtly believed that it might have also been

8   the proceeds of the bank robbery, so he seized it as evidence.

9   And I will find page here and give you --

10  *Q.* Page 10?

11  *A.* Okay.

12  *Q.* Save you some looking.

13  *A.* Thank you.

14      Yes, this evidence was seized on the 24th of October from

15  the property of Lee Fielding by Detective Brandtly.  On the

16  same date at 3/20, he logged it in as evidence and put it in

17  Locker Number 6 on the chain of custody.

18  *Q.* What happened to it after that?

19  *A.* The next entry is on the 30th of October 2006 at 2:58 p.m.

20  wherein Mick Dooley transferred it from Locker 6 where

21  Detective Brandtly placed it, and he transferred it into the

22  police vault, the evidence vault.

23  *Q.* Are there any other entries on the chain?

24  *A.* There are no other entries.

25  *Q.* So as it pertains to the U.S. Bank robbery, the total of

1    $20,029 were recovered; is that correct --

2    *A.  That is correct.*

3    *Q.* -- out of these exhibits?  And out of that money, the

4    defendant either personally recovered or verified receipt of

5    all of that money?

6    *A.  That's correct, sir.*

7          *MR. WEINHOEFT:*  If I may have just a moment, your

8    Honor?

9          *THE COURT:*  You may.

10         *MR. WEINHOEFT:*  Those are all my questions.  Thank

11   you.

12         *THE COURT:*  All right, thank you.

13         Mr. Freese, cross examination.

14         *COURT REPORTER:*  Mr. Freese, please make sure you turn

15   on your mic.

16         *MR. FREESE:*  I'm sorry?

17         *COURT REPORTER:*  Please make sure you turn on your

18   mic.

19         *MR. FREESE:*  I'm sorry about that.

20         *COURT REPORTER:*  Thank you.

21                    **CROSS EXAMINATION**

22   *Q.  (BY MR. FREESE:)*  Let me ask you a few questions, please.

23         Just tell me again, how much experience you have had as an

24   officer?

25   *A.*  I've been a police officer with Alton for almost ten years.

1   *Q.*  Okay.  And you then have known Mick Dooley that whole time?

2   *A.*  Yes.  He's been an officer for years.  I've known him for

3   almost that ten years.

4   *Q.*  Okay.  And have you had other cases involving that you have

5   dealt with --

6   *A.*  Many.  Many.

7   *Q.*  Have you -- had cases involving money?

8   *A.*  Sure, I'm sure, I'm certain.  I worked many, many

9   investigations with Mick Dooley.  I can't give you any

10  specific, but I would assume, yes, I've probably worked many

11  cases with Mick Dooley involving cash and/or drugs and/or guns,

12  all of the above.

13  *Q.*  Have you, up to this point, ever experienced any missing

14  money from any of your cases?

15  *A.*  No.  I don't believe so, no.

16  *Q.*  Now, were you present during the -- on the -- let's go back

17  to the Olin one minute.  Were you present during the whole time

18  of the search?

19  *A.*  Which search, sir, where at?

20  *Q.*  The Econo Lodge.

21  *A.*  No.  I was not present, period, at any time at the Econo

22  Lodge.

23  *Q.*  So you are not, yourself, know personally --

24  *A.*  A first-person witness?  No, sir.  I was not there at the

25  Econo Lodge during that search.

 1    *Q.*  So you don't know of your own personal knowledge?

 2    *A.*  That's true.

 3    *Q.*  You are going off what the reports said?

 4    *A.*  Off documentation that I read, yes, sir.

 5    *Q.*  Which place were you at for the search?

 6    *A.*  I participated in the search at 630 Trueby Street, which

 7    was the U.S. Bank robbery.  I was actually on the tactical

 8    response team and made entry into the residence to secure the

 9    residence.  I was present for that search warrant.  I wasn't

10    present for the entire search of the house.  After we secured

11    the residence, most of the search warrant team left the scene

12    and left it to other detectives and Mick Dooley to search.

13    *Q.*  When you say you were "responsible for securing the

14    premises"?

15    *A.*  Yes, sir.

16    *Q.*  What does that mean?

17    *A.*  Well, it's a tactical response team, it's a SWAT team.  Any

18    time we have reason to believe that someone maybe holed up with

19    weapons, sometimes we use our tactical response team, and we go

20    in like a SWAT team, and we knock and announce and enter

21    sometimes roughly and make sure if there is any armed people in

22    that house, that they're not able to get to the A evidence,

23    and/or B weapons.  So we get through the house quickly, secure

24    any persons that are inside, and make sure that they have no

25    access to potential evidence and or firearms.  We basically

1    secure the scene.

2    Q.   Okay.   And then where are you once you have secured

3    everything, what is your job from that point?

4    A.   Sometimes prisoner transport, if there are any, but after

5    the scene is indeed secure and we have done two, three checks

6    to make sure it is secure, we release it to detective and/or

7    other investigators who arrive at the scene to actually search

8    the residence or talk to witnesses.

9    Q.   Okay.

10        Now, would there be other officers involved in the search

11   besides --

12   A.   Me.

13   Q.   -- Mick Dooley?

14   A.   Oh, um --

15   Q.   I mean?

16   A.   -- probably yes.  I don't know.  Um, I don't know who was

17   actually involved in the search other than Mick Dooley, but I

18   would assume there would have been other detectives that were

19   assisting him in the search.   Leaving one person to search the

20   entire house would have been costly time-wise.

21   Q.   You said that you have worked with Mick Dooley for a number

22   of years?

23   A.   Whole time I've been a police officer, yes, sir.

24   Q.   What do you think of his crime scene processing habits --

25   A.   His ability?

1   *Q.*   -- at the scene?

2   *A.*   His ability?

3   *Q.*   His abilities and his habits as far as processing?

4   *A.*   Meticulous.

5   *Q.*   When you say "meticulous" --

6   *A.*   Very meticulous.  I would say that he was a very

7   experienced officer.  And I, for one, he knew a lot more about

8   being a cop than I do.  So I paid attention to him and tried to

9   learn from what he did from the times that I saw him actually

10  operating as a cop.  I'm not really sure if that's the question

11  you asked or not.

12  *Q.*   No.

13  *A.*   In my experience, how does he handle crime scenes?

14  *Q.*   No.  I think you did a good job of answering.  He was a

15  very meticulous person, very --

16  *A.*   In my experience, he is very meticulous, very detailed,

17  yes, sir.

18       *MR. FREESE:*  Your Honor, may I take a look at the

19  exhibits a minute?

20       *THE COURT:*  Of course.

21  *Q.*   *(BY MR. FREESE:)*  Now, again, going to Government's

22  Exhibit 55, you state that the evidence was recovered on

23  June 19th according to the document here?

24  *A.*   Is -- excuse me, sir, what is Exhibit 55, can you --

25  *Q.*   I'm sorry, the Olin --

1    *A.*  You have all my documentation.

2    *Q.*  I'm sorry, that's the only copy I have, so I apologize.

3          *MR. FREESE:*  May I, your Honor?

4          *THE COURT:*  You may or you could just tell him.

5    **Q.  (BY MR. FREESE:)**  On this one, on the Olin?

6          *THE COURT:*  You are talking about the Olin Credit

7    Union robbery?

8          *MR. FREESE:*  The Olin bank robbery.

9          *THE WITNESS:*  Yes, sir.

10   **Q**    **(BY  MR. FREESE:)**  You indicate here that there was, what,

11   property money seized on of $796, correct?

12   *A.*  That is part of the chain of custody, yes, sir.  And it

13   follows through to this one.

14   *Q.*  Right.  And then it was put in the vault on 6/27?

15   *A.*  That's correct, sir.

16   *Q.*  Now, you, of your own knowledge, do you know of why that

17   may have been a lapse of time?

18   *A.*  I do not.

19   *Q.*  May I ask, were you involved with, say, the counting of any

20   of the money?

21   *A.*  No.

22   *Q.*  Were you involved with the comparing the money with the any

23   of the other money, the bait money?

24   *A.*  Are you talking about the bait money?  No.  I believe that

25   was discovered by Detective Dooley, Mick Dooley.

1          THE COURT:  Sir, would you just, for the jurors

2     particularly, tell them what bait money is.  Some of us take

3     these things for granted.

4          THE WITNESS:  Well, for example in this case, in the

5     Olin Employees Credit Union bank robbery, in the teller drawers

6     they had small amounts of monies they had ten, $20 bills in two

7     different drawers, five in each drawer.  And in each one of

8     these drawers, they had a small little area that contained like

9     a metallic clip on it.  And they had this bait money.  They had

10    five bills in each one of these, that way -- and it was set up

11    with an alarm so when those bills were actually pulled from

12    that clip and the metal hit metal from the base of the drawer,

13    it would activate an alarm.

14          Now all ten of these bills were also -- the serial

15    numbers were recorded.  So if it popped up later in a mall or a

16    convenient store or something we could possibly trace that

17    money back to where it came from and who spent it where, to

18    help in evidence.  But that's bait money in a nutshell.

19          THE COURT:  Thanks.

20    *Q    (BY  MR.  FREESE:)* On Page 22 on exhibit --

21    A.   Are we still on the Olin Employees?

22    Q.   Yes.

23    A.   Go ahead, sir.

24    Q.   I notice here that up here "auto parts accessories,

25    evidence recovered 6/22," correct?

Cross Examination - VanBaketes, Pete

1    *A.*  It was recovered on, it looks like, "front bumper of Ford

2    F150 truck struck by Tahoe, discovered on June 22nd of 2006."

3    Yes, sir.

4    *Q.*  And then there were prints recovered on 6/29?

5    *A.*  According to the chain of custody, indeed, yes, sir.

6    *Q.*  Now, all of these, again, you, yourself, don't know when

7    necessarily all of these --

8    *A.*  That's correct.

9    *Q.*  And are you aware and familiar with all the procedures for

10   Officer Dooley's job?

11   *A.*  Officer Dooley's job?

12   *Q.*  As far as evidence officer.

13   *A.*  That -- which procedures are you talking about?  I mean, I

14   know how to locate, identify, process, tag, seize evidence, and

15   then later transport to it headquarters and properly enter it

16   into evidence, yes.

17   *Q.*  Are you familiar with whether or not there may be reasons

18   why there may be a gap between the time evidence is recovered

19   and it is logged in?

20   *A.*  Recovered and logged in?  Um, I'm not aware of any official

21   reasons.  I would assume that if some evidence required some

22   sort of processing, that could be one reason why it wasn't

23   immediately put into a vault or anything like that.  However,

24   valuable evidence, it's understood that it's -- it is put in

25   safekeeping, in an evidence locker or the vault, as soon as

Cross Examination - VanBaketes, Pete

1    possible.

2    Q.  But the items could be placed in the vault secured without

3    being logged in until all the evidence is logged in and they

4    log it in together?

5    A.  Well, no.  If there needs to be a chain of custody, I

6    personal would never ever do that.  I don't understand -- if I

7    am securing some evidence, I'm going to secure it in an

8    evidence locker as soon as possible especially valuable

9    evidence, guns, drugs, money.

10   Q.  Right --

11   A.  I wouldn't leave it sit somewhere for six or eight days.

12   Q.  But I'm asking --

13   A.  What do you mean, sir?

14   Q.  It could be placed in the evidence vault, and then when the

15   rest of the evidence is obtained, they -- it's recorded all at

16   once.  I'm just asking if that is possible?

17   A.  Is it possible for someone to put evidence in the evidence

18   vault, but not document it on the chain of custody?  I guess

19   it's possible.

20   Q.  Okay.  That's what I was asking.

21   A.  Foolish, but possible.

22   Q.  So just because it's -- there is a gap, number one, does

23   not mean that it's missing?

24   A.  Not there.  Yeah, certainly, it could be there, it's just

25   not documented that it's there.

1    *Q.*  It's not documented, but it could easily be there?

2    *A.*  Certainly.

3    *Q.*  And there could be various reasons why it was not

4    necessarily logged in at that particular time?

5    *A.*  Are we talking about the cash?

6    *Q.*  Yes.

7    *A.*  No, sir.

8    *Q.*  You don't think --

9    *A.*  No.  There is no -- cash, drugs, money, valuable evidence

10   need to be documented where it's at.

11   *Q.*  I'm not asking whether it needs to be --

12   *A.*  That's policy.

13   *Q.*  -- I'm asking, of your own knowledge, do you know whether

14   or not that is done or it has been done, it could be done?

15   *A.*  Has it been?  Certainly, someone could.

16   *Q.*  That's what I'm asking.  I'm not asking whether or not

17   that's what you would do.

18   *A.*  I guess it's possible.

19   *Q.*  You have answered the question.

20   *A.*  Certainly.

21   *Q.*  The let's go to the U.S. Bank a minute.  When the money was

22   found and seized, I believe that was on 10/23?

23   *A.*  Which money, sir, the money --

24   *Q.*  The U.S. Bank.

25   *A.*  The money at the Intown Suites or the money at 630 Trueby?

1   *Q.*  The 10/23 U.S. bank.

2   *A.*  What location was that seized from, was that the Intown

3   Suites, sir, is that what you were talking about?

4   *Q.*  I believe so.

5   *A.*  Go ahead.

6   *Q.*  You said, according to the chain of evidence command

7   there --

8   *A.*  Yes, sir.

9   *Q.*  -- that the 9,000 was seized on 10/23 and it was not logged

10  in until 10/30?

11  *A.*  I'll get you exact times here, sir.  Do you know what

12  evidence number you are specifically talking about, sir?

13        *THE COURT:*  Is there a number for the money that was

14  seized?

15        *MR. FREESE:*  I don't have the number, your Honor.

16        *THE WITNESS:*  Can you show me which one you are

17  talking about, sir, I'm not sure which one you are talking

18  about.  Are you talking about the $9,400 in the gym bag?

19  **Q   (BY  MR. WEINHOEFT:)** Yes.

20  *A.*  Go ahead.

21  *Q.*  Now, Mick Dooley was at the scene and he was one of the

22  officers there, correct?

23  *A.*  According to his reports and all the investigative reports

24  thus far, yes, sir.

25  *Q.*  Do you know whether or not Mick Dooley was on vacation at

1    that time?

2    *A.*   I have no idea.

3    *Q.*   So you don't know if he was called in off of vacation to

4    handle this job?

5    *A.*   I don't know that.  I don't know.

6    *Q.*   So you would not know whether or not --

7    *A.*   No, sir.

8    *Q.*   -- he was told to just put it in the slam locker and worry

9    about it when he comes back?

10   *A.*   I don't know.  I have no knowledge of that, no, sir.

11   *Q.*   Okay.  So again, there could be explanations as to why

12   there's a gap?

13   *A.*   Not legitimate explanations, no.  I have to disagree with

14   you there.  That's --

15   *Q.*   Well, if -- let me ask you --

16   *A.*   Go ahead.

17   *Q.*   -- and again, are you aware of whether or not Lieutenant

18   Hayes told him not worry about it and go on with his vacation

19   and do it when he comes back?

20   *A.*   I'm not aware of that.  I have no idea.

21   *Q.*   Are you aware that Lieutenant Hayes is Mick Dooley's

22   supervisor?

23   *A.*   He is my supervisor as well, yes, sir.

24   *Q.*   If Lieutenant Hayes told you to do something, would you go

25   ahead and do it, yes or no?

1    *A.*  That's not a yes-or-no question by any stretch of the

2    imagination.  Lieutenant Hayes has never told me not --

3    *Q.*  I didn't ask you --

4    *A.*  -- to enter evidence.

5         *THE COURT:*  I'm going to sustain the objection here.

6    If he ordered him to commit an unlawful act like --

7         *THE WITNESS:*  I would not follow that order.

8         *THE COURT:*  -- shoot everybody in Cottage Hills, he

9    would say no.

10        *THE WITNESS:*  I would absolutely not follow that

11   direct order.

12   *Q*   *(BY  MR.  WEINHOEFT:)* Obviously -- and I'm not -- I'll --

13   *A.*  I have no knowledge of what you are saying there, sir --

14   *Q.*  If -- if -- if Lieutenant Hayes was your supervisor, for

15   instance, said you are on vacation, you can finish this job

16   when you come back?

17   *A.*  Yes, sir.

18   *Q.*  Would you most likely say "fine" and go ahead and go back

19   on your vacation?

20   *A.*  Not until all valuable evidence was in the vault.

21   Certainly, I would maybe wait for paperwork.

22   *Q.*  That's what I --

23   *A.*  -- to get --

24   *Q.*  -- you would wait on the paperwork?

25   *A.*  Report writing, but not logging important evidence into the

1  vault.  That is something that I absolutely would not expect to

2  hear from my boss, Lieutenant Hayes, nor have I in ten years

3  heard from any of my supervisors, including the chief of police

4  and Lieutenant David Hayes, to, hey, don't put that money in

5  the vault.

6  *Q.*  No, no, that's not --

7  *A.*  Don't log it in.  That's unheard of in my ten years of

8  experience.

9  *Q.*  At least as far as you know?

10  *A.*  Correct, in my experience.

11  *Q.*  As far as you were concerned, but you are not the evidence

12  officer?

13  *A.*  Absolutely, that's correct.

14  *Q.*  In your experience, you have been on numerous search

15  warrant executions?

16  *A.*  Quite a few, yes, with the Alton Police Tactical Response

17  Team and the regional tactical response team, yes, sir.

18  *Q.*  You have seen quite a few, right?

19  *A.*  Been involved in many, yes, sir.

20  *Q.*  Have you ever seen or known of any officer taking any

21  evidence out of a place, pure and simple, without logging it,

22  without taking it, just taking it for themselves?

23  *A.*  Stealing?  No, sir.

24  *Q.*  You have never witnessed --

25  *A.*  You are describing thefts.  No, I've never witnessed anyone

1    stealing any evidence or nonevidence from a house during a

2    search warrant.  I believe that's what your asking.  No, sir.

3    Q.  You have never known it to occur?

4    A.  No, no, sir.  I've never witnessed anything of the sort.  I

5    wouldn't have that.

6    Q.  You never heard of it occurring?

7         MR. SMITH:  Objection.

8    A.  No.

9         THE COURT:  Just a minute.  I'm sorry.  What was the

10   objection?

11        MR. WEINHOEFT:  Objection is hearsay.  He is asking

12   him if he heard of other things at this point.  The officer has

13   testified he has no knowledge of the subject matter counsel is

14   asking about.

15        THE COURT:  Well, I'm going to let the answer stand.

16        Overruled.

17   A.  No.  No, sir.  I wouldn't stand for that.  Absolutely not.

18   Q   (BY  MR. FREESE:) You're still on the police force or the

19   Alton police force?

20        THE COURT:  Mr. Alton, how much time do you need to

21   finish this?

22        MR. FREESE:  Just a couple more minutes, your Honor.

23        THE COURT:  I've got two judges waiting on me on an

24   emergency matter.  Would you try to wrap this up for me very

25   quickly?

1          *MR. FREESE:*  If you want I can finish up when you come

2     back, your Honor.

3          *THE COURT:*  All right.

4          The Court is in recess.  It will take me about 15

5     minutes.

6                         *(Recess)*

7          *THE COURT:*  Be seated, please.

8          Thank you so much ladies and gentlemen for your

9     indulgence.  My three colleagues were here, and we had to make

10    some command decisions quickly, so it just had to be done.

11         Thank you.

12         We're continuing now with the cross examination.

13         Mr. Freese?

14    ***Q.  (BY MR. FREESE:)***  Okay.  Detective, I don't want to belabor

15    the point too much, I just want to go over a couple of things

16    with you, and this one -- these are three pages from exhibit --

17    Government's Exhibit 55 dealing with the Olin.  If you will?

18         *MR. FREESE:*  Sorry, I'm not electronically --

19         *COURTROOM DEPUTY:*  It's these two here.  It's zoom in

20    and zoom out.  Do you want it all on there the whole page or --

21         *MR. FREESE:*  I can move it up and down.

22         *COURTROOM DEPUTY:*  Okay.

23    ***Q.  (BY MR. FREESE:)***  On Page 20 of the chain of evidence?

24    *A.*  Yes, sir.

25    *Q.*  It says the shoe sole impression on the top of the bank

1    counter were recovered on June 16th; is that correct?

2    A.  Yes, sir.

3    Q.  But they weren't logged in as evidence until June 27th?

4    A.  That's correct, sir.

5    Q.  And by the same token the next item, a lighter from the

6    floor of the bank?

7    A.  Yes, sir.

8    Q.  6/16 to 6/27.  And the third item?

9    A.  Yes, sir.

10   Q.  Also, again, recovered on 6/19, not logged in until 6/27?

11   A.  Yes, sir.

12   Q.  And again, on Page 21 -- I'm sorry, going back to 6/20,

13   just so we cover all.  There were -- license plate inside the

14   Cavalier was recovered on 6/19?

15        THE COURT:  Is that a question?

16   Q    (BY  MR. FREESE:) Is that correct.  It says 6/19?

17   A.  I believe so.  It was moving around quickly.

18        THE COURT:  Mr. Freese, the way our evidence presenter

19   works, when you move it around like that, it makes me seasick.

20        MR. FREESE:  I'm sorry.

21   A.  I think it was, sir.  I think I know what you were saying.

22   Q    (BY  MR. FREESE:) Okay.  On Page 21 that license plate was

23   not logged in until 6/27; is that correct?

24   A.  I'm -- I see latent lists, women's sandals.

25   Q.  The very top, "evidence chain of custody."

1    *A.*  That doesn't have a description of the evidence.

2    *Q.*  That was from the Page 20.

3           *THE COURT:*  That's carrying over.

4           *THE WITNESS:*  I'll take your word for it.

5    **Q   (BY MR. FREESE:)** It's carrying over.  You read -- okay.

6    And again, that was logged in on 6/27?

7    *A.*  Yes, sir, I see that.

8    *Q.*  The next item was also logged in on 6/27, correct?

9    *A.*  Two pairs of women's sandals, yes, sir.

10   *Q.*  And those were shoes that were recovered on 6/19?

11   *A.*  Yes, sir.

12   *Q.*  So in all of these, it wasn't just necessarily money that

13   was not recorded for a while --

14   *A.*  There was a whole lot --

15   *Q.*  -- it was the whole evidence?

16   *A.*  There was a whole lot of evidence, yes, sir.

17   *Q.*  Which is a little bit different than assuming that it was

18   just money that may not have been recorded within the time

19   frame?

20           *MR. WEINHOEFT:*  Objection:  Argumentative nature of the

21   question.

22           *THE COURT:*  Well, that is an argument.  That will be

23   sustained.

24           *MR. FREESE:*  Okay.

25   **Q.  (BY MR. FREESE:)**  But there was a whole lot of other

Cross Examination - VanBaketes, Pete

1   evidence all recorded at the same time, about six to eight days

2   after it was recovered?

3   A.  I would have to look exactly at that, but it wasn't all at

4   the same time.

5   Q.  The ones that we were just reviewing?

6   A.  That was not logged in the same time as the money.

7   Q.  They were logged in around 6/19 -- or we covered 6/19 and

8   logged in 6/27, 6/28.

9   A.  I believe a lot of the money was logged in -- you are

10  correct.  You are correct.  Yes, similar time frame, yes, sir.

11  Q.  Now let's look at a couple from Exhibit 99, the U.S. Bank

12  robbery?

13  A.  Okay.

14  Q.  Again, on Page 13 it says items were recovered on 10/25 and

15  it was put into a slam locker on 10/26, correct?

16  A.  Which one are you looking at, sir?

17  Q.  The Number 2 "miscellaneous evidence seized."

18  A.  Evidence number 10139?

19  Q.  10136?

20  A.  Okay.  By Detective Simmons.  Go ahead, sir.

21  Q.  And it went into Locker 9?

22  A.  Yes, sir.

23  Q.  And it didn't get recorded into the vault until 10/30; is

24  that correct?

25  A.  It wasn't a transferred from Locker Number 9 to the vault

1    until 10/30 according to the custody; that's correct, sir.

2    Q.  That was two rolls of tape, one clear and one red?

3    A.  Yes, sir.

4    Q.  A blue key chain tag recovered from the keys of the

5    suspected vehicle was recorded on 10/23; is that correct?

6    A.  Yes, sir.

7    Q.  It went into Locker 6 on three days later, 10/26, by

8    Officer Brandtly; is that correct?

9    A.  I believe it says 10/26, yes, to Locker Number 6 by

10   Detective Brandtly.

11   Q.  And it did not get logged into the evidence vault until

12   10/30?

13   A.  It was in Locker Number 6 until October 30th when it was

14   transferred to the vault by Detective Dooley, yes, sir.

15   Q.  And again, the same thing, photographs were recovered on

16   10/20?

17   A.  Yes, sir.

18   Q.  Brandtly put them in the locker -- the slam locker on

19   10/26?

20   A.  10/26, yes, sir.

21   Q.  And it wasn't put into the evidence vault until 10/30; is

22   that correct?

23   A.  It was transferred on October 30th, yes, sir, to the vault.

24   Q.  So again, all of these, it's all of the evidence was being

25   logged in and transferred at the same time; is that correct?

1  *A.*  Roughly around the same time frame, yes, sir.

2  *Q.*  So again, it's not just the money that was not logged in?

3  *A.*  Correct.

4  *Q.*  But you, of your own knowledge, don't know that it was not

5  in the secured vault at the time, it just -- the paperwork was

6  not done?

7  *A.*  Certainly.  Yes, that's correct.

8  *Q.*  And this does show that that was characteristic of all of

9  the evidence and not just the money; is that correct?

10  *A.*  I don't understand your question there, sir.

11  *THE COURT:*  It wasn't just the money that was being

12  held up as far as logging it in, but the other evidence was

13  also being logged in belated.

14  ***Q***   ***(BY  MR. FREESE:)*** Is that correct?

15  *A.*  Some of it, yes, sir, that's correct.

16  *MR. FREESE:*  I have nothing else, your Honor.

17  *THE COURT:*  Any redirect?

18  *MR. WEINHOEFT:*  Briefly.

19  **REDIRECT EXAMINATION**

20  ***Q***   ***(BY  MR. WEINHOEFT:)*** So Detective, just to follow up on

21  that point, simply, the context of that is there is simply no

22  documentation to verify the authenticity of any of that

23  evidence from the time it was seized until the time it was in

24  the vault?

25  *A.*  It's not unusual for certain items to not be placed

1    immediately into the vault.  Photographs, a lot of times,

2    they're used to show witnesses, things like that.  Women's

3    shoes, certainly you have to remember what the purpose of the

4    chain of custody is.  It is not only to keep an accurate

5    documentation of what the evidence is, where it was found, and

6    whose hands it changed.  It's also in place to keep people from

7    tampering with evidence, with stealing evidence, and certainly,

8    I have had evidence on my desk, photographs, documents from

9    felony investigations I've worked for days.

10       However, 9,000-plus dollars would never sit on my desk for

11   more than two seconds.  There is some evidence such as cash,

12   drugs, money, that as a police officer, I simply am not going

13   to leave it up to someone to say that maybe that guy stole it.

14   I'm going to go log that evidence, what it is, and log it into

15   our evidence locker storage facility as soon as possible, for

16   that reason.

17       Other evidence, absolutely not.  Women's sandals, who's

18   going to blame a cop for stealing a pair of women's sandals?

19   Q.  Moreover, there is more specific evidence policy as it

20   relates to the booking of valuables such as cash and drugs

21   compared to other property; is that not true or are you aware

22   of that?

23   A.  I'm aware of old general orders involving evidence where

24   evidence -- specific evidence, valuable evidence, needs to be

25   stored immediately.

1   *Q.*  In reference to the U.S. Bank robbery, you were asked some

2   questions about your role and participation in the execution of

3   a search warrant in that particular case.  Do you remember

4   those questions?

5   *A.*  Yes, sir.

6   *Q.*  While you were there on scene, did you ever see the

7   defendant in possession of a laptop computer?

8   *A.*  I believe I did.

9   *Q.*  Tell us about that.

10  *A.*  I believe -- I don't remember much of the discussion, but I

11  believe he was holding and speaking about a laptop computer

12  standing near the steps, but I don't remember what the context

13  of the conversation was, and I don't remember anything else

14  about that.  Again, I was part of the entry team.  Once it was

15  secured, I didn't stick around and assist with the search.  I

16  left with the rest of the tactical response team.

17  *Q.*  And with regard to the execution of that search warrant or

18  the entire investigation of the U.S. bank robbery, did the FBI

19  also participate in that investigation?

20  *A.*  Yes, sir.

21  *Q.*  And was that also because that financial institution was

22  federally insured by the Federal Deposit Insurance Corporation?

23  *A.*  That's correct, sir.

24  *Q.*  And finally, on cross examination you were asked some

25  questions about the defendant and what type of evidence officer

1  he was and you described him as meticulous.

2  A.  Mmm-hmm.

3  Q.  By that, do you mean that he is a person that pays

4  attention to detail?

5  A.  Yes, sir.

6  Q.  And would scrutinize and closely examine exhibits within

7  his custody and in his control?

8  A.  Yes, sir.

9  Q.  And that's both on receipt and transfer out?

10  A.  That's exactly how I would describe it.

11        MR. WEINHOEFT:  That's all I have.  Thank you.

12        THE COURT:  You may step down, sir.

13        Call your next witness.

14        COURTROOM DEPUTY:  Do you solemnly swear that the

15  testimony you are about to give shall be the truth, the whole

16  truth, and nothing but the truth, so help you God?

17        THE WITNESS:  Yes, I do.

18        COURTROOM DEPUTY:  Would you state your name and spell

19  your last name for the record.

20        THE WITNESS:  Yes, ma'am.  Deirdre Durborow,

21  D-U-R-B-O-R-O-W.

22                    **DIRECT EXAMINATION**

23  Q.  (BY MR. SMITH:)  Ms. Durborow, without going into

24  specifics, have I agreed to take you out of order of what the

25  plan order was because you have a family medical emergency

1    tomorrow?

2    A.   That's correct, I do.

3    Q.   So we are trying to get you on and off today?

4    A.   I appreciate that.  Thank you.

5    Q.   Who are you employed by?

6    A.   I'm employed by the Department of Justice, the United

7    States attorney's office for the Southern District of Illinois.

8    Q.   And how long have you been an assistant United States

9    attorney?

10   A.   Yeah, I'm an assistant United States attorney with the

11   Southern District of Illinois, and I've been one since October

12   of 1991.  So approximately 17 years.

13   Q.   Would you explain to the jury what the responsibilities and

14   duties are of an assistant United States attorney, at least as

15   far as the criminal division?

16   A.   Yeah.  I'm in the criminal division and my primary

17   responsibility is prosecuting cases, much like the two

18   assistants here.  I, likewise, try and prosecute federal crimes

19   that occur within the Southern District of Illinois.  Southern

20   District of Illinois is the lower 38 counties.  It's

21   approximately I-70 down and Calhoun and Jersey make up the

22   Southern District of Illinois.

23        MR. SMITH:  May I approach, your Honor?

24        THE COURT:  You may.

25   Q    (BY MR. SMITH:)  I'm going to show you Government's

Direct Examination - Durborow, Deirdre

1  Exhibit 2.  And I have a copy.  It's an exact copy, correct?

2  A.  Yes, it is.

3  Q.  What is Government's Exhibit 2?

4  A.  Government's Exhibit 2 is an indictment for Montez Fuller,

5  Clarence Thomas, Phillip Timothy Bailey, and Bonnie Louise

6  Brown, and it was filed on or about August 18th of 2006.

7  Q.  And are you personally -- recognize this indictment, and

8  apart from having the Court take judicial notice of it, is this

9  the official indictment of a case you were prosecuting?

10  A.  Yes, it is.  This is the indictment in this matter.  It's a

11  first docket number or record number one out of this criminal

12  number in this case.  And I am familiar with it.  I did not

13  take -- bring this before the grand jury, another assistant

14  did, but I was later assigned the case and responsible for it,

15  so I'm familiar with the indictment.

16  Q.  And you were responsible for the prosecution of the case

17  all the way through, correct?

18  A.  Yes, sir, I am.

19        MR. SMITH:  The government moves for the admission of

20  Government's Exhibit 2.

21        MR. FREESE:  No objection.

22        THE COURT:  Admitted.

23        (Exhibit Gvt's 2 received in evidence)

24        THE WITNESS:  There was likewise a superseding

25  indictment filed in this matter.

Direct Examination - Durborow, Deirdre

1   *Q*   *(BY  MR. SMITH:)* And you should have the superseding

2   indictment before you.

3   A.  Yes, that's -- I see it now.

4   Q.  Yeah, who were you prosecuting?

5   A.  The superseding indictment was essentially the original

6   indictment, Government's Exhibit 2, as well as an added a

7   defendant Laveda Brown, and it added a forfeiture count against

8   Montez Fuller.  The superseding indictment was filed on or

9   about October 19th of 2006.  And I think it's Document 61 in

10  that case.

11  Q.  And as relevant to this particular case, first off, Count

12  1, what were you prosecuting Montez Fuller, Clarence Thomas,

13  and Bonnie Brown for?

14  A.  Count 1 of the superseding indictment was, likewise,

15  similar to Count 1 of the indictment, and it was for bank

16  robbery or credit union robbery.  The Granite City Steel Credit

17  Union in Granite City, Illinois.

18  Q.  Okay.  And were you working with other law enforcement,

19  including the FBI, on this particular case?

20  A.  Yes, this case involved the robbery of two credit unions,

21  one being the Granite City Steel Federal Community Credit

22  Union.  The second one was in Alton, the Olin Community Federal

23  Credit Union.  So there were two credit unions that were robbed

24  by the five individuals charged in the indictment.

25  Q.  Okay.

1          And going on to Count 3 of the superseding indictment, what

2     does that charge?

3     A.   Count 3 is the bank robbery, or in federal terms, it's

4     called "aggravated" or "armed bank robbery."  And that's for or

5     of a credit union so it's armed robbery of a credit union and

6     this is of the Olin Community Credit Union in Alton, Illinois

7     on or about October 16th 2006.

8     Q.   And you are a federal prosecutor and were you prosecuting

9     this case in federal court?

10    A.   That's correct.

11    Q.   And what did you do in preparing the case for trial as far

12    as assimilating the evidence?

13    A.   This case was assigned to me.  I, likewise, did not charge

14    the superseding indictment.  It was charged by another

15    assistant who retired, Richard Lloyd.  After he retired the

16    case was given to me.  It had a trial date, I believe, of

17    May 15th.  So approximately a month before trial was to begin

18    on May 15th, it was roughly the second week of April.

19    Q.   May 15th of 2007?

20    A.   Yes, May 15th of 2007 when the trial was set.  I was

21    getting ready for trial with the FBI agent that was the case

22    agent in the matter.  She was the federal agent that was

23    responsible for helping prosecute both of these cases that were

24    adopted from the Alton Police Department as well as the Granite

25    City Police Department.  So in the process of getting ready for

Direct Examination - Durborow, Deirdre

1   trial, we had to go get the evidence that was physically

2   collected by the departments that investigated those crimes

3   that occurred in their counties.

4   Q.  So what steps did you take to work with the FBI to

5   assimilate and gather the evidence for trial?

6   A.  Yeah, I basically told the FBI agent, Melanie Jiminez, when

7   I wanted to go up and do it and that I wanted to begin working

8   on the case.  I had an opportunity to read the case file.  I

9   knew that it was a voluminous file, there were lots of reports,

10  there was lots of evidence.  I knew that it would take time to

11  go through all the evidence and to determine which witnesses

12  would need to be called for the evidence and which evidence to

13  use.  So in doing that, I asked Agent Jiminez to call up to the

14  Alton Police Department and to set a date to go up there so we

15  could visit with them, we could discuss the case, review the

16  evidence, and pick up the evidence.  And we did that on

17  April 10th of 2006.  That was a Tuesday.

18  Q.  Is it common or uncommon in the ordinary course of your

19  business to have local police departments holding evidence for

20  federal prosecution?

21  A.  It's very common.  In federal cases there's basically two

22  types of cases that are brought.  One that's generally done

23  entirely by federal agencies, investigated by federal agencies,

24  and then there's another type of case that is primarily done by

25  your local law enforcement or your state law enforcement, such

1    as Illinois State Police, where then the federal agency or the

2    federal government adopts the case because it is also a federal

3    crime.

4        So this was an instance where two separate robberies had

5    occurred in two different towns by the same people, so the

6    federal government adopted this case to try both of these

7    crimes together.

8    Q.  Regarding Count 3, the Olin Credit Union robbery evidence,

9    did you have occasion to go with Special Agent Melanie Jiminez

10   of the FBI on or about April 10th 2007 to gather the evidence?

11   A.  Yeah, Agent Jimenez and I met there separately, drove our

12   separate vehicles to the Alton Police Department.  We met with

13   the Alton police.  We reviews the reports.  I was new to the

14   case.  I had read the case file, but I wanted to sit down with

15   the agents and have them tell me about the case, what the

16   evidence was, what they thought, to kind of work as a team, and

17   also to pick up the evidence, to go through evidence, and then

18   to take it back so that I could determine which pieces of

19   evidence would be used at trial and to mark that evidence in

20   operation for trial.  So we did that on Tuesday, April 10th.

21   Q.  And again, would this be something that is usual or unusual

22   in the normal course of preparing a case?

23   A.  No.  It's very common.  The federal prosecutor gets very

24   involved whenever they adopt a case.  We want to make sure that

25   we present an orderly, timely, organized case before federal

1    judges.  So it's very common, and it's not unusual at all.

2    Q.  And who did you meet up at the time Alton Police Department

3    for purposes of gathering the evidence?

4    A.  Yeah.  Mick Dooley met Melanie and I.  He escorted us to

5    their conference room at the Alton Police Department.  Then a

6    detective by the name of Jake Simmons, who was also on the

7    case, he helped investigate this Count 3 of the superseding

8    indictment, and so we met with him and the defendant Mick

9    Dooley.

10   Q.  And what was done to actually retrieve or gather the

11   federal evidence from the Alton Police Department?

12   A.  Yeah, after we discussed the case in general, and they

13   basically told me what they had done, they had also had a nice

14   binder of reports prepared.  I asked for a copy of that.  I

15   took that.  At that time I said, "Well, let's go ahead and get

16   the evidence."  Melanie Jiminez and Mick Dooley left this

17   conference room.  They went left to get the evidence to

18   retrieve it so that we could go through it.  And myself and

19   Detective Jake Simmons waited in this conference room until

20   they returned with the evidence.

21   Q.  And when they returned, what happened?

22   A.  When they returned with it, he came back, Mick Dooley

23   carried it.  It was two very large Tupperware or totes, those

24   big, blue plastic or colored totes.  It was two of those.  So

25   they brought those into the conference room.

1          At that time I had originally intended that I wanted to

2     open up and go through each piece of evidence that was seized.

3     There was probably close to 75 pieces of evidence or better

4     seized in this case.  So I knew that there was quite a bit of

5     evidence and it take quite a bit of time.  However, we were

6     only a month out from trial.  Because of that, I knew that I

7     had that evidence to look at and understand.  I, likewise, had

8     this Granite City evidence that we would have to deal with, so

9     I knew we would have a lot of different things to deal with.

10         So my plan was to go through each and every piece of

11    evidence.  We did not do that that day, because at this time,

12    the Alton Police Department was investigating a homicide, I

13    believe, as well as a shooting.  And we were in a conference

14    room that had like not chalk boards, but those white boards

15    where they had different notes and stuff in reference to these

16    crimes that had occurred.  And while Mick Dooley and Melanie

17    Jiminez was getting the evidence, I was discussing with the

18    detective Jake Simmons what they were investigating.  And I

19    realized that they had important cases that they needed to get

20    working on, that they had several leads that they needed to

21    attend to.  So at that time I decided we would not go through

22    the evidence because I knew it would take some time, that

23    Melanie and I would take the totes with us, and we would get

24    back with them and go through it on another date.

25    Q.  And was that due to the appearance that they were busy in a

1   homicide active investigation?

2   A.  It wasn't the appearance, they were.  They were hustling

3   and bustling.  There were detectives walking buy, coming in and

4   out.  These crimes had recently been committed.  They needed to

5   get out there and hit the streets and finish these things up.

6   Q.  So now you are up in the second-floor conference room of

7   the Alton Police Department, Mick Dooley and Melanie are there

8   and you and Jake Simmons?

9   A.  Correct.

10  Q.  How does the evidence get to the vehicles?

11  A.  Basically what happens then, after I decided we wouldn't go

12  through it, we went ahead and collected the evidence.  Mick

13  Dooley carried it for Melanie Jiminez, these two large totes.

14  As I said earlier, we were on a second-floor conference room.

15  Mick Dooley and Melanie Jiminez took the elevator, I took the

16  steps.  I met them in the entranceway, and Mick Dooley put the

17  totes in her Suburban.

18  Q.  Now directing your attention to Friday, April 13th of 2007.

19  Relative to the Olin Credit Union robbery evidence, what

20  happened?

21  A.  On Friday 13th -- if I might back up, on the 12th we picked

22  up evidence from the Granite City Police Department -- or

23  excuse me, we went to the Granite City Police Department on the

24  12th to review some of the evidence with our intention of also

25  picking up their evidence.

1    *Q.*  Let me stop you there.  That would be the evidence as it

2    pertained to Count 1 of that superseding indictment, correct?

3    *A.*  That's correct, the evidence that pertained to Count 1.

4        And so at that time we met with the detective by the name

5    of Mike Parkinson.  We, likewise, kind of discussed the case,

6    much like I had done with the Alton Police Department.

7        This individual Montez Fuller was also a suspect in a

8    couple of other crimes.  One that was believed to have been

9    committed in Granite City and one that was committed in

10   Edwardsville.  He robbed a Moto Mart up there.  So we watched

11   the video of that, compared it to some of our evidence.  We

12   were confident that Montez Fuller, not only robbed these two

13   credit unions, but was probably also responsible for the armed

14   robbery of this FotoMart.

15       We were going to collect the evidence that day, but

16   Detective Parkinson had to be in Madison County to testify.  So

17   we told him we would come back the next day.  We met him that

18   Friday morning at the Granite City police station.

19   *Q.*  That's April 13th?

20   *A.*  That's April 13th.  And Melanie and I picked up the

21   evidence from the Granite City Police Department.  We were,

22   again, in separate cars.  I went back to my office, and it was

23   sometime around lunch or shortly thereafter I received a phone

24   call from Agent Jimenez advising me that there was a problem

25   with the evidence and that money was missing.

Direct Examination - Durborow, Deirdre

1    *Q.*  What did you do upon hearing that there was a problem with

2    your evidence for your federal prosecution?

3    *A.*  Yeah, obviously, I'm extremely concerned learning of this

4    so I immediately go over to the FBI office, which is also in

5    are Fairview Heights, and I meet with her and other agents and

6    I look at the envelopes myself.  I see that they clearly have

7    been cut.  The money's missing, and we begin to discuss what we

8    need to do to figure out what's happened.

9    *Q.*  And an FBI investigation started as a result?

10   *A.*  Absolutely.  Immediately, there were several FBI agents met

11   with us.  It was myself, Melanie Jiminez, John Kelly was also

12   there, as well as Mike Meyer.  All of the agents had on plastic

13   gloves when they were touching these envelopes to ensure that

14   their fingerprints weren't left on them.

15   *Q.*  Did you have occasion to see and meet Mickey Dooley on

16   April 13th of 2007?

17   *A.*  Yes, I did, on April 13th.

18   *Q.*  Where at and under what circumstances?

19   *A.*  Mick Dooley and Jake Simmons came to the FBI office in

20   Fairview Heights.  They had been called by Melanie Jiminez in

21   reference to the missing money.  They both showed up at the FBI

22   and I, in fact, spoke with Mick Dooley and Detective Jake

23   Simmons.

24   *Q.*  All right.  And in quick summary, what occurred outside the

25   FBI office on April 13th of 2007?

1    *A.*  Yeah, basically, what happened is they show up there and,

2    at the FBI office.  I met them downstairs.  It had already been

3    decided by the FBI supervisor that he didn't want anybody

4    looking at the evidence or touching the evidence.  Didn't want

5    anyone, essentially, coming up into the FBI's secured area, so

6    I met with Detective Simmons and with Mick Dooley, and I

7    explained to them that.  That upset them.  I told them that we

8    were going to figure out what happened.  We were starting an

9    immediate investigation.

10   And they were questioning, wanting to see parts of the

11   envelopes that were in question, so I told them I would go back

12   upstairs.  I photocopied -- I had the agents photocopy some of

13   the envelopes so they could see where they had been tampered

14   with.  Then myself, John Kelly, and Agent Mike Meyer went

15   downstairs and we spoke with Mick Dooley and Jake Simmons

16   again.  We showed them the envelopes and we looked at them.

17   These are the photocopies.

18   I recall Mick Dooley showing me where his initials were on

19   one of the envelopes and commenting on where they signed.  In

20   general, we were just discussing the evidence, these envelopes.

21   *Q.*  When meeting with Mick Dooley outside the FBI headquarters

22   on April 13th of 2007, did you have occasion to observe him?

23   *A.*  Yes, I did.

24   *Q.*  Did anything strike you as unusual at the time?

25   *A.*  You know, at the time I can't say it really struck me as

1    unusual.  I -- he was -- he did appear nervous and he was

2    pacing back and forth.  At the time I didn't think it was that

3    big of a deal because evidence is missing, and he's the

4    evidence custodian.  He should be concerned.  So at the time it

5    didn't strike me as totally odd.  As I look back on it, perhaps

6    I think it is a little more telling now.  But he, clearly, was

7    upset about it.

8    Q.  Now, following the discovery of the tampered evidence, did

9    you have to continue with the federal prosecution on Montez

10   Fuller and the other co-defendants?

11   A.  Yes, we did.

12   Q.  All right.  And how did the tampered evidence affect your

13   federal prosecution in this case?

14   A.  The tampered evidence had a huge impact on this case.  It

15   had the potential impact of jeopardizing the entire indictment

16   or the entire superseding indictment.  Any time evidence has

17   been tampered with, is missing, stolen or lost, you have

18   problems.  Because of that, there was substantial motions that

19   were filed by the defense attorneys in the superseding

20   indictment.  It caused additional work.  It compromised the

21   integrity of the entire investigation.  It ultimately

22   compromised the case.

23       It caused or created a great deal of uncertainty as to how

24   it would affect the trial, how the jury would perceive it.  And

25   ultimately and most importantly, it affected what evidence I

1    was able to present in that trial.  And I had to leave some

2    really good evidence out.  And that was very upsetting to have

3    to leave important, incriminating evidence out against two very

4    violent individuals, Montez Fuller and Clarence Thomas.

5    Q.  Now, in your prosecution of that case, were there, in fact,

6    bait bills?

7    A.  Yes, there were bait bills recovered.

8    Q.  And did that assist in your prosecution?

9    A.  Very much so.

10   Q.  Were the bait bills tampered with?

11   A.  No, the bait bills were not tampered with.  The bait bills

12   were recovered from a Chevrolet Cavalier that was used in the

13   robbery of the Olin Credit Union.  And they basically did a

14   switch, they had two vehicles that were used.  And the female

15   that was driving this Chevrolet Cavalier after they switched,

16   the bait bills were found inside the Chevrolet Cavalier.  And

17   they were packaged separately, they were listed as bait bills.

18       What's important about bait bills is that those are

19   recorded serial numbers that the bank maintains so that Olin

20   Credit Union knew or maintained.  So we were able to

21   definitively link those bait bills to that robbery, and that

22   car was stopped shortly after the robbery had occurred.

23   Q.  And did the Alton police reports verify which were bait

24   bills and the serial numbers of those bills being held as

25   evidence?

Direct Examination - Durborow, Deirdre

1    *A.* Yes, they did.

2    *Q.* All right.  And were you aware, on finding out about the

3    Olin Credit Union tampered evidence, whether or not there was

4    another pending federal bank robbery prosecution arising out of

5    Alton?

6    *A.* I knew there was another case.  One of my colleagues who

7    was just next door to my office, Tom Daly, had a federal case,

8    a bank robbery of another -- of another Alton institution.  So

9    we had talked briefly about these bank robberies.

10       After -- on the 13th, after I discovered that the evidence

11   was missing or stolen, after I spoke with Mick Dooley and

12   Detective Simmons, I left the FBI office.  I called my

13   supervisors immediately and notified them.  And I went back and

14   the first person I met with was Tom Daly, and I told him we

15   have problems, you need to check your evidence and make sure

16   it's still there.

17   *Q.* Was that the U.S. Bank?

18   *A.* Yes, it was.

19   *Q.* When local law enforcement, like the Alton Police

20   Department, is holding evidence for federal prosecution, do you

21   rely on those local police officers to preserve the integrity

22   of the evidence and the complete chain of custody and the

23   accuracy of that chain of custody?

24   *A.* Absolutely.  When we adopt a case federally, we are

25   essentially, then, taking the state and local's case, making it

Direct Examination - Durborow, Deirdre

1    our own, and they become a part of our team, and we expect them

2    to maintain it, preserve it, up until the point we take it for

3    trial.  In some instances, on some departments, I have my

4    federal agents pick up the evidence immediately.  In other

5    cases, I'll leave the evidence with the local department until

6    trial.

7            *MR. SMITH:*  No further questions on direct, your

8    Honor.

9            *THE COURT:*  Cross examination?

10                      **CROSS EXAMINATION**

11   *Q.  (BY MR. FREESE:)*  Mrs. Durborow.

12   *A.*  Good afternoon, Mr. Freese.

13   *Q.*  Okay.  Number one, when did -- now you said that Agent

14   Jimenez retrieved the evidence on Tuesday; is that correct?

15   *A.*  It was Tuesday, April 10th.

16            *THE COURT:*  You need him to turn on his mic?

17            *MR. FREESE:*  It's on.

18            *COURTROOM DEPUTY:*  No, it's not on.

19            *MR. FREESE:*  It's showing green.

20            *COURTROOM DEPUTY:*  Okay.  There you go.

21   *A.*  I specifically recall it was Tuesday April 10th, and I

22   remember that because it was my birthday.

23   *Q   (BY  MR. FREESE:)* Now, when the evidence was taken from

24   the Alton Police Department, did you and Agent Jimenez travel

25   together?

1    *A.*  No, we did not.  We took separate vehicles.  We met at the

2    Alton Police Department around nine, 9:30 it was fairly early.

3    *Q.*  And whose vehicle was the evidence placed?

4    *A.*  It was placed in Agent Jimenez's government vehicle.  It

5    was like an SUV.

6    *Q.*  Okay.  So it was in her vehicle that she was using?

7    *A.*  Correct.

8    *Q.*  And she brought it back to her office?

9    *A.*  That's correct.

10   *Q.*  Do you know what she did with it?

11   *A.*  No, I don't know what she did with it.

12   *Q.*  When -- do you know when she reviewed the evidence?

13   *A.*  Yes, I do know when she reviewed the evidence.  We had

14   discussed -- we had planned to meet that entire week and work

15   on the case, so we picked up the Alton evidence on the 12th.

16   We met the next day -- excuse me, we picked up the Alton

17   evidence on the 10th, that Tuesday.  The next day on the 11th

18   we, again, got together and talked about the case and was

19   preparing.  We had a motion to suppress on the 16th that we

20   were getting ready for.  We had met with Granite City then on

21   the 12th and then we picked up the evidence from Granite City

22   on the 13th, and so I believe she was putting it together after

23   the 13th.

24   *Q.*  Okay.  So for three days the evidence sat in her

25   possession?

1   *A.*  Well, yeah, it was maintained in the FBI office in their --
2   I'm sure in their secured facility.
3   *Q.*  Do you know where it was?
4   *A.*  No.  I wasn't responsible for it and I didn't put it there
5   or take it there.  That was her responsibility.
6   *Q.*  Okay.  So the first you knew of it was when she contacted
7   you?
8   *A.*  Absolutely, on the 13th.
9   *Q.*  But between the 10th and the 13th, you have, yourself, no
10  knowledge as to where that money was or how it was stored?
11  *A.*  That's correct.
12  *Q.*  Do you know if there was any logging or listing of the
13  money, the evidence?
14  *A.*  You know, there apparently was not because she -- I don't
15  know personally.  I believe that's what happened on Friday the
16  13th when she was assimilating both the evidence from the
17  Granite City and the Olin, logging it, that she discovered and
18  it called me that day.
19  *Q.*  So --
20  *A.*  But I don't know between the day we picked it up on the
21  10th to the 13th what she did with it.
22  *Q.*  So again, it could have been three days with it not being
23  logged in some place as far as you know.
24  *A.*  That could be.
25  *Q.*  When you went out to the Alton Police Department, you

1    initially met with Officer Dooley?

2    *A.*  Yeah, Mick Dooley met us in the lobby and took us up stairs

3    to a conference room, and then I met with Detective Jake

4    Simmons.

5    *Q.*  And the four of you had a conference for a while?

6    *A.*  Yes, we did.

7    *Q.*  Discussing the case and the evidence?

8    *A.*  Yes, sir.

9    *Q.*  Was there any mention of need to be -- need to be in a

10   hurry to get this done?

11   *A.*  No.  They did not mention or -- they were very

12   accommodating, and they were very willing sit there with us and

13   go through it.  And we went through and discussed the case.

14       As I said earlier, while they were out picking up the

15   evidence, Agent Jimenez and Mick Dooley, I was discussing the

16   pending cases that they were working on and realized they were

17   very busy and had important work that they needed to go do.

18   *Q.*  So did most of that come from your conversations with

19   Sergeant Simmons?

20   *A.*  Again, Sergeant Simmons didn't say, you know, we really

21   need to get going.  He would have sat there.  If I wanted to go

22   through those totes, I'm sure we would have done it that day.

23   I made a decision that we were not going to do it that day

24   because I could tell they needed to go out and hit the streets.

25   *Q.*  Now, had -- do you know if Agent Jimenez had contacted Mick

1 Dooley prior to the 10th?

2 *A.* I'm sure she did.  I told her to make arrangements for us

3 to go up there and meet with them and pick up the evidence.

4 *Q.* Had she talked to you at all about how -- how did you learn

5 about the time and place?

6 *A.* I believe I told her when I wanted it.  I think I said

7 let's do it Tuesday at this time and see if they're available.

8 We had -- Agent Jimenez and I discussed the fact that we needed

9 to get on this case.  There was a lot of evidence.  Trial was

10 literally a month away, and we needed to get going.  So it was,

11 essentially -- I can't say for sure that I sat that time and

12 date, but the Alton Police Department accommodated us, that's

13 for sure.

14 *Q.* Now, you indicated that on the Friday the 13th, Sergeant

15 Simmons and Mick Dooley came out to the FBI office?

16 *A.* Yes, they did.

17 *Q.* Do you know if it was their suggestion that they come out

18 to find out what was going on?

19 *A.* You know, I don't know who suggestion it was.  I assume

20 that they were, likewise, concerned that evidence was missing

21 and that's why they showed up.  I did not speak with either of

22 them and tell them to come there.  I did speak with them when

23 they were at the FBI office.

24 *Q.* What was Sergeant Simmons' attitude like?

25 *A.* You know, I didn't know Sergeant Simmons.  I had just met

1    him for the first time on the 10th, so I really didn't know

2    him.  He kind of, I guess -- after I came down the second time

3    and showed 'em the photocopies of the envelopes, I would say he

4    kind of started to cop an attitude.  I was trying to maintain

5    the tempers and make sure that -- assure everybody, the FBI as

6    well as this local police department, that we were not going to

7    let this affect our case; we would figure out who did it; and

8    to try to maintain the relationship between the federal and

9    state law enforcement was something I was thinking of.  But

10   during the conversation sergeant -- or Detective Simmons

11   started to kind of point the finger at the FBI, you have it,

12   you had it.

13       And I kind of said, hold on.  Let's not go there.  We'll

14   figure this out.  We'll take the appropriate measures to make

15   sure that this fully gets investigated, and we will solve it.

16   Q.  So Sergeant or Detective Simmons began to indicate that the

17   fault may lie with the FBI?

18   A.  Yes, he did.

19   Q.  Now --

20   A.  I think he kind of got mad at me, too, while we were

21   discussing it.  He -- he -- he was uneasy with some of my

22   answers.  I wasn't letting them go upstairs, I wasn't letting

23   them see the envelopes.  That upset him.  They considered it

24   their evidence, they wanted to see it.  My thinking was we

25   don't need anybody else fooling around with these envelopes any

1    more than possible.  And the FBI supervisor of that office had

2    been called, and he gave a directive not to let anybody in.

3    And I didn't feel it was also in any authority to have them

4    come up.

5    Q.  Now, Mick Dooley was the evidence officer, correct?

6    A.  That's correct.

7    Q.  And your understanding for his position would be he's the

8    one that would be responsible for maintaining the evidence?

9    A.  Absolutely, he was responsible for maintaining it.

10   Q.  And as the saying goes with management:  If you're the one

11   overall responsible, it's your job -- even if it's -- and

12   responsibility, even if you didn't have the duty to do -- the

13   you -- you didn't actually do it?

14       In other words, if there is a problem and something goes

15   wrong, the manager is the one that's going to be ultimately

16   responsible, correct?

17   A.  I guess that depends on what context you are talking.  I

18   mean, ultimately, when I try a case, I feel like I'm the one

19   that's ultimately responsible for getting it done.  I would,

20   likewise, think that sometimes managers should view it the same

21   way.  If they are the manager, that the buck stops at their

22   office.  Some people don't seem to have that attitude.

23   Q.  So if you, in one of your cases, you wound up missing some

24   reports because maybe a clerk or an assistant or a paralegal

25   misfiled or lost it, who is going to take the blame?  As the

1    lead attorney, you are going to be responsible for that case,

2    aren't you?

3    A.   Let's put it this way --

4         MR. SMITH:  Objection, your Honor.  I think it's

5    confusing administrative and criminal law is what it's doing.

6         THE COURT:  And in legal parlance we would say --

7         MR. FREESE:  No, your Honor.

8         THE COURT:  No, no.  In legal parlance, your objection

9    is?

10        MR. SMITH:  It's -- okay.

11        THE COURT:  How about its not relevant?

12        MR. SMITH:  Thank you, your Honor.

13        THE COURT:  Sustained.

14        Now look, here we're talking about a criminal

15   prosecution.

16        MR. FREESE:  Correct.

17        THE COURT:  And the Court will explain to the jury

18   what the law is, irrespective of what this witness or the FBI

19   or anyone else thinks.  So let's make that clear.

20        She's talking about, I'm an assistant United States

21   attorney, I have this case.  And you are asking her who is

22   responsible for what.  Well, it depends on the context that you

23   are talking about, so make your questions specific.

24        For instance --

25        MR. FREESE:  Okay.

1          THE COURT:  -- certainly, General Eisenhower might be

2     responsible if some private got drunk in England before they

3     made their invasion on D-Day because he is in charge of all of

4     it.

5          MR. FREESE:  Yes.

6          THE COURT:  And he might feel responsible and shoot

7     the private, but we wouldn't say that it was his fault that the

8     private really got drunk, would we?

9          MR. FREESE:  No, your Honor.

10          THE COURT:  So let's just ask a question that's

11     specific to this situation, and she can answer it.

12          MR. FREESE:  Okay.

13     Q.   (BY MR. FREESE:)  If a confession for a case, which could

14     mean the difference between winning or losing the case, was

15     lost, and it's your case, would you feel -- would you be

16     nervous and scared and upset about it until an answer was

17     resolved?

18     A.   If any piece of evidence were missing, lost, or stolen in

19     one of my cases, I would be concerned and I would get down to

20     the bottom of it, what happened.

21     Q.   Would you possibly be nervous and upset about it?

22     A.   I'm not saying I would be nervous.  I would just want to

23     figure out and find out what happened --

24     Q.   Well, you are --

25     A.   -- to make sure that -- you know, I would do everything in

Cross Examination - Durborow, Deirdre

1   my power to make sure that the problem was overcome or figured

2   out.

3   Q.  Your initial impression of Mick Dooley, that he was

4   somewhat nervous and apprehensive, but your initial impression

5   was, yeah, because he is upset over the missing money because

6   he knows he's responsible for it.  Isn't that what you

7   testified a little earlier?

8   A.  Yes, that's correct.  I didn't --

9   Q.  And that was your impression at the time you saw him when

10  your memory of him was fresh?

11  A.  He was definitely pacing and nervous.

12  Q.  And --

13  A.  Agitated.

14  Q.  And your impression was it didn't strike you as overly

15  something unusual; is that correct?

16  A.  No, it didn't strike me.  I thought he should be concerned,

17  he is the evidence technician.  I would be concerned if I were

18  in his shoes.

19  Q.  And that was your immediate impression when you saw his

20  reactions?

21  A.  That was my initial impression, yes.

22  Q.  Is that unusual, and you said you would expect him to be?

23  A.  I would expect him to be.

24          MR. FREESE:  Nothing else, your Honor.

25          MR. SMITH:  Just one.

Cross Examination - Durborow, Deirdre

1          THE COURT:  I have one question and I'll let both of

2     you follow up.  If you want to, you are not required to.

3          So we are clear, when you are talking about the

4     defendant being somewhat agitated when he found out the money

5     was missing, are you speaking on the 16th when you were back

6     with the FBI at their office?

7          THE WITNESS:  That was on the 13th.

8          THE COURT:  On the 13th?

9          THE WITNESS:  On Friday, April 13th when I met with --

10    at the FBI office, the defendant was there.  He was -- he

11    appeared to me to be nervous or upset, yes.

12         THE COURT:  Now, earlier when you took possession of

13    what you called the "totes" on the 10th, the defendant was

14    present then?

15         THE WITNESS:  Yes, sir, he was.

16         THE COURT:  Do you have any recollection of what his

17    countenance was then, what was his demeanor?

18         THE WITNESS:  I do have a recollection of it.  He was

19    quiet.  He didn't say anything.  He just kind of sat there.  He

20    was not -- he didn't really say anything.

21         THE COURT:  All right.  Do you have any follow-up

22    questions on that?

23         MR. FREESE:  No.

24         How often --

25         THE COURT:  On that question.

Cross Examination - Durborow, Deirdre

1          *MR. FREESE:*  It is going to be on that question, but

2    it's a --

3          *THE COURT:*  All right.

4    **Q.   (BY MR. FREESE:)**  Because you said he was very quiet.   In

5    the past was that -- how often had you seen him that way?

6    *A.*   I don't personally know the defendant.  I know of him.  I

7    knew that he was an Alton Police Department officer.  I knew

8    him from a few other cases when I worked in Madison County when

9    I was in law school.  But I can't, per se, say that I really

10   knew the defendant.  I don't really know him.  I know of him.

11   I know that he worked at the Alton Police Department.

12   *Q.*   So you would have no idea then, since you don't know him --

13   *A.*   He may be --

14   *Q.*   -- whether that quietness was his normal attitude?

15   *A.*   He may be a very quiet man, I don't really know him.

16   *Q.*   So there was nothing unusual about that?

17   *A.*   I can't say it was unusual or not.

18   *Q.*   Okay.

19          *MR. FREESE:*  That's all, your Honor.

20          *THE COURT:*  Did you want to follow up on that in any

21   way?

22          *MR. SMITH:*  Not that question, your Honor.

23          *THE COURT:*  But you do have redirect coming?

24          *MR. SMITH:*  Just one.

25          *THE COURT:*  All right.  Go ahead.

Redirect Examination - Durborow, Deirdre

<u>**REDIRECT EXAMINATION**</u>

1

2  *Q.  (BY MR. SMITH:)*  And it's only to avoid confusion for later

3  on.  You had indicated and you testified that you didn't allow

4  them up in the FBI headquarters, correct?

5  *A.*  That's correct.

6  *Q.*  Were you still there when they ultimately were allowed up

7  or did you leave?  Only from your personal knowledge.

8  *A.*  As I recall, I met with them twice on the 13th.  One time

9  in front of the elevator, which was inside the building, and

10  one time outside the building.  The second time when we were

11  outside the building in front of the front door, two FBI agents

12  were with me, Agent Kelly and Agent Meyer.  And then I don't

13  recall ever going upstairs or being with them upstairs.  I

14  don't remember that if that was the case.

15  *Q.*  That's fine.  We will follow up with the rest of the story

16  with another witness.

17      *THE COURT:*  All right.  You may step down.  I hope

18  that works out tomorrow.

19      *THE WITNESS:*  Thank you, your Honor.

20      *THE COURT:*  Be careful.

21      All right.  Ladies and gentlemen, I'm going to turn

22  you loose just a little bit early tonight.  It's about 4:30 and

23  I know some of you have a distance to travel.  Just a word of

24  caution to you, I give this to all the jurors.  You have got a

25  lot to think about, and you don't need to be thinking about it

1    when you are driving home.  You need to be looking around and

2    avoiding all of the truckers and the people on their telephones

3    that are fixing to kill you if you don't see them first.  I

4    know this from hard experience.  It's hard to keep your mind

5    off this case.  I'll be thinking about it, too.  But just trust

6    me on this one, be careful.  You are a good jury.  You have

7    been paying attention to this very interesting case.

8              Tomorrow allow yourself plenty of time to get here.

9    We will have a witness in the box at 8:00, and we will be ready

10   to go, and we will all be here, too.

11             It's been a good day.  We've got a lot done and have a

12   restful and enjoyable evening.

13             Now all rise for the jury.

14       *(Following proceedings held outside presence of jury:)*

15             *THE COURT:*  You may be seated.

16             Is Mr. Daly up first in the morning?

17             *MR. SMITH:*  Actually, Special Agent Melanie Jiminez,

18   up from Miami, who is going to be upset with me.

19             *THE COURT:*  Why would she be upset with you?

20             *MR. SMITH:*  She had childcare issues, but I think she

21   is going to work them out.

22             *THE COURT:*  Put five kids through college, then you

23   have childcare issues.  Give her my best.  Childcare issues.

24             Have a good evening.  I appreciate everybody's hard

25   work.  It's a good day.

1           *(Court adjourned until 9/4/08 at 8:00 a.m.)*

2                              -oOo-

3                      REPORTER'S CERTIFICATE

4        I, Molly N. Clayton, RPR, Official Court Reporter for the
U.S. District Court, Southern District of Illinois, do hereby
5   certify that I reported with mechanical stenography the
proceedings contained in pages 1 - 243; and that the same is a
6   full, true, correct and complete transcript from the record of
proceedings in the above-entitled matter.

7

             DATED this 6th day of January, 2009.

8

9

10                              *s/Molly N. Clayton, RPR*
                      _____

11

12                              Molly N. Clayton, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25